# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                        No. CR 22-0634 JB

ROBERT PADILLA, a.k.a. "Fat Head"
and GARY COCA,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion for Order Compelling Immunity for Witness, filed June 3, 2024 (Doc. 308)("Immunity Motion"); and (ii) the Defendant's Mr. Padilla's Motion for New Trial, filed February 13, 2024 (Doc. 273)("MNT"). The Court held hearings on April 25, 2024, June 10, 2024, and July 8, 2024. <u>See</u> Clerk's Minutes at 1, filed April 25, 2024 (Doc. 306)("April 25, 2024, Hearing Minutes"); Clerk's Minutes at 1, filed June 10, 2024 (Doc. 314)("June 10, 2024, Hearing Minutes"); Clerk's Minutes at 1, filed July 8, 2024 (Doc. 325)("July 8, 2024, Hearing Minutes"). The primary issues are: (i) whether the Court may compel Plaintiff United States of America to grant Janaya Atencio, a witness whom the United States called at the trial of Defendant Robert Padilla, prosecutorial immunity from perjury charges where Atencio asserts that her sworn trial testimony was mistaken, but refuses to correct her testimony under oath without immunity; and (ii) whether Atencio's changed testimony regarding R. Padilla's alibi -- that he was in Atencio's apartment when Leroy Lucero was murdered -- warrants a new trial, where other evidence does not corroborate the alibi. The Court concludes that: (i) the Court may not and should not compel the government to grant Atencio immunity, because withholding immunity from Atencio does not violate R. Padilla's due process

rights; and (ii) Atencio's changed testimony does not warrant a new trial, because R. Padilla's lack of diligence caused his failure to discover Atencio's changed testimony before trial, and the changed testimony is not likely to produce an acquittal.

## FACTUAL BACKGROUND

To provide context, the Court takes its recitation of facts from the Redacted Third Superseding Indictment, filed April 19, 2023 (Doc. 80)("Third Superseding Indictment"), and the Revised Presentence Investigation Report as to Robert Padilla, filed August 1, 2024 (Doc. 326)("Revised PSR"). The Court finds, based on a preponderance of evidence, certain facts in the and Third Superseding Indictment and in the Revised PSR as true. Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion which involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes the following findings of fact related to the Syndicato de Nuevo Mexico ("SNM"), R. Padilla's criminal activities, Lucero's role in the United States' investigation into SNM, Lucero's murder, and the United States' subsequent investigation into Lucero's murder:

## FINDINGS OF FACT

1.      SNM is a prison gang that formed in February, 1980, after a prison riot at the Penitentiary of New Mexico ("PNM") in Santa Fe, New Mexico. See Revised PSR ¶ 5, at 6.

2.      "During the prison riot, twelve correctional officers were taken hostage and several of them were seriously assaulted and raped by the inmates." Third Superseding Indictment ¶ 3, at 2.

3.      SNM and other prison gangs that formed in the wake of the 1980 prison riot "focused primarily on gaining their own status within the correctional institutions by employing violence upon the inmate population to assume a position of leadership and control."  Revised PSR ¶ 5, at 6.

4.      "As a result, the SNM gang expanded throughout the New Mexico penal system and has boasted as many as 500 members since the 1980s, with approximately 200 currently active members who control the gang."  Revised PSR ¶ 5, at 6.

5.      "SNM gang members are bound to protect the enterprise's members and associates who commit crimes by hindering, obstructing, and preventing law enforcement officers from identifying, apprehending, and successfully prosecuting and punishing the offenders."  Revised PSR ¶ 7, at 7.

6.      "Members who fail to show continued loyalty to the gang are disciplined in various ways, to include murder and assaults."  Third Superseding Indictment ¶ 5, at 3.

7.       SNM is connected to at least fifteen homicides and/or assaults that occurred within the New Mexico penal system between 1988 and 2014.  See Revised PSR ¶ 8, at 7.

8.      Between 2015 and 2022, the United States investigates and indicts approximately 170 SNM members, prospects, and associates for federal charges related their criminal activities. See Revised PSR ¶ 11, at 7.

9.      Between 2018 and 2019, the United States Drug Enforcement Agency ("DEA") investigates the Robert Padilla Drug Trafficking Organization ("RPDTO") and identifies R. Padilla as a primary supplier of cocaine, heroin, and methamphetamine in Las Vegas, New Mexico who works with SNM associates to facilitate his drug trafficking enterprise. See Revised

PSR ¶ 12, 29 at 8, 14; See Draft Transcript of December 6, 2023, Trial. at 282:13-16 (taken December 6, 2023)("December 6, 2023, Tr.").[1].

10.     As part of this investigation, the DEA observes R. Padilla selling tens of thousands of dollars of powder and crack cocaine.  See Revised PSR ¶ 13-4, 16, at 8-9.

11.     While the United States investigates and prosecutes these SNM cases, Lucero, a former SNM leader, serves as an FBI informant and United States witness, and testifies during a lengthy SNM trial in 2018.  See Revised PSR ¶ 12, at 8.

12.     On May 24, 2018, Lucero informs the FBI that unknown individuals are harassing him and his family.  See Revised PSR ¶ 15, at 8.

13.     Lucero tells the FBI that: (i) Lucero's neighbor observed two men in a white car parked near his family's home; (ii) an unknown individual kicked down Lucero's front door at approximately 3:00 A.M. on May 24, 2018; and (iii) an unknown individual called Lucero's home several times, asked his wife if she was scared, and alluded to knowing the family's schedule.  See Revised PSR ¶ 15, at 8.

14.     On June 30, 2018, Lucero and his wife tell the FBI that, on that same day, an unknown woman called and stated that she knew two people who want to "take them out," and, later that day, an unknown man arrives at Lucero's home, and asks for Lucero and his wife. Revised PSR ¶ 15, at 8.

15.     R. Padilla is an SNM "primo," which is a close associate, but not a member.  See Revised PSR ¶ 29, at 14.

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

16.     On the evening of July 21, 2019, R. Padilla, Atencio, Conferina Halpern, Vanessa Montaño, and others party at Atencio's apartment in Las Vegas, New Mexico.  See December 6, 2023, Tr. at 289:6-294:13 (Atencio)(describing a party at her apartment that R. Padilla, Halpern, and Montaño attend, during which Atencio posts a photograph of R. Padilla on Snapchat that prompts an argument between R. Padilla and Robert "Bobs" Archuleta); id. at 305:4-308:19 (Atencio)(Atencio stating that Atencio Photographs I-VII (admitted December 6, 2023, as Padilla Trial Exhibits G-M)("Atencio Photographs") depict the party at her apartment about which she testifies); Draft Transcript of December 8, 2023 Trial at 254:23-265:7 (taken December 8, 2023)("December 8, 2023, Tr.")(Montaño)(testifying that: (i) she attends a party at Atencio's apartment which shares key details with the party about which Atencio testifies; and (ii) Montaño does not have any independent recollection of the date on which she was at Atencio's house with R. Padilla and Halpern); id. at 332:11-338:9 (Halpern)(testifying that: (i) she attends a party at Atencio's apartment which shares key details with the party about which Atencio testifies; and (ii) Halpern does not have any independent recollection of the date on which she was at Atencio's house with R. Padilla, Atencio, and Montaño); id. at 349:10-23 (Halpern)(testifying that she cannot say with certainty that the party she describes is July 22, 2019); Text Message Exchange Between Bryan Acee and Janaya Atencio (dated January 9, 2024)(admitted as Padilla Hearing Exhibit D on June 10, 2024)("Atencio Snapchat Photograph")(showing that Atencio took a Snapchat photograph of R. Padilla eating Cheetos in Atencio's apartment on July 21, 2019, and R. Padilla is wearing the same shirt that he is wearing in Atencio Photographs II-VII); Padilla Cheetos Photograph (dated July 21, 2019)(admitted as Padilla Hearing Exhibit B on June 10, 2024)("Padilla Cheetos Photograph")(showing R. Padilla eating Cheetos in Atencio's apartment and wearing the same shirt he is wearing in Atencio Photographs II-VII and Atencio Snapchat

Photograph); Draft Transcript of July 8, 2024, Hearing at 52:2-53:8 (taken July 8, 2024)("July 8, 2024, Tr.")(Salazar, R. Padilla's investigator)(testifying that forensic examination of Atencio's computer indicates that Atencio Photographs II-VII were taken on July 21, 2019); infra, at 149-50 (describing how R. Padilla is wearing that same shirt in the photographs that Atencio sent to her lawyer, Megan Mitsunaga, on November 1, 2021, which, according to Atencio's recollection on November 1, 2021, depict a party at her apartment on July 21, 2019, during which R. Padilla gets into an argument with Archuleta over the telephone)(citing Email from Megan Mitsunaga to Elaine Ramirez, no subject line at 1-15 (dated November 1, 2021)(admitted as United States Hearing Exhibit 27 on June 10, 2024)("Atencio/Mitsunaga Email 1"); Email from Megan Mitsunaga to Elaine Ramirez re: this was the next day when he came back at 1-4 (dated November 1, 2021)(admitted as United States Hearing Exhibit 28 on June 10, 2024)("Atencio/Mitsunaga Email 2")); Email from Megan Mitsunaga to Elaine Ramirez, no subject line, at 1-2 (dated November 1, 2021)(admitted as United States Hearing Exhibit Hearing 29 on June 10, 2024)("Atencio/Mitsunaga Email 3")).[2]

17.    On the evening of July 22, 2019, Gary Coca drives R. Padilla to Lucero's home, where Lucero and his wife are watching television.  See Revised PSR ¶ 18, 20, at 9; December 6, 2023, Tr. at 188:21-193:7 (Castellano, Coca);  id. at 188:21-201:7 (Castellano, Coca).

---

[2]The Court's finding of fact that there is only one party at Atencio's apartment between July 21, 2019, and July 22, 2019, and that this party occurs on July 21, 2019, is not an attempt to substitute the Court for the jury, either the one in the conducted trial or the one in any future trial, as the fact-finder in this case.  Instead, the Court makes this finding of fact to guide its analysis in this Memorandum Opinion and Order, because the date of Atencio's party, and whether there are two parties, are key issues in the Immunity Motion and the MNT.  What the Court thinks the evidence shows helps it determine whether a new trial is appropriate.

18.     While R. Padilla and Coca are parked outside Lucero's home, R. Padilla reaches over Coca to the driver's side and honks the horn.  See Revised PSR ¶ 18, 20, at 9; December 6, 2023, Tr. at 193:8-10 (Castellano, Coca).

19.     Lucero comes out of the house and approaches the passenger side to speak with R. Padilla, who asks Lucero about drug money that Lucero owes R. Padilla.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 193:14-195:4 (Castellano, Coca).

20.     Lucero tells R. Padilla that they will address later the issue.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 195:6-8 (Coca).

21.     R. Padilla pulls out a black .45 caliber handgun and attempts to shoot Lucero, but the gun does not fire.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 196:7-198:18 (Castellano, Coca).

22.     Lucero backs away, and R. Padilla hands the gun to Coca and directs him to "fix it."  Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 198:18-21 (Castellano, Coca).

23.     Coca observes that the gun is unloaded, and, after loading it, Coca shoots Lucero.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 198:22-199:25 (Castellano, Coca).

24.     After Coca shoots Lucero, Coca returns the gun to R. Padilla, and R. Padilla shoots Lucero, who falls to the ground.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 199:25-200:11 (Coca, Castellano).

25.     Hearing the gunshot, Lucero's wife runs to the front door of her home, and she sees her husband on the ground.  See Revised PSR ¶ 18, at 9.

26.     Lucero tells his wife that he has been shot, and he asks her to call the police.  See Revised PSR ¶ 18, at 9.

27.     As she runs inside to call the police, R. Padilla exits the vehicle and shoots Lucero again.  See Revised PSR ¶ 18, 20 at 9-10; December 6, 2023, Tr. at 200:12-201:7 (Castellano, Coca);  Draft Transcript of December 7, 2023 Trial at 141:10-143:2 (taken December 7, 2023)("December 7, 2023, Tr.")(Frederickson, R. Padilla's fellow inmate)(testifying that R. Padilla told him that he shot someone who was working with federal authorities in a driveway); id. at 241:17-243:17 (Garcia, R. Padilla's fellow inmate)(testifying that R. Padilla told him how R. Padilla killed Lucero in front of Lucero's house); December 8, 2023 Tr. at 40:5-21 (Urquizo, R. Padilla's fellow inmate)(testifying that R. Padilla told him how R. Padilla killed Lucero in front of Lucero's house).

28.     After hearing the second gunshot, Lucero's wife runs back outside the home and sees a black vehicle speeding away.  See Revised PSR ¶ 18, at 9.

29.     When Las Vegas Police Department ("LVPD") officers arrive on the scene, they discover Lucero lying in a pool of blood with apparent gunshot wounds in his right upper chest area and right forearm.  See Revised PSR ¶ 17, at 9.

30.     Although paramedics and firefighters attempt to save his life, Lucero succumbs to his wounds and dies on the scene.  See Revised PSR ¶ 17, at 9.

31.     Lucero's wife tells LVPD officers that she received information that Coca was one of the men who shot her husband.  See Revised PSR ¶ 18, at 9.

32.     Over the next few days, law enforcement officers interview Lucero's neighbors and other confidential human sources ("CHS") who inform them that Padilla is also involved in Lucero's murder.  See Revised PSR ¶ 18, at 9.

33.     On July 29, 2019, law enforcement officers respond to a call of a suspicious person, and pursue Coca on foot after he abandons the vehicle driven during Lucero's murder.  See Revised PSR ¶ 22, at 10.

34.     In that vehicle, officers uncover a .45 caliber pistol which matches the shell casings located at the Lucero murder scene.  See Revised PSR ¶ 22, at 10.

35.     Despite the matched casings, forensic examiners are unable to conclude whether the bullets in Lucero's body are from the same firearm.  See Revised PSR ¶ 22, at 10.

36.     On August 15, 2019, New Mexico State Police investigators interview Coca while he is in custody on an unrelated charge.  See Revised PSR ¶ 19, at 9.

37.     During the interview, Coca denies any involvement in Lucero's murder.   See Revised PSR ¶ 19, at 9.

38.     During Coca's second interview on September 5, 2019, Coca tells law enforcement officers that R. Padilla killed Lucero.  See Revised PSR ¶ 20, at 9.

39.     Coca tells law enforcement that R. Padilla wanted to have Lucero killed because Padilla believed he was a cooperating witness against the SNM.  See Revised PSR ¶ 21, at 10.

40.     Coca tells law enforcement that, although R. Padilla was not, at this time, an SNM member, R. Padilla had SNM members intimidate others and collect money on his behalf to further his drug trafficking activities.  See Revised PSR ¶ 21, at 10; December 6, 2023, Tr. at 282:13-16 (Coca).

## PROCEDURAL BACKGROUND

This section outlines this litigation's procedural context.  First, the Court provides findings of fact regarding R. Padilla's arrest and pre-trial detention related to his separate drug trafficking case.  Second, the Court details R. Padilla's indictment in the Lucero murder case and provides

findings of fact regarding the United States' contact with Atencio before R. Padilla's murder trial. Third, the Court details R. Padilla's murder trial, , and the Court provides findings of fact regarding the United States' contact with Atencio during R. Padilla's murder trial. Finally, the Court discusses post-trial developments, including Atencio's recantation and revision of her trial testimony regarding R. Padilla's alibi on the night of Lucero's murder, and the parties' arguments regarding R. Padilla's requests to immunize Atencio and for a new trial.

### 1.    <u>R. Padilla's Arrest and Pre-Trial Detention</u>.

Between August 5 and 16, 2019, law enforcement officers surveil R. Padilla's devices and execute three search warrants on his residences. <u>See</u> Revised PSR ¶ 23, at 10. On September 11, 2019, the United States indicts R. Padilla on nineteen counts related to his drug trafficking activities. <u>See</u> <u>United States v. Padilla</u> No. CR 19-3113 JB, Redacted Indictment at 1-12 (filed September 11, 2019)(D.N.M.)(Doc. 2 in CR 19-3113). Officers arrest R. Padilla at an Albuquerque bar on September 19, 2019. <u>See</u> Revised PSR ¶ 23, at 10.

### <u>FINDINGS OF FACT</u>

The Court makes the following findings of fact related to the R. Padilla's arrest, the United States' following investigation, and R. Padilla's criminal activity during pre-trial detention:

1.    During his FBI interview, R. Padilla denies killing Lucero and insists that he has an alibi -- he was staying with Lucero's first cousin, Halpern, on the night of July 22, 2019. <u>See</u> Revised PSR ¶ 23, at 10.

2.    When FBI agents tell R. Padilla that they heard R. Padilla offered to pay to have Lucero and another suspected informant killed, R. Padilla denies the accusation. <u>See</u> Revised PSR ¶ 23, at 10.

3.    After R. Padilla's arrest, the FBI interviews Halpern. <u>See</u> Revised PSR ¶ 24, at 10.

4. During this interview, Halpern tells the FBI that, since R. Padilla's arrest, R. Padilla had called her to tell her that he was in love with her, and that R. Padilla's family gave her money, which she suspects was given to pay for her silence. See Revised PSR ¶ 24, at 11.

5. While incarcerated at Cibola County Correctional Center, R. Padilla tells fellow inmate Phillip Garcia that he killed Lucero, because Lucero cooperated with authorities and failed to pay Padilla for heroin. See Revised PSR ¶ 32, at 12.

6. On October 29, 2020, Garcia tells FBI Agent Brian Acee that "Padilla had disclosed to him that he killed L.L. and had indicated he intended to kill Marcos Ruiz with a 'hot shot' of heroin, as he believed M. Ruiz was cooperating with the government." Revised PSR ¶ 30, at 14; December 7, 2023, Tr. at 239:10-240:20 (Armijo, Garcia).

7. Garcia agrees to cooperate with the FBI and record conversations with R. Padilla. See Revised PSR ¶ 30, at 14; December 7, 2023, Tr. at 245:5-19 (Garcia).

8. On November 20, 2020, before the FBI places a recording device on Garcia, several inmates assault Garcia in Garcia's cell and call Garcia a rat, while R. Padilla waits outside Garcia's cell. See PSR ¶ 31, at 12; December 7, 2023, Tr. at 199:23-210:22 (Ellison, Sabroe); Pod Cam Video of Assault of Philip Garcia at 00:12-1:11 (dated November 25, 2020)(admitted as United States Trial Exhibit 129A on December 7, 2023)("Garcia Assault Video I"); December 7, 2023, Tr. at 245:20-263:15 (Armijo, Garcia)

9. Immediately after Garcia exits his cell following the assault, R. Padilla strikes Garcia outside of Garcia's cell and calls Garcia a rat. See Garcia Assault Video I at 1:11-1:23; December 7, 2023, Tr., at 249:13-15 (Garcia); id. at 260:20 (Garcia); id. at 261:6-14 (Armijo, Garcia); id. at 263:11-15 (Garcia).

10.    As a result of the November 20, 2020, assault, Garcia sustains lacerations and bruising on his face and back.  See PSR ¶ 32, at 12; December 7, 2023, Tr., at 211:12-25 (Ellison, Sabroe); Garcia Photographs I (admitted as United States Trial Exhibit 149 on December 7, 2023)("Garcia Photographs I"); Garcia Photographs II (admitted as United States Trial Exhibit 150 on December 7, 2023)("Garcia Photographs II"); December 7, 2023, Tr. at 261:6-14 (Armijo, Garcia); id. at 261:15-262:13 (Armijo, Garcia).

11.    On November 1, 2021, Atencio sends Ms. Mitsunaga: (i) several photographs of a party at Atencio's apartment, where R. Padilla is wearing the same shirt that he is wearing in the Atencio Snapchat Photograph and the Padilla Cheetos Photograph; (ii) several photographs "from the next day when Mr. Padilla returned for a second visit," where R. Padilla is wearing a different shirt; and (iii) a description of "Ms. Atencio's recall of the events of the gathering that Robert Padilla attended."   Atencio/Mitsunaga Email 1 at 1-15; Atencio/Mitsunaga Email 2 at 1-4; Atencio/Mitsunaga Email 3 at 1-2.

12.    On November 21, 2021 Atencio tells Ms. Mitsunaga:

> What I can recall from the evening of July 21, 2019.  Robert, Conferina, This [sic] guy that was working for Robert on his Mobile homes (I can't remember his name), Joe Leyba, & I were hanging out in my old apartment. We we [sic] drinking a little bit & a little while later Arturo Ruiz showed up with his younger daughter but only stayed a little while & he & his daughter left. from the best of memory around 7pm Robert Archuleta called my phone & asked to talk to Robert Padilla started arguing & getting aggressive on the phone threatening each other back & fourth on the phone saying they were going to kill each other & each other's family. After that Robert, Conferina, & Joe left together around 8ish?? Because Robert Padilla was nervous being at my apartment because Robert A. Told him that he was going to go over there to kill him. They didn't say where they were going. Robert, Conferina, & Joe came back the next day around 10am? & Robert was drunk they hung out for awhile & they left & we all met up later at Marcos Ruiz's house.

Atencio/Mitsunaga Email 3 at 1-2.

13.     On November 16, 2021 Ms. Mitsunaga forwards Atencio/Mitsunaga Emails 1-3 to the United States.   See Atencio/Mitsunaga Email 1 at 1; Atencio/Mitsunaga Email 2 at 1; Atencio/Mitsunaga Email 3 at 1.

14.     In late 2021 or early 2022, R. Padilla tells Cole Fredrickson, another fellow inmate, that he shot and killed an FBI informant in the informant's driveway because he was mad at him. See Revised PSR ¶ 28, at 11; December 7, 2023, Tr. at 141:10-143:2 (Armijo, Frederickson).

15.     In June 2022, R. Padilla is transferred to PNM because of his gang-related conduct and his "identification as a direct threat to CCCC".  PSR ¶ 33, at 13.

16.     While incarcerated at PNM, R. Padilla tells fellow inmate Lupe Urquizo, a former SNM member, that he and Coca killed Lucero, and R. Padilla "outlin[es] the general circumstances provided by Coca, and state[s] that he [is] going to blame it on his (Padilla's) cousin, Marcos Ruiz."  Revised PSR ¶ 26, at 13.  See December 8, 2023, Tr. at 40:5-21 (Urquizo).

17.     On August 25, 2022, PNM officials receive information that R. Padilla has been providing Urquizo with narcotics to deliver between two PNM pods.  See Revised PSR ¶ 34, at 15; December 8, 2023, Tr. at 44:10-13 (Urquizo).

18.     On September 6, 2022, PNM officials find approximately 338.5 units of buprenorphine, a Schedule III controlled substance, in R. Padilla's cell.

19.     On September 21, 2022, PNM officials find coded messages in various cells, including R. Padilla's, which implicate Padilla in gang activity and drug distribution at PNM.  See Revised PSR ¶ 36.

2.    **R. Padilla's Indictment in the Lucero Murder Case and the United States'
Contact with Atencio Before R. Padilla's Murder Trial.**

On April 11, 2023, the federal Grand Jury charges R. Padilla with: (i) Violent Crimes in
Aid of Racketeering (VICAR), specifically murder, U.S.C. § 1959(a)(1); (ii) Retaliating Against
a Witness, Victim, or Informant, 18 U.S.C. § 1513(a)(1)(B); (iii) Killing While Engaged in Drug
Trafficking, 18 U.S.C. § 848(e)(1)(A); (iv) Using, Carrying and Brandishing a Firearm During and
in Relation to a Drug Trafficking Crime; Possessing and Brandishing a Firearm in Furtherance of
Such Crime; Discharging Said Firearm; and Causing Death Through Use or Possession of a
Firearm,    18    U.S.C. § 924(c)(1)(A)(ii),    (iii),    and    924(j)(1);    (v) Witness    Tampering,
18 U.S.C. § 1512(a)(2)(C);    (vi) Conspiracy,    21    U.S.C. § 846;    (vii) Possession    with    Intent    to
Distribute    Buprenorphine,    21    U.S.C. §§ 841(a)(1)    and    (b)(1)(E);    and    (viii) Possession    of
Contraband in Prison, 18 U.S.C. § 1791(a)(2).    See Redacted Third Superseding Indictment at 7-
11, filed April 19, 2023 (Doc. 80)("Third Superseding Indictment").

**FINDINGS OF FACT**

The Court makes the following findings of fact related to the United States' contact with
Atencio before R. Padilla's murder trial:

1.    On November 14, 2023, Acee serves Atencio a trial subpoena to testify at
R. Padilla's murder trial.  See FBI 302 of November 14, 2023, Contact with Janaya Atencio at 1
(dated    November    16,    2023)(admitted    as    United    States    Hearing    Exhibit    31    on    June    10,
2024)("November 16, 2023, Atencio 302").

2.    When Acee serves Atencio her trial subpoena, Atencio says that she is anxious
about testifying at R. Padilla's murder, and that R. Padilla's friends and family have been

pressuring her to testify favorably for R. Padilla.  See November 16, 2023, Atencio 302 at 1; June 10, 2024, Tr. at 143:16-144:8 (Armijo, Acee).

3.    When Acee serves Atencio her trial subpoena, Atencio does not tell Acee that she was unsure whether her expected testimony -- where she is expected to testify the R. Padilla left her apartment early in the evening on July 22, 2019 -- was about the right date.  See November 16, 2023, Atencio 302 at 1; June 10, 2024, Tr. at 143:16-144:11 (Armijo, Acee); id. at 157:9-13 (Robert, Acee).[3]

### 3.    R. Padilla's Murder Trial.

In this section, the Court details R. Padilla's murder trial, which begins on December 4, 2023.  See Clerk's Minutes at 1, filed December 4, 2023 (Doc. 260).  Although the Court proceeds chronologically, the Court also notes that there are several key takeaways for the purposes of this Memorandum Opinion and Order.  The first key takeaway is that the United States introduces evidence inculpating R. Padilla in Lucero's murder, including: (i) Coca's testifying that he saw R. Padilla kill Lucero; and (ii) several of R. Padilla's fellow inmates' testifying that R. Padilla has told them that he killed Lucero.  The second key takeaway is that R. Padilla presents an alibi defense where two witnesses -- Halpern and Montano -- testify that R. Padilla was at Atencio's apartment around the time that Lucero was murdered on July 22, 2019.  The third key takeaway is that when the United States calls Atencio as a witness, she undermines R. Padilla's alibi defense by testifying that R. Padilla left her apartment early in the evening on July 22, 2019.

---

[3]Atencio's post-trial testimony contradicts Acee's post-trial testimony regarding these communications.  See June 10, 2024, Tr. at 36:25-37:16 (Atencio)(testifying that when Acee serves her trial subpoena, she tells him that she is concerned that she has her dates mixed up).  Assessing each witness' credibility and the record as a whole, the Court does not adopt Atencio's version of events and credits Acee's testimony for the reasons stated below in detail.  See infra, at 166-67.

      a.      **FBI Special Agent Brian Acee**.

On December 5, 2023, the United States calls Brian Acee as a witness.  See Exhibit and Witness List at 1, filed December 4, 2023 (Doc. 260-1)("Exhibit and Witness List"); Draft Transcript of December 5, 2023, Trial at 58:5-6 (taken December 5, 2023)(Castellano)("December 5, 2023, Tr.").  Acee has been investigating the SNM since 2015, when he formed an inter-agency task force to mitigate the gang's violence against correctional officers, gather intelligence about their activities, target their drug and firearms trafficking, and solve cold cases linked to SNM.  See December 5, 2023, Tr. at 59:15-18 (Acee); id. at 62:18-65:20 (Castellano, Acee).  At the time of R. Padilla's trial, Acee has over twenty-four years of law enforcement experience, including approximately fifteen years at the FBI.  See December 5, 2023, Tr. at 59:2-12 (Acee).  Acee describes Lucero's FBI cooperation and 2018 testimony against fellow SNM members in a highly publicized double homicide case.  See December 5, 2023 Tr. at 110:17-111:16 (Castellano, Acee); id. at 115:2-12 (Castellano, Acee).  Acee testifies that, late on July 22, 2019, or early in the morning of July 23, 2019, LVPD officers inform him that Lucero had been killed on July 22, 2019, in his driveway, and that Acee's subsequent investigation led him to interview Coca about his involvement in Lucero's murder.  See December 5, 2023 Tr. at 118:9-119:22 (Castellano, Acee).  Acee testifies that he never made any promises to Gary Coca in exchange for his cooperation.  See December 5, 2023 Tr. at 119:23-25 (Castellano, Acee).

      b.      **Gary Coca's Trial Testimony**.

On December 6, 2023, the United States calls Gary Coca as a witness.  See Exhibit and Witness List at 2; December 6, 2023, Tr. at 168:11-2 (Castellano).  Coca testifies that he has known Lucero, R. Padilla, and M. Ruiz since they were all children.  See December 6, 2023, Tr. at 180:15-181:16 (Castellano, Coca).  Coca says that he has spent time in prison with Lucero and that,

although Coca is not a prison gang member, Lucero was in SNM.  See December 6, 2023, Tr. at 181:19-182:10 (Castellano, Coca).  Coca testifies that he has sold drugs for R. Padilla's drug trafficking organization and that, on occasion, Coca burned customers' cars at R. Padilla's direction if they failed to discharge their drug debts.  See December 6, 2023, Tr. at 184:7-13 (Castellano, Coca); id., at 186:4-186:17 (Castellano, Coca).  Coca also describes how, in the months leading up to Lucero's murder, R. Padilla tells Coca that Lucero must be cooperating with federal authorities because Lucero "never got charged with the RICO act" during an earlier SNM prosecution, and Lucero only served ten years out of a fifteen-year sentence for an earlier firearm conviction. December 6, 2023, Tr. at 206:16-207:22 (Coca, Castellano).  Coca also describes a party where R. Padilla accuses Lucero of being a "rat."   December 6, 2023, Tr. at 204:25-205:5 (Coca, Castellano).  Coca testifies that, around this period, R. Padilla tells Coca to give Lucero a "hotshot" - - a lethal dose -- of heroin, and even gives Coca a full syringe of heroin mixed with mercury to kill Lucero.  December 6, 2023, Tr. at 207:23-208:9 (Castellano, Coca).  Coca says that when he offers the filled syringe to Lucero, Lucero refuses, because Lucero does not trust a heroin shot that he does not make himself.  See December 6, 2023, Tr. at 208:16-209:9 (Castellano, Coca).  Coca also testifies that, around this time, R. Padilla offers Arturo Ruiz $20,000 to kill Lucero.  See December 6, 2023, Tr. at 209:20-210:15 (Castellano, Coca).

Coca describes how, at around 6:00 P.M. on July 22, 2019, M. Ruiz and Joe Leyba pick Coca up from R. Duran's house.  See December 6, 2023, Tr. at 188:21-25 (Coca).  Coca testifies that, after leaving R. Duran's house, the three men pick up R. Padilla and go to the home of one of R. Padilla's workers.  See December 6, 2023, Tr. at 189:1-4 (Coca).  Coca says that, while there, M. Ruiz gets a call from either his girlfriend or wife and leaves.  See December 6, 2023, Tr. at 189:4-6 (Coca).  Coca testifies that R. Padilla, who had been drinking, gives Coca the keys to his

black Honda -- which Coca identifies on the stand when the United States shows him photographs -- and asks Coca to drive the two of them around Las Vegas.  See December 6, 2023, Tr. at 189:7-191:1 (Coca, Castellano).  Coca says that, while the two of them are driving, R. Padilla tells Coca to go to Lucero's house, and Coca drives them there.  See December 6, 2023, Tr. at 192:22-193:7 (Coca, Castellano).  Coca describes how, when they arrived at Lucero's house, R. Padilla reaches over to the driver's side and honks the horn, and Lucero exits his home and approaches R. Padilla on the passenger's side.  See December 6, 2023, Tr. at 193:9-195:2 (Coca, Castellano).  Coca says that R. Padilla then asks Lucero for drug money, and Lucero tells him that he will get it to R. Padilla later.  See December 6, 2023, Tr. at 195:3-8 (Coca).  Coca says that R. Padilla then pulls out a gun and fires it at Lucero, but the gun does not discharge.  See December 6, 2023, Tr. at 196:14-198:6 (Coca, Castellano).  Coca testifies that Padilla then threw the gun to Coca, and tells him to "fix it," which Coca interprets to mean that Coca should take the gun and shoot Lucero.  December 6, 2023, Tr. at 198:18-25 (Castellano, Coca).  Coca testifies that, after inspecting the gun and finding no bullet in the chamber, Coca loads the gun and shoots at Lucero.  See December 6, 2023, Tr. at 199:1-20 (Castellano, Coca).  Coca describes how, although Coca believes he hit Lucero, Lucero does not fall.  See December 6, 2023, Tr. at 199:23-25 (Coca).  Coca says that he then gives R. Padilla the gun, and Padilla shoots Lucero, who falls to the ground.  See December 6, 2023, Tr. at 199:25-200:11 (Coca, Castellano).  Coca says that he then tells R. Padilla that they should leave, but R. Padilla refuses, and responds: "Hold on. Let me make sure I get this fucker."  December 6, 2023, Tr. at 200:15-20 (Coca, Castellano).  Coca testifies that R. Padilla then exits the car and shoots Lucero again, while Lucero is crawling towards his house and yelling towards his wife, who is coming out of the house, "call the cops."  December 6, 2023, Tr. at 200:22-202:5 (Coca,

Castellano).  Coca says that R. Padilla then runs back into his car, and Coca drives them away.  See

December 6, 2023, Tr. at 202:16-19 (Coca).

          **c.**      **Janaya Atencio's Trial Testimony.**

After Coca concludes his testimony on December 6, 2023, the United States calls Janaya

Atencio as a witness.  See Exhibit and Witness List at 2; December 6, 2023, Tr. at 284:7-8

(Castellano).  At her testimony's start, Atencio says that she is nervous and suffers from anxiety.

See December 6, 2023, Tr. at 284:21-285:5 (Castellano, Atencio).  Atencio says that she and

R. Padilla are friends, and she has known Padilla for over ten years.  See December 6, 2023, Tr. at

285:2-12 (Castellano, Atencio).  Atencio testifies, over the course of her friendship with Padilla,

she dealt drugs for the Padilla DTO, and she never heard any mention of SNM while trafficking

drugs for R. Padilla.  See December 6, 2023, Tr. at 311:10-312:10 (Castellano, Atencio); id. at

314:24-315:2 (Castellano, Atencio).  Atencio describes how R. Padilla, Halpern, Montaño, and

several others attend a party at her apartment on July 22, 2019.  See December 6, 2023, Tr. at 289:6-

18 (Castellano, Atencio); id. at 301:10-302:8 (Castellano, Atencio).  Atencio also says that Montaño

brought a bottle of Jägermeister[4] to the party.  See December 6, 2023, Tr. at 301:18-20 (Atencio).

Atencio says that her apartment has one bedroom, a kitchen, a bathroom, and a living area, and that

she would know if someone stayed the night.  See December 6, 2023, Tr. at 294:17-295:7

(Castellano, Atencio).  When she is asked if she would let someone spend the night at her apartment,

Atencio says that she would not allow an overnight stay.  See December 6, 2023, Tr. at 293:18-22

(Castellano, Atencio).  During cross-examination, R. Padilla's counsel shows Atencio several

---

[4]Jägermeister is brand of German herbal liqueur that has a thirty-five percent alcohol by volume.
See Jägermeister, Wikipedia, available at https://en.wikipedia.org/wiki/J%C3%A4germeister (last
visited October 28, 2024).

photographs of R. Padilla, Halpern, and others at Atencio's apartment that Atencio took, some of which appear to have been taken during the day. See December 6, 2023, Tr. at 305:4-308:19 (Robert, Atencio); Atencio Photographs I-VII. Atencio says that she took these photographs on July 22, 2019.[5] See December 6, 2023, Tr. at 305:4-308:19 (Robert, Atencio).

Atencio testifies that Montaño arrives at the party later than others, but, other than affirming that it is dark when Montaño arrives, Atencio is not able to state precisely when Montaño arrives. See December 6, 2023, Tr. at 301:14-25 (Castellano, Atencio). Atencio testifies that, after she posts pictures of R. Padilla on Snapchat, Robert "Bobs" Archuleta calls Atencio saying "bad things about" R. Padilla. December 6, 2023, Tr. at 290:16-291:19 (Castellano, Atencio). Atencio says that R. Padilla and Archuleta then speak to each other over the telephone, and exchange violent threats. See December 6, 2023, Tr. at 292:20-293:7 (Castellano, Atencio). Atencio testifies that, at some time in the night, R. Padilla and Halpern go into Atencio's bedroom, but do not spend the night, because they eventually leave while it is still dark outside. See December 6, 2023, Tr. at 293:24-295:4 (Castellano, Atencio); id. at 295:8-14 (Castellano, Atencio). Atencio says that she does not see R. Padilla until the next morning. See December 6, 2023, Tr. at 293:8-294:13 (Castellano, Atencio). Atencio testifies that, on July 23, 2019, R. Padilla, R. Padilla's son -- Devyn Padilla -- A. Ruiz, and A. Ruiz' daughter come to her apartment. See December 6, 2023, Tr. at 309:21-310:20 (Castellano, Atencio). Atencio says that she does not remember whether M. Ruiz or Halpern also come to her apartment that same day. See December 6, 2023, Tr. at 308:24-309:16 (Castellano, Atencio); id. at 311:1-3 (Castellano, Atencio).

---

[5]Atencio says that the July 22, 2019, photographs were loaded on her personal computer, which she gave to her lawyer, Megan Mitsunaga, to hand over to the United States, although Atencio cannot confirm whether her lawyer gave the United States the photographs, or the computer itself. See December 6, 2023, Tr. at 312:18-314:3 (Robert, Atencio).

### d.    Acee's Disclosure Regarding His Conversation With Janaya Atencio.

On December 7, 2023, the trial's fourth day, the United States tells the Court that Atencio "remembered things after her testimony."  December 7, 2023, Tr. at 3:16-19 (Castellano).  The Court and the parties determine that, outside the jury's presence, Acee, under oath, will summarize his conversation with Atencio, which took place the prior night.  See December 7, 2023, Tr. at 3:16-4:3 (Castellano, Court, Robert).  Acee says that, while Atencio is eating dinner on December 6, 2023, she calls FBI Agent Nancy Stemo, who hands the cellular telephone to Acee.  See December 7, 2023, Tr. at 4:14-18 (Acee).  Acee states that Atencio "has a lot of anxiety," and had "been think[ing] more and more about that evening which was prompted by" her December 6, 2023, testimony.  December 7, 2023, Tr. at 4:18-20 (Acee).  Acee says that Atencio

> did recall that the next morning, [July 23, 2019,] the defendant, [his] son Devin, Marcos Ruiz and Conferina did return to her house.  She thought the time around [] ten A.M. [] and that the defendant was what she described as blackout drunk[], pushed her door in because she was asleep, and that the four people I just mentioned and Janaya hung out that morning.  She thought that Marcos Ruiz was high, possibly on methamphetamine and that he was tripping out[], and kept saying something [to] effect of[, "] I can't believe [they got] Smurf["] or[, "]I can't believe Smurf is dead[."]

December 7, 2023, Tr. at 4:21-5:7 (Acee).  Acee says that when he speaks to Atencio again on the morning of December 7, 2023, to confirm Atencio's recollection, Atencio repeats what she had said the prior night.  See December 7, 2023, Tr. at 5:10-14 (Acee).  Acee also says that Atencio recalls that, later in the day on July 23, 2019, R. Padilla, Atencio, D. Padilla, M. Ruiz, and Halpern go to party at M. Ruiz's house.  See December 7, 2023, Tr. at 5:23-25 (Acee).  Acee says that Atencio recalls how, at this party, Coca arrives in R. Padilla's black car, and R. Padilla and Coca speak to each other, but Atencio does not know about what they talk.  See December 7, 2023, Tr. at 6:1-3 (Acee).  After Acee concludes his testimony, R. Padilla's counsel does not ask Acee any follow-up

questions. See December 7, 2023, Tr. at 6:23-24 (Robert)("I don't have any questions for the agent."). The parties discuss with the Court how Atencio's recollection of M. Ruiz's July, 23, 2019, statements may be admissible under different hearsay exceptions, see December 7, 2023, Tr. at 7:19-9:5, and the United States says it is are "not sure [it is] going to call her" again, December 7, 2023, Tr. at 9:7. R. Padilla's counsel also comments: "I do think that her recollection was made in good faith. I don't think she was trying to hide anything yesterday. It didn't appear to be who she was." December 7, 2023, Tr. at 7:1-4 (Robert).

## FINDINGS OF FACT

The Court makes the following findings of fact related to Atencio's contacts with the United States during R. Padilla's murder trial:

1.      The United States does not fail to disclose any relevant information regarding Atencio's contacts with the United States during R. Padilla's murder trial. See December 7, 2023, Tr. at 3:16-9:5 (Castellano, Court, Robert, Acee).

2.      During R. Padilla's murder trial, Atencio does not tell Acee, or any other law enforcement officer, that she is unsure whether her trial testimony is about the right date. See December 7, 2023, Tr. at 4:14-6:3 (Acee).

### e.      Cole Frederickson's Trial Testimony.

On December 7, 2023, the United States calls Cole Frederickson, R. Padilla's former fellow inmate at Cibola Correctional, as a witness. See Exhibit and Witness List at 4; December 7, 2023 Tr. at 122:23-24 (Armijo). Frederickson describes his lengthy history of drug addiction and related criminal activity. See December 7, 2023, Tr. at 123:22-136:2 (Armijo, Frederickson). During this portion of Frederickson's testimony, Frederickson acknowledges that his favorable sentencing in a previous case is partially contingent on his truthful testimony at Padilla's murder

trial.  See December 7, 2023, Tr. at 132:13-133:6 (Armijo, Frederickson); United States v. Cole

Fredrickson No. CR 21-1426-MV (D.N.M.), Addendum to Plea Agreement ¶ 2 (dated May 5,

2023)(admitted as United States Trial Exhibit 189A on December 7, 2023)("Frederickson Plea

Agreement Addendum").  Frederickson's plea agreement provides:

> The Defendant hereby agrees to cooperate with the United States by giving
> truthful and complete information and/or testimony concerning the Defendant's
> participation in and knowledge of criminal activities.  The Defendant understands
> that if the Defendant falsely implicates an innocent person in the commission of a
> crime or exaggerates the involvement of any person in the commission of a crime,
> or if the Defendant falsely minimizes the involvement of any person in the
> commission of a crime, then the Defendant will be in violation of this plea
> agreement, and the United States will have the right to rescind the plea agreement
> and reinstate criminal proceedings against the Defendant.

Frederickson Plea Agreement Addendum ¶ 2, at 1.  Frederickson testifies that he knows Padilla

from their time at Cibola Correctional in late 2021 until approximately July, 2022.  See December

7, 2023, Tr. at 136:16-137:9 (Armijo, Robert).  Frederickson says that, during this period, he

purchases Suboxone[6] from Padilla, who lived in the same pod, and that Padilla makes liquor while

incarcerated.  See December 7, 2023, Tr. at 139:15-141:9 (Armijo, Frederickson).  Frederickson

says that, on one occasion, after Padilla had been drinking, Padilla tells Frederickson that he shot

someone who was working with federal authorities in a driveway.  See December 7, 2023, Tr. at

141:10-143:2 (Armijo, Frederickson).

###### f.    Gabriela Sabroe's Trial Testimony.

After Frederickson concludes his testimony on December 7, 2023, the United States calls

Gabriela Sabroe as a witness.  See Exhibit and Witness List at 4; December 7, 2023, Tr. at 198:4-

7 (Ellison).  Sabroe is a correctional officer who works at Cibola Correctional during Padilla's

---

[6]Suboxone is a brand name for buprenorphine, a Schedule III controlled substance.  See
Revised PSR ¶¶ 34-35, at 13.

incarceration. <u>See</u> December 7, 2023, Tr. at 199:6-199:22 (Ellison, Sabroe). Sabroe describes Padilla's violent assault of Garcia, a fellow Cibola Correctional inmate who was cooperating with federal authorities, on November 25, 2020, and explains various aspects of the relevant security camera footage of the assault. <u>See</u> December 7, 2023, Tr. at 199:23-210:22 (Ellison, Sabroe); Garcia Assault Video I at 0:00-1:23, Pod Cam Video 2 of Assault of Philip Garcia at 0:00-1:23 (dated November 25, 2020)(admitted as United States Trial Exhibit164A on December 7, 2023)("Garcia Assault Video II"). In the footage, four inmates enter Garcia's cell, and another inmate closes the door behind them. <u>See</u> Garcia Assault Video I at 00:12-00:21. The door remains closed for almost one minute, during which R. Padilla, wearing a grey shirt and tan pants, walks around the common area outside, occasionally looking at Garcia's cell. <u>See</u> Garcia Assault Video I, at 00:21-1:11; December 7, 2023, Tr. at 205:5-11 (Ellison, Sabroe). During this period, a hand reaches out of the cell -- Sabroe describes this movement as one made "for help to get somebody's attention." December 7, 2023, Tr. at 208:12-14 (Ellison, Sabroe). <u>See</u> Garcia Assault Video I at 00:45-1:05. The four inmates and Garcia, staggering, then exit the cell, and R. Padilla strikes Garcia. <u>See</u> Garcia Assault Video I at 1:11-1:23. Sabroe testifies that, following this incident, Garcia is treated for lacerations on his face, a mark or lash on his back, and bleeding on top of his eyebrow. <u>See</u> December 7, 2023, Tr., at 211:12-25 (Ellison, Sabroe).

> **g.      Phillip Garcia's Trial Testimony.**

After Sabroe concludes her testimony on December 7, 2023, the United States calls Phillip Garcia as a witness. <u>See</u> Exhibit and Witness List at 4; December 7, 2023, Tr. at 220:12-13 (Armijo). Garcia, who is incarcerated at the time he testifies, describes his lengthy criminal history. <u>See</u> December 7, 2023, Tr. at 221:4-227:13 (Armijo, Garcia). Garcia also says that, although he is not in SNM, he has several family members in the gang, including Billy Garcia, whom federal

authorities investigated as an SNM member.  See December 7, 2023, Tr. at 223:12-224:16 (Armijo, Garcia).  Garcia testifies that, during a federal prison stint that began in 2007, he cooperates with authorities on two separate occasions by telling the Special Investigations Services ("SIS") about various gang activity at his facilities.  See December 7, 2023, Tr. at 231:2-234:9 (Armijo, Garcia). Garcia says that he is released early, in 2020, because of his cooperation.  See December 7, 2023, Tr. at 233:24-234:9 (Armijo, Garcia).  Garcia testifies that, after his release, he violates his supervised release conditions and is sent to Cibola Correctional, where he is housed in the same pod as R. Padilla.  See December 7, 2023, Tr. at 234:15-237:15 (Armijo, Garcia).  Garcia says that, shortly after Garcia arrives at Cibola Correctional, R. Padilla tells him that: (i) R. Padilla wants to kill M. Ruiz, who is, at this time, also at Cibola Correctional, because R. Padilla believes M. Ruiz is cooperating with authorities against R. Padilla; and (ii) R. Padilla killed Lucero.[7]  See December 7, 2023, Tr. at 239:10-240:20 (Armijo, Garcia).  Garcia says that R. Padilla's confession to Lucero's murder was "the very first words that he told me," December 7, 2023, Tr. at 240:16-17

---

[7]Garcia also provides color on why Padilla brags about Lucero's murder while at Cibola Correctional: to gain status in SNM, an individual must commit a violent assault or a murder, particularly of an informant, see December 7, 2023, Tr. at 277:24-278:9 (Armijo, Garcia), id. at 291:25-292:3 (Armijo, Garcia), and then "he's got to confess that to everybody." December 7, 2023, Tr. at 281:9-10 (Gainor).  Garcia says that, based on his long incarceration history, Garcia assumes a leadership position at Cibola Correctional, where inmates who want to gain status in prison gangs need to talk to him about their plans to tell other inmates about their violent crimes, or to kill another inmate.  See December 7, 2023, Tr. at 279:21-280:24 (Gainor, Garcia); id. at 283:17-23 (Gainor, Garcia).  See also December 7, 2023, Tr. at 282:2-3 (Garcia)("I've been in prison my whole life and yes, that is correct[,] that's the way it flies.").  Garcia testifies:

> When people get to prison or jail in [R. Padilla's] situation they tell [others about their] crime because that puts them next on the totem pole . . . . Robert wanted to [b]e the man[,] he wanted to be the next man [to join SNM,] so that's why I believe he's bragging about it.

December 7, 2023, Tr. at 290:25-291:6 (Garcia).

(Garcia), and that Garcia knows Lucero personally, because he had "done a lot of time with" Lucero, December 7, 2023, Tr. at 240:24-25 (Garcia).  Garcia testifies that R. Padilla tells him about Lucero's murder in detail:

> He told me that him and a person by the name of Gary Coca went to Smurf's house and that they had called Smurf before they were going to his house and told him that he had just got a whole bunch of heroin that he was going to drop off to Smurf.  So that way Smurf will come out to meet him without a pistol because sure was known for carrying weapons.  So he said [] that when Smurf came to the door that Gary Coca was sitting in the driver's seat and he shot Smurf . . . And he being [] Gary Coca . . . . Robert said that he gave Gary Coca a bunch of drugs and money for doing it . . . . He said he actually got out of the car after Gary Coca shot Smurf, Smurf was trying to crawl back to the house, trying to yell[, "]call the police,["] and Robert was laughing about it, saying[, "]you don't need to call the police you need to call the cor[o]ner because you're dead.["]  That's what he said. . . . . [H]e told me that he had been giving Smurf a whole bunch of heroin and that Smurf wasn't paying him and that he knew that Smurf was cooperating because all the SNMers started getting hit with RICO cases, and Smurf was the only one that had not got caught[,] he was the only one that was not indicted on [RICO], so he started asking Smurf about it.

December 7, 2023, Tr. at 241:17-243:17 (Garcia).  Garcia testifies that R. Padilla tells him that a high ranking SNM member told Padilla that, if R. Padilla killed Lucero, R. Padilla would improve his standing in SNM.  See December 7, 2023, Tr. at 243:25-244:10 (Armijo, Garcia).  Garcia says that Garcia then reaches out to SIS to request that the authorities equip him with a recording device, because Garcia believes there is a meeting planned in the Cibola Correctional yard, where R. Padilla is expected to tell others that he killed Lucero.[8]  See December 7, 2023, Tr. at 245:5-19 (Garcia).

---

[8]Garcia says that Padilla's confession at this meeting would be truthful because falsely accusing someone of being an informant is not taken lightly in prison.  See December 7, 2023, Tr. at 291:20-24 (Garcia)("[A]t this meeting the truth was going to have to be told because . . . if Robert lied about any of the situation it would be his life in danger for lying.").

Garcia says that, before Garcia and the authorities can execute their plan, however, Padilla and several other inmates assault him.  <u>See</u> December 7, 2023, Tr. at 245:20-246:13 (Armijo, Garcia).  Garcia describes the assault: "They're assaulting me, they stabbed me and tried to beat me up, you know, they stabbed me in my back a couple of times and they were trying to choke [me out,] they had a noose they were trying to put it around my neck[,] trying to choke me out." December 7, 2023, Tr. at 248:10-14 (Garcia).  Garcia says that, during the beating, his assailants call him a rat.  <u>See</u> December 7, 2023, Tr. at 258:15-19 (Armijo, Garcia).  Garcia describes further how, after he gets out of his cell, R. Padilla "was standing right at the front door [of the common area] and before the [officers] can open the door he sucker punched me [on] the side of the face," December 7, 2023, Tr. at 249:13-15 (Garcia), and "calls me a rat," December 7, 2023, Tr. at 260:20 (Garcia).  During Garcia's testimony, the United States admits several photographs of Garcia taken at Cibola Correctional immediately after his assault.  <u>See</u> December 7, 2023, Tr. at 246:14-18 (Armijo, Court, Gainor); Garcia Photographs I-II. Describing Garcia Photograph I, Garcia says that the red marks under his eye and on his neck from R. Padilla's punch and the other assailants' tightening of a noose around his neck, respectively:



Gracia Photographs I.  <u>See</u> December 7, 2023, Tr. at 261:6-14 (Armijo, Garcia).  Describing Garcia

Photographs II, which are taken after medical personnel treat him, Garcia says his assailants

stabbed him, causing the red marks on his back, and beat him, causing the redness on his chest:



Garcia Photographs II.  <u>See</u> December 7, 2023, Tr. at 261:15-262:13 (Armijo, Garcia).  Garcia

says that, after the assault, "Padilla told me that I got what I deserved because I was a rat, and that

I got what I deserve because I was trying to snitch on him, and that [his] attorney confirmed that I was cooperating with the Government against him."  December 7, 2023, Tr. at 263:11-15 (Garcia).

###    h.    Lupe Urquizo's Trial Testimony.

After Garcia concludes his testimony on December 7, 2023, the United States calls Lupe Urquizo a witness.  See Exhibit and Witness List at 4; December 7, 2023, Tr. at 331:1-8 (Urquizo). Like Garcia, Urquizo testifies that he is incarcerated at the time of Padilla's murder trial.  See December 7, 2023, Tr. at 332:17-19 (Armijo, Urquizo).  Unlike Garcia, Urquizo was a SNM member for approximately fifteen years.  See December 7, 2023, Tr. at 332:13-16 (Armijo, Urquizo).  Urquizo says that, based on his SNM involvement, he pled guilty to a federal racketeering conspiracy charge.  See December 7, 2023, Tr. at 333:8-13 (Armijo, Urquizo). Urquizo also says that, because he cooperates with authorities during his federal case, his life is in danger:

> Oh, man, well, pretty much as soon as I talked to the FBI, I was done.  I had a hit on me, I had a green light, and pretty much it was over, like my life.  They get ahold of me, I'm going to die pretty much.  I'll get killed.  As soon as I [cooperated with federal authorities], it was over [for] me."

December 7, 2023, Tr. at 334:2-7 (Urquizo).  When asked if killing informants is an SNM rule, Urquizo testifies: "Yes, ma'am.  Anybody -- after that, you don't have to be SNM, it could be any other organization, doesn't matter, as long as they know that you ratted, it's over."  December 7, 2023, Tr. at 334:9-12 (Armijo, Urquizo).  During Urquizo's testimony, the United States offers a letter that outlines Urquizo's cooperation agreement terms.  See Letter from Damon Martinez to Rosanne Camunez Re: Terms of Agreement for debriefings of LUPE ORQUIZO, at 1-2 (dated March 6, 2017)(admitted as United States Trial Exhibit 177 on December 7, 2023)("Urquizo Cooperation Terms").  Urquizo says that he understands those terms to mean that, if he tells the

truth during his cooperation, the United States cannot use anything he says against him.  See

December 7, 2023, Tr. at 334:21-336:12 (Armijo, Urquizo).

On December 8, 2023, the United States continues its direct examination of Urquizo.  See

Exhibit and Witness List at 4; December 8, 2023, Tr. at 21:1-10 (Court, Urquizo).    Like

Frederickson, Urquizo acknowledges that falsely implicating an innocent person or exaggerating

the involvement of a person in the commission of a crime would violate his plea agreement.  See

December 8, 2023, Tr. at 27:6-14 (Armijo, Urquizo).  Urquizo testifies about some of his prior

SNM activity, including organizing the murder of Javier Molina, an SNM member and government

informant, in 2014.  See December 8, 2023, Tr. at 23:1-26:5 (Urquizo, Armijo).  Urquizo says that

he served time with R. Padilla, who was his cell neighbor at PNM for approximately six months -

- July, 2022, to January, 2023.  See December 8, 2023, Tr. at 34:23-35:25.  Urquizo says that, after

he tells R. Padilla that he is an SNM member, R. Padilla tells Urquizo that R. Padilla is incarcerated

for killing Lucero, who is an FBI informant.  See December 8, 2023, Tr. at 36:8-38:9 (Armijo,

Urquizo).  Urquizo also says that, on July 22, 2022, R. Padilla tells Urquizo that it is the three-year

anniversary since he killed Lucero.  See December 8, 2023, Tr. at 38:10-25 (Armijo, Urquizo).

Urquizo says that R. Padilla describes Lucero's murder in detail:

> He told me that -- well, I mean, he said a lot of stuff, but the main one that he said
> is whenever he had him and Gary Coca go over there to Leroy's house, and [Padilla]
> honked; [Lucero] came out.  And then Gary Coca shot him. He shot him.  And after
> he shot him, he got the gun and he got out and actually shot him one time. . . . He
> just bragged about it, that he was going to get away with it, because -- he was trying
> to throw it off on somebody else named Marcos Ruiz, his cousin or something.  He
> said, "I'm just going to throw it off that dude.  They're not going to believe him over
> me."  He's all, "because I've never really been in trouble."

December 8, 2023, Tr. at 40:5-21 (Urquizo).  Urquizo says that, "right away," December 8, 2023,

Tr. at 39:8 (Urquizo), Urquizo and R. Padilla would call each other "carnal," December 8, 2023,

Tr. at 39:7 (Urquizo), which is a term an SNM member -- and only an SNM member -- uses to refer

to another SNM member, see December 8, 2023, Tr. at 39:1-40:2 (Armijo, Urquizo).  Urquizo

drives home the point: "[Y]ou can only say 'carnal' if you're an SNMer.  If you're not SNM, you

are not allowed to say that word." December 8, 2023, Tr. at 39:25-40:2 (Urquizo).  Urquizo says

that R. Padilla tells him that R. Padilla spoke to an SNM leader -- Anthony Baca, a.k.a. "Pup," see

Dec. 8, 2023, Tr. at 22:12-20 (Armijo, Urquizo).  See December 8, 2023, Tr. at 40:24-25.  Urquizo

describes "Pup" as a "shot caller," for SNM, meaning that "Pup" is "like the boss, the main guy

that made all the rules, everything that happened went through him."  December 8, 2023, Tr. at

22:14-20 (Urquizo).  Urquizo describes how R. Padilla tells him about R. Padilla's conversation

with "Pup" regarding Lucero's murder, and how, as a result, R. Padilla became an SNM member:

> He did [tell me something about "Pup."]  He said that he had a conversation with "Pup."  I don't know how true that is.  He had a conversation.  And that, now that "Pup" was over there in ADX,[9] or whatever, that he was going to start taking over.  Since he did that he got rank, he got a lot of rank.  Which I believe, because anytime you kill an informant, especially an FBI informant, that's pretty much like killing an agent, killing a cop.  So you automatically get rank for that.
>
> So he told me that he talked to him, or spoke to him through somebody else.  And yes, that he got ranked because of that.  So now he was an SNM Gang member.  So I asked him, "So you did that for the [SNM Gang]?"
>
> He's all, "Well, yeah, I'm not going to do it just to do it."

December 8, 2023, Tr. at 40:24-41:15 (Urquizo).  Urquizo confirms that a man does not need to be

in prison to become an SNM member, or to assist the SNM.  See December 8, 2023, Tr. at 51:24-

52:19 (Armijo, Urquizo).  For example, a man can murder someone outside of prison to become

an SNM member, or a person can traffic drugs or commit assaults for SNM to gain favor.  See

---

[9]"ADX" refers to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado.  See Mark Binelli, Inside America's Toughest Prison, N.Y. Times (March 26, 2015).

December 8, 2023, Tr. at 51:24-52:19 (Armijo, Urquizo).   Urquizo also describes how R. Padilla

sells drugs at PNM.  See December 8, 2023, Tr. at 44:10-13 (Urquizo).  Urquizo says that, in early

2023, R. Padilla learns that Urquizo is an FBI informant, and R. Padilla calls a hit out on Urquizo,

who is eventually moved to a different unit in PNM.  See December 8, 2023, Tr. at 48:13-49:23

(Armijo, Urquizo).

   **i.**   **Conferina Halpern's Reluctance to Testify.**

   On December 8, 2023, R. Padilla's counsel informs the Court that Halpern does not want

to testify:

>    Conferina doesn't want to [] come and honor her subpoena.  She expressed
> about 7 excuses for not wanting to come yesterday morning [when] we talked to
> her on the phone.  When we were investigating the case she refused to talk to us,
> we don't really know what else to do but subpoena her.  We need her here.  She is
> an important witness for us and she doesn't want to come and testify that's the
> bottom line.

December 8, 2023, Tr. at 16:16-24 (Robert).  The Court then instructs R. Padilla's counsel to tell

Halpern that, if Halpern does not voluntarily come to testify, the Court can issue an arrest warrant

and send the United States marshals to pick her up.  See December 8, 2023, Tr. at 18:7-15 (Court).

R. Padilla's counsel represents to the Court that he will speak to Halpern to get her to testify,

despite the impression of R. Padilla's counsel that "she's reluctant."  December 8, 2023, Tr. at

19:7-13 (Robert).

   **j.**   **Acee's December, 8, 2023, Trial Testimony.**

   After Urquizo concludes his testimony on December 8, 2023, the United States re-calls

Acee as a witness.  See Exhibit and Witness List at 5; December 8, 2023 Tr. at 147:2-8 (Court,

Castellano).   Acee testifies that he did not "place certain people next to" R. Padilla during

R. Padilla's pre-trial detention.  December 8, 2023, Tr. at 147:11-16 (Castellano, Acee).  Acee

says that Garcia was not part of the R. Padilla investigation before Garcia contacted Acee about R. Padilla's incriminating statements.  See December 8, 2023, Tr. at 147:17-148:8 (Castellano, Acee).  Acee testifies that "[t]he day we brought [a recording device to Cibola Correctional] was the day that Phillip Garcia was beaten up and stabbed," December 8, 2023, Tr. at 156:1-3 (Acee), and Acee suspects a correctional officer at Cibola Correctional "tipped off inmates that Garcia was coming with a wire," December 8, 2023, Tr. at 154:11-13 (Acee).[10]  Acee also testifies that he is not aware of any law enforcement agency obtaining a search warrant for Atencio's computer "that would have searched and definitively found" photographs with metadata regarding the time the photos were taken.  December 8, 2023 Tr. at 197:2-3 (Gainor).

---

[10]Acee also describes how, when bringing a recording device into a state prison facility, the FBI tries to operate secretively: "The FBI routinely arrests corrupt police officers, correctional officers.  And it's a very sensitive matter, and [the Garcia recording operation] was on a need-to-know basis."  December 8, 2023, Tr. at 153:4-7 (Acee).  Moreover, Acee says that he has investigated drug problems and potential corruption at Cibola Correctional "numerous times."  December 8, 2023, Tr. at 153:16; 154:2 (Acee).  Acee testifies that, after Garcia's assault, Cibola Correctional does not cooperate with Acee's subsequent investigation into the attack:

> [Castellano:]    And after Phillip Garcia was assaulted, what steps did you take to follow up on how that may have happened?
>
> [Acee:]    I initially requested the cooperation of the facility, which I didn't get from the warden. So I had to obtain subpoenas from your office to force the administration at Cibola County to give me their videos.  I also asked for their cellphone and telephone records, because I suspected an officer there had tipped off inmates that Garcia was coming in with a wire.
>
> [Castellano:]    How cooperative was the facility at that time?
>
> [Acee:]    Not at all, and the warden was subsequently fired.

December 8, 2023, Tr. at 154:3-17 (Castellano, Acee).

### k.    <u>Nathan Duran's Refusal to Testify and Subsequent Arrest</u>.

On December 8, 2023, R. Padilla's counsel tells the Court that Nathan Duran, who "saw the aftermath of the shooting," December 8, 2023, Tr. at 248:7-8 (Robert), refuses to testify:

> [Duran says, "]I don't want to go.  I said[, "]you have to go.["] He said[, "]I don't want to go, I don't want to have anything to do with it.  I said[, "]I'm sorry I can't release you from the subpoena[." H]e's still in Las Vegas as we stand here today."

December 8, 2023, Tr. at 248:22-249:1 (Robert).  The Court prepares a bench warrant for N. Duran, and orders the United States Marshals to pick up Duran in Las Vegas.  <u>See</u> December 8, 2023, Tr. at 249:16-251:24; Warrant for the Arrest of a Witness or Material Witness in a Pending Criminal Case at 1 (dated December 8, 2023), filed December 8, 2023 (Doc. 237).  The United States Marshals arrest N. Duran later that day.  <u>See</u> Warrant for the Arrest of a Witness or Material Witness in a Pending Criminal Case at 1 (executed December 8, 2023), filed January 18, 2024 (Doc. 268).

### l.    <u>Vanessa Montaño's Trial Testimony</u>.

After Acee concludes his testimony on December 8, 2023, R. Padilla calls Vanessa Montaño as a witness.  <u>See</u> Exhibit and Witness List at 5; December 8, 2023, Tr. at 253:2-13(Robert, Court, Montaño).  Montaño testifies that, during the summer of 2019, she was working as a hostess and manager at a restaurant in Las Vegas called Pino's Restaurant.  <u>See</u> December 8, 2023, Tr. at 253:25-254:14 (Robert, Montaño).  Montaño says that, on July 22, 2019, she attends a party at Atencio's apartment after finishing her shift at Pino's Restaurant.  <u>See</u> December 8, 2023, Tr. at 254:23-255:9 (Robert, Montaño).  Montaño testifies that Pino's Restaurant closes at 8:00 P.M., and she stays for approximately two hours to clean and lock up after closing.  <u>See</u> December 8, 2023, Tr. at 255:6-18 (Robert, Montaño).  Montaño says that, after leaving Pino's

Restaurant at around 10:00 P.M., she picks up a bottle of Jägermeister to bring to Atencio's apartment. See December 8, 2023, Tr. at 255:19-256:2 (Robert, Montaño). Montaño says that, when she walks into Atencio's apartment, she sees only Atencio in the living room. See December 8, 2023, Tr. at 256:8-12 (Robert, Montaño). Montaño testifies that, some time later, R. Padilla and Halpern come out of the bedroom, Atencio introduces them to Montaño, and the four of them take "a couple of shots," December 8, 2023, Tr. at 257:20 (Montaño), of Jägermeister, see December 8, 2023, Tr. at 257:13-20 (Robert, Montaño). Montaño says that: (i) the four of them chat in the living room for about twenty minutes; (ii) Halpern asks Atencio and Montaño for advice about oral sex; and (iii) after the discussion, R. Padilla and Halpern return to the bedroom. See December 8, 2023, Tr. at 257:23-258:4 (Robert, Montaño); id. at 261:5-22 (Armijo, Montaño). Montaño testifies that she stays at Atencio's until around 2:00 A.M., and that, after R. Padilla and Halpern return to the bedroom, Montaño does not observe them come out again. See December 8, 2023, Tr. at 258:5-14 (Robert, Montaño). Montaño says that she does not recall "any argument or issue with a person named Bobs" when she was at Atencio's apartment, December 8, 2023, Tr. at 260:22-23 (Armijo), and that she saw only Atencio, R. Padilla, and Halpern at Atencio's apartment that evening, see December 8, 2023, Tr. at 264:24-265:24 (Armijo, Montaño). Montaño also says that she does not have any "independent recollection," December 8, 2023, Tr. at 263:21-22 (Armijo), of the date she was at Atencio's house with R. Padilla and Halpern, and that she only says it is July 22, 2019, because R. Padilla's counsel told her:

> [Armijo:]    So I guess I'm wondering how you are able to tie it down to July 22nd, when your testimony is inconsistent with another person that was there, and you don't know Robert Padilla very well. I mean, how -- and you don't know Leroy Lucero. How is it that you're able to pin it down to July 22nd of 2019?
>
> [Montaño:]    I never said a date.

[Armijo:]    Oh, okay.  So you have no idea what date this was?

[Montaño:]    No, I never said the date.

[Armijo:]    Okay.  Well, I'm glad you clarified.  So this could have been in June of 2019?

[Montaño:]    Not that I could tell you.  I just know that the guy told me when it was.

[Armijo:]    I'm sorry?

[Montaño:]    A guy told me when it was and what day.

[Armijo:]    Okay.  Well, I'm not asking you to testify about what a guy told you and what day.  May I ask who that guy was that gave you a date?

[Montaño:]    I can't tell you his name.

[Armijo:]    Is he the one that was just asking you questions?

[Montaño:]    Yes, him.

[Armijo:]    Okay.  Well, you have no independent recollection of what day it was that you were at Janaya's house with Robert Padilla and Conferina?

[Montaño:]    Yes.  You're asking me about something happened four-plus years ago, and you expect me to remember that?

[Armijo:]    Well, the date is kind of important, given that these jurors are trying to determine whether or not Robert Padilla committed a murder.  So yes, I am.

[Montaño:]    I understand that, but I can't remember four-plus years ago.

December 8, 2023, Tr. at 262:22-264:1 (Armijo, Montaño).  See December 8, 2023, Tr. at 266:18-19 (Montaño)("I don't remember the day that I went to her house."); id. at 266:25-267:3 (Montaño)("I can't tell you the date that I went there.  You're asking me something that happened four-plus years ago.  I can't tell you the date.").  When the United States shows her Atencio Photograph VI, which Atencio testifies was taken on July 22, 2019, see December 6, 2023, Tr. at

305:5-308:19 (Atencio, Robert), Montaño says that she does not recognize the man sitting behind R. Padilla and Halpern, and she is certain that she did not see him the night that she saw R. Padilla and Halpern at Atencio's apartment.  See December 8, 2023, Tr. at 264:20-265:7 (Armijo, Montaño).

### m.    Rebecca Duran's Trial Testimony.

After Montaño concludes her testimony on December 8, 2023, the United States calls Rebecca Duran as a witness.  See Exhibit and Witness List at 5; December 8, 2023, Tr. at 270:4-17 (Robert, Court, Duran).  R. Duran describes her drug addiction and criminal history, which includes two convictions for drug-related offenses -- possession and trafficking -- and one conviction for escape from lawful custody.[11]  See December 8, 2023, Tr. at 271:7-273:1 (Robert, R. Duran).  R. Duran says that she served nine months in State prison for the felony escape conviction.  See December 8, 2023, Tr. at 272:9-273:1 (Robert, R. Duran).  R. Duran also says that her late husband, who is also M. Ruiz' cousin, was an SNM gang member.[12]  See December 8, 2023, Tr. at 285:13-287:6 (Robert, R. Duran).  R. Duran testifies that, in the afternoon of July 22, 2019, M. Ruiz and Joe Leyba come to her Las Vegas home and pick up Coca, who is hanging

---

[11]Providing more detail on the latter charge, R. Duran says that she cut off her GPS monitoring device.  See December 8, 2023, Tr. at 272:12-17 (Robert, R. Duran).

[12]R. Duran also says that: (i) R. Padilla is not in SNM; (ii) her late husband never talked about R. Padilla being in SNM; and (iii) she never has heard about R. Padilla being associated with SNM.  See December 8, 2023, Tr. at 286:6-18 (Robert, R. Duran); id. at 296:17-23 (Robert, R. Duran).  R. Duran also says that she has known R. Padilla since 1999, and she has bought drugs -- likely methamphetamines -- from him at least once, if not several times.  See December 8, 2023, Tr. at 290:23-293:1 (Robert, R. Duran).  R. Duran also acknowledges that, although she told the FBI in September, 2019, that Coca was an SNM member, she is not sure if he is in SNM or another rival gang, Los Carnales.  See December 8, 2023, Tr. at 294:18-295:21 (Robert, R. Duran); id. at 286:19-287:2 (Robert, R. Duran).

out with her son, Juan.  See December 8, 2023, Tr. at 276:2-277:16 (Robert, R. Duran).  R. Duran

testifies that her son wants to go with M. Ruiz, Leyba, and Coca, but that Coca tells her son to "sit

this one out."  December 8, 2023, Tr. at 279:5-20 (R. Duran, Robert).  R. Duran says that the three

men, driving a black Honda, then leave her house without her son, and Coca returns at around 3:00

A.M. on July 23, 2019.  See December 8, 2023, Tr. at 279:24-280:11 (Robert, R. Duran); id. at

282:14-24 (Robert, R. Duran).  R. Duran describes how Coca is "awake[,] like real awake,"

December 8, 2023, Tr. at 284:10-11 (R. Duran), and how she cannot tell if he is under the influence

of drugs or alcohol, see December 8, 2023, Tr. at 284:12-20 (Robert, R. Duran).  R. Duran says

that Coca stays at her house until 7:00 A.M., when he leaves in a black Honda.  See December 8,

2023, Tr. at 284:21-285:4 (Robert, R. Duran).

### n.    Conferina Halpern's Trial Testimony.

After R. Duran concludes her testimony on December 8, 2023, the United States calls

Conferina Halpern as a witness.  See Exhibit and Witness List at 5; December 8, 2023, Tr. at 330:6-

7 (Robert).  Halpern, who is Lucero's cousin, says that, for a two-month period in the summer of

2019, she dates R. Padilla.  See December 8, 2023, Tr. at 331:14-334:10 (Robert, Halpern); id. at

345:11-12 (Armijo, Halpern).  Halpern describes how, during this period, she "know[s R. Padilla]

to always have a gun," December 8, 2023, Tr. at 345:3-5 (Armijo, Halpern), and that he has a gun

on July 21, 2019, see December 8, 2023, Tr. at 345:6-10 (Armijo, Halpern).  Halpern also testifies

that, during this period, she attends a party at Atencio's apartment with R. Padilla, Leyba, D.

Padilla, and Montaño.[13]  See December 8, 2023, Tr. at 332:11-334:15 (Robert, Halpern).  Halpern

---

[13]Although Halpern does not identify Montaño by name, she says that a woman who
brought Jägermeister was at the party and that Halpern has only met this woman once -- at the
party at Atencio's apartment.  See December 8, 2023, Tr. at 334:7-24.

denies soliciting sexual advice from Atencio and Montano during this party. See December 8, 2023, Tr. at 349:24-350:21 (Armijo, Halpern). Halpern says that D. Padilla "was there at the beginning[] and then he left," although Halpern does not know when he left. December 8, 2023, Tr. at 334:2-4 (Halpern). Halpern cannot say with certainty that the night she describes is July 22, 2019. See December 8, 2023, Tr. at 335:2-21 (Robert, Halpern); id. at 349:10-23 (Armijo, Halpern). When asked if she remembers seeing Montaño on July 22, 2019, Halpern says: "If that's the date that she was there, then I guess that's the date. I don't remember. I'm so sorry." December 8, 2023, Tr. at 335:2-4 (Halpern). When asked if the night she describes -- the party with Montaño at Atencio's apartment -- is the "evening that Leroy Lucero was killed," Halpern responds, " I don't know." December 8, 2023, Tr. at 335:5-7 (Robert, Halpern). When asked if the Atencio Photographs are "of the party that night," December 8, 2023, Tr. at 335:17-18 (Armijo), Halpern responds: "Yes, that's what was told to me . . . I didn't see the date," December 8, 2023, Tr. at 335:19-21. See December 8, 2023, Tr. at 349:10-14 ("[Armijo:] . . . you can't even really say what the specific date was; correct? . . . [Halpern:] I can't. I saw those pictures, and everybody saying that it's from that night, so [] then it must have been from that night."). When asked if she has "any independent recollection of any dates," December 8, 2023, Tr. at 349:20-21 (Armijo), Halpern responds: "I remember the next day when my cousin called me to let me know that my cousin was dead," December 8, 2023, Tr. at 349:22-23 (Halpern). Halpern says that, after Atencio's party, she sleeps with R. Padilla in Atencio's bedroom, and that R. Padilla is in the bedroom the next morning. See December 8, 2023, Tr. at 337:21-338:9 (Robert, Halpern). Halpern says that, when she wakes up in Atencio's bedroom, M. Ruiz and R. Padilla are in the room, and M. Ruiz says: "Did you see, I got that Smurf fucker." December 8, 2023, Tr. at 342:4-6 (Robert, Halpern). See December 8, 2023, Tr. at 339:4-14 (Halpern, Robert). Halpern says that,

when R. Padilla got back into bed with her, his hands were cold, which was unusual for him.  <u>See</u>

December 8, 2023, Tr. at 358:13-19 (Armijo, Halpern).  When asked if R. Padilla left at any point

during the night, Halpern says: "Not that I know of.  I don't know."  December 8, 2023, Tr. at

338:10-12 (Robert, Halpern).  Halpern testifies further that she is unsure if R. Padilla left the room

during the night:

> [Armijo:]    Okay.  And then sometime after you fell asleep, you remembered -- or when you fell asleep, you remember the defendant next to you in bed; correct?
>
> [Halpern:]    I do, yes.
>
> [Armijo:]    Okay.  But you cannot tell the jury what time that was at; correct?
>
> [Halpern:]    No.  But I know it was at nighttime, because it was dark.
>
> [Armijo:]    Okay.  But at nighttime, but no specific time; correct?
>
> [Halpern:]    I yeah, don't know.
>
> [Armijo:]    Okay.  And then sometime later you heard a commotion in the bedroom.  And at that point, you heard the defendant and Marcos Ruiz entering the room; correct?
>
> [Halpern:]    Well, that's the thing.  I don't remember if he was getting out of bed, or if he was coming into the room.
>
> [Armijo:]    Okay.
>
> [Halpern:]    I don't know if he was opening the door, like from the inside, or if he was opening it from the outside.  I'm so sorry I don't remember that.

December 8, 2023, Tr. at 354:21-355:24 (Armijo, Halpern).  On cross-examination, Halpern

describes how she fears R. Padilla:[14]

> [Armijo:]    . . . there is one thing that you were consistent about, and that is that, as you sit here today, you are in fear of your life from Robert Padilla?

---

[14]Halpern also says that M. Ruiz threatens to kill her "if anything happened to Padilla." December 8, 2023, Tr. at 363:5-8 (Armijo).  Halpern cannot recall if M. Ruiz made this threat before or after Lucero's murder.  <u>See</u> December 8, 2023, Tr. at 363:9-11(Armijo, Halpern).

> [Halpern:]    Yes, I am.
>
> [Armijo:]    And you have expressed that fear on numerous occasions to the FBI; the fear from Robert Padilla?
>
> [Halpern:]    Yes, I have.
>
> [Armijo:]    And he once told you that he would kill you if you got involved with another man?
>
> [Halpern:]    Yes, he did.

December 8, 2023, Tr. at 343:22-344:7 (Armijo, Halpern).  Halpern also testifies that she believes

R. Padilla's friends and family have been paying her hush money:

> [Armijo:]    Okay.  So, as you sit here today, you've been paid hush money -- your term -- by persons you are believed to be associated with Robert Padilla?
>
> [Halpern:]    That's what I was told, that it was hush money.
>
> [Armijo:]    And you've been paid that money approximately six times?
>
> [Halpern:]    I don't know how many times, but they gave me a hundred dollar[s] several times.
>
> [Armijo:]    Okay.  And who is "they"?
>
> [Halpern:]    Different people.  Cynthia[15] one time. Devyn another time. Several different people.
>
> [Armijo:]    Okay.  And they would come up to you and give you money?
>
> [Halpern:]    Mr. Padilla would tell me to go pick up money.  And then to meet them wherever.  And then I would tell them sometimes, no, I don't want to. Just go, you need it, go get it, whatever.  And I would pick it up, yeah.  It stopped in 2020.

December 8, 2023, Tr. at 345:13-346:6 (Armijo, Halpern).  Halpern says that she received money

under these circumstances six times, and that, on one occasion, a man, whom Halpern believes

R. Padilla sent, comes to her home and tries to take her camping, which Halpern perceives as a

---

[15]"Cynthia" refers to Cynthia Quintana, the mother of R. Padilla's son, D. Padilla, and "Devyn" refers to D. Padilla.  See December 8, 2023, Tr. at 346:25-347:4 (Armijo, Halpern).

threat.  See December 8, 2023, Tr. at 369:21-371:7 (Armijo, Halpern).  Halpern also says that,

while R. Padilla is in pre-trial detention, R. Padilla calls Halpern several times about Atencio's

party:

> [Armijo:]    Now, during your time -- during the time that the defendant
> was initially arrested, he would call you; correct?
>
> [Halpern:]    Yes.
>
> [Armijo:]    And he would try and specifically tell you that he had been
> with you all night; correct?
>
> [Halpern:]    He was always talking about that night.
>
> [Armijo:]    Okay.
>
> [Halpern:]    I don't remember the conversations.  But I'm sure you guys
> have them recorded, and you guys can pull them up.

December 8, 2023, Tr. at 348:8-18 (Armijo, Halpern).

In this context, Halpern does not recall several damaging statements that she made during

an earlier FBI interview.  See December 8, 2023, Tr. at 351:12-353:2 (Armijo, Halpern).  These

forgotten statements include: (i) that, a couple of weeks before Lucero's murder, around July 4,

2019, Halpern overhears a conversation between R. Padilla and A. Ruiz, where the two men

discuss "taking out a cellmate," December 8, 2023, Tr. at 351:16-20 (Armijo, Halpern), where the

"the 'cellmate' was a reference to [Halpern's] cousin, Leroy Lucero," December 8, 2023, Tr. at

351:22-23 (Armijo)(quoting R. Padilla and A. Ruiz); (ii) that Halpern believes that she may have

been drugged at Atencio's party, see December 8, 2023, Tr. at 352:17-353:2 (Armijo, Halpern);

(iii) that, when Halpern wakes up in Atencio's bedroom after the party, she hears R. Padilla and

Ruiz entering the room,[16] see December 8, 2023, Tr. at 355:8-357:1 (Armijo, Halpern); (iv) that

Halpern heard M. Ruiz say either "I got that Smurf fucker," or, "we got that Smurf fucker,"[17]

December 8, 2023, Tr. at 357:2-11 (Armijo, Halpern).    When the United States tries to refresh

Halpern's memory by showing her a copy of the FBI report from her January 15, 2020, interview,

Halpern says that she does not remember telling the FBI that she overheard R. Padilla and A. Ruiz

discussing killing Lucero, or that she believes she may have been drugged at Atencio's party.  See

December 8, 2023, Tr. at 363:17-364:5 (Armijo, Halpern); id. at 353:7-17 (Armijo, Halpern).

During this portion of her testimony, Halpern expresses her reluctance to testify:

> [Armijo:]    Now, you have been -- you've blocked the defendant's calls;
> correct?
>
> [Halpern:]    Yes.
>
> [Armijo:]    And you blocked the calls because you felt that you were being
> pressured to testify a certain way; correct?
>
> [Halpern:]    No, I blocked his calls because I felt like I don't want to talk
> to him anymore.
>
> [Armijo:]    All right.  But are you saying that it had nothing to do with the
> fact that you're in fear of your life of him?
>
> [Halpern:]    Well, yes, I am afraid for my life.  And so, yes, that's part of
> it.
>
> [Armijo:]    And you're nervous testifying here; is that correct?
>
> [Halpern:]    Yes. . . .

---

[16]This prior statement is inconsistent with Halpern's trial testimony, where she says that she is unsure if R. Padilla and M. Ruiz were entering or exiting the room.  See December 8, 2023, Tr. at 354:21-355:24 (Armijo, Halpern).

[17]This prior statement is inconsistent with Halpern's trial testimony, where she says that she heard M. Ruiz say only: "I got that Smurf fucker." December 8, 2023, Tr. at 357:6-7 (Halpern). See id. at 342:4-6 (Robert, Halpern).

[Armijo:]     And, in fact, you had another interview with Nancy Stemo and Ry[an] Ellison with the United States on November 21st.  Do you recall that, just recently?

[Halpern:]     Yes.

[Armijo:]     And when you met with them, that was in Las Vegas; correct?

[Halpern:]     Yes.

[Armijo:]     And you again talked about how fearful you were; correct?

[Halpern:]     I can't remember.

[Armijo:]     You can't remember?

[Halpern:]     No, ma'am.

[Armijo:]     You didn't state that you were scared to testify?

[Halpern:]     I may have.

[Armijo:]     And that you're afraid that if you -- that you will be killed if you testify; correct?

[Halpern:]     Yes, ma'am.

[Armijo:]     And this was in relationship to, if you testified for the Government; correct?

[Halpern:]     This is in relation to this entire case.  I don't want to be here.

[Armijo:]     Okay.  And you even, again on the 21st, talked about the threats that you were receiving; correct?

[Halpern:]     Yes.

[Armijo:]     And do you still feel threatened today?

[Halpern:]     Yes.

December 8, 2023, Tr. at 364:6-365:25 (Armijo, Halpern).  See December 8, 2023, Tr. at 362:12-

14 (Halpern)("I really don't remember.  I am so sorry.  This is very stressful, and I cannot seem to

think correctly right now.").  Halpern also says that she has "felt threatened throughout this process . . . from the defendant."  December 8, 2023, Tr. at 370:6-10 (Armijo, Halpern).

    o.  **Nathan Duran's Trial Testimony.**

  On December 11, 2023, the trial's sixth day, R. Padilla calls Nathan Duran as a witness.  See Exhibit and Witness List at 5; Draft Transcript of December 11, 2023 Trial at 17:1-11 (Court, Gainor, N. Duran)("December 11, 2023, Tr.").  N. Duran is Lucero's next-door neighbor.  See December 11, 2023, Tr. at 18:11-16 (Gainor, N. Duran).  N. Duran testifies that, on the night of Lucero's murder, N. Duran hears two gunshots while playing video games with his son.  See December 11, 2023, Tr. at 18:20-19:4 (Gainor, N. Duran).  See id. at 27:2-4 (Gainor, N. Duran).  N. Duran says that he then brings his son into the bedroom with his son's mother, grabs his pistol, and walks outside.  See December 11, 2023, Tr. at 19:4-8 (N. Duran).  N. Duran testifies that, when he gets outside, he sees a "six foot, scrawny" man, December 11, 2023, Tr. at 19:15-16 (N. Duran), shoot Lucero in Lucero's driveway.  December 11, 2023, Tr. at 19:8-21 (N. Duran, Gainor).  See id. at 29:12-20 (Armijo, N. Duran).  N. Duran says that he then yells at the shooter and runs towards him, and the shooter runs into a dark car parked under a streetlight outside Lucero's home.  See December 11, 2023, Tr. at 20:14-21:5 (Gainor, N. Duran); id. at 27:10-21 (Gainor, N. Duran).  N. Duran testifies that, after the shooter flees, the car speeds away.  See December 11, 2023, Tr. at 31:10-13 (Armijo, N. Duran).  N. Duran recalls that the LVPD interview him several times, including the night Lucero is murdered, and about a week later.  See December 11, 2023, Tr. at 21:6-9 (Gainor, N. Duran); id. at 24:15-25:3 (Armijo, N. Duran).  N. Duran does not recall, however, telling the police at his second interview that Coca and M. Ruiz shot Lucero.  See December 11, 2023, Tr. at 21:16-18 ("[Gainor:] Didn't you tell the police that it was Mr. Coca and Mr. Ruiz who did the shooting? . . . [N. Duran:] I don't recall any of the names.")(Gainor,

N. Duran).  N. Duran says that he cannot identify, and has not identified, either the shooter or the

driver:

> [Armijo:]    And back o[n] initial day of July 22, 2019, you did not have any names to give law [enforcement] as to who it was, correct?
>
> [N. Duran:]    No.
>
> [Armijo:]    Because you did not see the face of the person, correct?
>
> [N. Duran:]    No.
>
> [Armijo:]    And when you were interviewed a second time, you had no names to give law enforcement, correct?
>
> [N. Duran:]    No.
>
> [Armijo:]    You didn't see a face[,] correct[?]
>
> [N. Duran:]    [N]o.
>
> [Armijo:]    And if they asked you about [a] name it wasn't any name that you supplied them with, because you didn't see anybody, correct?
>
> [N. Duran:]    No.
>
> [Armijo:]    All right.  And so as you sit here today, since you didn't [see a] person's face, can you not tell this jury a name of who the shooter was, correct?
>
> [N. Duran:]    I can[not].
>
> [Armijo:]    Or who the driver was, correct?
>
> [N. Duran:]    No.
>
> [Armijo:]    Or if there was even another person in the car, correct?
>
> [N. Duran:]    No.

December 11, 2023, Tr. at 32:4-33:4 (Armijo, N. Duran).  On cross-examination, N. Duran admits

that, several days earlier, the U.S. Marshals arrested him for refusing to testify at R. Padilla's murder

trial.  See December 11, 2023, Tr. at 24:16-22 (Armijo, N. Duran).  N. Duran also says that he is

afraid to testify, and he had told the United States that he does not want to testify when he spoke

with the prosecution team approximately one month before R. Padilla's murder trial.  See December

11, 2023, Tr. at 23:23- 24:14 (Armijo, N. Duran).

### p.    Acee's December 11, 2023, Trial Testimony.

After N. Duran concludes his testimony, the United States re-calls Acee as a witness.  See

Exhibit and Witness List at 5; December 11, 2023, Tr. at 34:9-13 (Castellano, Acee).

Acknowledging that R. Padilla's counsel has suggested, as a defense, that M. Ruiz was at the scene

of Lucero's murder -- and that M. Ruiz, not R. Padilla, killed Lucero -- the United States asks Acee

if M. Ruiz is "scrawny."  December 11, 2023, Tr. at 34:18 (Castellano).  See December 11, 2023,

Tr. at 34:15-17 (Castellano).  Acee, who has met M. Ruiz, says that M. Ruiz is not scrawny, and

during "that summer he was close to 300 pounds, he's lost a little bit of weight [since] then but he's

[definitely] larger than me and I'm 215."  December 11, 2023, Tr. at 34:17-21.  Acee testifies further

that Acee would not "describe [M. Ruiz] as the person that Mr. Duran just testified to as a person

who was scrawny."  December 11, 2023, Tr. at 22-25 (Castellano).   After the United States

concludes Acee's third direct examination, R. Padilla's counsel declines to cross-examine him.  See

December 11, 2023, Tr. at 35:7-12 (Court, Gainor).

### q.    R. Padilla's Murder Conviction.

On December 12, 2023, the jury finds R. Padilla guilty on all eight counts.  See Verdict at

1-3 (dated December 12, 2023), filed December 12, 2023 (Doc. 255).  The jury does not make any

factual findings, but it finds that the United States showed "beyond a reasonable doubt that the

defendant, Robert Padilla, committed first degree murder," and that R. Padilla is guilty of

"retaliation against a witness, victim, or informant."  Verdict at 1-2.  See Verdict at 1-3.

4.      <u>**Post-Trial Developments**</u>.

In January, 2024, after R. Padilla's conviction, Atencio allegedly changes her recollection whether the party at her apartment occurred on July 21, 2019, or on July 22, 2019 -- the night that Lucero is murdered.  <u>See</u> MNT at 5; United States' Response to Defendant's Motion for New Trial at 4, filed March 5, 2024 (Doc. 280)("MNT Response").  R. Padilla then moves for a new trial, and the Court holds a hearing on April 25, 2024.  <u>See</u> MNT at 1-11; April 25, 2024, Hearing Minutes at 1.  At the April 25, 2024, hearing, Atencio does not testify, and the parties agree that they need another evidentiary hearing, which is scheduled for June 10, 2024.  <u>See</u> April 25, 2024, Hearing Minutes at 1-2; Transcript of April 25, 2024, Hearing at 25:6-27:5 (Court, Anderson, Mitsunaga, Robert, Castellano)("April 25, 2024, Tr."); <u>id.</u> at 31:1-7 (Court).  After the April 25, 2024, hearing, R. Padilla moves the Court for an order compelling the United States to grant Atencio immunity against a perjury charge if she testifies at the upcoming June 10, 2024, hearing.  <u>See</u> Immunity Motion at 1-15.  The Court then holds two evidentiary hearings -- one on June 10, 2024, and one on July 8, 2024.  <u>See</u> June 10, 2024, Hearing Minutes at 1; July 8, 2024, Hearing Minutes at 1.

After the July 8, 2024, hearing, R. Padilla files a supplemental motion for new trial.  <u>See</u> Mr. Padilla's Supplemental to Motion for New Trial at 1, filed August 27, 2024 (Doc. 330)("MNT Supplement").  The MNT Supplement recounts parts of the June 10, 2024, hearing, and offers a new ground for granting R. Padilla a new trial: that the United States' alleged failure to disclose Atencio's uncertainty regarding her testimony is a due process violation pursuant to <u>Brady v. United States</u>, 397 U.S. 742 (1970)("<u>Brady</u>").  <u>See</u> MNT Supplement at 3-12.  Additionally, the MNT Supplement attaches a transcribed conversation between Atencio and Joe Romero, an

attorney who represented[18] Atencio in an unrelated case.  See Transcript of April 25, 2024, Hearing at 5:5-7 (Robert)("April 25, 2024, Tr."); Telephone Conversation between Janaya Atencio and Joe Lnu [sic] at 2:1-22:20 (dated January 8, 2024), filed August 27, 2024 (Doc. 330-1)("Romero/Atencio Telephone Conversation").   During her conversation with Mr. Romero, Atencio describes her changed recollection and how she allegedly told the United States about her uncertainty when she was served a trial subpoena.  See Romero/Atencio Telephone Conversation at 11:19-12:16.  Finally, the parties submit written closing arguments for R. Padilla's MNT.  See Mr. Padilla's Written Closing Argument in Support of His Motion for New Trial at 1-30, filed October 7, 2024 (Doc. 338)("Padilla MNT Closing Arguments"); United States' Written Arguments Related to the Defendant's Motion and Supplement to Motion for New Trial at 1-18 (Doc. 337)("United States MNT Closing Arguments").

First, the Court describes how Atencio came to revise her testimony in early 2024.  Second, the Court describes R. Padilla's MNT.  Third, the Court describes the April 25, 2024, Hearing. Fourth, the Court discusses the Immunity Motion.  Fifth, the Court recounts the June 10, 2024, hearing, and the July 8, 2024, hearing.  Finally, the Court summarizes the parties' supplemental briefing and written closing arguments.

### a.    Atencio's Revised Recollection.

In January, 2024, Atencio revises her recollection of key events about which she testified after she speaks with R. Padilla about the party at her apartment and reviews a photograph of the party.  According to her revised recollection, the party about which she testified -- where R. Padilla left early in the evening -- occurred on July 21, 2019, and not on July 22, 2019.  Between January

---

[18]Mr. Romero also represents R. Padilla in his drug trafficking case -- United States v. Padilla, No. CR-19-3113 JB (D.N.M).

8, 2024, and January 14, 2024, while R. Padilla is incarcerated and awaiting sentencing in his murder case at Doña Ana County Detention Center in Las Cruces, New Mexico, Atencio and R. Padilla speak over the telephone twenty-five times.  See United States Summary of Padilla and Atencio Telephone Calls at 1-9 (dated June 6, 2024)(admitted as United States Hearing Exhibit 1 on June 10, 2024)("United States Telephone Call Summaries").  On January 8, 2024, R. Padilla calls Atencio fifteen times between 12:00 P.M. and 9:00 P.M.  See United States Telephone Call Summaries at 1-5.  The first seven calls occur successively between approximately 12:10 P.M. and 2:15 P.M.; R. Padilla calls Atencio back each time that the preceding call terminates, when R. Padilla's telephone credits expire.  See United States Telephone Call Summaries at 1-3.  See e.g., Robert Padilla/Janaya Atencio Jail Call #1 at 16:30-34 (dated January 8, 2024)(admitted as United States Hearing Exhibit 2 on June 10, 2024)("Padilla/Atencio Jail Call 1").  During these first seven calls, R. Padilla and Atencio discuss Atencio's testimony at Padilla's murder trial regarding her apartment party and various details about that party.  See, e.g., Padilla/Atencio Jail Call 1 at 5:45-7:30(R. Padilla, Atencio).    Throughout the calls, R. Padilla insists that Atencio testified inaccurately whether he left her apartment during the party.  See, e.g., Padilla/Atencio Jail Call 1 at 5:15-5:45 (R. Padilla, Atencio).  R. Padilla expresses frustration over Atencio's testimony and how, in his view, her mistaken testimony led to his murder conviction.  See, e.g., Padilla/Atencio Jail Call #2 at 1:45-1:50 (dated January 8, 2024)(R. Padilla)(admitted as United States Hearing Exhibit 3 on June 10, 2024)("Padilla/Atencio Jail Call 2)("Your mistake cost me my life.").  R. Padilla also insists that Atencio's decision to send her Snapchat photos to her attorney -- instead of R. Padilla's family or attorneys -- similarly was fatal to his defense.  See e.g., Padilla/Atencio Jail Call 2 at 2:45-3:30 (R. Padilla)(asserting that Atencio "could have saved my life with those pictures");    Padilla/Atencio    Jail    Call    #3    at    14:15-14:25    (dated    January    8,

2024)(R. Padilla)(admitted as United States Hearing Exhibit 4 on December 10, 2024)("Padilla/Atencio Jail Call 3)("You shouldn't have made that decision [regarding the pictures' importance] yourself; my life is on the line.").  Throughout the telephone conversations, R. Padilla reminds Atencio of her testimony's consequences.  See, e.g., Padilla/Atencio Jail Call 1 at 9:00-9:05 (R. Padilla)("I'm going to prison for the rest of my life."); Padilla/Atencio Jail Call 3 at 7:00-7:10 (R. Padilla)("My kids don't deserve not to have a dad."); Padilla/Atencio Jail Call #6 at 11:30-40 (dated January 8, 2024)(R. Padilla)(admitted as United States Hearing Exhibit 7 on December 10, 2024)("Padilla/Atencio Jail Call 6")("I haven't seen anybody in my family in four years or four months, not even seen, I'm dying. I haven't even seen my kid. They don't even know what I look like anymore."); id. at 12:55-13:00 (R. Padilla)("I have a little baby boy that just fucking knows my voice."); id. at 13:50-14:00 (R. Padilla)("You know how many people would like to kill me because they think I'm an SNM member now?"); id. at 15:30-15:45 (R. Padilla)("What if I don't get out of prison because I got killed because of some other [sic] mistake?").

Over the first seven telephone calls, R. Padilla recounts Atencio's party and asserts that he does not leave her apartment that evening.  See, e.g., Padilla/Atencio Jail Call 1 at 7:00-7:30 (R. Padilla, Atencio); Padilla/Atencio Jail Call 2 at 6:30-7:25 (R. Padilla, Atencio).  In the earlier telephone calls, Atencio agrees with some of R. Padilla's descriptions, but she reiterates that she does not remember R. Padilla spending the night.  See Padilla/Atencio Jail Call 1 at 12:58-13:10 (Atencio)("I remember all that . . . other stuff, but I can't remember fucking if you guys left or not. I thought you guys had left in Devin's car because you guys were arguing."); Padilla/Atencio Jail Call 2 at 6:30-7:25 (R. Padilla)(trying to jog Atencio's memory by describing how Montaño brought a bottle of Jägermeister and they drank a "whole liter"; Atencio agrees with certain

details -- including that Montaño brought the Jägermeister, Atencio posted a photograph on Snapchat of R. Padilla eating Cheetos, and Halpern asked for sexual advice before returning to Atencio's room with R. Padilla -- but she does not agree with Montaño's testimony that R. Padilla never left Atencio's party, and she suggests that Montaño must "remember[] better than I do"). As the conversations continue, R. Padilla and Atencio paint a picture of a party at Atencio's apartment where the following events occur. First, R. Padilla and Archuleta argue on a cellular phone call after Atencio posts a photograph on Snapchat of R. Padilla eating Cheetos. see Padilla/Atencio Jail Call 2 at 4:00-4:25 (Atencio)("You were drunk as fuck. I know that. You were like super drunk, remember? That's why I was taking videos you eating those Cheetos. Because your eyes were all squinty and you're all shoving Cheetos down your mouth, all laughing. You remember? And so I posted that picture and that's when Bobs hit you up. And I do remember Vanessa going and we chilled there."); Padilla/Atencio Jail Call #4 at 5:40-45 (dated January 8, 2024)(R. Padilla)(admitted as United States Hearing Exhibit 5 on June 10, 2024)("Padilla/Atencio Jail Call 4")("I talked to Bobs . . . he said . . . she sent me pictures of you with your hands all full of Cheetos"). Second, Montaño brings a bottle of Jägermeister. See Padilla/Atencio Jail Call 2 at 6:40-45 (Atencio)("I do remember Vanessa there, showing up with that bottle."); Padilla/Atencio Jail Call #5 at 3:30-3:35 (dated January 8, 2024)(Atencio)(admitted as United States Hearing Exhibit 6 on June 10, 2024)("Padilla/Atencio Jail Call 5")("I remember Vanessa taking that bottle"). Third, Atencio's friend, Naomi Varela, arrives at Atencio's party around midnight, and stays until at least 2:00 A.M.. See Padilla/Atencio Jail Call 5 at 2:30-3:40 (Atencio, R. Padilla)("[D]o you remember Naomi, my friend? Naomi Varela . . . she was there, dude . . . she didn't leave my house till like two in the morning. But the thing is, Rob, is that she remembers you leaving like around like probably like around two in the morning, like maybe half an hour

before she left."); id. at 4:40-4:50 (Atencio)(stating that Naomi "didn't get there till like midnight"); Padilla/Atencio Jail Call #7 at 3:30-3:45 (dated January 8, 2024)(Atencio)(admitted as United States Hearing Exhibit 6 on June 10, 2024)("Padilla/Atencio Jail Call 7")("Naomi is gonna fucking probably stop talking to me because I told you that she was there."); id. at 3:30-3:45 (R. Padilla)("I already knew about Naomi.  I just didn't know her last name.").  Fourth, R. Padilla and Halpern spend time alone in Atencio's room; at some point, they emerge from the room, and Halpern seeks sexual advice from Atencio and Montaño.  See Padilla/Atencio Jail Call 2 at 6:45-6:50 (Atencio)("I do remember you and Confe going to the room and then now that I do remember Confe [saying][19] she knows how to give head."); Padilla/Atencio Jail Call 5 at 3:35-

---

[19]Because Atencio's voice cuts out for a few seconds, see Padilla/Atencio Jail Call 2 at 6:49-52, the Court is not certain that Atencio says the word "saying" here.  Regardless of what was said during the few seconds that are missing from the recording, however, Atencio recalls the specific discussion of sexual advice.  See Padilla/Atencio Jail Call 2 at 6:45-6:50 (Atencio).  Atencio's recollection is consistent with Montaño's trial testimony:

> [Armijo]     Okay.  Now, you said you gave Janaya some sexual -- or not Janaya -- Confe some sexual advice?
>
> [Montaño]    Yes.
>
> [Armijo]    What was going on that you needed to give her advice?
>
> [Montaño]    I can explain.
>
> [Armijo]    Well, I'm asking you to.
>
> [Montaño]    It's a little awkward.  She just needed advi[c]e about a sexual tip.  And we gave her that advice.
>
> [Armijo]    Okay.  What sexual tip was that?
>
> [Montaño]    I don't know how to put it in normal grammar.  But oral sex.
>
> [Armijo]    All right.  And so you gave her that advice?
>
> [Montaño]    Yes, we did.

3:40 ("I did Confe's makeup, I do remember you guys going to the room and all that."). Fifth, R. Padilla leaves in the early morning hours and comes back to Atencio's apartment.  See Padilla/Atencio Jail Call 5 at 3:50-4:25 (Atencio)( "I do remember you leaving at like two in the morning."); id. at 3:50-4:25 (R. Padilla)("Where did I go? Where would I've went?"); id. at 3:50-4:25 (Atencio)("I don't know, dude, I remember you and Devin and Confe getting in the car, and Joe Leyba, getting in Devin's car, the, the red Cadillac, in the back of the apartment and you guys left, dude.  But then you guys came back. But that wasn't until like 2 in the morning."); id. at 3:50-4:25 (R. Padilla)("Are you sure we left?"); id. at 3:50-4:25 (Atencio)("Dude, my friend Naomi was there and she was sober.  She helped me clean my house I was all drunk and, when you guys left, it was a big old mess."); id. at 7:10-7:25 (R. Padilla)("If I left at 2:00 A.M., that'd be great."); id. at 7:10-7:25 (Atencio)("Dude, maybe you guys went and took Joe Leyba home.  Dude, I don't know like what you guys did when you guys left the apartment."); id. at 7:10-7:25 (R. Padilla)("That's probably what exactly happened. You're probably exactly right.").

When R. Padilla questions whether some of these events may have happened on different nights, Atencio maintains that everything they are discussing happened on one night.  See Padilla/Atencio Jail Call 5 at 6:56-7:00 (R. Padilla)("Yeah, but we partied at your house more than once."); id. at 6:56-7:00 (Atencio)("But I have pictures of that night, Rob."); id. at 15:30-50 (R. Padilla)("We partied at your house another night that I remember."); id. at 15:30-50 (Atencio)("Yeah, Rob, but the reason I'm remembering this exact night is because you were

---

[Armijo]     Who is "we"?

[Montaño]     Me and Janaya.

December 8, 2023, Tr. at 261:5-22 (Armijo, Montaño).

arguing with Bobs."). Neither R. Padilla nor Atencio say, at any point during the first seven calls, that there were two parties at Atencio's apartment on consecutive nights, or that Atencio took photographs of a party at her apartment other than the one they are discussing. See generally Padilla/Atencio Jail Calls 1-7. Atencio agrees to retrieve the photographs of the party from her computer. See Padilla/Atencio Jail Call 6 at 13:00-13:10 (Atencio)("I'm gonna get that computer, and I'm gonna do what I can."); Padilla/Atencio Jail Call 7 at 7:45-9:00 (R. Padilla, Atencio). R. Padilla is certain that those Snapchat photographs will exonerate him, because they will show that he was at Atencio's apartment when Lucero was murdered. See Padilla/Atencio Call 2 at 3:14-3:30 (R. Padilla)("You could have sent those pictures to Devin, anybody . . . . You could have put them on the Internet. They're not illegal pictures. You could have just gave them to anybody. But those pictures were showing where I was at. They were showing the time."); Padilla/Atencio Jail Call 6 at 9:25-9:30 (Padilla)("I'm telling you, all those pictures -- I know you're going to have a picture of [sic] a video almost at the same of when that happened."); id. at 13:35-13:45 (R. Padilla)("If there's a picture of me or a video showing me on the couch at ten forty-five and the murder happened [at] ten forty-five, I don't have to get sentenced."). By the end of the seventh call, R. Padilla tells Atencio that R. Padilla's brother, Angelo, is going to call Atencio, and then R. Padilla is going to call Atencio back around 6:00 or 7:00 P.M. See Padilla/Atencio Jail Call 7 at 15:20-35 (R. Padilla). When Atencio asks R. Padilla whom A. Padilla's attorney is, R. Padilla tells her that it is Joe Romero. See Padilla/Atencio Jail Call 7 at 10:05-10:20 (Atencio, R. Padilla).

Sometime between 2:15 P.M. and 2:59 P.M. on January 8, 2024, Atencio and Mr. Romero speak on the phone about Atencio's revised recollection. See Padilla/Atencio Jail Call 7 at 16:24 (indicating that Padilla/Atencio Call 7 lasted sixteen minutes and twenty-four seconds);

Padilla/Atencio Jail Call #8 at 1:20-1:30 (Padilla, Atencio)(admitted as United States Hearing Exhibit 9 on June 10, 2024)("Padilla/Atencio Jail Call 8"); United States Telephone Call Summaries at 3 (indicating that Padilla/Atencio Jail Call 7 begins at 1:58 p.m., and Padilla/Atencio Jail Call 8 begins at 2:59 P.M.). Atencio tells Mr. Romero that the party about which she testified at R. Padilla's murder trial occurred on July 21, 2019, instead of on July 22, 2019. See Romero/Atencio Telephone Conversation Transcript at 1:11-13 (Romero, Atencio). Atencio says that her new recollection aligns with what Thomas Jeffrey, her former and current boyfriend, see MNT Response at 3, has been telling her since before she testified at R. Padilla murder's trial, see Romero/Atencio Telephone Conversation Transcript at 1:14-16-20. Atencio also says that Jeffrey, who "owned the apartment building [where Atencio lived] at the time of Mr. Lucero's murder," MNT at 8, has been telling her that the building's surveillance video shows that R. Padilla is at Atencio's apartment on the night Lucero is murdered. See Romero/Atencio Telephone Conversation Transcript at 14:19-15:15 (Romero, Atencio). Atencio says that Jeffrey checked the surveillance video that evening after another Las Vegas resident, "Toosa," calls Jeffrey to tell him about Lucero's murder. Romero/Atencio Telephone Conversation Transcript at 16:05-08 (Romero)("Okay. And then at whatever time [Toosa] called. And then -- and then you're saying, if I understood you correctly, that Tom then looked over to the apartment where you were staying and he saw Robert there?"); id. at 16:08-16:11 (Atencio)("Yeah. He saw that Rob was there. See and Tom's been telling me this every [sic] since the beginning but I've been arguing with him."). Although Mr. Romero notes that there must be a record of the telephone conversation between Jeffrey and Toosa, see Romero/Atencio Telephone Conversation Transcript at 16:01-03, R. Padilla has not produced this telephone record or any surveillance footage from July 22, 2019, that purportedly shows that he was at Atencio's apartment that entire evening.

Atencio tells Mr. Romero that she now believes she can sort out the correct dates, because she discovered a Snapchat photograph that has a date stamp on it:

> Rob's all telling me this and then he's like, see but that was the night before and I was being [sic] and then once I found that Snapchat and I'm like oh, my gosh, you were right too, you know his memory of what he remembers is better than mine. . . and [the Snapchat photograph] has the date.  It doesn't have the time of it but has the date.

Romero/Atencio Telephone Conversation Transcript at 6:3-16 (Atencio).   Atencio tells Mr. Romero that some events that she and R. Padilla discussed over the first seven jail calls -- Atencio posting on Snapchat a photograph of R. Padilla eating Cheetos, Varela coming to Atencio's apartment, and R. Padilla leaving Atencio's apartment with Halpern, Leyba, and D. Padilla for a short period around 2:00 A.M. -- occurred on July 21, 2019, rather than on July 22, 2019.  See Romero/Atencio Telephone Conversation Transcript at 6:24-7:1 (Atencio)("[T]he reason I'm remembering this date is 'cause he's arguing with Bobs (phonetic).  And the day that he's arguing with Bobs he started arguing with Bobs because I posted that picture and that's the day they were arguing."); id. at 7:14-16 (Romero)("So on the 21st, if I remember what you told me earlier, that was the date that both -- and you tell me that both Vanessa [Montaño] and Naomi [Varela] were at your house?"); id. at 7:16-18 (Atencio)("No, no, no.  So it was just Vanessa that -- I mean it was just Naomi that night.").

> [Romero]:    Okay.  And then on the 21st, which is the date you thought all this happened and that's the date you were testifying to, that day Robert, from what you can remember, Robert did leave that night about 2:00 in the morning?
>
> [Atencio]:    Yeah.  Yeah and that was the night of the wrong night that I was thinking you know he did leave.  . . . You know and that's what I was saying that he left because it was the wrong night.
>
> [Romero]:    And that night that he left, he did leave with Confidena [sic] and Devin but you said it was about 2:00 in the morning?

> [Atencio]:    Yeah.  Yeah he left with -- he left with Confi (phonetic), Joe.
> I think it was Joe [Leyba] and they were all getting in -- -in -- they were getting in
> Devin's red car and it was parked on railroad and M (phonetic).

Romero/Atencio Telephone Conversation Transcript at 5:16-6:5 (Romero, Atencio).  Atencio also

tells Romero that some events that she and R. Padilla discussed over the first seven jail calls -

- R. Padilla and Halpern spending time alone in Atencio's room, Montaño bringing a bottle of

Jägermeister, and Halpern discussing sexual advice with Atencio and Montaño -- occurred on July

22, 2019:

> [Romero]:    Okay.  So on the 21st, if I remember what you told me earlier,
> that was the date that both -- and you tell me that both Vanessa and Naomi were at
> your house?
>
> [Atencio]:    No, no, no. So it was just Vanessa that -- I mean it was just
> Naomi that night. And then the next day 'cause so I have another picture too of why
> I remember too is because I have another picture the 21st where we were drinking
> like a gallon like I told you of Jager.  And the night that Vanessa was there which
> was the next night, we were drinking a fifth of Jager and it came with two shot
> glasses and she brought it after work.  And she didn't get there out of work till like
> 11:00 and she stayed there.   We stayed partying till [sic] or she left and I do
> remember now like Confi and them being in the room.  And the only reason I
> remember is because how Rob said that Confi was all asking her that question, you
> know?
>
> > [Romero]:    Asking Vanessa?
> >
> > [Atencio]:    Yeah.
> >
> > [Romero]:    Okay. And Naomi was there on the 22nd or the 21st?
> >
> > [Atencio]:    Naomi was there on the 21st.
> >
> > [Romero]:    Okay. So was Vanessa also there on the 21st or just the 22nd?
> >
> > [Atencio]:    Just the 22nd.

Romero/Atencio Telephone Conversation Transcript at 7:14-8:11 (Romero, Atencio).   See

Romero/Atencio Telephone Conversation Transcript at 8:16-18 (Romero, Atencio)("So Vanessa

[Montaño] was testifying about the 22nd and remembering 'cause she wasn't there on the 21st if I

understand you correctly."); id. at 8:18-20 (Atencio)("Yeah so she was testifying on the right day. I was testifying on the wrong day.").  Atencio's confidence that Varela and Montaño were at her apartment at different nights -- but that on both nights, Atencio and her friends drank Jägermeister -- is inconsistent with her discussion with R. Padilla earlier in the afternoon on January 8, 2024, where she says both that Varela remembers Montaño being there, and that she does not know if Varela remembers Montaño being there.  See Padilla/Atencio Jail Call 5 at 4:25-4:30 (R. Padilla)("Does [Naomi] also remember Vanessa?"); id. at 4:30-35 (Atencio)("Yeah, I just asked her."); id. at 15:20-25 (R. Padilla)("You're saying Naomi remembers Vanessa?"); id. at 15:25-30 (Atencio)("I don't know if she remembers Vanessa being there or not.").

When Mr. Romero asks Atencio what she remembers about M. Ruiz arriving at her apartment on the morning of July 23rd, Atencio says

> I remember because he showed up and then I do remember him saying -- I can't remember if he admitted to killing [Lucero] or he is talking about him and it's because he said he killed Michael Ortego too.  So I googled I was like 'cause I didn't know Smurf so I didn't google him 'cause I didn't know who he was.

Romero/Atencio Telephone Conversation Transcript at 9:03-08 (Atencio).  Atencio also says that she is "pretty sure," Romero/Atencio Telephone Conversation Transcript at 9:19 (Atencio), that she has a photograph of M. Ruiz and his brother "hanging out in the living[]room," Romero/Atencio Telephone Conversation Transcript at 10:01-02 (Atencio), of her apartment on July 23, 2019, see Romero/Atencio Telephone Conversation Transcript at 9:15-10:10 (Romero, Atencio).  R. Padilla has not produced this photograph.  In sum, Atencio asserts that there were two parties at her apartment on consecutive evenings and that, at R. Padilla's murder trial, Atencio mistakenly testified regarding the first party, on the evening of July 21, 2019, when R. Padilla left briefly in the early morning hours of July 22, 2019.  Halpern did not testify that she slept over with

R. Padilla at Atencio's apartment more than once, and no trial witness testified that there were two consecutive parties at Atencio's apartment.  When Mr. Romero asks Atencio the key question -- whether, at the second party on the evening of July 22, 2019, R. Padilla ever left her apartment, Atencio says that he did not:

> [Romero]:    Oh, okay. So on the 22nd, as far as you can remember, they didn't leave at all?
>
> [Atencio]:    No, now -- no, they didn't 'cause now that I'm thinking of the right day, no, he didn't because I remember him being there and then I remember 'cause that's why I couldn't remember because that was that day I remember for sure because of the pictures on July 21st happened, they did leave that night.  So then that's why I was being confused.  I was like, Rob, no, you left, you know.  And now that I know I'm talking about the wrong night, he was there that night and we were drinking, you know.  And then I do remember because I remember [M. Ruiz] showing up in the morning.  But what I couldn't remember I was like how did they leave and then [M. Ruiz] show up in the morning and Rob's there.  I couldn't remember how Rob got back over there but obviously getting the wrong date.

Romero/Atencio Telephone Conversation Transcript at 4:9-24 (Romero, Atencio).

Atencio tells Mr. Romero several times that, when Acee served her a trial subpoena, she told him that her expected testimony might be about the wrong night.  See Romero/Atencio Telephone Conversation Transcript at 6:17-22 (Atencio); id. at 19:14-17 (Atencio)("And I told them the federal agents too.  And I even -- I think I'm pretty sure I told the federal agents. I was like you know Tom['']s thinking that I'm having the wrong day you know.").  Cf. November 16, 2023, Atencio 302 at 1 (indicating that, on November 14, 2023, Acee serves Atencio a trial subpoena for Padilla's murder trial, and documenting how Atencio: (i) "describes being anxious to get the whole thing behind her"; (ii) tells investigators that R. Padilla "had been calling her and her fiancee [sic] frequently" and "wanted her to testify that he had been at her apartment all night, thus could not have been involved in the murder of Leroy LUCERO"; and (iii) says that D. Padilla

and his mother, Cynthia Quintana, were also "pressuring . . . intimidating and bothering her on behalf of Robert PADILLA.")(capitals in original).  Atencio recounts how she raises her concerns to Acee, who allegedly tells her that she does not have her dates mixed up:

> I told the federal agent when he came to my house to subpoena me. . .  I told him. "Are you sure we're talking about the right day?["] I go[, "]'cause my fiancé is remembering a different day.["]  I was all -- I was all the only reason I remember this day is 'cause Bobs -- Bobs was talking.  You know when people are making death threats to each other and you know like getting me involved like calling my phone, you're gonna remember that, you know? . . .  Well all that happened on the 21st but I'm all referring to that day.  And I asked the federal agent, I'm like, "Are you sure it's the day Bobs and him are arguing?"  He's like, "I'm sure I'm sure," you know.  He's like so I told him, "Okay, is there any way you can get my text messages from here until the trial and see."  And he's, "Oh, we can't pull up old text messages" although 'cause that's the only way I'll know for sure we're talking about the right day.  So I told him since the beginning that I was unsure of it being the right day and he -- he assured me that I was talking about the right day.

Romero/Atencio Telephone Conversation Transcript at 11:20-12:16 (Atencio)(ellipses and brackets added).  See id. at 7:1-4 (Atencio)("And I asked the federal agent I'm like is it the right day? You know he's arguing but I even asked him, can you get my phone records? And he said no."); id. at 13:21-14:4 (Atencio).

On multiple occasions, Mr. Romero suggests that Atencio would not be in legal trouble for changing her testimony based on her new recollection:

> [Romero]:    . . . you know when last time when you had called me I guess after you had testified and you were worried 'cause you -- you remembered seeing --
>
> [Atencio]:    Marcos.
>
> [Romero]:     -- correct me if I'm wrong. -- Marcos there the next morning but when you testified you didn't remember and you weren't sure.
>
> [Atencio]:    Yeah because I was thinking of the wrong day and --
>
> [Romero]:    Yeah so --
>
> [Atencio]:     -- that was (inaudible) that's what's --

> [Romero]:    -- I think that's what -- that's what would -- would explain -- would explain everything in a way that you know you weren't intentionally lying about anything, you just were confused about the dates.  And then the -- the Snapchat picture sort of jogged your memory now about it for sure.

Romero/Atencio Telephone Conversation Transcript at 10:25-11:18 (Romero, Atencio)(ellipses added).  See id. at 18:4-16 (Romero)("Well you made an honest mistake, right?"); id. at 19:10-13 (Romero)(responding to Atencio's description of how her conversations with R. Padilla and discovery of the Snapchat photograph jogged her memory, and saying: "Well to me that's -- that's an honest -- you know, especially when all these dates kind of blur together you know.  And Snapchat that has a date stamp can really truly refresh your recollection about that right?").  When R. Padilla speaks with Atencio after her telephone call with Romero, R. Padilla echoes this sentiment:

> I'm gonna to tell you this. I don't want you to say anything that's not true and I don't want you to get in trouble in any way. But I promise you on my son's life, if you forget something and you think you're scared of the FBI just because you forgot to tell him the first time or something, you can't get in trouble. All you can do is say it was a mistake. The only time people get in trouble for lying is if they lied that they did something.

Padilla/Atencio Jail Call 8 at 1:55-2:20 (R. Padilla).

During R. Padilla's first conversation with Atencio after her telephone call with Mr. Romero, R. Padilla initially says that the night when Atencio took Snapchat photographs of him eating Cheetos is the same night as the one where Montaño came over:

> R. Padilla:    This is what I remember you asking me. Is it cool that my friend Vanessa comes over here? I said I don't care who comes over here. And then she showed over Jaeger. And then we're in the kitchen on your little table drinking Jaeger . . . . We sat on a couch with a beer . . . .

> Atencio:    That's when you started eating those Cheetos and stuff, I think . . . I don't know.

> R. Padilla:    Well either way, I ended up on that couch and I look up and I remember you guys dancing, you and Confe right there, and one of you guys had a phone in your hand . . . .

> Atencio:    Because [] you were all eating those Cheetos all drunk, remember? I was all laughing at you . . . .

> R. Padilla:    What time do you think that was at? . . . Before Vanessa or after?

> Atencio:    That was before Vanessa got there.

Padilla/Atencio Jail Call 8 at 7:28-8:50 (R. Padilla, Atencio).  It is not until Atencio tells R. Padilla

that the Snapchat photographs are from July 21st, 2019, see Padilla/Atencio Jail Call 8 at 10:40-

11:15 (Atencio, Padilla), that R. Padilla begins to say that there must have been two parties at

Atencio's house:

> I know we drank at your house more than once.  That's what I'm saying. That's that's [sic] when Naomi went over and cleaned the bottles up.  And then we went and went and we went and stayed at at at [sic] um Joe Leyba's little house and I boned her on the floor I remember that night because I [got] fucking cuts on my knees. And then the next day we ended up drinking at your house since the morning. And that's whenever her friend went. Your friend went over.

Padilla/Atencio Jail Call 8 at 11:20-11:45 (R. Padilla).  Atencio responds simply to R. Padilla's

recollection here: "No."  Padilla/Atencio Jail Call 8 at 11:45-50 (Atencio).

Following this exchange, R. Padilla tries several times to convince her that there were two

parties at her house:  a night with the Snapchat photograph, about which she testified at his murder

trial, and a different night where Montaño came over to Atencio's, Halpern and R. Padilla spent

the night, and M. Ruiz came over the next morning and confessed to Lucero's murder.  See

Padilla/Atencio Jail Call 8 at12:15-1300 (R. Padilla, Atencio); Padilla/Atencio Jail Call 8 at 13:20-

14:00 (Atencio, R Padilla); Padilla/Atencio Jail Call #9 at 1:55-3:05; Padilla/Atencio Jail Call 9 at

3:40-4:00 (R. Padilla).  Atencio either disagrees or does not remember as R. Padilla does.  See

Padilla/Atencio Jail Call 8 at13:00-13:15 (Atencio)("I'm all confused then because I've been under

the impression this whole time, that this night happened the same night you and Bobs were arguing when you're eating those Cheetos."); id. at 14:00-14:10 (Atencio)("I'm fucking confused as fuck."); id. at 15:47-15:50 (Atencio)("I don't remember you staying the night."); id. at 16:00-16:10 (Atencio)("I do remember you in the room and then her coming out.  But I thought that was the same night of you eating the Cheetos dude and you texting Bobs."); Padilla/Atencio Jail Call 9 at 3:08-3:10 (Atencio)("I'm fucking completely lost now, dude."); id. at 4:45-5:50 (Atencio)("I'm fucking way thrown off now.").  Eventually, Atencio agrees with R. Padilla that there are two different parties, and that Montaño was not at Atencio's apartment on July 21st when Atencio took the Snapchat photographs.  See 7:35-8:30 (R. Padilla, Atencio); id. at 11:15-12:45 (R. Padilla, Atencio).

By the time R. Padilla calls Atencio for the tenth time on January 8, 2024, Atencio is convinced that she had her dates confused during her trial testimony.  See, e.g., Padilla/Atencio Jail Call #10 at 1:40-1:45 (date January 8, 2024)(Atencio)(admitted as United States Hearing Exhibit 11 on June 10, 2024)("Padilla/Atencio Jail Call 10")("This whole time . . . I was talking about the wrong fucking night.").  Although Atencio appears to sort out some details, like whether Montaño and Varela are at the same party, see Padilla/Atencio Jail Call 10 at 8:40-8:45 (Atencio)("Naomi said she never met Vanessa."), she still cannot recall other key facts, like where she slept if R. Padilla slept in her room the entire night, see Padilla/Atencio Jail Call 10 at 4:20-4:30 (Atencio)("And I do need to apologize because I told him that . . . you had never spent the night in my house.  But I forgot because I'm like, well, where would I have slept? And I'm still thinking where was I even at?  But I do remember you guys being in my room.").  Regardless, on these later calls, Atencio agrees with R. Padilla that there are two parties at her apartment on

consecutive nights and that the one about which she testified -- where R. Padilla left briefly at

some point in the night  -- was July 21st, 2019, the night before Lucero was murdered:

> I already sent your brother the [photograph] of that night from July 21st.  I sent him
> that one of you eating the Cheetos.  That's where it all started with Bobs.  And
> that's the night I've been talking about.  And that's not the night of the murder,
> though.  Then I'm saying, I remember the night of the murder now. . . .  Like, it's
> coming together.  Because Naomi said she never met Vanessa.  And but the picture
> that I have of the night that I thought the murder was on, where you're drinking a
> full, a big bottle of Jager.  The night that Vanessa [brought] the bottle, it was a fifth,
> not a full fucking gallon.

Padilla/Atencio Jail Call 10 at 8:25-8:55 (Atencio).  Next, R. Padilla tells Atencio that he told his

lawyers that "we were partying for a couple days," Padilla/Atencio Jail Call 10 at 9:35-9:40 (R.

Padilla), and that "the only time I've ever slept in your room or used your bed for sex" was the

night before the morning where "Marcos showed up in the morning and [] said what he did,"

Padilla/Atencio Jail Call 10 at 9:40-9:50 (R. Padilla). In response, Atencio says, "I remember now

the next night but I was getting it all mixed up," Padilla/Atencio Jail Call 10 at 10:25-10:30

(Atencio).  R. Padilla asks Atencio to speak with Mr. Romero before talking to the FBI, because

"all they're going to do is say that I called you and made you fucking change your mind."

Padilla/Atencio Jail Call 10 at 12:20-12:25 (R. Padilla).  Atencio then assures R. Padilla that he is

not pressuring her: "No. That, honest to God, that's not the fucking truth."  Padilla/Atencio Jail

Call 10 at 12:25-12:30 (Atencio).

     R. Padilla calls Atencio five more times on January 8, 2024.  See United States Telephone

Call Summaries at 4-5.  On these calls, R. Padilla and Atencio continue hashing out the details

discussed during the first ten calls, and, on at least one occasion, R. Padilla gets details mixed up

himself:

> The day that Smurf got murdered . . . I know for a fact that I was drinking
> Jager . . . . [T]he thing I remember the most is you guys dancing there, and you . . .

> Snapchatting . . . and then me and Confe went to the room . . . [and] that girl,
> Vanessa, said she stayed there till two, two or three in the morning.

Padilla/Atencio Jail Call #11 at 7:40-8:10 (dated January 8, 2024)(R. Padilla)(admitted as United States Hearing Exhibit 12 on June 10, 2024)("Padilla/Atencio Jail Call 11").  Regardless, during these later calls, R. Padilla and Atencio are both convinced that there were two parties at Atencio's apartment on consecutive days, and that Atencio's testimony was about the first one, on July 21st, 2019, and Montaño's and Halpern's testimonies were about the second one, on July 22nd, 2019. See, e.g., Padilla/Atencio Jail Call #12 at 12:30-40 (dated January 8, 2024)(R. Padilla)(admitted as United States Hearing Exhibit 13 on June 10, 2024)("Padilla/Atencio Jail Call 12")("In your mind, the 21st was the murder night.  And then Vanessa showed up the next night."); id. at 12:40-45 (Atencio)("Yes, yes.  See, that's, that's what I was thinking.").

On January 9, 2024, at around 7:30 A.M., Atencio calls Acee; the two speak for approximately twelve minutes.  See Chronology of Post-Trial Communications with Janaya Atencio at 1 (dated March 5, 2024)(admitted as United States Hearing Exhibit 34 on June 10, 2024)("FBI/Atencio Communication Chronology").  According to the MNT, Atencio tells Acee on this call that her testimony is inaccurate and that she had gotten the date of the party wrong. See MNT at 6-7.  R. Padilla also asserts that, on this call, Acee "assured her that she had in fact gotten the date right, that her trial testimony was accurate, and that in any event that it was 'no big deal.'"  MNT at 7 (internal quotation has no citation).  R. Padilla also alleges that, on this call, Acee falsely tells Atencio that R. Padilla "had the metadata from photographs which provided the correct date."  MNT at 7.  Acee's FBI records paint a different picture of this conversation.  See FBI/Atencio Communication Chronology at 1-2.  According to Acee, Atencio tells him that Jeffrey "had been giving her a hard time about testifying and told ATENCIO that she had testified

incorrectly." FBI/Atencio Communication Chronology at 1-2 (capitals in original). Acee also says that Atencio tells him that the photographs that she shared with her attorney, and one photograph, in particular, of R. Padilla eating chips on her couch, show that R. Padilla could not have killed Lucero. See FBI/Atencio Communication Chronology at 2. Acee recalls that Atencio's account confused him, and that his "several attempts to better comprehend the significance of the photo and Thomas' statements to ATENCIO [] [were] unsuccessful." FBI/Atencio Communication Chronology at 2 (capitals in original). Acee also notes that Atencio "reminded SA Acee that her Thomas [sic] had told her not to testify and that the SNM was going to kill her." FBI/Atencio Communication Chronology at 2.

Regarding his own statements to Atencio, Acee says that he thanked her for testifying, pointed out that several other witness also testified, and "commented that the jury weighed all the evidence and returned their findings to the court." FBI/Atencio Communication Chronology at 2. By the end of the call, Atencio tells Acee that she will send the photograph of R. Padilla eating chips to Acee. See FBI/Atencio Communication Chronology at 2. A few minutes after the telephone call ends, Atencio sends Acee a screenshot of her cellular telephone screen, which shows a Snapchat photograph of R. Padilla eating Cheetos with the caption: "The Cheeto Munster lmao 😂." Atencio Snapchat Photograph. See FBI/Atencio Communication Chronology at 2 (describing how Atencio sent Acee the Snapchat photograph on January 9, 2024, at 7:42 A.M.). The Snapchat photograph has a date stamp that indicates it was posted on Atencio's Snapchat story on July 21, 2019. See Atencio/Acee Snapchat Photograph.

## FINDINGS OF FACT

The Court makes the following finding of fact related to the Atencio and Acee's communications on January 9, 2024:

1.    On January 9, 2024, Atencio does not tell Acee that she testified about the wrong date at R. Padilla's murder trial.  See FBI/Atencio Communication Chronology at 1-2; June 10, 2024, Tr. at 148:14-149:2 (Acee)(testifying that, on January 9, 2024, Atencio never tells him that she testified about the wrong date at R. Padilla's murder trial and that she did not "in any way lead [Acee] to believe that she had information that was different from what she testified about.").[20]

R. Padilla calls Atencio four times on January 9, 2024, once on January 10, 2024, and five times on January 14, 2024.  See United States Telephone Call Summaries at 5-9.  These later calls feature more of the same.  R. Padilla and Atencio agree that Atencio hosted two parties on consecutive nights and that she mixed up the dates during her trial testimony.  See United States Telephone Call Summaries at 5-9; Defense Summaries -- ROBERT & JANAYA Calls at Rows 14-26 ("Padilla Summary of Padilla and Atencio Telephone Calls") .

###     b.    <u>The Motion for New Trial.</u>

On February 13, 2024, R. Padilla files a motion for new trial.  See MNT at 1-11.  In the MNT, R. Padilla urges the Court to "enter and order setting this motion for an evidentiary hearing, and granting a new trial . . . after that hearing."  MNT at 10.  R. Padilla asserts that Atencio has revised her testimony, and that she now recalls that R. Padilla and Halpern slept over in her apartment on July 22nd.  See MNT at 5.  R. Padilla insists that Atencio's "post-verdict revelations, constituting a complete revision of the testimony that she gave at trial," warrant an evidentiary hearing and a new trial, because, had Atencio "testified at trial in accordance with her current

---

[20]Acee's post-trial testimony contradicts Atencio's post-trial testimony, where she says that she tells Acee, on January 9, 2024, that she testified about the wrong date.  See June 10, 2024, Tr. at 42:17-45:5 (Robert, Atencio).  Assessing each witness' credibility and the record as a whole, the Court does not adopt Atencio's version of events and credits Acee's testimony for the reasons stated below in detail.  See <u>infra</u>, at 166-67.

recitation of events, all three alibi witnesses, Ms. Atencio, Ms. Halpern, and Ms. Montaño would have been in agreement: Mr. Padilla was in Ms. Atencio's apartment all evening, night and early morning on July 22-23, 2019." MNT at 6. The MNT also asserts that Jeffrey, who did not testify at R. Padilla's murder trial, has told Atencio "that he had seen recordings from the surveillance system blanketing the apartment building that confirmed his knowledge that Mr. Padilla and Ms. Halpern were in Ms. Atencio's apartment when Mr. Lucero was murdered by Mr. Coca (and possibly by Mr. Ruiz)." MNT at 5. R. Padilla lays out the United States Court of Appeals for the Tenth Circuit's five-factor test for granting a new trial based on newly discovered evidence: the evidence must be discovered after trial, the late discovery must not have been because of counsel's lack of diligence, the evidence is not merely impeachment, the new evidence is material to the principal issues involved the case, and the new evidence would likely result in an acquittal at a new trial. See MNT at 2-3 (citing United States v. Quintanilla, 193 F.3d 1139. 1147 (10th Cir. 1999); United States v. Sinclair, 109 F.3d 1527. 1531 (10th Cir. 1997)("Sinclair"); and United States v. Boutte, 2023 U.S. Dist. LEXIS 105408 (D.N.M. 2023)). R. Padilla maintains that the developments which his MNT describes -- i.e., Atencio's and Jeffrey' alleged recollections about July 22, 2019 -- qualify as newly discovered evidence that warrants a new trial. See MNT at 9-10.

Regarding the United States' role in Atencio's revised testimony, R. Padilla alleges that, when Atencio reached out to Acee to tell him that she had gotten her testimony wrong, Acee disagreed and told her that her testimony was correct. See MNT at 7. R. Padilla also suggests that, on this same telephone call, Acee lies to Atencio about R. Padilla's access to evidence: "Acee told Ms. Atencio that the defense had the metadata from photographs which provided the correct date. That was not true. Indeed, the defense had previously requested that the government provide

that data, making it likely that the agent was aware that the defense lacked that information." MNT at 7. Regarding R. Padilla's diligence relating to Atencio's new testimony, R. Padilla states that his "first real opportunity to test the facts related by Ms. Atencio to the jury at trial was cross examination," because Atencio rebuffed his lawyers and investigators each of the several times they tried to speak with her before his murder trial. MNT at 8. Regarding R. Padilla's diligence relating to Jeffrey' alleged testimony and the surveillance recordings that Jeffrey has allegedly seen, R. Padilla says that his attorneys and investigators reached out to Jeffrey, "who advised that he had sold the apartment building and would contact the new owner to see about getting the surveillance recordings." MNT at 8. After this initial contact, Jeffrey rejects each of R. Padilla's counsel's attempts to interview him or to obtain the alleged recordings. See MNT at 8-9. Accordingly, R. Padilla contends that he "had no inkling" about Jeffrey' alleged account of seeing the recordings and observing R. Padilla at Atencio's apartment around the time Lucero was murdered. See MNT at 9. The MNT does not mention any subpoenas -- for trial testimony or surveillance recordings -- that R. Padilla may have served Jeffrey or the alleged new owners of the apartment building. See MNT at 7-11. In sum, the MNT requests a new trial, because "the other testimony during the trial calling into question the notion that Mr. Padilla killed Mr. Lucero, Ms. Atencio's epiphany, and the addition of Mr. Jeffrey' previously unavailable testimony, would in all likelihood result in Mr. Padilla's acquittal." MNT at 9-10.

### c.     Atencio's February, 26, 2024 Contact With Acee.

On February 26, 2024, Atencio calls Acee again, and they speak for approximately thirty-two minutes. See FBI/Atencio Communication Chronology at 3. During this telephone conversation, Atencio describes how Jeffrey had received information from a family member that Coca was telling people that Jeffrey is a rat. See FBI/Atencio Communication Chronology at 3.

Atencio also tells Acee that R. Padilla had reached out to her, and that Jeffrey was upset that she had testified and had told her that she testified incorrectly.  See FBI/Atencio Communication Chronology at 3.  According to Acee's notes from this conversation, Atencio says, multiples times, that she believes she testified honestly at R. Padilla's murder trial and that Jeffrey's criticism of her is confusing her.  See FBI/Atencio Communication Chronology at 3.  Acee tells Atencio that, if Jeffrey has information related to R. Padilla's whereabouts on July 22, 2019, Jeffrey needs to come forward and testify for himself, and not through Atencio.  See FBI/Atencio Communication Chronology at 3-4.  Acee also tells Atencio that he would follow up on the alleged threats that Coca made against Atencio or Jeffrey.  See FBI/Atencio Communication Chronology at 4.  A few hours after Atencio and Acee finish their conversation, Atencio sends Acee the following text message, to which Acee does not reply: "Hey Brian, for the safety of myself and my kids I don't feel comfortable going forward with anything."  FBI/Atencio Communication Chronology at 4.

### d.  The Motion for New Trial Response.

On March 5, 2024, the United States files a response to R. Padilla's MNT.  See MNT Response at 3-11.  The MNT Response recounts how Atencio reached out to Acee during R. Padilla's murder trial to correct her testimony only insofar as she previously did not describe how R. Padilla, D. Padilla, M. Ruiz, and Halpern showed up her house the morning after Lucero was murdered, and M. Ruiz spoke about how he could not believe that Lucero was dead.  See MNT Response at 2.  The MNT Response also describes: (i) Atencio and Acee's January 9, 2024, telephone conversation, where Atencio tells Acee that she got her dates mixed up; (ii) the January 9, 2024, text message exchange, where Atencio sends Acee the Snapchat photograph of R. Padilla eating Cheetos; and (iii) Atencio and Acee's February 26, 2024, correspondence, where Atencio details Jeffrey's criticism of her testimony.  See MNT Response at 4.  The United States agrees

with the five-factor <u>Sinclair</u> test for new trials based on newly discovered evidence, and adds that "[d]iscrediting a witness's veracity is the definition of impeachment and cannot be the basis for a grant of a motion for new trial grounded on newly discovered evidence."  MNT Response at 7 (citing <u>United States v. DeLeon</u>, 428 F.Supp.3d 841, 1168 n.157 (D.N.M. Oct. 29, 2019)(Browning, J.)(citing <u>Impeach</u>, Black Law's Dictionary (11th ed. 2019)(defining impeach as"[t]o discredit the veracity of (a witness)").  Additionally, the United States asserts that, although Atencio's post-trial statements were discovered after trial, they do not qualify as newly discovered evidence under <u>Sinclair</u>, because: (i) R. Padilla could have learned the same information while the trial was ongoing, given that R. Padilla's counsel could have followed up with Atencio after Acee described his mid-trial conversation with her; (ii) Atencio's statements are merely impeaching, given that her new account, where she expresses doubt regarding her party's date and details Jeffrey's skepticism and pressure campaign, questions only her credibility at trial; (iii) the evidence is not material to the principal issues involved, given that it only impeaches Atencio, and does not add to Montaño and Halpern's trial testimony; and (iv) the evidence would not acquit R. Padilla, given that impeaching Atencio's trial testimony does not overcome other witness testimony, including Coca's, and Atencio's new trial testimony would be impeached with statements she made to Acee during Padilla's murder trial, where she corroborates her original trial testimony by recalling that R. Padilla and others returned to her apartment in the morning of July 23, 2019.  <u>See</u> MNT Response at 7-10.  The MNT Response does not address directly whether Jeffrey's alleged statements regarding the surveillance recordings would qualify as new evidence, but considers, rather, these statements as part of Atencio's revised recollection, given that she, not Jeffrey, allegedly has relayed Jeffrey's statements.  <u>See</u> MNT Response at 3-5, 7-10.

### e.    **The Motion for New Trial Reply**.

On reply, R. Padilla disputes the United States' assertion that Atencio's new testimony is merely impeachment.  See Mr. Padilla's Reply to the Government's Response to Motion for New Trial at 3-4, filed March 19, 2024 (Doc. 286)("MNT Reply").  R. Padilla maintains that Atencio's post-trial statements are not "some extrinsic information which challenges Ms. Atencio's testimony at trial."  MNT Reply at 4.  Instead, R. Padilla characterizes Atencio's post-trial statements as an attempt to correct her trial testimony and offer new, substantive testimony that R. Padilla was at Atencio's apartment when Lucero was murdered.  See MNT Reply at 4. R. Padilla also disputes the United States' assertion that his defense team was not diligent in obtaining the allegedly new evidence before or during trial.  See MNT Reply at 4-5.  R. Padilla again details how Atencio and Jeffrey rebuff his defense team when his team tries to contact Atencio and Jeffrey before trial to develop R. Padilla's alibi defense.  MNT Reply at 4-5. R. Padilla again does not mention any subpoenas that he issued which would have helped him obtain Jeffrey's testimony or the allegedly exculpatory surveillance recordings.  See MNT Reply at 4-5.  Finally, R. Padilla contends that Atencio's testimony is material, because "the jury would have had confirmation of Mr. Padilla's alibi defense, buttressed by the testimony of Ms. Halpern and Ms. Montaño."  MNT Reply at 5.

### f.    **The April 25, 2024, Hearing**.

On April 25, 2024, the Court holds a hearing on R. Padilla's MNT.  See April 25, 2024, Hearing Minutes at 1.  At the hearing, the Court asks the parties to discuss at the bench Atencio's lack of representation and potential perjury liability if she chooses to testify in contradiction with her trial testimony.  See Transcript of April 25, 2024, Hearing at 3:3-17, filed August 13, 2024 (Doc. 329)("April 25, 2024, Tr.")(Court).  During this discussion, although the United States does

not commit to pursuing or declining perjury charges, it informs the Court that it is concerned about Atencio's revised recollection, given R. Padilla and Atencio's lengthy jail calls. See April 25, 2024, Tr at 3:23-4:4 (Castellano)("I have concerns about the communications between the two of them, which kind of changes things a little bit. I mean to say[, "]I was mistaken[,"] would be one thing, but to have the defendant communicating with he regularly on that basis is what raises additional concerns."). The parties also inform the Court about Atencio's recorded conversation with Romero on January 8, 2024, where she outlines her revised recollection. See April 25, 2024, Tr at 4:8-7:10 (Castellano, Court, Robert). The United States tells the Court that R. Padilla's counsel disclosed the Romero/Atencio Telephone Conversation Transcript for the first time that morning, on April 25, 2024, and the Court notes that he, too, was not aware of the telephone conversation. See April 25, 2024, Tr at 4:9-25 (Castellano, Court, Robert). R. Padilla urges the Court to listen to R. Padilla and Atencio's jail calls, which, he insists, illustrate a genuine attempt to remind Atencio of the true sequence of events, rather than an attempt to coerce her into falsely testifying. See April 25, 2024, Tr. at 7:11-17 (Robert). R. Padilla also tells the Court that, although he successfully subpoenaed Jeffrey that morning, Jeffrey "is not here." April 25, 2024, Tr. at 6:7-9 (Robert); id. at 21:12-14 (Robert). Although Atencio attends the April 25, 2024, hearing, she does not testify, and the parties agree that they need another evidentiary hearing, which is scheduled for June 10, 2024. See April 25, 2024, Hearing Minutes at 1-2; April 25, 2024, Tr. at 25:6-27:5 (Court, Anderson, Mitsunaga, Robert, Castellano); id. at 31:1-7 (Court).

On April 26, 2024, R. Padilla's counsel asks the United States to "grant Janaya Atencio immunity from prosecution for perjury should she testify at the" June 10, 2024, evidentiary hearing. Forwarded Email from Marc Robert to Ronald Gainor, Sonia Salazar, and Raquel Rodriguez re: Immunity for Janay [sic] Atencio at 1, dated April 26, 2024 (admitted as Padilla Hearing Exhibit F

on June 10, 2024)("Immunity Request Email").  The United States responds: "The United States

will not provide immunity to Janaya Atencio to perjure herself at the hearing."  Immunity Request

Email at 1.

g.    **The Immunity Motion**.

One week before the June 10, 2024, evidentiary hearing, R. Padilla asks the Court to order

the United States to immunize Atencio against a potential perjury charge relating to her anticipated

testimony.  See Immunity Motion at 1.  In addition to repeating much of the MNT's factual and

procedural background, the Immunity Motion alleges more details from Atencio and Acee's

conversation regarding her revised recollection:

> When Ms. Atencio spoke with SA Acee about this, he told her that she had
> not testified incorrectly; that the defense had the date-stamped photographs; that
> she had been drinking and doing drugs that night; that "12 people" had "testified
> otherwise" than her recent realization; and that she might be in danger, personal
> physical danger, if she testified about the recent confirmation of her error in
> conflating the events of those two dates.  Ms. Atencio denied using drugs.

Immunity Motion at 6 (internal quotations have no citations).  R. Padilla also alleges that Acee

implied that Atencio would be in danger if she changed her testimony:

> SA Acee told her that she was not mistaken; that "12 people" had "testified
> otherwise" from what Ms. Atencio was now saying; suggesting that those "12
> people" might take unkindly to Ms. Atencio coming forward with her refreshed
> recollection. Ms. Atencio perceived this as a warning that she might be in physical
> danger if she corrected her testimony.

Immunity Motion at 4.  The Immunity Motion emphasizes how Coca's alleged recent threats

against Atencio and Jeffrey have also discouraged her from testifying.  See Immunity Motion at

7.

In the Immunity Motion, R. Padilla contends that, when he asks the United States to

immunize Atencio, "the lead prosecutor refused, saying the government will not immunize the

witness from 'her perjury' at the evidentiary hearing."  Immunity Motion at 7-8 (internal quotation

has no citation).  According to R. Padilla, "[t]his response made it clear that the government will

assert that Ms. Atencio's testimony about her realization concerning her inaccurate trial testimony

and Mr. Padilla's alibi would be perjury."  Immunity Motion at 8.  R. Padilla insists that the Court

must hear Atencio's new testimony to determine if it is credible, because "[i]f Ms. Atencio's post-

trial realizations and revelations are true, then Mr. Padilla was wrongly convicted of" murdering

Lucero, and the Court should give R. Padilla a new trial.  Immunity Motion at 9.  Accordingly,

R. Padilla asks the Court to compel the United States to immunize Atencio so that she may testify

without fear of a perjury charge.  See Immunity Motion at 13-14.

To determine whether the Court can order the United States to immunize Atencio,

R. Padilla proposes a two-pronged test from United States v. Ebbers, 458 F.3d 110 (2d Cir.

2006)("Ebbers").  See Immunity Motion at 10-11.  First, R. Padilla must show that

> "the government has used immunity in a discriminatory way, has forced a potential
> witness to invoke the Fifth Amendment through 'overreaching,' [United States v.
> Diaz, 176 F.3d 52, 115 (2d Cir. 1999)], or has deliberately denied immunity for the
> purposes of withholding exculpatory evidence and gaining a tactical advantage
> through such manipulation."

Immunity Motion at 10 (quoting Ebbers, 458 F.3d at 119).  Second, R. Padilla must show that the

potentially immunized witness will give ""material, exculpatory and not cumulative [evidence

that] is not obtainable from any other source.""  Immunity Motion at 10-11 (quoting Ebbers, 458

F.3d at 119 (quoting United States v. Burns, 684 F.2d 1066, 1077 (2d Cir. 1982)).  R. Padilla does

not explain, however, what relief the Ebbers court contemplates when it applies this two-pronged

test.  See Immunity Motion at 10-11.  Instead, the Immunity Motion says only that the Ebbers

court "addressed the question whether [sic] the government's decision to immunize prosecution

witnesses and not defense witnesses constituted 'overreach.'"  Immunity Motion at 10 (internal

quotation has no citation).  R. Padilla also asserts that, in addition to the Second Circuit, "[o]ther circuits have held that a court may order immunity for a defense witness if 'the prosecution intentionally seeks to distort the fact-finding process by deliberately withholding immunity from a defense witness to exclude exculpatory evidence.'"  Immunity Motion at 11 (quoting United States v. Reece, 797 F. Supp 843, 847 (D. Co. 1993)(Babcock, J.)(citing Government of Virgin Islands v. Smith, 615 F.2d 964, 968 (3d Cir. 1980); and United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir. 1991))).  R. Padilla does not provide a Tenth Circuit case regarding a district court's ability to order immunity.  See Immunity Motion at 1-15.  Instead, R. Padilla identifies an unpublished case in this district: United States v. Vallejos, No. CR 03-2241 JP, 2006 WL 8443786 (D.N.M. Aug. 24, 2006)(Parker, J.)("Vallejos").  Immunity Motion at 11.  R. Padilla says that, in Vallejos, the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, "ordered that the government grant immunity to the witness or face dismissal of the indictment for prosecutorial misconduct," where "the government raised the possibility" that a witness who "came forward after [the trial] with exculpatory evidence that was not available to the defense before or during the trial" may face criminal charges "based on testimony that the witness might offer at the evidentiary hearing on Mr. Vallejos' [motion] for new trial."  Immunity Motion at 11-12.  The Immunity Motion also says that Senior "Judge Parker held that even the government's implicit threat to prosecute the witness on his testimony constituted substantial interference with the witness' decision [to withhold his testimony.]"  Immunity Motion at 12 (emphasis in original).  The Immunity Motion does not: (i) explain what issue Judge Parker decided in Vallejos; (ii) provide any quotations from Vallejos; or (iii) direct the Court to specific pages of Senior Judge Parker's opinion to support any of its characterizations of Vallejos.  See Immunity Motion at 11-12.  Rather, the Immunity Motion alleges that the Vallejos circumstances -

- a witness coming forward after trial with previously unavailable, exculpatory evidence -- is "the same situation presented here." Immunity Motion at 11. Accordingly, R. Padilla asks the Court to order the United States to grant Atencio immunity, as it purports Senior Judge Parker does in Vallejos. See Immunity Motion at 13.

### h.    The June 10, 2024, Hearing.

At the June 10, 2024, hearing, the parties argue the Immunity Motion. See Transcript of June 10, 2024, Hearing at 3:9-15:24, filed July 17, 2024 (Doc. 323)("June 10, 2024, Tr.")(Robert, Court). After Mr. Robert, R. Padilla's counsel, repeats the Immunity Motion's core arguments, the Court asks him how a district court legally may force the United States to immunize Atencio. See June 10, 2024, Tr. at 11:3-5 (Court). Mr. Robert tells the Court that, in addition to the Vallejos method -- i.e., giving the United States a choice between dismissing the charges and immunizing a witness -- the Court may follow the Second Circuit, but Mr. Robert does not explain how the Second Circuit orders immunity in the cases that he cites. See June 10, 2024, Tr. at 12:14-19 (Robert)("Well, the case law that I've cited, mostly from the Second Circuit in the motion suggests that there are ways for the Court to be able to, within the law, to require the Government to grant immunity. And I'll stand on that precedent."). Mr. Robert admits that he has not found a Tenth Circuit or Supreme Court of the United States case on point. See June 10, 2024, Tr. at 12:20-22 (Court, Robert). The Court also asks R. Padilla's counsel if Atencio is reluctant to testify, because she is afraid of R. Padilla. See June 10, 2024, Tr. at 14:22-15:2 (Court, Robert). In response, Mr. Robert insists that Atencio is not afraid of R. Padilla, but that she is afraid of M. Ruiz, Coca, and the SNM. See June 10, 2024, Tr. at 15:3-20 (Robert).

The United States does not file a response to the Immunity Motion, but orally opposes it at the June 10, 2024, hearing. See June 10, 2024, Tr. at 16:3- 26:6 (Castellano, Court). First, the

United States addresses Vallejos.[21]  See June 10, 2024, Tr. at 16:3-18:24 (Castellano).  The Vallejos

post-trial witness -- Robert Sanchez -- was not at risk of a perjury charge:  instead, Sanchez offered

"to come forward and take the rap" for Vallejos' carjacking conviction.  June 10, 2024, Tr. at 17:3-

6 (Castellano.  Before Sanchez could testify at a motion for new trial evidentiary hearing, the

United States asked the Court to appoint Sanchez a lawyer to "independently advise Mr. Sanchez

of his rights, as well as the jeopardy he might put himself in by testifying and admitting to all

elements of these offenses, and telling him about the consequences."  June 10, 2024, Tr. at 17:11-

15 (Castellano).  The United States says that "no representations were made about what would

happen to Mr. Sanchez one way or the other."  June 10, 2024, Tr. at 17:23-25 (Castellano).  On

reconsideration, Judge Parker "reversed himself," June 10, 2024, Tr. at 16:15 (Castellano), because

he found that the prosecution's representations about Sanchez' testimony and his potential criminal

liability "did not sway [Sanchez] to take the Fifth; that his counsel who advised him and spoke to

him ultimately is the one who told him to take the Fifth," June 10, 2024, Tr. at 18:2-5 (Castellano).

The United States argues that the present circumstances are even more favorable for the United

States, because it has "made no representations to Ms. Atencio whatsoever" about her perjury

liability.  June 10, 2024, Tr. at 18:10-11 (Castellano).  Second, the United States distinguishes

R. Padilla's other supporting case law, arguing that, in those cases, there were allegations that the

United States used immunity unfairly by immunizing their own witnesses and refusing to

immunize defense witnesses.  See June 10, 2024, Tr. at 18:25-19:6 (Castellano).  Here, no

witnesses, on either side, have been immunized.  See June 10, 2024, Tr. at 19:6-8 (Castellano).

Overall, the United States argues that the alleged new evidence does not "'materially alter the total

---

[21]Mr. Castellano also represents to the Court that he litigated Vallejos.  See June 10, 2024, Tr. at 16:5-6.

mix of evidence before the jury'" June 10, 2024, Tr. at 23:8-9, because Atencio's revised recollection is not credible, and R. Padilla told Garcia, Urquizo, Frederickson, and Messier that he killed Lucero, see June 10, 2024, Tr. at 19:15-23:15 (Castellano, Court).

After the parties conclude their immunity arguments, R. Padilla calls Atencio as a witness. See June 10, 2024, Tr. at 33:16-34:8 (Robert, Court).  Atencio agrees with Mr. Robert when he asks: "Are you concerned about testifying about what you now know to be true because you're concerned about being prosecuted for perjury?"  June 10, 2024, Tr. at 35:10-14 (Robert, Atencio). Atencio says that, before the trial, she was concerned that she might be confused about the date of the party at her apartment.  See June 10, 2024, Tr. at 35:21-36:24 (Robert, Atencio).  Atencio describes how, before she is served a trial subpoena, her partner, Jeffrey, tells her to "make sure [she] was talking about the right day," but "didn't really, like expand" on his view.  June 10, 2024, Tr. at 53:11-13 (Atencio).  Atencio says that she tells Acee, when he serves her trial subpoena, that she is concerned she had her dates mixed up.  See June 10, 2024, Tr. at 36:25-37:16 (Robert, Atencio).  Atencio testifies that Acee then "pressured" her by telling her that she "was talking about the right day."  June 10, 2024, Tr. at 37:16-22 (Atencio, Robert).  Atencio also says that, during the trial, Acee "pulled me to the side and had me talk to Randy [Castellano]" about her confusion regarding the dates.  June 10, 2024, Tr. at 38:3-14 (Robert, Atencio).  Atencio says that, during this conversation, she tells Mr. Castellano that she may have mixed up the dates, and Mr. Castellano assures her that she has the right date.  See June 10, 2024, Tr. at 38:16-22 (Atencio). Atencio says that, during the trial, Mr. Robert's cross-examination makes her think that she is testifying about the wrong date.  See June 10, 2024, Tr. at 40:8-15 (Robert, Atencio).

Atencio admits that her concerns grow after speaking with R. Padilla over the telephone in January, 2024, and, in particular, after she finds the Atencio Snapchat Photograph, which shows

R. Padilla eating Cheetos on her couch and has a July 21, 2019 date stamp.  See June 10, 2024, Tr. at 40:24-42:2 (Robert, Atencio).  Atencio says that, after viewing the Atencio Snapchat Photograph, she "was like 100 percent sure" that she testified about the wrong date.  See June 10, 2024, Tr. at 42:11-16 (Robert, Atencio).  Atencio also says that, around January, 2024, after she tells Jeffrey that she thinks she mixed up the dates, Jeffrey says something along the lines of: "I've been telling you."  June 10, 2024, Tr. at 54:8-20 (Robert, Atencio).  Atencio says that Jeffrey knows that Atencio mixed up the dates, because Jeffrey says that he saw R. Padilla on the surveillance footage[22] from Atencio's apartment on July 22, 2019.  See June 10, 2024, Tr. at 54:25-56:10.  Atencio says that, after feeling confident that she had her dates confused, she calls Acee[23] to tell him about her realization, but he told her that "it didn't really matter because . . . other people had testified otherwise."  June 10, 2024, Tr. at 42:17-43:23 (Robert, Atencio).  When Mr. Robert asks her several questions about what her impression was after speaking with Acee, Atencio paints a complex picture, saying that she came away thinking that: (i) she should come forward to correct the record, see June 10, 2024, Tr. at 44:17-23 (Robert, Atencio); (ii) Acee does not discourage her from correcting the record, see June 10, 2024, Tr. at 44:12-16 (Robert, Atencio); and (iii) Acee is "a little angry" with her and "acting like [she] was a criminal, you know, in the situation," such that she was "a little nervous to come forward" because she felt like she was being accused of a crime, June 10, 2024, Tr. at 45:5-25 (Atencio, Robert).  Atencio describes how she then relays the

---

[22]Atencio estimates that there were approximately ten cameras that covered the building's hallways and exterior.  See June 10, 2024, Tr. at 52:18-53:7 (Atencio, Robert).  Atencio agrees with Mr. Robert that "pretty much the whole place was covered."  June 10, 2024, Tr. at 53:5-7 (Robert, Atencio).

[23]Although Atencio does not say when she calls Acee, the Court concludes, based on context, that this event refers to her telephone conversation with Acee on January 9, 2024, discussed supra, at 67-68.

same information about her revised recollection to Mr. Romero and Sonia Salazar, an investigator

for R. Padilla.  See June 10, 2024, Tr. at 43:1-22 (Robert, Atencio).

Atencio then testifies that she was not lying at R. Padilla's murder trial, or when she spoke

to Acee, Romero, or Salazar:

> [Robert]:    When you told Agent Acee and Joe Romero and Ms. Salazar about your -- what you learned and what you thought now the truth was about the 22nd, were you lying?
>
> [Atencio]:    No.
>
> [Robert]:    Were you telling the truth?
>
> [Atencio]:    Yes.
>
> [Robert]:    When you testified at trial that Mr. Padilla was not in your apartment at that time at which Mr. Lucero was killed, were you lying then?
>
> [Atencio]:    I wasn't lying. I was talking about the day before.
>
> [Robert]:    Okay. And I guess that's the point.  It's -- was it incorrect what you said at trial?
>
> [Atencio]:    Yes.
>
> [Robert]:    And was it a mistake or was it a -- testimony that was on purpose?
>
> [Atencio]:    It was a mistake.
>
> [Robert]:    Okay. At the time at which you testified at trial, you believed that what you were testifying to was the truth?
>
> [Atencio]:    Yes.
>
> [Robert]:    At the time, as we sit here today, do you still believe that?
>
> [Atencio]:    No.

June 10, 2024, Tr. at 48:1-25 (Robert, Atencio).  Although Atencio insists that she is not lying and

did not lie at R. Padilla's murder trial, after consulting with her lawyer, Ms. Mitsunaga, she refuses

to "testify about what [she] now know[s] to be the truth about what happened on July 22nd of 2019"

unless the United States immunizes her against a potential perjury charge. June 10, 2024, Tr. at 49:1-22 (Robert, Atencio). Atencio says that she is afraid of M. Ruiz and of being prosecuted for perjury, but that she is not afraid of R. Padilla. See June 10, 2024, Tr. at 56:11-25 (Robert, Atencio). Atencio concludes her direct examination by asserting that R. Padilla never threatened or coerced her to change her story. See June 10, 2024, Tr. at 57:3-6 (Robert, Atencio).

On cross-examination, Atencio agrees with Mr. Castellano that the United States has made no representations to her about her perjury liability. See June 10, 2024, Tr. at 58:5-10 (Castellano, Atencio). Atencio says that R. Padilla's reminders, during the jail calls, that her mistake cost him his life and will leave his children fatherless made her feel "[l]ike a shitty person . . . [b]ecause I was thinking [of] the wrong day." June 10, 2024, Tr. at 59:15-60:40 (Castellano, Atencio). The United States shows Atencio two emails, with photographs of R. Padilla at her apartment, that Atencio sent to her lawyer, Megan Mitsunaga, on November 1, 2021. See June 10, 2024, Tr. at 64:3-68:21 (Castellano, Atencio)(discussing Atencio/Mitsunaga Email 1 at 1-15, and Atencio/Mitsunaga Email 2 at 1-4). When Mr. Castellano asks Atencio if the photographs in these emails were taken on July 22, 2019, or July 23, 2019 -- as the emails suggest -- Atencio says that she cannot be sure, because the photographs do not have dates on them. See June 10, 2024, Tr. at 65:14-25 (Castellano, Atencio); id. at 66:1-24 (Castellano, Atencio). The United States also shows Atencio a third email that she sent to Ms. Mitsunaga on November 1, 2021. See June 10, 2024, Tr. at 68:22-69:24 (Castellano, Atencio)(discussing Atencio/Mitsunaga Email 3 at 1-3). In Atencio/Mitsunaga Email 3, Atencio says:

> What I can recall from the evening of July 21, 2019. Robert, Conferina, This [sic] guy that was working for Robert on his Mobile homes (I can't remember his name), Joe Leyba, & I were hanging out in my old apartment. We we [sic] drinking a little bit & a little while later Arturo Ruiz showed up with his younger daughter but only stayed a little while & he & his daughter left. from the best of memory around 7pm

> Robert Archuleta called my phone & asked to talk to Robert Padilla started arguing & getting aggressive on the phone threatening each other back & fourth on the phone saying they were going to kill each other & each other's family. After that Robert, Conferina, & Joe left together around 8ish?? Because Robert Padilla was nervous being at my apartment because Robert A. Told him that he was going to go over there to kill him. They didn't say where they were going. Robert, Conferina, & Joe came back the next day around 10am? & Robert was drunk they hung out for awhile & they left & we all met up later at Marcos Ruiz's house.

Atencio/Mitsunaga Email 3 at 1-2.  Although Atencio acknowledges that, in this email, she said that R. Padilla left her apartment on July 21, 2019, she cannot recall presently if those statements are accurate.  See June 10, 2024, Tr. at 69:7-9 (Atencio).  Atencio also acknowledges that, during her February 10, 2022, FBI interview, she said that she hosted a party the same day Lucero was killed, but testifies: "I was talking about the day before, again, like I was talking about the wrong date." June 10, 2024, Tr. at 70:14-15 (Atencio).

Eventually, Atencio invokes her Fifth Amendment privileges.  See June 10, 2024, Tr. at 72:9-11 (Atencio).  Specifically, Atencio invokes her Fifth Amendment privileges when asked (i) whether she told the FBI, on February 10, 2022, that R. Padilla and Archuleta got into an argument on the same day that Lucero was murdered, see June 10, 2024, Tr. at 72:10-14 (Castellano, Atencio); (ii) whether she told the FBI, on February 10, 2022, that, on the day Lucero was murdered, Jeffrey saw on the surveillance footage men with guns in her apartment building, and Jeffrey told her to have everybody leave, see June 10, 2024, Tr. at 73:8-18 (Castellano, Atencio); (iii) whether "the next morning, Padilla, Halpern, and Leyba returned to the apartment" and R. Padilla kicked in the door, June 10, 2024, Tr. at 73:19-24 (Castellano, Atencio); (iv) whether she told the United States Attorney's Office, during a pre-trial interview on November 30, 2023, that R. Padilla, Halpern, Leyba, and D. Padilla were at her apartment the night Lucero was murdered, June 10, 2024, Tr. at 76:11-16 (Castellano, Atencio)(discussing FBI 302 of

November 30, 2023, Interview with Janaya Atencio (dated December 3, 2023)(admitted as United States Hearing Exhibit 33 on June 10, 2024)("November 30, 2023, Atencio Interview 302")); (v) whether she told the United States Attorney's Office, during a pre-trial interview on November 30, 2023, that Jeffrey had told her about the surveillance footage on the night Lucero was murdered, see June 10, 2024, Tr. at 76:20-23 (Castellano, Atencio); and (vi) several other details from her November 30, 2023, pre-trial interview that corroborate her trial testimony, see June 10, 2024, Tr. at 79:1-80:20 (Castellano, Atencio).    When the United States shows Atencio the November 16, 2023, Atencio 302, which documents how the FBI served Atencio a trial subpoena, Atencio disputes that she told the FBI that R. Padilla had been calling her and asking her to testify that he had been at her apartment for the entire evening that Lucero was murdered.  See June 10, 2024, Tr. at 74:7-12 (Castellano, Atencio).  Immediately after she disputes those circumstances, however, she confers with counsel, and invokes her Fifth Amendment privileges.  See June 10, 2024, Tr. at 74:13-14 (Atencio).  Atencio also disputes that D. Padilla was pressuring her regarding her testimony -- as the November 16, 2023, Atencio 302 describes -- but agrees that Quintana -- D. Padilla's mother -- was pressuring her.  See June 10, 2024, Tr. at 74:15-75:12 (Castellano, Atencio).

The United States then shows Atencio a photograph of R. Padilla, wearing the same shirt that he is wearing in the Atencio Snapchat Photograph, and sitting on the same beige couch next to an unidentified person, who is holding a bag a Cheetos.  See June 10, 2024, Tr. at 81:15-83:1 (Castellano, Atencio)(discussing Padilla Cheetos Photograph).  The Padilla Cheetos Photograph has a header that indicates it was taken on July 21, 2019, at 9:04 P.M., in Las Vegas.  See Padilla Cheetos Photograph.  Although Atencio admits that she took this photograph with her cellular telephone, she invokes her Fifth Amendment privileges when asked why she did not produce this

photograph earlier.  See June 10, 2024, Tr. at 82:8-83:1 (Castellano, Atencio).  Similarly, when the United States asks her about a photograph of R. Padilla, wearing a different shirt and sitting on a different beige couch in front of a sunlit window, Atencio invokes her Fifth Amendment privileges "regarding this photograph . . . [i]ncluding how it was created."  June 10, 2024, Tr. at 83:2-11 (Castellano, Atencio)(discussing Padilla Window Photograph (dated July 22, 2019)(admitted as Padilla Hearing Exhibit C on June 10, 2023)("Padilla Window Photograph")). The Padilla Window Photograph has a header that indicates it was taken on July 22, 2019, at 1:40 P.M., in Las Vegas.  See Padilla Window Photograph.  Later, Atencio clarifies that she created both photographs by using her cellular telephone to take a photograph of her computer screen, because the images -- including the date and time banners -- were on her computer.  See June 10, 2024, Tr. at 105:20-107:12 (Castellano, Atencio).  Atencio also later says that, as far as she knows, the dates and times on the banners are accurate.  See June 10, 2024, Tr. at 116:7-11 (Castellano, Atencio).

Next, the United States walks through the FBI/Atencio Communication Chronology, and Atencio agrees with, and does not add to, most of it, including that: (i) on December 6, 2023, during R. Padilla's trial, she told Acee that she had forgotten some details about the morning after Lucero was murdered; and (ii) on January 9, 2024, she sent Acee the Atencio Snapchat Photograph, and he told her that this photograph likely did not change anything related to R. Padilla's murder conviction.  See June 10, 2024, Tr. at 83:12-86:5 (Castellano, Atencio). During this testimony, Atencio invokes her Fifth Amendment privileges regarding: (i) whether Jeffrey gave her a hard time about her trial testimony, see June 10, 2024, Tr. at 84:9-12 (Castellano, Atencio);  and (ii) most of what Acee and Atencio discussed during their February 26, 2024, conversation, other than the fact that Acee told Atencio that other witnesses testified at R. Padilla's

murder trial, see June 10, 2024, Tr. at 86:6-87:14 (Castellano, Atencio).  Next, the United States

plays some of R. Padilla and Atencio's jails calls.  See June 10, 2024, Tr. at 87:17-88:7 (Castellano,

Atencio).  Responding to the statements that she made to R. Padilla in Padilla/Atencio Jail Call 1,

Atencio says that she still believes that the United States did not "tell [her] to say anything."  June

10, 2024, Tr. at 88:13-15 (Castellano, Atencio).  Finally, Atencio asserts her Fifth Amendment

privileges when the United States asks her questions about how her revised recollection differs

from her trial testimony.  See, e.g., 91:1-9 (Castellano, Atencio).

On redirect, Atencio disputes the United States' framing her jail calls with R. Padilla as a

pressure campaign, and she insists that the Atencio Snapchat Photograph jogged her memory.  See

June 10, 2024, Tr. at 118:7-119:21 (Robert, Atencio); id. at 119:25-120:25 (Robert, Atencio).

Atencio also says that she is confident her revised recollection is correct, that her trial testimony

is wrong, and that she never lied to R. Padilla during their jail calls.  See June 10, 2024, Tr. at

132:4-9 (Robert, Atencio); id. at 135:23-25 (Robert, Atencio).  After Atencio concludes her

testimony, R. Padilla's counsel observes: "I think if she doesn't get immunized, then she's not

going to take the stand and testify about those things."  June 10, 2024, Tr. at 141:2-4 (Robert).

The United States then calls Acee as a witness.  See June 10, 2024, Tr. at 141:22-142:4

(Armijo, Court).  Acee says that he never spoke to Atencio in a threatening way and that, when he

served her subpoena, Atencio tells him that D. Padilla and Quintana had been attempting to contact

her.  See June 10, 2024, Tr. at 143:16-144:8 (Armijo, Acee).  Acee agrees that these comments are

"the extent of [his] conversation with her that day."  June 10, 2024, Tr. at 144:10-11 (Armijo,

Acee).  Regarding any other conversations with Atencio before or during R. Padilla's trial, Acee

says that he did not have any conversations with Atencio "prior to her testimony in reference to

her testifying."  June 10, 2024, Tr. at 144:15-24 (Armijo, Acee).  Acee says that, during their

January 9, 2024, conversation, Atencio tells Acee that Jeffrey had been "giving her a pretty hard time about her testimony."  June 10, 2024, Tr. at 146:21 (Acee).  Acee says that, during this conversation, Atencio appears worried and guilty because she believes that she made a mistake at trial, and Acee tries to calm her down by telling her that there were many other important witnesses besides her.  See June 10, 2024, Tr. at 146:17-148:13 (Armijo, Acee).  Acee also says that, on January 9, 2024, Atencio never tells him that she had been speaking with R. Padilla, or that she believes she has confused her dates.  See June 10, 2024, Tr. at 148:14-149:2 (Armijo, Acee).  Regarding the February 26, 2024, conversation -- where Atencio describes hearing about threatening telephone calls from Coca -- Acee says that he investigated whether Coca made any such calls, and he found none.  See June 10, 2024, Tr. at 149:24-22 (Acee).  Acee also says that, on this call, Atencio says that she had testified honestly at R. Padilla's murder trial.  See June 10, 2024, Tr. at 150:23-151:4 (Acee).  Acee testifies that, on this call, he tells Atencio that, if Jeffrey has pertinent information, he should come forward with it, rather than have Atencio describe what Jeffrey allegedly knows or saw.  See June 10, 2024, Tr. at 152:21-153:3 (Acee).  Acee says that, during these post-trial communications, Atencio never told him that she had testified about the wrong dates.  See June 10, 2024, Tr. at 152:1-3 (Armijo, Acee).  On cross-examination, Acee says that he does not remember Atencio saying that she is not sure whether her expected testimony is about the right night, although he remembers her being unsure about many aspects of her testimony.  See June 10, 2024, Tr. at 157:9-13 (Robert, Acee).  Acee also denies ever suggesting to Atencio that other witnesses might not be happy with her revised recollection.  See June 10, 2024, Tr. at 162:18-163:1 (Robert, Acee).

After Acee concludes his testimony, the parties begin to argue the Immunity Motion's merits.  See June 10, 2024, Tr. at 187:3-25 (Court, Robert).  R. Padilla asserts that, if Atencio

receives immunity, she would testify that R. Padilla is in her apartment "from early evening until the following morning, on July 22nd and July 23, without leaving," and that, at trial, her recollection that R. Padilla left her apartment is about July 21st, and not about July 22nd.  See June 10, 2024, Tr. at 191:23-193:4 (Robert).   R. Padilla argues that this testimony, when combined with Montaño's and Halpern's, solidifies R. Padilla's alibi, and would acquit him at a new trial.  See June 10, 2024, Tr. at 193:4-194:21 (Robert).   R. Padilla asserts that denying the Court the opportunity to hear from Atencio is a due process violation.  See June 10, 2024, Tr. at 198:19-23 (Robert).  When the Court asks R. Padilla to identify prosecutorial misconduct that may justify compelling the United States to immunize Atencio, R. Padilla points to Acee's alleged post-trial statements to Atencio -- where he allegedly tells her that she got her dates right, that other witnesses may not be happy with her changed story, and that Atencio's memory is unreliable because she was drinking and doing drugs on the nights in question -- as well as the two pre-trial instances where Atencio allegedly tells Acee and Mr. Castellano that she may have mixed up her dates, but the two men tell her that she has the dates right.  See June 10, 2024, Tr. at 201:14-205:1 (Court, Robert).  R. Padilla also emphasizes the Immunity Request Email, where the United States says it "will not provide immunity to Janaya Atencio to perjure herself," Immunity Request Email at 1, as an example of prosecutorial misconduct, see June 10, 2024, Tr. at 205:2-14 (Robert).  Finally, R. Padilla points out that, although the United States' witnesses were not immunized, Coca testified under a cooperation agreement that may reduce his sentence significantly:

> [T]here are different forms of immunity, if you will.  And when somebody comes to court testifying under an agreement in which a 5K1.1 motion is likely to be filed, reducing a sentence, in Coca's case, a potential life without parole sentence[,] to something significantly less, that's not exactly immunity, but it's not exactly not.  I mean, the Government chooses to whom to endow with these enormous privileges to be able to avoid years, if not decades, of their life spent in prison. . . .

> So while it's not immunity it's certainly greasing the skids for that testimony, as they poured rocks on the skids for Ms. Atencio coming forward with her now ironclad understanding of what actually occurred on those two days.

June 10, 2024, Tr. at 207:19-208:18 (Robert).  In response, the United States disputes that it engaged in any prosecutorial misconduct, pointing to Acee's testimony that he does not recall Atencio ever telling him that she had mixed up her dates.  See June 10, 2024, Tr. at 209:23-210:7 (Castellano).  The United States also disputes that Atencio's revised recollection changes meaningfully the total mix of evidence.  See June 10, 2024, Tr. at 214:21-216:3 (Court, Castellano).

After the parties conclude their Immunity Motion arguments, the Court invites the parties to argue the MNT.  See June 10, 2024, Tr. at 220:25-221:1 (Court).  First, R. Padilla calls Salazar as a witness.  See June 10, 2024, Tr. at 221:2-3 (Robert).  Salazar testifies that, although she tried to interview Atencio "at least three times" before R. Padilla's murder trial, June 10, 2024 Tr. at 223:8 (Salazar), each time Salazar went to Las Vegas to meet with Atencio, Atencio would stop answering Salazar's calls; thus, no one on R. Padilla's team interviewed Atencio before R. Padilla's murder trial, see June 10, 2024, Tr. at 222:1-223:12 (Robert, Salazar).  Salazar says that, in January, 2024, Atencio tells Salazar that she mixed up her dates at trial, and that the events she spoke about at trial took place on July 21, 2019, and not on July 22, 2019.  See June 10, 2024, Tr. at 224:1-225:2 (Salazar, Robert).  Salazar asserts that Atencio tells her that, on July 22, 2019, R. Padilla, Montaño, and Halpern all drank Jägermeister at her apartment, and that R. Padilla and Halpern spent the night.  See June 10, 2024, Tr. at 225:11-23 (Robert, Salazar).  Salazar also says that Atencio was upset about her January 9, 2024, conversation with Acee, because she felt that he "kind of blew her off."  June 10, 2024, Tr. at 226:21-227:9 (Robert, Salazar).  Salazar testifies that, during a May 29, 2023, Zoom meeting, Atencio tells her and Mr. Robert that she "felt that

[members of the prosecution team] were intimidating," June 10, 2024, Tr. at 229:21 (Salazar), but Salazar does not describe any specific allegation that Atencio makes regarding this issue. See June 10, 2024, Tr. at 229:11-21 (Robert, Salazar). On cross-examination, Salazar testifies that A. Padilla sent Salazar the Padilla Cheetos Photograph and Padilla Window Photograph in early January, 2024, and that A. Padilla got those photographs from Atencio. See June 10, 2024, Tr. at 234:11-18 (Robert, Salazar).

i. **The July 8, 2024, Hearing**.

At the July 8, 2024, hearing, the parties continue arguing the MNT. See July 8, 2024, Hearing Minutes at 1. First, the parties discuss R. Padilla's recent attempts to serve Jeffrey, despite Jeffrey's documented unwillingness to testify on R. Padilla's behalf. See July 8, 2024, Tr. at 3:25-6:9 (Court, Armijo, Castellano, Robert). The parties agree that R. Padilla has served Jeffrey properly,[24] and the United States does not oppose the Court's plan to issue a bench warrant to arrest Jeffrey for failing to appear at the hearing. See July 8, 2024, Tr. at 5:9-6:9 (Robert, Court, Castellano, Armijo). During the hearing, the Court issues Jeffrey's arrest warrant. See Warrant for the Arrest of a Witness or Material Witness in a Pending Criminal Case at 1 (dated July 8, 2024), filed July 8, 2024 (Doc. 318).

Next, the United States continues to cross-examine Salazar. See July 8, 2024, Tr. at 6:10-13 (Armijo, Salazar). When the United States asks Salazar to identify a portion of the jail calls where Atencio says that R. Padilla spent the night at her apartment on July 22, 2019, Salazar points to an exchange in Padilla/Atencio Jail Call 9 where Atencio says, "I think you did [spend the

---

[24]Specifically, the United States agrees that Jeffrey was served properly when the process server saw Jeffrey through the glass door of his apartment, Jeffrey refused to accept service and intimidated the process server, and the server left the subpoena at Jeffrey's front door. See July 8, 2024, Tr. at 4:16-5:17 (Robert, Court, Castellano).

night,]" and that he "might have spent the night," while Atencio questions him about where she would have slept if he slept in her bed.  See July 8, 2024, Tr. at 8:23-11:6 (Salazar, Armijo). Salazar also points to a portion of Padilla/Atencio Jail Call 10, where Atencio, again questioning where she would have slept if R. Padilla spent the night July 22, 2019, says that, although she remembers R. Padilla and Halpern coming out of her room, and Halpern asking Montaño and Atencio for sexual advice, she recalls that R. Padilla only slept in her room for a few hours and woke up some time between two and four in the morning.  See July 8, 2024, Tr. at 13:11-16:5 (Armijo, Salazar).  Next, the United States asks Salazar about the photographs from the June 10, 2024, hearing.  See July 8, 2024, Tr. at 24:22-25:1 (Armijo, Salazar).  Salazar says that Atencio sent A. Padilla those photographs -- the Padilla Cheetos Photograph and the Padilla Window Photograph -- and A. Padilla then sent them to Salazar, thus Salazar cannot testify how the date-stamped banners appear on the images.  See July 8, 2024, Tr. at 25:2-25:14 (Armijo, Salazar). Moreover, Salazar says that Atencio's attorney, Ms. Mitsunaga, furnished R. Padilla's defense team Atencio's computer -- which has the underlying images -- some time after the June 10, 2024, hearing, pursuant to a subpoena that R. Padilla served on Atencio.  See July 8, 2024, Tr. at 25:14-26:9 (Armijo, Salazar).

At this point, the United States represents that, despite the Court's order that the Atencio's computer be produced at the courthouse, R. Padilla's defense team and Ms. Mitsunaga have rebuffed the United States' requests for access to the computer.  See July 8, 2024, Tr. at 27:8-28:18 (Armijo, Court, Robert).  The Court orders the defense to "produce it right now," July 8, 2024, Tr. at 27:25 (Court), and R. Padilla's defense team sends someone to Salazar's hotel room to retrieve

the computer, see July 8, 2024, Tr. at 28:23-29:4 (Salazar, Court). Mr. Robert also gives[25] the

United States a flash drive that holds a copy of the computer's contents. See July 8, 2024, Tr. at

30:25-31:4 (Robert, Court). Salazar then confirms that she found photographs from July 21, 2019,

and July 22, 2019, on Atencio's computer, and that R. Padilla did not subpoena Atencio before

R. Padilla's murder trial. See July 8, 2024, Tr. at 31:21-32:11 (Armijo, Salazar). Specifically,

Salazar testifies that, although she found "the same type of photographs that were produced via e-

mail to Ms. Mitsunaga [before trial]," she did not find any photographs that were taken "around

July 22nd between 10:00 P.M." and midnight. July 8, 2024, Tr. at 33:13-20 (Salazar, Armijo). See

July 8, 2024, Tr. at 52:7-11 (Salazar)(describing how the July 21, 2019, photographs on Atencio's

computer match the "pictures we used at trial of the group sitting -- you know, Conferina, Mr.

Padilla, Joe Leyba."). Salazar also confirms that these same photographs were produced in

discovery, without metadata that would indicate when they were taken. See July 8, 2024, Tr. at

---

[25]Mr. Robert also represents incorrectly his team's possession of Atencio's computer:

MR. ROBERT:    And, Your Honor, just to clarify, I think we actually got the computer either Thursday or Friday of last week.

THE WITNESS:    We got it on Wednesday.

MR. ROBERT:    Okay. On Wednesday. So that would have been the --

THE WITNESS:    July 3rd.

MR. ROBERT:    July 3rd.

MS. ARMIJO:    Well, I believe they got it back from the company. They had in their possession, as testified to, early June; is that right?

THE WITNESS:    Yes.

July 8, 2024, Tr. at 31:6-17 (Robert, Salazar, Armijo).

52:18-:53:2 (Robert, Salazar).  Salazar then says that she discovered some photographs that were taken on July 22, 2019, the last of which was taken at 6:09 P.M., but she did not discover any photographs from July 23, 2019.  See July 8, 2024, Tr. at 53:18-54:4 (Robert, Salazar). Specifically, Salazar says that the July 22, 2019, photographs show "them" at an outdoor gathering, which is possibly a barbecue.  July 8, 2024, Tr. at 53:18-21 (Robert, Salazar).  Salazar does not testify that she discovered any July 22, 2019, photographs that show R. Padilla, Atencio, Halpern, Leyba, Montaño, or D. Padilla at Atencio's apartment.  See July 8, 2024, Tr. at 53:18-54:4 (Robert, Salazar).  Regarding the lack of pictures from July 22 and July 23, Salazar agrees that it is "theoretically possible [that] things that might have been deleted, for example, photographs from the 22nd and 23rd, could be recovered from a computer's cache," but that R. Padilla's defense team did not conduct a "full forensic evaluation" of Atencio's computer such that they could recover any deleted items from its cache.  July 8, 2024, Tr. at 60:2-9 (Robert, Salazar).  Neither Mr. Robert nor Salazar explain why they did not conduct a full forensic evaluation of Atencio's computer.

After Salazar's testimony, Mr. Robert represents that he intends to call Jeffrey as a witness after the United States Marshals arrest him and bring him to the courthouse.  See July 8, 2024, Tr. at 75:19-22 (Robert).  The Court appoints counsel for Jeffrey, because he may face exposure for his failure to obey a lawful subpoena.  See July 8, 2024, Tr. at 96:16-22 (Court).  The parties and the Court then agree to continue oral arguments at another time, because it is unlikely that Jeffrey will appear before the end of the day.  See July 8, 2024, Tr. at 96:16-98:4 (Robert, Court, Armijo). Before concluding the hearing, the Court asks R. Padilla to comment on two cases that address witness recantation in both a motion for new trial and a habeas context -- United States v. DiPaolo, 835 F.2d 46 (2d Cir. 1987), and In re Stewart, 78 F.4th 690 (4th Cir. 2023) -- in his written closing arguments.  See July 8, 2024, Tr. at 98:6-100:21 (Castellano, Court, Robert).  The Court then

approves sending out Atencio's computer for forensic examination. See July 8, 2024, Tr. at 101:1-102:21 (Castellano, Court, Robert). Finally, the parties agree to not set a date for the next hearing -- where Jeffrey would testify -- while they wait for the United States to conduct its forensic examination of Atencio's computer. See July 8, 2024, Tr. at 104:2-18 (Robert, Court, Gainor, Castellano).

Two days later, Jeffrey files a Motion to Quash Warrant for Tommy Jeffrey, filed July 10, 2024 (Doc. 320)("Motion to Quash"), arguing that Jeffrey "offers to surrender himself before the Court, to accept service of a subpoena for a rescheduled Evidentiary Hearing, and to appear and testify truthfully at said hearing." Motion to Quash at 1-2. The following day, the Court grants the Motion to Quash. See Order Granting Motion to Quash Warrant for Tommy Jeffrey at 1, filed July 11, 2024 (Doc. 321). On August 5, 2024, the Court schedules another hearing for September 9, 2024. See Notice of Motion Hearing as to Defendant Robert Padilla on Mr. Padilla's Motion for a New Trial, filed August 5, 2024 (Doc. 328).

### j.    The Motion for New Trial Supplement.

On August 27, 2024, R. Padilla files his MNT Supplement, which adds a new ground for granting his MNT: that the United States' alleged failure to disclose Atencio's uncertainty regarding her testimony is a Brady violation. See MNT Supplement at 3-12. To support his argument, R. Padilla attaches to the MNT Supplement the Romero/Atencio Telephone Conversation Transcript. See Romero/Atencio Telephone Conversation Transcript at 1. R. Padilla does not identify specifically which statements Atencio allegedly made to the United States constitute Brady material, and instead alleges generally that "Ms. Atencio had repeatedly expressed concerns that she had confused the dates on which critical events occurred." MNT Supplement at 6.

   **k.**  **R. Padilla's Withdrawal of Jeffrey as a Witness**.

On September 5, 2024, before the United States responds to the MNT Supplement, R. Padilla moves to vacate the follow-up hearing -- where Jeffrey was supposed to testify -- and informs the Court that the "parties have announced that no additional witnesses would be called, and that the evidence to be presented relative to the motion has been presented during previous hearings."  Unopposed Motion to Vacate Hearing Set for September 9, 2024 at 1, filed September 5, 2024 (Doc. 331).

   **l.**  **The Motion for New Trial Supplement Response, and the Motion for New Trial Supplement Reply.**

On September 12, 2024, the United States responds to the MNT Supplement.  <u>See</u> United States' Response to Defendant's Supplement to Motion for New Trial at 1-13, filed September 12, 2024 (Doc 334)("MNT Supplement Response").  In short, the United States argues that Atencio never told any members of the prosecution team that she was confused about the dates; thus, the United States could not have suppressed evidence that does not exist.  <u>See</u> MNT Supplement Response at 7.  On reply, R. Padilla disputes the United States' position, arguing: "The government was aware that Ms. Atencio had deep concerns about the correctness of her trial testimony long before trial.  Ms. Atencio raised those concerns again before she took the stand."  Mr. Padilla's Reply to Government Response to Supplement to Motion for New Trial at 7, filed October 7, 2024 (Doc. 339)("MNT Supplement Reply").  R. Padilla identifies three instances where Atencio allegedly tells the United States that she is unsure whether her expected testimony is about the right date: (i) when Acee serves her with a trial subpoena; (ii) during R. Padilla's murder trial, when Atencio allegedly speaks to the prosecution team about her uncertainty; and (iii) after

R. Padilla's murder conviction, when Atencio reaches out to Acee.  See MNT Supplement Reply at 3.

         **m.**      **R. Padilla's Written Closing Arguments.**

On October 7, 2024, both the United States and R. Padilla submit written closing arguments.  See United States MNT Closing Arguments at 1-18; Padilla MNT Closing Arguments at 1-30.  In addition to repeating many of his previous arguments, R. Padilla asserts:

> Aside from the recording (and transcript) of [Atencio's] conversation with Mr. Romero, and the testimony of Ms. Salazar regarding her conversation with Ms. Atencio, the Court to this day has not had the opportunity to hear directly from Ms. Atencio the truth: that Robert Padilla was in her apartment from the late afternoon of July 22, 2019, until the following morning.

Padilla MNT Closing Arguments at 10-11.  Because Atencio has not testified fully regarding her revised recollection, R. Padilla submits that both Atencio's conversation with Mr. Romero and Salazar's sworn testimony about her conversations with Atencio are both admissible as statements against interest.  See Padilla MNT Closing Arguments at 28.  As requested, R. Padilla also argues that United States v. DiPaolo, 835 F.2d 46, and In re Stewart, 78 F.4th 690, are inapposite, because the former involves testimony that is recanted under duress -- actual and threatened violence -- and the latter involves a habeas petitioner changing his story after allegedly recovering a new memory through hypnosis.  See Padilla MNT Closing Arguments at 15-19.  Although R. Padilla attempts to distinguish United States v. DiPaolo, 835 F.2d 46, and In re Stewart, 78 F.4th 690, R. Padilla does not point the Court to any case where a district court grants a motion for a new trial after a

witness alleges that his or her trial testimony was incorrect.  See Padilla MNT Closing Arguments at 1-30.[26]

### n.    The United States' Written Closing Arguments.

The United States MNT Closing Arguments largely repeats arguments in earlier briefing and at oral arguments regarding the MNT: R. Padilla failed to discover Atencio's revised recollection, because of his lack of due diligence; her revised recollection is merely impeaching and is immaterial to the principal issues; and her revised recollection would not acquit R. Padilla. See United States MNT Closing Arguments at 5-9.  Regarding R. Padilla's new Brady argument, the United States maintains that "Atencio never made representations to any member of the prosecution team that she was confused about the date that the defendant left her house."  United States MNT Closing Arguments at 10.  The United States points to five circumstances to challenge Atencio's assertion that she was confused about the dates and communicated that confusion to the United States before or during R. Padilla's murder trial: (i) Atencio testifies that the United States never told her to say anything specifically at R. Padilla's murder trial, and that she "admitted that the idea of the wrong date came up only after she spoke to the defendant on the phone"; (ii) Acee testifies that the United States' approach to gathering information from Atencio focuses on events, rather than specific dates; (iii) R. Padilla and Atencio "never had an answer during their jail call conversations about where she stayed the night that Leroy Lucero was murdered"; (iv) R. Padilla "employed a pressure and confusion campaign" to get Atencio to change her story after his murder trial; and (v) Atencio's changing recollections and unclear testimony compromise her credibility

---

[26]R. Padilla's other briefs also do not point the Court to any case where a district court granted a motion for a new trial after a witness alleges that his or her trial testimony was incorrect. See MNT at 1-11; MNT Reply at 1-7; MNT Supplement at 1-12.

such that "she cannot be believed when she says she got her dates mixed up or that she tried to communicate that concern to anyone on the prosecution team before trial." United States MNT Closing Arguments at 10-15.

## FINDINGS OF FACT

The Court makes the following finding of fact related to Atencio's contacts with Mr. Castellano during R. Padilla's murder trial:

1.    During R. Padilla's murder trial, Atencio does not tell Mr. Castellano that she is unsure whether her expected testimony is about the right date.  See June 10, 2024, Tr. at 144:15-24 (Acee)(testifying that he did not have any conversations with Atencio "prior to her testimony in reference to her testifying"); United States MNT Closing Arguments at 10 ("Atencio never made representations to any member of the prosecution team that she was confused about the date that the defendant left her house."); id. at 18 (indicating that Mr. Castellano signs the United States MNT Closing Arguments).[27]

---

[27]Atencio's post-trial testimony contradicts this finding of fact.  See June 10, 2024, Tr. at 38:3-22(Atencio)(testifying that, during R. Padilla's murder trial, Acee asks her to speak with Mr. Castellano about her confusion regarding the dates, and Mr. Castellano assures her that she has the right date).  Assessing the credibility of all parties -- Atencio, Acee, and Mr. Castellano --  and evaluating the record as a whole, the Court does not adopt Atencio's version of events and, instead, credits Acee's testimony and Mr. Castellano's representations for the reasons stated below in detail.  See infra, at 166-67.  Mr. Castellano has appeared before the Court many times, his words and representations to the Court are as good as gold, and he has been truthful as a prosecutor even when it hurts.  Given that Acee and Mr. Castellano agree on this point, and given that Atencio has been all over the place on a number of issues, her credibility is almost shot, and she is very impeachable, the Court credits Acee's and Mr. Castellano's testimony and representations to the Court.

### o.    R. Padilla's Glossip Supplement.

On March 2, 2025, R. Padilla supplements his MNT with an additional brief highlighting the Supreme Court's recent decision in Glossip v. Oklahoma, 604 U.S. -- , 145 S. Ct. 612 (2025)(Sotomayor, J.)("Glossip"). See Mr. Padilla's Supplement to Motion for New Trial to Address the U.S. Supreme Court's Decision in *Glossip v. Oklahoma*, 2025 LEXIS 865, filed March 2, 2025 (Doc. 352)("Glossip Supplement"). R. Padilla argues "that the Glossip decision provides further support for the motion for new trial." Glossip Supplement at 1. R. Padilla asserts that, in Glossip, the Supreme Court concludes that the government violates a defendant's due process rights by failing to correct false trial testimony. See Glossip Supplement at 2-3. R. Padilla argues that the same situation is present here, where Atencio allegedly tells the United States that she is uncertain about her trial testimony, and the United States allegedly "never advised the defense team of Ms. Atencio's expressed uncertainty." Glossip Supplement at 4.

### LAW REGARDING IMMUNIZING WITNESSES TO REMEDY DUE PROCESS VIOLATIONS

District courts may not immunize witnesses:

> Virtually all jurisdictions recognize that use immunity is a creature of statute which can be conferred only by the Executive Branch of the government. See, e.g., United States v. Richardson, 588 F.2d 1235, 1241 (9th Cir. 1978), cert. denied, 440 U.S. 947, . . . (1979); Ryan v. Commissioner, 568 F.2d 531, 540 (7th Cir. 1977), cert. denied, 439 U.S. 820, . . . (1978); United States v. Graham, 548 F.2d 1302, 1315 (8th Cir. 1977); United States v. Leyva, 513 F.2d 774, 776 (5th Cir. 1975); In Re Lochiatto, 497 F.2d 803, 804 n.2 (1st Cir. 1974); In Re Kilgo, 484 F.2d 1215, 1218 (4th Cir. 1973). See generally United States v. Turkish, 623 F.2d 769 (2d Cir. 1980).

United States v. Hunter, 672 F.2d 815, 818 (10th Cir. 1982)("Hunter")(ellipses added), overruled on other grounds by United States v. Call, 129 F.3d 1402, 1404 n.2 (10th Cir. 1997). See United States v. Serrano, 406 F.3d 1208, 1217 (10th Cir. 2005)("Serrano")("Every other Circuit, save the

Third,[28] has likewise held a district court does not have the inherent authority to grant a defense witness use immunity."); United States v. LaHue, 261 F.3d 993, 1014 (10th Cir. 2001)("LaHue")("[C]ourts have no inherent authority to grant a witness use immunity.").  The Tenth Circuit has, however, "left open the possibility 'that where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the government to choose between conferring immunity or suffering an acquittal.'" LaHue, 261 F.3d at 1014 (quoting Hunter, 672 F.2d at 818).  See Serrano, 406 F.3d at 1218 n.3.  Pressuring the United States to immunize a witness may remedy a due process violation that stems from the United States' withholding witness immunity.  See Hunter, 672 F.2d at 818 (expressing no opinion on the United States Court of Appeals for the Third Circuit's first "technique a court might employ if a prosecutor's refusal to grant witness use immunity handicaps a defendant's presentation of his case" -- a district court threatening to dismiss an indictment unless the prosecution grants immunity -- and rejecting the second technique -- a district court "bestow[ing] use immunity upon a witness whose testimony is essential to an effective defense . . . under the guise of due process.").

Although a "defendant's right to present a defense is essential to a fair trial," this due process right "does not include the right to compel a witness to waive his Fifth Amendment privilege against self incrimination." Serrano, 406 F.3d at 1214-15.  A witness' sovereignty over his testimony cuts both ways; just as a defendant may not compel a witness to waive his Fifth Amendment privileges, the government may not coerce a witness to invoke those privileges:

[T]he government cannot substantially interfere with a defense witness's decision to testify.  In Webb v. Texas, 409 U.S. 95, 97-98 . . . (1972)(per curiam), the

---

[28]After Serrano, the United States Court of Appeals for the Third Circuit abrogates its prior holding in Government of the Virgin Island v. Smith, 615 F.2d 964 (3d Cir. 1980), and holds that district courts lack authority to grant use immunity to a defense witness.  See United States v. Quinn, 728 F.3d 243, 252-57 (3d Cir. 2013).

Supreme Court held a trial judge's "lengthy and intimidating warning" and "threatening remarks" effectively caused the defendant's only witness not to testify in violation of the Due Process Clause. Therefore, a judge's admonition to a witness can violate Webb if it is threatening and employs coercive language. United States v. Smith, 997 F.2d 674, 680 (10th Cir. 1993). Courts have applied Webb to prosecutors, United States v. Crawford, 707 F.2d 447, 449 (10th Cir. 1983), and to the joint conduct of the district judge and prosecutor. United States v. Blackwell, 694 F.2d 1325, 1333-35 (D.C. Cir. 1982).

The due process analysis Webb dictates must be conducted on a case-by-case basis. Smith, 997 F.2d at 680. The dispositive question in each case is whether the government actor's interference with a witness's decision to testify was "substantial." Crawford, 707 F.2d at 449. Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering. Smith, 997 F.2d at 680; see also United States v. Davis, 974 F.2d 182, 187 (D.C. Cir. 1992). The potential for unconstitutional coercion by a government actor significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney. See Smith, 997 F.2d at 683 (Belot, J., concurring).

United States v. Serrano, 406 F.3d 1208, 1215-16 (10th Cir. 2005)(ellipses added)(emphasis in original). A judge or prosecutor may violate a defendant's due process rights if they "'actively' encourag[e] a witness not to testify, or [] badger[] a witness to remain silent." United States v. Smith, 997 F.2d 674, 680 (10th Cir. 1993)(quoting United States v. Arthur, 949 F.2d 211, 216 (6th Cir.1991)). See United States v. Dalton, 918 F.3d 1117, 1130 (10th Cir. 2019). When a witness changes her testimony, "[j]udges and prosecutors do not necessarily commit a Webb-type violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously." United States v. Smith, 997 F.2d at 680. A judge's perjury warning may violate due process, however, "if it is 'threatening' and employs 'coercive language indicating the court's expectation of perjury.'" United States v. Smith, 997 F.2d at 680 (quoting United States v. Harlin, 539 F.2d 679, 681 (9th Cir. 1976)). Surveying relevant Tenth Circuit case law and academic literature, the Court also has determined that the United States' selective immunization violates due process when: (i) the non-immunized

witness's testimony is material, exculpatory, not cumulative, and not obtainable from any other

source; and (ii) the prosecution's decision to deny immunity is made with the deliberate intention

to distort the fact-finding process.  See United States v. Baca, 447 F. Supp. 3d 1149, 1220-22

(D.N.M. 2020)(Browning, J.), aff'd sub nom. United States v. Cordova, 25 F.4th 817 (10th Cir.

2022).[29]

---

[29]In United States v. Baca, the Court states:

> The majority of Courts of Appeals have adopted a standard to determine whether the United States' selective use of immunity violates the due process rights of the defendant that requires a showing that: "[(i) t]he witness's testimony is material, exculpatory, not cumulative, and not obtainable from any other source; and [(ii) t]he government's decision to deny immunity was made with the 'deliberate intention of distorting the fact-finding process.'"  William F. Johnson & Jennifer K. Kim, Defense Witness Immunity: The Time Has Come in the 9th Circuit -- Will it Catch On?, Andrews White-Collar Crime Reporter, 2010 WL 697368, at *1 (quoting United States v. Turkish, 623 F.2d 769, 776 (2d 1980)).  The Tenth Circuit, more than once, has articulated the second part of that test in context of determining whether selective use of immunity is a due process violation: if a United States officer deliberately has denied immunity to alter the fact finding process, the United States must decide whether to grant immunity to right the wrong or watch as the Court acquits the defendant.

>> However, in [United States v.]Hunter, [672 F.2d 15, 818 (10th Cir. 1982), abrogation on other grounds recognized in  United States v. Call, 129 F.3d 1302, 1404 (10th Cir. 1997), cert. denied, 524 U.S. 906 (1998)),] we left open the possibility 'that where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the  government to choose between conferring immunity or suffering an acquittal.

> United States v. LaHue, 261 F.3d 993, 1014 (10th Cir. 2001)(quoting United States v. Hunter, 672 F.2d at 818, and citing United States v. Chalan, 812 F.2d 1302, 1310 (10th Cir. 1987), cert denied. 488 U.S. 983 (1988)); United States v. Dalton, 918 F.3d 1117, 1131 (10th Cir. 2019); United States v. Apperson, 441 F.3d 1162, 1203 (10th Cir. 2006).  The Tenth Circuit, however, has declined to expressly adopt this standard.  See United States v. LaHue, 261 F.3d at 1014 ("We need not decide this legal question. . .").  Despite the Tenth Circuit's reluctance to adopt the standard officially, the Tenth Circuit has affirmed a district court case that used the standard, explicitly stating that the district court did not abuse its discretion when it declined

to grant immunity, because the defendants did not demonstrate that the United States was deliberately attempting to "distort the fact finding process." United States v. LaHue, 261 F.3d at 1015. It affirmed another district court case that used the standard, concluding that the defendant did not provide "factual support for that contention [that the United States' decision to not grant immunity was a deliberate attempt to distort the fact finding process, and i]n the absence of such support, there is no merit to his assertion, and in turn no basis for concluding that the district court abused its discretion in refusing to grant immunity." United States v. Apperson, 441 F.3d at 1203-04. Notably in United States v. Apperson, the Tenth Circuit declined to "'sift through th[e] case's voluminous record to find support for the [defendants'] claims,'" 441 F.3d at 1204 (quoting United States v. LaHue, 261 F.3d at 1015), and instead deferred to the district court's ruling. This statement implies that the Tenth Circuit would have applied the standard itself when making its decision, had it not had the district court's rulings. Because the Tenth Circuit has repeatedly referenced the standard and affirmed a case based on the standard, the Court is inclined to apply the standard in this case.

Moreover, the Court believes that applying this standard is the right legal decision. Applying this standard reconciles the tension between allowing the United States to do its prosecutorial job and safeguarding the defendant's due process rights. Although Congress has given the United States immunization power, courts must check that power to ensure it is being applied. The Tenth Circuit's articulated standard still guards the United States prosecutors against baseless arguments. The standard uses the word "deliberately," which requires defendants to focus on prosecutor's intent, and not only the outcome. Moreover, the word "deliberately" lays a heavy burden atop defendants' shoulders, as they must demonstrate the United States' intent and not the outcome of the United States' immunization. This standard accords with the related presumption of prosecutor regularity, which "'supports prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'" United States v. Deberry, 430 F.3d 1294, 1299 (10th Cir. 2005) (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)).

The Tenth Circuit has implied that the presumption of prosecutor regularity, which applies in selective-prosecution claims, is applicable to selective-immunity claims. See United States v. Serrano, 406 F.3d at 1218. In United States v. Serrano, the Tenth Circuit presumed, in the absence of clear evidence in the record that demonstrated that the United States attorney committed misconduct, that "the United States attorney's office has properly discharged its official duties." 406 F.3d at 1218. Although the Tenth Circuit has not explicitly stated that the presumption of prosecutor regularity applies to selective-immunity claims, the presumption of prosecutor regularity is sufficiently analogous to selective-immunity claims that the Court looks to it for guidance. In selective-prosecution claims, "[t]he defendant is asking the judiciary to exercise power over a 'special province of the executive

branch, a province in which, for good reason, the executive possesses broad discretion." United States v. Deberry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 464 (internal quotation marks omitted in United States v. Deberry). In this selective-immunity claim, Cordova is asking the Court to exercise power over immunity, an area that Congress has elected to give to the Department of Justice and not to the courts. Although selective-immunity claims are less subject to the concerns that judicial review will "'chill law enforcement by subjecting the prosecutors motives and decisionmaking to outside inquiry,'" which could "reveal[] the Government's enforcement policy" than selective-prosecution claims, United States v. DeBerry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 464), the Court still could undermine a larger strategic prosecutorial plan by interfering with immunity decisions. Thus, the analogous nature of the two claims guides the Court to ensure that the proposed Tenth Circuit standard accords with the presumption of prosecution regularity. The use of the word "deliberately" in the majority approach accords with the similarly heavy burden, clear evidence -- that the presumption of prosecutorial regulatory places on defendants. Nonetheless, both doctrines also provide a mechanism for defendants to seek remedy for due process violations. The Court, thus, concludes that the majority approach is consistent with the presumption of prosecutor regularity, because the two doctrines share similar goals, defendant burdens, and prosecutorial safeguards. Accordingly, the Court applies the Tenth Circuit proposed test to this case.

The majority approach requires a defendant bringing a selective-immunity claim to show that "the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process." United States v. LaHue, 261 F.3d at 1015 (internal quotations omitted). Most Courts of Appeals have adopted the same proposed test but added an additional requirement -- that the witness testimony is "material, exculpatory, not cumulative, and not obtainable from any other source." William F. Johnson & Jennifer K. Kim, Defense Witness Immunity: The Time Has Come in the 9th Circuit -- Will it Catch On?, Andrews White-Collar Crime Reporter, 2010 WL 697368, at *1 (citing United States v. Turkish, 623 F.2d 769, 776 (2d 1980)). Although the Tenth Circuit has not included that requirement in its proposed standard, see, e.g., United States v. Dalton, 918 F.3d at 1131; United States v. Apperson, 441 F.3d at 1203, it has implied in at least two cases that the majority approach would require the defendant to satisfy that requirement. See United States v. LaHue, 261 F.3d at 1015 (stating that, in part, the defendants do not meet their burden, because they do not "explain how their testimony would be material, exculpatory, and not cumulative as well as unavailable from any other source")(citing United States v. Bahadar, 954 F.2d 821, 826 (2d Cir. 1992)(requiring testimony to be material, exculpatory, not cumulative, not available from another source to meet standard), cert. denied, 506 U.S. 850 (1992); United States v. Ochoa, 124. F.3d 218 (Table), 1887 WL 488738, at *3 (implying the requirement was not met by stating that the defendant did not meet the burden,

in part, because "[t]his testimony, even if believed, would not have exonerated the defendant and would not have materially challenged the testimony about the defendant's . . . role"). The Court notes that the most recent Tenth Circuit cases to touch on the proposed standard have omitted the requirement. See e.g. United States v. Dalton, 918 F.3d at 1131; United States v. Apperson, 441 F.3d at 1203. Regardless, the Court thinks that the Tenth Circuit would apply the majority approach, because it has affirmed the district courts in the past that have applied that approach. Thus, the Court will apply that requirement.

United States v. Baca, 447 F. Supp. 3d 1149, 1220-22 (D.N.M. 2020)(Browning, J.), aff'd sub nom. United States v. Cordova, 25 F.4th 817 (10th Cir. 2022). In United States v. Baca, the Court also acknowledges and applies in the alternative two tests that the United States Court of Appeals for the Ninth Circuit and the United States Court of Appeals for the Third Circuit use to evaluate whether selective immunization violates due process:

> The United States Court of Appeals for the Ninth Circuit has articulated its own use-immunity test. See United States v. Straub, 538 F.3d 1147, 1162 (9th Cir. 2008) . . . . The Ninth Circuit's test lessens the burden defendants carry. William F. Johnson & Jennifer K. Kim, Defense Witness Immunity: The Time Has Come in the 9th Circuit – Will it Catch On? at 3, 24 Andrews White-Collar Crime Reporter 1 (2010). Rather than focusing on whether the United States intended to distort the fact-finding process, the Ninth Circuit focuses on the whether the United States' "conduct had the effect of distorting the fact-finding process." William F. Johnson & Jennifer K. Kim, Defense Witness Immunity: The Time Has Come in the 9th Circuit -- Will it Catch On? at 3. The Ninth Circuit first assesses whether "'the witness's testimony would have been relevant.'" United States v. Straub, 538 F.3d at 1157 (quoting William v. Woodford, 384 F.3d 567, 600 (9th Cir. 2004)). The Ninth Circuit "describes the relevant requirement as 'minimal.'" United States v. Straub, 538 F.3d at 1157 (quoting William v. Woodford, 384 F.3d at 600).

> Either the prosecution intentionally caused the witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process or the prosecution granted immunity to a government witness but denied immunity to a defense witness who directly contradicted the government witness, and this denial had the effect of distorting the fact-finding process.

> United States v. Straub, 538 F.3d at 1162.

> . . . .

> The United States Court of Appeals for the Third Circuit has its own five-part selective- immunity test. See Gov't of Virgin Islands v. Smith, 615 F.2d 964, 972 (3d Cir. 1980), abrogated on other grounds by United States v. Quinn, 728 F.3d

243 (3d Cir. 2013). The Third Circuit has the following requirements for the defendant: "'[1] [I]mmunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity.'" United States v. Quinn, 728 F.3d at 262 (quoting Gov't of Virgin Islands v. Smith, 615 F.2d at 972).

United States v. Baca, 447 F. Supp. 3d at 1224, 1226 (ellipses added). The Court explains further why the Tenth Circuit would and should adopt the majority approach, and not adopt either the Ninth Circuit or the Third Circuit approach:

When the Tenth Circuit elects to adopt a defense-witness-immunity approach, it should choose the majority approach, which is the standard that it has referenced, instead of the Ninth Circuit's approach or the Third Circuit's approach. The majority approach has the highest burden for defendants. See William F. Johnson and Jennifer K. Kim, Defense Witness Immunity: The Time has Come in the 9th Circuit -- Will it Catch On?, 2010 WL 697368, at *1 (stating that the majority approach is "considerably higher than that of the 9th Circuit"). The majority approach best balances the defendant's ability to present an effective defense and due process under the Fourteenth Amendment of the United States Constitution while respecting Congressional intent to leave immunity exclusively to the Executive Branch.

The Constitution instructs the Executive Branch to "faithfully execute[]" the laws, U.S. Const. art. II, § 3, and thus the Executive Branch has "broad discretion to enforce" those laws. United States v. Serrano, 406 F.3d at 1217 (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)(internal quotations omitted in United States v. Serrano). Congress facilitated this execution by enacting the Immunity Witness Act, 18 U.S.C. §§ 6001-05, which authorizes the United States to compel a witness to testify by granting them use immunity. See 18 U.S.C. §§ 6002-03. Congressional intent is plain -- the Executive Branch has broad discretion to immunize witnesses to better enforce the laws. Thus, the Court must place a heavy burden on the defendant to avoid disturbing that power unless necessary to avoid a due process violation. See United States v. LaHue, 261 F.3d at 1015. A violation of a constitutional right necessitates disrupting that power. The defendant, however, must come forth with sufficient evidence to justify the Court peering into prosecutorial decision-making. The majority of Courts of Appeals have limited the situations in which they will impose consequences for the United States deciding not to immunize a defense witness, realizing Congress' intent. To expand the scope of judicial consequences for the United States' refusal to immunize a defense witness, "proponents [of use immunity for defense

- 108 -

witnesses] must address their arguments to Congress, not the courts." <u>United States v. Lenz</u>, 616 F.2d 960, 962-63 (6th Cir. 1980).

Scholars and other Courts of Appeals have argued that the burden need not be so high, because a lower burden, such as the Third Circuit's approach or the Ninth Circuit's approach, would better equalize the power disparity between the United States and the defendant. Nathaniel Lipanovich, <u>Resolving the Circuit Split on Defense Witness Immunity: How the Prosecutorial Misconduct Test has Failed Defendants and What the Supreme Court Should Do About It</u>, 91 Tex. L. Rev. 175, 189-90 (2012). The Court disagrees that such a measure is necessary. A trial is not meant to be an equal proceeding, but rather a fair proceeding. A defendant will rarely have the resources to match the United States' resources, but a proceeding can still be fair. A trial is structured to account for imbalances between the parties and make the proceedings as fair as possible. Many of those structures take the form of burdens on the United States. For instance, the United States cannot address a defendant's decision not to testify, and courts instruct juries not to read into that decision. <u>See</u> <u>United States v. Rahseparian</u>, 231 F.3d 1267, 1272, 1276 n.3 (10th Cir. 2000). Notably, the United States has the burden of proof -- a "defendant can prevail without presenting any evidence at all, while the prosecution must convince the jury beyond a reasonable doubt of defendant's guilt." Nathaniel Lipanovich, <u>Resolving the Circuit Split on Defense Witness Immunity: How the Prosecutorial Misconduct Test has Failed Defendants and What the Supreme Court Should Do About It</u>, 91 Tex. L. Rev. at 189-90. Retaining the exclusive authorization to immunize witnesses provides the United States with the opportunity to obtain information, information that the defendant's right not to testify may hinder them from getting otherwise.

Motions for new trials are "generally disfavored," and courts grant new trials with "extreme caution." Matthew B. Jager, United States v. Griffin: <u>Can a Convicted Codefendant's Exculpatory Testimony Be Newly Discovered Evidence on a Defendant's Rule 33 Motion for a New Trial?</u>, 37 Am. J. Trial Advocacy 421, 423 (2013). To protect against new trial motions resulting from codefendants collaborating to exonerate each other after trial, courts do not characterize a former codefendant's exculpatory testimony, if the former codefendant originally chose to not testify and if the defendant was aware of the testimony, as newly discovered evidence. <u>See</u> <u>United States v. Muldrow</u>, 19 F.3d at 1339 ("If a former codefendant who originally chose not to testify subsequently comes forward and offers testimony exculpating a defendant, the evidence is not newly discovered if the defendant was aware of the proposed testimony before trial.")(citing <u>United States v. DiBernardo</u>, 880 F.2d 1216, 1224-25 (11th Cir. 1989); <u>United States v. Metz</u>, 652 F.2d 478, 480 (5th Cir. 1981)). If the Court adopted the Ninth Circuit's approach or the Third Circuit's approach, this lower burden on defendants could result in an undermining of the protections that courts have put in place regarding cooperative perjury. This burden would allow a co-conspirator who has taken a

plea agreement to reveal suddenly, after trial, evidence that exonerates his or her conspirator.

. . . .

Moreover, the majority approach still provides redress when the United States deliberately abuses immunity to distort the fact-finding process while also according with the presumption of prosecutorial regularity. See United States v. LaHue, 261 F.3d at 1015. The presumption of prosecutorial regularity compels courts to "presume that [prosecutors] have properly discharged their official duties" in selective immunity cases. United States v. Deberry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 465)(alteration in United States v. Deberry). As discussed supra, the Court concludes that the absence of a presumption would "'chill law enforcement by subjecting the prosecutor's motives and decisonmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy,'" United States v. Deberry, 430 F.3d at 1299 (quoting United States v. Armstrong, 517 U.S. at 465), and the Court concludes the presumption also should apply to use-immunity claims. The only standard that fully accords with that presumption is the majority approach. The majority approach presumes proper prosecutorial discharge and allows consequence only when that presumption is overcome by evidence that the United States deliberately distorted the fact-finding process. In contrast, the Third Circuit's approach and the Ninth Circuit's approach do not presume proper prosecutorial discharge of duties. Under the Third Circuit's approach and the Ninth Circuit's approach, the defendant needs to show only that the United States' actions have "the effect of distorting the fact finding process." Defense Witness Immunity at 3 (emphasis in Defense Witness Immunity). Accordingly, a United States prosecutor can discharge his or her duties properly but still face the defendant's acquittal or the Court's compulsion of a grant of use immunity under these approaches. Thus, the Third Circuit's approach and the Ninth Circuit's approach do not accord with the presumption of prosecutorial regularity. Moreover, not only does the majority approach presume prosecutorial regularity, it still respects the defendant's right to due process by providing a mechanism for defendants to demonstrate prosecutorial misconduct. See United States v. Deberry, 430 F.3d at 1299. If a defendant can show that the United States deliberately distorted the fact-finding process, the Court can redress the harm by giving the United States the choice of providing grant immunity or watching the Court acquit the defendant. See United States v. LaHue, 261 F.3d at 1014. Thus, the Court concludes that the Tenth Circuit should adopt the majority approach to use immunity for defense witnesses.

United States v. Baca, 447 F. Supp. 3d at 1228-30 (ellipses added).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802). Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "Hearsay bars a party from presenting its own statements, such as 'a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination.'" United States v. Baca, 447 F. Supp. 3d at 1206 (quoting United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See United States v. DeLeon, 287 F. Supp. 3d 1187, 1235-36 (D.N.M. 2018)(Browning, J.).

## LAW REGARDING STATEMENTS AGAINST INTEREST

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest." United States v. Lozado, 776 F.3d 1119, 1125 (10th Cir. 2015)(citing Williamson v. United States, 512 U.S. 594, 599 (1994)). A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person

believed it to be true." Fed. R. Evid. 804(b)(3)(A). Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "'the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'" United States v. Smalls, 605 F.3d at 780-81 (quoting Williamson v. United States, 512 U.S. at 599). The Tenth Circuit says: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." United States v. Smalls, 605 F.3d at 783. That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Williamson v. United States, 512 U.S. at 600. See United States v. Baca, 447 F. Supp. 3d at 1206-07; United States v. DeLeon, 287 F. Supp. 3d at 1240.

## LAW REGARDING MOTIONS FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a)    Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b)    Time to File.**

      **(1)    Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial

until the appellate court remands the case.

(2)    **Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bold in original).  Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one.  See Fed. R. Crim. P. 33(a).  See also United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999)("Quintanilla").  "A motion for a new trial is not regarded with favor and should only be granted with great caution."  Sinclair, 109 F.3d at 1531 (citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1997)).  "'[A] defendant may not invoke rule 33 when he or she has pled guilty.'"  United States v. Christy, 883 F. Supp. 2d 1040, 1047 (D.N.M. 2012)(Browning, J.)(quoting United States v. Lambert, 603 F.3d 808, 809 (10th Cir. 1979)).

"The Tenth Circuit has further stated that when 'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'"  United States v. Thomas, No. 13-CR-01874 MV, 2016 WL 9819560, at *8 (D.N.M. August 5, 2016)(Vázquez, J.)(quoting United States v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)).  "'The power to grant a new trial on the ground that the verdict is against the weight of the evidence should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.'"  United States v. Guzman-Martinez, No. CR 03-2118 RB, 2004 WL 7338099, at *1 (D.N.M. March 10, 2004)(Brack, J.)(quoting United States v. Mounkes, 204 F.3d 1024, 1027 (10th Cir. 2000)).

The Court previously has addressed motions for new trials under rule 33 in various cases.  See, e.g., United States v. Kearney, No. CR 19-2848 JB, 2023 WL 5176276, at *23-31 (D.N.M.

Aug. 11, 2023)(denying a motion for a new trial where, despite the defendant's complaints, the Court properly instructs the jury, appropriately excuses an intimidated juror, and does not excuse a juror who had prior business dealings with one of the defendant's business associates); United States v. Folse, No. CR 15-2485 JB, 2018 WL 6047415, at *20-22 (D.N.M. Nov. 19, 2018)(Browning, J.)(denying a motion for a new trial and a request for additional discovery where the defendant does not produce evidence that, with additional discovery, he could show that the United States destroyed evidence and, despite having earlier had notice that alleged deficiencies might exist in the United States' evidence, he did not seek evidence of such information); United States v. Neha, No. CR 04-1677 JB, 2006 WL 4062889, at *2-4 (D.N.M. June 26, 2006)(Browning, J.)(denying a new trial motion where the defendant complains of the United States' brief references to his criminal history and of the United States' comment to the jury that the Court altered a co-conspirator's statement, and where the weight of the evidence supports the verdict).

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence if the defendant presents that motion within three years of the verdict of guilt.  See Fed. R. Crim. P. 33(b)(1).  Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlines in Sinclair. See 109 F.3d at 1531.  The defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

Sinclair, 109 F.3d at 1531 (quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992).

See Quintanilla, 193 F.3d at 1147 (discussing Sinclair's rule 33 test).  See also United States v.

Velarde, No. CR 98-0391 JB, 2008 WL 5993210, at *31-44 (D.N.M. May 16, 2008)(Browning, J.)(permitting a new trial in a sexual assault case where, after the trial, the defendant uncovered evidence that the alleged victim had accused other individuals of sexual assault. "Under Sinclair, a court cannot grant a new trial on the discovery of new impeachment evidence." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *33 (D.N.M. February 2, 2015)(Browning, J.)(citing Sinclair, 109 F.3d at 1531).

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, the Supreme Court holds that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59 (2004)(Scalia, J.). In Davis v. Washington, 547 U.S. 813 (2006)(Scalia, J.), the Supreme Court further elaborated on what constitutes a "testimonial" statement:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. See Ohio v. Clark, 576 U.S. 237, 245 (2015)(Alito, J.)("[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial."). The Tenth Circuit has restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement

is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d 1024, 1048 (10th Cir. 2014)(quoting United States v. Smalls, 605 F.3d 765, 777-78 (10th Cir. 2010))(brackets in United States v. Morgan).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).

    In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009)(Scalia, J.), the Supreme Court addresses whether the admission of a sworn affidavit by a forensic chemist, who testifies in the affidavit that the substance which police seized from the defendant is cocaine of a certain amount, violates the Confrontation Clause.  See 557 U.S. at 307.  The Supreme Court first concludes that such affidavits are testimonial, because they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and because, under Massachusetts law, the sole purpose of the affidavit is to provide prima facie evidence of the content of the substance seized.  557 U.S. at 310.  The Supreme Court then used the affidavit that the prosecution introduces to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]"  At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320.  Because there is no opportunity to cross-examine on these issues, the Supreme Court concludes that introduction of the affidavit violates the defendant's rights under the Confrontation Clause.  See 557 U.S. at 329 ("The Sixth Amendment does not permit the

prosecution to prove its case via ex parte out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error."). The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming v. New Mexico, 564 U.S. 647, 661 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" (quoting Melendez-Diaz v. Massachusetts, 557 U.S. at 319 n.6)). The Court has evaluated Confrontation Clause issues several times. See United States v. Salas-Aguayo, No. CR 12-3109 JB, 2024 WL 453642, at *21 (D.N.M. Feb. 6, 2024)(Browning, J.)(concluding that the Confrontation Clause does not bar co-conspirator statements, nonhearsay, or statements that were not made for use in the investigation or prosecution of a crime); United States v. DeLeon, 558 F. Supp. 3d 1105, 1125 (D.N.M. 2021)(Browning, J.)(concluding that a statement made from one inmate to another in a prison recreation yard is not testimonial, because the statements was not given to law enforcement, and there is no indication the declarant intended to create a record for trial or other proceeding)United States v. Chapman, No. CR 14-1065 JB, 2015 WL 4042177, at *26-29 (D.N.M. June 29, 2015)(Browning, J.)(concluding that prohibiting a defendant from cross-examining a witness about an uncharged alleged theft does not violate the Confrontation Clause).

## LAW REGARDING MOTIONS FOR NEW TRIAL BASED ON ALLEGED BRADY VIOLATIONS

The United States' withholding of evidence that, if made available, would tend to exculpate a defendant violates that defendant's due process rights. See Brady, 373 U.S. 83, 87 (1963). Upon

the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  See Fed. R. Crim. P. 33(a).  Motions for new trials are, however, disfavored and "should only be granted with great caution."  Quintanilla, 193 F.3d at 1146 (reversing district court's grant of a new trial motion based in part on alleged Brady violations).  A defendant seeking a new trial based on an alleged Brady violation must demonstrate that: "'(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'"  United States v. Velarde, 485 F.3d 553, 558 (10th Cir. 2007)(quoting Quintanilla, 193 F.3d at 1149 n.10).  "Evaluation of a Brady claim asserted in a motion for a new trial involves an application of [those] three elements . . . and not the five-prong . . . test utilized in typical newly discovered evidence claims." Quintanilla, 193 F.3d at 1149 n.10.  The Court has denied previously a motion for new trial for not meeting all three Quintanilla elements.  See United States v. Gould, No. CR 03-2274 JB, 2011 WL 1103805, at *10-14 (D.N.M. Mar. 16, 2011)(Browning, J.)(denying a motion for new trial where the prosecution suppresses documents regarding the victim's psychological state, because the defendant does not demonstrate that the evidence is favorable or material).

The Constitution does not "demand an open file policy."  Kyles v. Whitley, 514 U.S. 419, 437 (1995).  "While an 'open file' policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue." Smith v. Sec'y Dep't of Corr., 50 F.3d at 828 (emphasis in original)(internal quotations have no citations).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more.  But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in

the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, <u>see</u> <u>Brady</u>, 373 U.S. at 87 . . .), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

<u>Kyles v. Whitley</u>, 514 U.S. at 437-38 (ellipses added)(internal quotations have no citations).

The United States' good faith or bad faith is irrelevant.  <u>See</u> <u>Brady</u>, 373 U.S. at 87.  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  <u>Kyles v. Whitley</u>, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation exists only "when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  <u>Kyles v. Whitley</u>, 514 U.S. at 433 (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976)).  On the other hand, "[t]he Constitution, as interpreted in <u>Brady</u>, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  <u>Smith v. Sec'y Dep't of Corr.</u>, 50 F.3d at 823.

**1.     Suppression.**

"[W]hile proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a <u>Brady</u> claim, such proof is by no means necessary."  <u>Smith v. Sec'y Dep't of Corr.</u>, 50 F.3d at 824.  In <u>United States v. Hernandez-Muniz</u>, 170 F.3d 1007 (10th Cir. 1999), the Tenth Circuit determines that the United States does not suppress information when it does not provide the defendant with his own statement made to an agent, but instead provides the defendant with the agent's statements made at a preliminary hearing, because the defendant's trial counsel attended that hearing, cross-examined the agent, and the transcripts of the preliminary hearing testimony were made available

to the defendant.  See United States v. Hernandez-Muniz, 170 F.3d at 1010.  The Tenth Circuit holds that the United States does not suppress the defendant's statement, because it "provided the allegedly exculpatory information at the preliminary hearing" and "due process does not necessarily require disclosure in a specific form or manner."  United States v. Hernandez-Muniz, 170 F.3d at 1011.

2.    **Favorability.**

The evidence in question must be exculpatory or favorable to the defendant.  See Smith v. Sec'y Dep't of Corr., 50 F.3d at 825; United States v. Gray, 52 F. App'x. 945, 947 (9th Cir. 2002)(holding that medical records of the alleged victim containing extensive impeaching evidence bearing on her ability and inclination accurately and truthfully to perceive, remember, and relate what occurs are favorable to the defendant, because they are impeachment material).  "It is precisely because defense counsel does not, and cannot, know what potentially exculpatory evidence the prosecutor possesses that there cannot realistically be any meaningful distinction between the prosecutor's obligation under Brady in a general request case and its obligation in a no request case."  Smith v. Sec'y Dep't of Corr., 50 F.3d at 826-27.  The prosecution has an obligation to disclose obviously exculpatory evidence regardless whether the defense has requested it.  See Smith v. Sec'y Dep't of Corr., 50 F.3d at 827.

3.    **Materiality.**

"To make the materiality determination, [the court] view[s] the evidence's significance in relation to the record as a whole."  United States v. Hughes, 33 F.3d 1248, 1252 (10th Cir. 1994).  Evidence is "material" for purposes of granting a new trial on an alleged Brady violation "'"only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."'"  United States v. Velarde, 485 F.3d at 559 (quoting

United States v. Robinson, 39 F.3d 1115, 1118 (10th Cir. 1994)(quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  "'"A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."'"  United States v. Velarde, 485 F.3d at 559 (quoting United States v. Robinson, 39 F.3d at 1118)(quoting United States v. Bagley, 473 U.S. at 682 (1985)(quotations in United States v. Bagley have no citations).  In evaluating materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles v. Whitley, 514 U.S. at 434.  "A showing of materiality 'does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).'"  Scott v. Mullin, 303 F.3d 1222, 1230-31 (10th Cir. 2002)(quoting Kyles v. Whitley, 514 U.S. at 434).

The Tenth Circuit notes that:

> Under this more flexible, sliding scale approach to assessing the materiality vel non of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation.  As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation.  Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a Brady violation.

Smith v. Sec'y Dep't of Corr., 50 F.3d at 827.  Failure to disclose a specifically requested report is "'seldom, if ever excusable.'"  Smith v. Sec'y Dep't of Corr., 50 F.3d at 830 (quoting United States v. Agurs, 427 U.S. at 106).

## ANALYSIS

The Court undertakes its analysis in three sections.  First, the Court concludes that it will neither grant Atencio immunity, nor force the United States to immunize her or face acquittal,

because: (i) district courts may not immunize witnesses; and (ii) the United States' withholding immunity from Atencio does not violate R. Padilla's due process rights. Second, the Court concludes that it will not order a new trial based on newly discovered evidence, because: (i) R. Padilla's own lack of diligence caused any failure to obtain Atencio's revised recollection; and (ii) Atencio's revised recollection would not likely produce an acquittal at a new trial. Third, the Court concludes that it will not order a new trial, based on alleged Brady violations, because (i) the United States did not suppress Atencio's revised recollection; and (ii) Atencio's revised recollection may not be favorable to R. Padilla. Accordingly, the Court denies the Immunity Motion and the MNT.

## I.    **THE COURT DENIES THE IMMUNITY MOTION.**

The Court denies the Immunity Motion, because: (i) the Court cannot immunize Atencio; (ii) the Court can order the United States to immunize Atencio or face dismissal only if withholding immunity from Atencio causes R. Padilla prejudice which a new trial cannot remedy; (iii) withholding immunity from Atencio does not violate R. Padilla's due process rights, given that she has consulted with counsel about her revised recollection, and the United States has not threatened to prosecute her for perjury related to her revised recollection; and (iv) even if withholding immunity from Atencio violates R. Padilla's due process rights, the Court will not order the United States to immunize her or face dismissal, because a new trial can remedy any prejudice stemming from withholding immunity from Atencio. The Court analyzes each issue in turn.

### A.    **THE COURT CANNOT IMMUNIZE ATENCIO.**

As an initial matter, the Court concludes that it cannot use its judicial power to immunize Atencio, because the Tenth Circuit holds the district courts lack the authority to immunize

witnesses.  See, e.g., LaHue, 261 F.3d at 1014 ("[C]ourts have no inherent authority to grant a witness use immunity."); Hunter, 672 F.2d at 818 ("Virtually all jurisdictions recognize that use immunity is a creature of statute which can be conferred only by the Executive Branch of the government."); Serrano, 406 F.3d at 1217 ("Every other Circuit, save the Third, has likewise held a district court does not have the inherent authority to grant a defense witness use immunity."). Accordingly, the Court denies the Immunity Motion, to the extent that it asks the Court to immunize Atencio.


### B.    THE COURT CAN TELL THE UNITED STATES THAT IT EITHER CAN IMMUNIZE ATENCIO OR FACE DISMISSAL ONLY IF WITHHOLDING IMMUNITY CAUSES R. PADILLA PREJUDICE WHICH A NEW TRIAL CANNOT CURE.

R. Padilla asks the Court to tell the United States that it either can immunize Atencio or face dismissal on the basis of a due process violation.  See Immunity Motion at 13.  Whether the Court can grant R. Padilla's request boils down to whether the Court can exercise the power it would be flexing -- i.e., dismissing R. Padilla's indictment.  Telling prosecutors that they can either immunize defense witnesses or face dismissal indicates that immunizing defense witness will cure some Constitutional violation that warrants dismissal.

In R. Padilla's case, the alleged underlying violation is one of due process.  Atencio's Fifth Amendment invocation could demonstrate that R. Padilla's due process rights have been violated in one of three ways: (i) the Court could have coerced Atencio into not testifying fully; (ii) the United States could have coerced Atencio into not testifying fully; and (iii) the United States could have immunized witnesses selectively.  See United States v. Smith, 997 F.2d at 680 (concluding

that a judge or prosecutor may violate a defendant's due process rights if they "'actively' encourage[e] a witness not to testify, or [] badger[] a witness to remain silent")(quoting United States v. Arthur, 949 F.2d at 216); United States v. Baca, 447 F. Supp. 3d at 1220-23 (concluding that selective immunization violates due process when: (i) the non-immunized witness' testimony is material, exculpatory, not cumulative, and not obtainable from any other source; and (ii) the prosecution's decision to deny immunity is made with the deliberate intention to distort the fact-finding process).  Although the Court concludes later that neither the Court nor the United States has violated R. Padilla's due process rights, see supra, at 131-38, the present inquiry is whether the Court has the power to dismiss R. Padilla's indictment based on one or more of these alleged due process violations, and, if so, under what circumstances the Court can exercise that power.

      **1.**     **<u>The Tenth Circuit Has Not Determined Whether District Courts Can Tell The United States That It Can Either Immunize A Witness Or Face Dismissal.</u>**

The Tenth Circuit has declined to determine whether district courts can force the United States to immunize witnesses or face dismissal:

> Although "the decision to grant immunity lies in the <u>exclusive</u> discretion of the prosecutor," we have "left open the possibility 'that where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the government to choose between conferring immunity or suffering an acquittal.'"

United States v. Dalton, 918 F.3d at 1131 (first quoting Serrano, 406 F.3d at 1218, then quoting LaHue, 261 F.3d at 1014 (quoting Hunter, 672 F.2d at 818))(emphasis in Serrano); Serrano, 406 F.3d at 1218 (concluding that there is "no need to reach" the question that Hunter and LaHue declined to answer regarding "whether a district court could compel a United States attorney, on pain of dismissal, to grant immunity when the prosecutor deliberately denies immunity in an attempt to distort the fact finding process"); LaHue, 261 F.3d at 104 (stating that Hunter "left open

the possibility 'that where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the government to choose between conferring immunity or suffering an acquittal.' . . . .  We need not decide this legal question . . . .")(quoting <u>Hunter</u>, 672 F.2d at 818); <u>Hunter</u>, 672 F.2d at 818("We express no opinion on the first device discussed in [<u>Government of Virgin Islands v. Smith</u>, 615 F.2d 964] to force the prosecution to grant immunity [or suffer an acquittal] inasmuch as no claim of prosecutorial misconduct has been made."). Accordingly, the Court evaluates how other Courts of Appeals answer this specific question and how the Tenth Circuit, other Courts of Appeals, and the Supreme Court limit a district court's power to dismiss indictments to remedy due process and other Constitutional violations outside of the witness immunity context.

**2.**     <u>**The Second Circuit Holds That District Courts May Force The United States to Immunize Witnesses In Limited Circumstances**</u>.

Although the Tenth Circuit declines to answer the question before the Court -- <u>i.e.</u>, whether a district court threaten the United States with dismissal unless the United States immunizes a witness -- the Second Circuit holds that district courts may "requir[e] the government to grant defense witness immunity at the risk of dismissal of the indictment" where: (i) "the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment"; (ii) "the witness's testimony must be material, exculpatory, and not cumulative"; and (iii) "the testimony must be unobtainable from any other source."  <u>United States v. Bahadar</u>, 954 F.2d 821, 826 (2d Cir. 1992).  Although the Court has not endorsed the Second Circuit's remedy of forcing the United States to immunize a defense witness or risk dismissal, the Second Circuit's three-pronged test matches the test that the Court previously has used to evaluate whether selective immunization violates due process.

- 125 -

Compare <u>United States v. Bahadar</u>, 954 F.2d at 826, <u>with</u> <u>United States v. Baca</u>, 447 F. Supp. 3d at 1220-23.  Thus, the Court interprets the Second Circuit's "carrot-and-stick approach" as a way to remedy due process violations stemming from selective immunization.   <u>United States v. Bahadar</u>, 954 F.2d at 826.  The Second Circuit explains that its hands-on approach to managing witness immunity

> recognizes the essential unfairness of permitting the Government to manipulate its immunity power to elicit testimony from prosecution witnesses who invoke their right not to testify, while declining to use that power to elicit from recalcitrant defense witnesses testimony that meets our three-part test (however its components are understood). Although we have recognized that "[t]he fifth amendment due process clause does not mandate 'that defense witness immunity must be ordered whenever it seems fair to grant it,'" [<u>United States v. </u>]<u>Pinto</u>, 850 F.2d [927] 935 [(2d Cir. 1988)](quoting [<u>United States v. </u>]<u>Turkish</u>, 623 F.2d [769] 777 [(2d Cir. 1980)]), we have consistently assumed that, in some limited circumstances, using the immunity device in a one-sided manner can result in a basic unfairness that rises to the level of a violation of procedural due process.

<u>United States v. Dolah</u>, 245 F.3d 98, 106 (2d Cir. 2001), <u>abrogated on other grounds by</u> <u>Crawford v. Washington</u>, 541 U.S. 36 (2004)(Scalia, J.).

Although the Court also recognizes how selective immunization can violate due process, the Second Circuit neither binds nor convinces the Court to follow its hands-on approach without a more searching inquiry.  As the Court has stated, the Court hesitates to coerce the United States to exercise its immunity power, because such coercion, which is premised on the Court's alleged ability to dismiss an indictment based on a due process violation, appears to be a "raw use of judicial power."  June 10, 2024, Tr. at 11:23 (Court).  With no clear Tenth Circuit guidance on whether the Court may use its power to dismiss an indictment to coerce the United States to immunize a witness, the Court next investigates under what conditions a district court may dismiss an indictment, generally.  This inquiry informs the Court's conclusion regarding if, and when, the

Court can exercise these coercive powers to remedy a due process violation stemming from selective immunization.

3.    **District Courts May Dismiss Indictments Only If A New Trial Cannot Cure The Underlying Due Process Violation.**

In this sub-section, the Court looks at how the Supreme Court and the Tenth Circuit limit a district court's power to dismiss indictments to remedy due process and other Constitutional violations outside of the witness immunity context. This broader inquiry confirms the Court's initial hesitation and persuades the Court that it can dismiss an indictment based on a due process violation -- including those stemming from the United States' selective immunization -- only in rare circumstances where a new trial cannot remedy the underlying due process violation.

In the context of destroyed evidence -- which is a due process violation -- the Tenth Circuit holds that a district court may dismiss an indictment if "the disposition of evidence that is central to the case may permanently deprive the defendant of due process." United States v. Bohl, 25 F.3d 904, 914 (10th Cir. 1994)("Bohl").[30] Bohl's circumspect approach is based on California v. Trombetta, where the Supreme Court evaluates "whether the Fourteenth Amendment [] demands that the State preserve potentially exculpatory evidence on behalf of defendants." California v. Trombetta, 467 U.S. 479, 481 (1984)(Marshall, J.)("Trombetta"). On this issue, the Supreme Court holds that "the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant

---

[30]Other Courts of Appeals also hold or imply that some Brady violations may be so severe that dismissal is warranted. See United States v. Pasha, 797 F.3d 1122, 1138-39 (D.C. Cir. 2015)("[I]f the lingering prejudice of a Brady violation has removed all possibility that the defendant could receive a new trial that is fair, the indictment must be dismissed."); United States v. Kearns, 5 F.3d 1251, 1253 (9th Cir. 1993)(holding that a "district court may dismiss an indictment for a violation of due process" and evaluating whether the United States' failure to disclose material impeachment evidence warrants dismissal).

remains unable to 'obtain comparable evidence by other reasonably available means.'" <u>Bohl</u>, 25

F.3d 904, 909-10 (10th Cir. 1994)(quoting <u>Trombetta</u>, 467 U.S. at 489).  In dicta, the Supreme

Court recognizes that district courts may dismiss an indictment when key evidence has been

destroyed:

> [F]ashioning remedies for the illegal destruction of evidence can pose troubling
> choices.  In nondisclosure cases, a court can grant the defendant a new trial at which
> the previously suppressed evidence may be introduced.  But when evidence has
> been destroyed in violation of the Constitution, the court must choose between
> barring further prosecution or suppressing -- as the California Court of Appeal did
> in this case -- the State's most probative evidence.

<u>Trombetta</u>, 467 U.S. at 486-87.

In <u>Bohl</u>, the Tenth Circuit applies <u>Trombetta</u>'s dicta and holds that destroyed evidence may

"permanently deprive the defendant of due process" such that dismissal is the proper remedy.

<u>Bohl</u>, 25 F.3d at 914.  When key evidence has been destroyed, "the decision to either suppress the

government's secondary evidence describing the destroyed material or to dismiss the indictment

turns on the prejudice that resulted to the defendant at trial."  25 F.3d at 914.  To evaluate how

severely the destruction prejudices the defendant at trial, "[s]uch factors as the centrality of the

evidence at trial, the reliability of the secondary evidence, and the effect such destruction had on

the defendant's ability to present a defense, must be considered in the calculus."  <u>Bohl</u>, 25 F.3d at

914.

Using this approach, the Tenth Circuit evaluates whether the United States' destruction of

evidence permanently prejudices the <u>Bohl</u> defendants such that dismissal is warranted.  <u>See Bohl</u>,

25 F.2d at 914.  At trial, a jury convicts defendants Richard Bell and George Bohl for defrauding

the Federal Aviation Administration ("FAA") by building radar and radio transmission towers with

non-conforming steel.  <u>See</u> 25 F.3d at 909.  Although Bell and Bohl request access to the towers,

their requests go unanswered, and the FAA destroys the towers before Bell and Bohl can test their steel composition. See 25 F.3d at 908-09. Applying Trombetta, the Tenth Circuit concludes that the destruction of the towers violates due process, because the United States destroyed the towers even though "it had received substantial independent evidence suggesting that [the United States'] test of the steel might have been flawed and that the steel might, in fact, have conformed to the Contract specifications." Bohl, 25 F.3d at 913. In fashioning a remedy, the Tenth Circuit, pursuant to Trombetta's dicta, dismisses the indictment, because the steel composition "was critical to the government's case," the defendants "offered credible evidence that their own tests might have produced exculpatory evidence and that the government's testing methodology was flawed," and the United States "does not suggest an alternative to protect Bell and Bohl's due process rights." Bohl, 25 F.3d at 914.

Although Bohl addresses how a district court may cure prejudice stemming from destroyed key evidence, the Court concludes that Bohl provides guidance on how to construe narrowly a district court's power to remedy a due process violation, like selective immunization. Accordingly, considering Bohl and its Trombetta origins, the Court concludes that whether it can dismiss an indictment based on a selective immunization due process violation also "turns on the prejudice that resulted to the defendant at trial." Bohl, 25 F.3d at 914. When that prejudice is so severe that there is no other "alternative to protect [a defendant's] due process rights," the Court may dismiss the indictment. Bohl, 25 F.3d at 914. Other Supreme Court cases evaluating similar circumstances provide similar guidance: a district court's power to dismiss an indictment should be construed narrowly. See Bank of Nova Scotia v. United States, 487 U.S. 250, 263 (1988)(Kennedy, J.)("We conclude that the District Court had no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were

prejudiced by such misconduct.  The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict.").

> Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial.  The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense.  Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

> More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.  This has been the result reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment.  The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.

United States v. Morrison, 449 U.S. 361, 363, 365-66 (1981)(White, J.)(reversing indictment dismissal based on alleged Sixth Amendment violation, where the defendant did not show that "the claimed violation had prejudiced the quality of effectiveness of respondent's legal representation").

The Court concludes that a new trial can cure most, if not all, selective immunization due process violations, because the Court can order a new trial, and the United States will know that it must change its immunization practices at the second trial to avoid a third trial.  Requiring district courts to determine that a new trial cannot cure a due process violation before dismissing an indictment balances fairly the United States' prosecutorial job and the Court's duty to safeguard the defendant's due process rights.  See United States v. Baca, 447 F. Supp. 3d at 1221 ("Although Congress has given the United States immunization power, courts must check that power to ensure it is being applied properly.").  Accordingly, the Court concludes that it can tell the United States

that it either can immunize Atencio or face dismissal only if a new trial cannot remedy the due process violation.

### C.     THE COURT WILL NOT TELL THE UNITED STATES THAT IT CAN EITHER IMMUNIZE ATENCIO OR FACE DISMISSAL, BECAUSE WITHHOLDING IMMUNITY DOES NOT VIOLATE R. PADILLA'S DUE PROCESS RIGHTS.

The Court does not order the United States to immunize Atencio, because there is no underlying due process violation that immunization would remedy. The Court evaluates three possible ways that R. Padilla's due process rights could have been violated in relation to Atencio's decision to invoke her Fifth Amendment rights: (i) the Court could have coerced Atencio into not testifying fully; (ii) the United States could have coerced Atencio into not testifying fully; and (iii) the United States could have immunized witnesses selectively. See United States v. Dalton, 918 F.3d at 1130 (concluding that a government actor substantially interferes with a witness' decision to invoke his or her Fifth Amendment privileges "'when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering'")(quoting Serrano, 406 F.3d at 1216)(emphasis in United States v. Dalton, but not in Serrano); United States v. Smith, 997 F.2d at 680 (concluding that a judge or prosecutor may violate a defendant's due process rights if they "'actively' encourage[e] a witness not to testify, or [] badger[] a witness to remain silent")(quoting United States v. Arthur, 949 F.2d at 216); United States v. Baca, 447 F. Supp. 3d at 1220-23 (concluding that selective immunization violates due process when: (i) the non-immunized witness's testimony is material, exculpatory, not cumulative, and not obtainable from any other source; and (ii) the prosecution's decision to deny immunity is made with the deliberate intention to distort the fact-finding process).

As to the first possible due process violation, the Court concludes that its statements to Atencio do not violate R. Padilla's due process rights, because the Court did not discourage Atencio from testifying or otherwise indicate that it expected Atencio to perjure herself.  See United States v. Smith, 997 F.2d at 680 (concluding that, when a witness changes his or her testimony, "[j]udges and prosecutors do not necessarily commit a [due process] violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously," and that a judge's perjury warning may violate due process "if it is 'threatening' and employs 'coercive language indicating the court's expectation of perjury'")(quoting United States v. Harlin, 539 F.2d at 681).  At the April 25, 2024, hearing, the Court and Atencio have the following exchange:

> [Court]: So I've read everything that's been filed.  And then Mr. Castellano and Mr. Robert and Mr. Gainor have filled me in on a few more kind of developments here.  And it seems to me that one of the possibilities this morning is that you may take the stand and testify differently than you did in trial.  Anytime that occurs, you know, I just want to protect you, because, you know, there is a possibility the Government could, you know, be upset by that, and do something with it.  And so rather than putting you at any risk, or in trouble, Ms. Richelle Anderson from the Villa Law Firm is here, and I'm going to appoint her to help you this morning to decide what's best for you.  She's your attorney, and you can talk to her and trust her and everything like that.  I am trying to track down Megan Mitsunaga, who I think has represented you in the 19-3113 case.  And if we can track her down, she'll get over here, and you can have both lawyers and you can sit there and talk to them.  But I just want to protect you and make sure that everything you do is in your interests, and just the best thing for you.  Do you kind of understand what I'm doing?
>
> [Atencio]: Yes.

April 25, 2024, Tr. at 14:1-25 (Court, Atencio).  When Atencio asks the Court what it means by "in trouble," the Court replies:

> Well, Ms. Anderson can talk to you about that. I don't want to do anything to hurt anybody's motion, or frighten you, or anything like that. I'm just trying to

protect you. So the best way to do it is give you an attorney to let you kind of talk about that to.

April 25, 2024, Tr. at 15:8-13 (Court).  At no point during this exchange, or any other exchange, does the Court discourage Atencio from testifying or say that it expects her to commit perjury by changing her testimony.  Accordingly, the Court concludes that its statements to Atencio -- explaining its reasoning for appointing a lawyer for her -- do not violate R. Padilla's due process rights.

As to the second possible due process violation, the Court concludes that the United States' statements about Atencio's perjury liability do not violate R. Padilla's due process rights, because the United States has not "'actively' [dis]couraged" Atencio from testifying or "badger[ed]" her to remain silent.  United States v. Smith, 997 F.2d at 680 (quoting United States v. Arthur, 949 F.3d at 216).  The Court agrees that the United States has "made no representations to Ms. Atencio whatsoever" about her perjury liability.  June 10, 2024, Tr. at 18:10-11 (Castellano).  Atencio also agrees that the United States has not made any representations to her about her perjury liability. See June 10, 2024, Tr. at 58:5-10 (Castellano, Atencio).  At most, the United States advised R. Padilla's lawyer that it "will not provide immunity to Janaya Atencio to perjure herself at the [June 10, 2024,] hearing."  Immunity Request Email at 1.  Importantly, R. Padilla's lawyer does not specify which statements he seeks to protect from allegedly unfair prosecution: "We request that the government grant Janaya Atencio immunity from prosecution for perjury should she testify at the hearing on the motion for new trial."  Immunity Request Email at 1.  The United States' decision not to provide blanket immunity for any perjury that Atencio may commit at the June 10, 2024, hearing is not a specific threat to prosecute her for perjury if she changes her testimony.

This position is reasonable, because it is not clear that Atencio has committed or would commit perjury based on her revised recollection.  "The elements of perjury are that a witness: (1) when testifying under oath, gives false testimony; (2) concerning a material matter; (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." United States v. Massey, 48 F.3d 1560, 1573 (10th Cir. 1995)(citing United States v. Dunnigan, 507 U.S. 87, 94, (1993)).  Considering the totality of the circumstances, it would be difficult for the United States to prove, beyond a reasonable doubt, that Atencio intends to provide false testimony by revising her recollection.  A more reasonable conclusion is that Atencio has been asked to recall details about one or more alcohol-fueled parties from several years ago, and that she has changed her testimony, because she is confused or mistaken now, or she was confused or mistaken at R. Padilla's murder trial, and she is under tremendous pressure from both R. Padilla and Jeffrey to provide favorable testimony.  The Court has provided findings of fact regarding R. Padilla and Atencio's activities around the time of Lucero's murder.  See supra, at 5-8.  The trial testimony and out-of-court statements about those activities are convoluted and, on occasion, contradictory.  The Court understands how Atencio may be confused now or may have been confused at trial about what happened at her apartment on either July 21, 2019, or July 22, 2019. Accordingly, the Court concludes that the United States' representation that it would not provide blanket immunity for Atencio at the June 10, 2024, hearing does not violate R. Padilla's due process rights, because: (i) that statement is not a threat to prosecute Atencio for perjury based on her changed testimony; and (ii) the United States likely could not prosecute Atencio successfully for perjury, because she likely changed her testimony based on past or present confusion, faulty memory, or the pressure she faces from R. Padilla and Jeffrey to provide favorable testimony, rather than an intent to provide false testimony.

As to the final possible due process violation, the Court concludes that the United States has not immunized witnesses selectively, and thus, withholding immunity from Atencio does not violate R. Padilla's due process rights.  As an initial matter, the Court hesitates to conclude that the United States has engaged in selective immunization, because the United States has not immunized anyone on either side in this case.  See June 10, 2024, Tr. at 19:6-8 (Castellano).  The Court does not agree with R. Padilla's argument that the United States may as well have immunized some of the prosecution's witnesses, because some of them, including Coca, received favorable sentencing treatment based on their testimony at R. Padilla's murder trial.  See June 10, 2024, Tr. at 207:19-208:18 (Robert).  Potentially favorable sentencing treatment, pursuant to a U.S.S.G. § 5K1.1 motion, is not immunization.  Moreover, Atencio, like Coca, received favorable treatment in her own related drug case: the United States dismissed her charges after she completed a pretrial diversion program.  See United States v. Padilla No. CR 19-3113 JB, Unopposed Motion to Dismiss the Indictment Without Prejudice at 1 (filed August 23, 2023)(D.N.M.)(Doc. 803 in CR 19-3113); United States v. Padilla No. CR 19-3113 JB, Order of Dismissal Without Prejudice at 1 (filed August 24, 2023)(D.N.M.)(Doc. 808 in CR 19-3113).

Putting aside the fact that the United States has not immunized anyone, and thus cannot have immunized selectively, the Court also concludes R. Padilla fails to satisfy both prongs needed to show a due process violation stemming from selective immunization -- i.e., the non-immunized witness' testimony must be material, exculpatory, not cumulative, and not obtainable from any other source, and the prosecution's decision to deny immunity must be made with the deliberate intention to distort the fact-finding process.  See United States v. Baca, 447 F. Supp. 3d at 1220-22.  Regarding the first prong, the Court concludes that Atencio's revised recollection is likely material, not cumulative, and not obtainable from any other source, but it may not be exculpatory.

The Court discusses this conclusion's rationale in greater detail later in its discussion about R. Padilla's MNT.  See infra, at 151-53, 156-63.  Regarding the second prong, there is no evidence that the United States denied Mr. Robert's request to immunize Atencio with the intention to distort the fact-finding process.  As the Court has explained, it is more likely that the United States denied this request, because: (i) it was overbroad and asked for blanket immunity regarding all testimony at the June 10, 2024, hearing; and (ii) Atencio likely does not face significant perjury liability, and thus there is no reason to immunize her.  See supra, at 134.  at The Court does not think that the fact-finding process has been distorted; the Court has a substantial record of testimony and out-of-court statements regarding the substance of Atencio's revised recollection.  Granting Atencio immunity would not expand the record meaningfully.  Thus, the Court cannot conclude that denying Atencio immunity has distorted or was intended to distort the fact-finding process.  Moreover, Atencio's circumstances are less compelling -- on both prongs -- than circumstances that the Court previously has found do not constitute a due process violation.  See United States v. Baca, 447 F. Supp at 1199, 1219 (concluding that the United States' decision to immunize a prosecution witness who testified that a defendant was paid to commit a murder, and not to immunize a defense witness who allegedly says otherwise, does not violate the defendant's due process rights).  Accordingly, the Court concludes that the United States has not engaged in selective immunization and that withholding immunization from Atencio does not violate R. Padilla's due process rights.

R. Padilla's citation to United States v. Vallejos, No. CR 03-2241 JP, 2006 WL 8443786 (D.N.M. Aug. 24, 2006)(Parker, S.J.)("Vallejos I"), does not persuade the Court otherwise.  In Vallejos I, the defendant asks for a new trial after his jury conviction for aiding and abetting a carjacking.  See 2006 WL 8443786, at *2.  Several months after his trial, Vallejos receives a letter from Robert Sanchez, who pled guilty in State court to the underlying carjacking.  See 2006 WL

8443786, at *2-3. In the letter, Sanchez says that, although he refused to testify at Vallejos' trial, he is willing to take the rap for the carjacking and testify at a new trial. See 2006 WL 8443786, at *2-3. At an evidentiary hearing for the new trial motion, the United States represents that, if Sanchez confesses, the United States might prosecute him and seek significant incarceration time. See 2006 WL 8443786, at *3-4. After consulting with a court-appointed attorney, Sanchez invokes his Fifth Amendment right against self-incrimination and refuses to testify at the evidentiary hearing. See 2006 WL 8443786, at *4.

The Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, determines that, although the United States "has an ethical duty to warn witnesses of the potential consequences of their testimony," the United States' statements about Sanchez' criminal liability "went further and actively discouraged Mr. Sanchez from testifying by implicitly threatening prosecution and significant jail time." 2006 WL 8443786 at *5. Borrowing from the United States Court of Appeals for the Second Circuit, Senior Judge Parker concludes that a district court may "impose on the Government a choice between granting a defense witness immunity or facing dismissal of an indictment in very limited circumstances," 2006 WL 8443786, at *6, which exist when the defendant establishes: (i) the United States immunizes witnesses discriminatorily to gain a tactical advantage, or through its own overreaching, has forced a witness to invoke the Fifth Amendment; (ii) the non-immunized witness' testimony is material, exculpatory, and not cumulative; and (iii the sought testimony cannot be obtained from any other source, see 2006 WL 8443786, at *6-7 (citing United States v. Bahadar, 954 F.2d 821, 826 (2d Cir. 1992), cert. denied, 506 U.S. 850 (1992)). After determining that all three elements are met and ordering the United States to immunize Sanchez or face dismissal, Senior Judge Parker reasons that, by "requiring dismissal if the Government chooses

not to request use immunity for Mr. Sanchez, the Court ensures that Defendant is not afforded an empty remedy since a retrial without the potential material and exculpatory testimony of Mr. Sanchez would not fully vindicate Defendant's rights."  2006 WL 8443786 at *8. !!

A month later, Senior Judge Parker grants the United States' motion to reconsider Vallejos I.  See United States v. Vallejos, No. CR 03-2241 JP, 2006 WL 8443857, at *1 (D.N.M. Sept. 29, 2006)(Parker, S.J.)("Vallejos II").  In Vallejos II, Senior Judge Parker determines that the United States did not interfere substantially in Sanchez' refusal to testify, because Sanchez' attorney represented that "she believed Mr. Sanchez acted on her advice, independent of whatever the Assistant United States Attorney said prior to Ms. Milner being assigned to represent Mr. Sanchez." 2006 WL 8443857, at *7.  In sum, Senior Judge Parker concludes that there is no due process violation when a witness refuses to testify based on his lawyer's advice rather than based on a prosecutor's threat.  See 2006 WL 8443857, at *7-8.  Atencio, like Sanchez, invokes her Fifth Amendment rights after consulting with her lawyer.  See June 10, 2024 Tr. at 34:5-8 (Court)(inviting Atencio's lawyer to sit behind Atencio during her testimony); id. at 70:16-80:20 (Castellano, Atencio, Court)(indicating that Atencio consulted with her lawyer about invoking her Fifth Amendment privileges during her testimony).  Accordingly, the Court concludes that, like in Vallejos II, Atencio's Fifth Amendment invocation was not coerced unlawfully in a way that violates R. Padilla's due process rights, and the Court should not force the United States to choose between granting her immunity or suffering an acquittal.  See Serrano, 406 F.3d at 1216 ("The potential for unconstitutional coercion by a government actor significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney.").[31]

_____

[31]The Court also concludes that withholding immunity from Atencio does not violate R. Padilla's due process rights under either the Third Circuit or the Ninth Circuit approaches to

D.    **EVEN IF WITHHOLDING IMMUNITY FROM ATENCIO VIOLATES R. PADILLA'S DUE PROCESS RIGHTS, THE COURT WOULD NOT TELL THE UNITED STATES THAT IT CAN EITHER IMMUNIZE ATENCIO OR FACE DISMISSAL, BECAUSE A NEW TRIAL COULD REMEDY THE DUE PROCESS VIOLATION.**

The Court concludes that, even if withholding immunity from Atencio violates R. Padilla's due process rights, this due process violation would not prejudice R. Padilla permanently such that he cannot get a fair second trial. If the Court were to grant R. Padilla a new trial based on due process violations related to Atencio's Fifth Amendment invocation, the United States would have to immunize her at a second trial to avoid a third trial. R. Padilla has not shown or alleged that a new trial could not comport with due process. R. Padilla's alleged due process violations do not inflict the permanent prejudice that may warrant dismissal. See Bank of Nova Scotia v. United States, 487 U.S. at 263 (holding that district courts may dismiss indictments on the basis of prosecutorial misconduct if due process violations prejudice sufficiently the grand jury's decision to indict); United States v. Morrison, 449 U.S. at 365-66 ("Our approach has thus been to identify

this issue. Under the Third Circuit approach, the United States' selective immunization violates a defendant's due process rights when: (i) immunity is properly sought in the district court; (ii) the defense witness is available to testify; (iii) the proffered testimony is clearly exculpatory; (iv) the testimony is essential; and (v) there are no strong governmental interests which countervail against a grant of immunity. See supra, at 107-08 n.29. As the Court explains further below, Atencio's proffered testimony is not clearly exculpatory. See infra, at 151-53; 156-63. Accordingly, the Court concludes that, under the Third Circuit approach, the United States does not violate R. Padilla's due process rights by withholding immunity from Atencio. Under the Ninth Circuit approach, the United States violates a defendant's due process rights if it withholds immunity from a witness whose testimony would have been relevant, and withholding immunity from defense witnesses -- while granting immunity to the United States' witnesses -- has the effect of distorting the fact-finding process. See supra, at 107 n.29. Although Atencio's revised testimony is relevant, the United States' refusal to immunize her does not satisfy the Ninth Circuit's test, because the United States has not had the effect of distorting the fact-finding process. See supra, at 131-38. Accordingly, the Court concludes that, under the Ninth Circuit approach, the United does not violate R. Padilla's due process rights by withholding immunity from Atencio.

and then neutralize the taint by tailoring relief appropriate in the circumstances . . . .  The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression."); Bohl, 25 F.2d at 914 (dismissing indictment where irreplaceable exculpatory evidence was destroyed); United States v. Pasha, 797 F.3d 1122, 1139 (D.C. Cir. 2015)("To be sure, dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant.")(citing Bank of Nova Scotia v. United States, 487 U.S. at 263; and United States v. Morrison, 449 U.S. at 365).  Accordingly, the Court concludes that, even if there is an underlying due process violation, the Court cannot dismiss R. Padilla's indictment, and, thus, the Court cannot force the United States to choose between immunizing Atencio and facing dismissal.

## II.    THE COURT WILL NOT ORDER A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.

The Court concludes that Atencio's revised recollection does not warrant a new trial for R. Padilla, because: (i) only Atencio's sworn post-trial testimony is new evidence for the purposes of the R. Padilla's rule 33 MNT; (ii) Atencio's sworn post-trial testimony does not warrant a new trial under rule 33, because R. Padilla's lack of diligence caused any failure to discover the testimony, the testimony is not exculpatory, and the testimony would not produce an acquittal at a new trial; and (iii) in the alternative, Atencio's out-of-court statements and hypothetical future testimony would also not warrant a new trial under rule 33, for the same reasons as those in (ii). The Court analyzes each issue in turn.

### A.    ONLY ATENCIO'S SWORN POST-TRIAL TESTIMONY IS NEW EVIDENCE FOR THE PURPOSES OF THE MNT.

As a threshold matter, the Court addresses whether there is newly discovered evidence. See United States v. Hill, 737 F.3d 683, 687 (10th Cir. 2013)("Implicit in a claim of newly discovered evidence is that there is new evidence -- that is, material that is admissible at

trial.")(emphasis in original).  R. Padilla acknowledges that "Atencio has not testified about her realization that Mr. Padilla was in her apartment from late afternoon on July 22, 2019, until the following morning."  Padilla MNT Closing Arguments at 27.  Absent Atencio's sworn testimony regarding R. Padilla's whereabouts on July 21, 2019, and July 22, 2019, the Court must determine whether R. Padilla identifies any admissible evidence that warrants a new trial under rule 33.  Anticipating this issue, R. Padilla argues that the Romero/Atencio Telephone Conversation Transcript and Salazar's testimony about her conversations with Atencio ("Salazar Testimony") are admissible as statements against interest.  Padilla MNT Closing Arguments at 28.  Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest."  United States v. Lozado, 776 F.3d at 1125 (citing Fed. R. Evid. 804(b)(3)(A)).  A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true."  Fed. R. Evid. 804(b)(3)(A).  Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "'the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'"  United States v. Smalls, 605 F.3d at 780-81 (quoting Williamson v. United States, 512 U.S. at 599).  The Tenth Circuit says: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."  United States v. Smalls, 605 F.3d at 783.  That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a

statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Williamson v. United States, 512 U.S. at 600.  See United States v. Baca, 447 F. Supp. 3d at 1206-07; United States v. DeLeon, 287 F. Supp. 3d at 1240; United States v. DeLeon, 558 F. Supp. 3d at 1126.  In sum, the Romero/Atencio Telephone Conversation Transcript and the Salazar Testimony are admissible pursuant to rule 804(b)(3) only if: (i) Atencio is unavailable; (ii) the statements sought to be admitted tend to inculpate Atencio; and (iii) the statements are corroborated by circumstances that indicate their trustworthiness.  See United States v. Hammers, 942 F.3d 1001, 1010 (10th Cir. 2019).

First, Atencio is unavailable, because she invokes her Fifth Amendment privileges.  See United States v. Morrow, 79 F.4th 1169, 1179 (10th Cir. 2023)(concluding that a witness who invokes her Fifth Amendment right against self-incrimination is unavailable under rule 804(a)(1)); United States v. Baca, 447 F. Supp. 3d at 1211 ("Because Garcia has invoked his Fifth Amendment right to silence, the Court concludes that he is unavailable for trial.").  Thus, to the extent that R. Padilla seeks to admit the Romero/Atencio Telephone Conversation Transcript and the Salazar Testimony to detail the parts of Atencio's revised recollection about which she refuses to testify, R. Padilla satisfies the first 804(b)(3) prong.  Regarding the second prong, the Court concludes that neither the Romero/Atencio Telephone Conversation Transcript nor the Salazar Testimony exposes Atencio to criminal liability.  In the Romero/Atencio Telephone Conversation Transcript and the Salazar Testimony, Atencio never says that she lied at R. Padilla's murder trial or that she intends to lie for him at a hearing for his MNT.  See supra, at 56-63, 91-95.  Instead, Atencio, under oath, maintains that she made a mistake at R. Padilla's murder trial and that she wants to offer her revised recollection as a correction.  See June 10, 2024, Tr. at 48:1-25 (Robert, Atencio).

As the Court has discussed, Atencio likely would not perjure herself if she testified fully about her revised recollection, because she likely changed her testimony based on past or present confusion, faulty memory, or pressure from R. Padilla and Jeffrey, rather than an intent to provide false testimony. See supra, at 134. Accordingly, neither the Romero/Atencio Telephone Conversation Transcript nor the Salazar Testimony tends to inculpate Atencio, and thus, neither would be admissible under rule 804(b)(3).

If the Court concludes otherwise -- i.e., that Atencio's revised recollection would be perjurious -- then her statements to Mr. Romero and Salazar inculpate her, because those statements reflect her perjurious revised recollection. In this alternative, however, neither the Romero/Atencio Telephone Conversation Transcript nor the Salazar Testimony would be admissible under rule 804(b)(3), because Atencio's statements in these conversations fail to satisfy the third 804(b)(3) prong, given that those statements -- which reflect a perjurious revised recollection -- would be untrustworthy. Statements that reflect a perjurious testimony are themselves intentional lies, which are inherently untrustworthy. A statement that is not "supported by corroborating circumstances that clearly indicate its trustworthiness" is not admissible under rule 804(b)(3). Fed. R. Evid. 804(b)(3)(B). See 4 Stephen A. Saltzburg, Michale M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual § 804.02[9] at 804-20-21 (11th ed. 2015)("Saltzburg, Martin, & Capra")("The mere fact that the statement could tend to subject the declarant to criminal liability is not enough; the proponent must also show other factors supporting the truthfulness of the statement."). Accordingly, the Court concludes that neither the Romero/Atencio Telephone Conversation Transcript nor the Salazar Testimony would be admissible under rule 804(b)(3). Although R. Padilla does not argue that the Padilla/Atencio Jail Calls also would be admissible under rule 804(b)(3), the Court concludes that those conversations

also would not be admissible for the same reasons: the statements are not inculpatory, and if they are, they are not trustworthy.

The Court also concludes that, even without the Romero/Atencio Telephone Conversation Transcript or the Salazar Testimony, R. Padilla identifies new evidence, because Atencio has testified generally about her revised recollection. At the June 10, 2024, hearing, Atencio says, under oath, that she testified mistakenly at R. Padilla's murder trial about July 21, 2019, instead of July 22, 2019. See June 10, 2024, Tr. at 48:1-25 (Romero, Atencio). The Court thus analyzes only whether the new admissible evidence that R. Padilla identifies -- i.e., Atencio's new testimony, which suggests that her old testimony was wrong, but does not detail whether R. Padilla spent the night at her apartment on July 22, 2019, see June 10, 2024 Tr. at 49:1-16 (Robert, Atencio)(Atencio refusing to testifying about "what [she] now know[]s to be the truth about" July 22, 2019) -- warrants a new trial under rule 33. See United States v. Hill, 737 F.3d at 68("Implicit in a claim of newly discovered evidence is that there is new evidence -- that is, material that is admissible at trial.")(emphasis in original).. Because Atencio's out-of-court statements -- in the Romero/Atencio Telephone Conversation, the Salazar Testimony, and the Padilla/Atencio Jail Calls -- would not be admissible at a new trial, the Court analyzes whether they warrant a new trial under rule 33 only in the alternative.[32]

_____

[32]The Court also concludes that Jeffrey's alleged statements that he saw R. Padilla at Atencio's apartment around the time Lucero was murdered, see MNT at 5, do not warrant a new trial, because those alleged statements are not new evidence. R. Padilla has not followed up on his arguments regarding Jeffrey's alleged statements, which R. Padilla raised in the MNT, but not in the Padilla MNT Closing Arguments. Compare MNT at 5, with Padilla MNT Closing Arguments at 1-29. Moreover, although R. Padilla served Jeffrey properly, and the Court issued an arrest warrant after Jeffrey failed to appear at the July 8, 2024, hearing, R. Padilla did not call Jeffrey as a witness for the MNT. See July 8, 2024, Tr. at 4:16-5:17 (Robert, Court, Castellano); Jeffrey Bench Warrant at 1; Jeffrey Withdrawal Motion at 1. There is no sworn testimony about the substance of Jeffrey's statements, and, in fact, Atencio declines to testify about Jeffrey's

## B.    ATENCIO'S NEW TESTIMONY DOES NOT WARRANT A NEW TRIAL UNDER RULE 33.

Having established that Atencio's testimony at the June 10, 2024, hearing is new, admissible evidence, the Court moves to the five <u>Sinclair</u> factors.  Under the <u>Sinclair</u> test, R. Padilla must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

<u>Sinclair</u>, 109 F.3d at 1531.  The Court concludes, although R. Padilla satisfies factors one, three, and four, he does not satisfy factors two or five.  Accordingly, the Court will not grant R. Padilla a new trial, pursuant to rule 33.

### 1.    <u>R. Padilla Discovered Atencio's New Testimony After His Murder Trial</u>.

The Court concludes that R. Padilla satisfies the first <u>Sinclair</u> factor, because he discovered Atencio's new testimony after his murder trial.  The United States admits that this factor is satisfied, and the Court agrees with the parties: it was only after the trial that Atencio made her

---

statements when asked.  <u>See</u> June 10, 2024, Tr. at 53:8-18 (Robert, Atencio).  Without any testimony or other competent evidence regarding Jeffrey's statements or the underlying footage, the Court will not order a new trial based on newly discovered evidence related to those statements or the underlying footage.  <u>See</u> <u>United States v. Hill</u>, 737 F.3d at 687 ("Implicit in a claim of newly discovered evidence is that there is new <u>evidence</u> -- that is, material that is admissible at trial.")(emphasis in original).  In the alternative, the Court evaluates the merits of R. Padilla's arguments related to Jeffrey's possible testimony, and concludes that, even if Jeffrey had testified about what he allegedly saw, that testimony would not warrant a new trial pursuant to rule 33, because R. Padilla failed to obtain that testimony, and the footage itself, due to his own lack of diligence.  <u>See</u> MNT at 8-9 (indicating that: (i) R. Padilla knew about the surveillance footage before the trial; (ii) R. Padilla knew that Jeffrey had access to it; (iii) R. Padilla did not subpoena Jeffrey for the footage or his testimony; and (iv) R. Padilla did not subpoena anyone else to obtain the footage or testimony about it).

statements about how her trial testimony was incorrect. See United States MNT Closing Arguments at 6. Accordingly, R. Padilla satisfies the first Sinclair factor.

### 2.    R. Padilla's Lack of Diligence Caused His Failure to Discover Atencio's New Testimony Before Trial.

Turning to the second Sinclair factor, the Court concludes that R. Padilla's lack of diligence caused his failure to discover Atencio's revised recollection before trial. "Due diligence does not require that a defendant exercise the highest degree of diligence possible to locate evidence prior to trial; only 'reasonable diligence' is required." United States v. LaVallee, 439 F.3d 670, 701 (10th Cir. 2006)(quoting United States v. Allen, 554 F.2d 398, 403 (10th Cir. 1977)). Had R. Padilla been reasonably diligent, he could have elicited Atencio's new testimony at his murder trial. The Tenth Circuit has affirmed denials of motions for new trials in similar circumstances. In United States v. LaVallee, the Tenth Circuit concludes that the defendant -- a correctional officer convicted of assaulting an inmate -- was not reasonably diligent in obtaining allegedly exculpatory testimony from the inmate that the defendant assaulted, because the defendant did not attempt to interview the inmate before trial. See 439 F.3d at 701. Although R. Padilla asserts that he tried to interview Atencio before trial, see MNT at 8, those interview attempts do not show that he was diligent in obtaining her new testimony, specifically. During Atencio's cross-examination, R. Padilla's counsel did not ask questions suggesting that Atencio was testifying about the wrong date. See December 6, 2023 Tr. at 297:6-314:4 (Robert, Atencio); July 8, 2024 Tr. at 32:15-18 (Armijo, Salazar)(Padilla's investigator agreeing that, during Atencio's cross-examination and recross-examination, "it was never discussed at all that there was two nights in a row that Mr. Padilla was at [Atencio's] house"). Instead, R. Padilla's counsel asked Atencio about what time R. Padilla left her apartment on July 22, 2019. See December 6, 2023 Tr. at 302:12-303:1 (Robert,

Atencio).   Accordingly, like the defendant in United States v. LaVallee, R. Padilla was not reasonably diligent in trying to discover the testimony that he offers as new evidence for the purposes of a rule 33 motion, because he never attempted to elicit that testimony at trial.   See United States v. Garcia-Alvarez, 541 F.3d 8, 18 (1st Cir. 2008)("Rule 33 does not give counsel a second opportunity to rectify a faulty trial strategy.")

To the extent R. Padilla argues that he could not have pursued his new theory without the date-stamped Padilla Cheetos Photograph, which Atencio pulled from her Snapchat profile, R. Padilla does not provide any reason why he did not subpoena Atencio for her Snapchat data. See, e.g., Padilla/Atencio Jail Call 4 at 5:40-45 (illustrating how R. Padilla always has known about Atencio's Snapchat photographs of him eating Cheetos at her apartment).   In short, the fact that Atencio rebuffed R. Padilla's attempts to interview her before his murder trial does not mean that R. Padilla was reasonably diligent in eliciting her new testimony.   Even without Atencio's Snapchat data -- which R. Padilla could have gotten -- R. Padilla could have asked Atencio questions on cross-examination that challenge whether she is testifying about the right date, and, thus, elicited her new testimony.   R. Padilla's choice to not attempt to elicit this information from Atencio-- when he had enough information to conjecture that she might be testifying about the wrong date -- means that R. Padilla was not reasonably diligent in discovering Atencio's new testimony.   While cross-examining without knowing the answer is always treacherous and a landmine, the possibility of a "wrong" answer did not have much downside here.   Criminal cases do not have the discovery that civil cases enjoy, and criminal lawyers do not always know everything that they would like to know before trial.

### 3.    __Atencio's New Testimony Is Not Merely Impeaching__.

Regarding the third <u>Sinclair</u> factor, the Court concludes that Atencio's new testimony is not merely impeaching.  The Court rejects the United States' argument that Atencio's new testimony does "nothing more than potentially call into question her veracity."  MNT Response at 8-9.  Atencio now testifies that her old testimony was about July 21, 2022, and not about July 22, 2022.  <u>See</u> June 10, 2024, Tr. at 48:1-25 (Romero, Atencio).  This testimony is new, substantive evidence about R. Padilla's whereabouts when Lucero was murdered.  The Court confronted a similar issue in <u>United States v. Baca</u>, and concluded that, there, allegedly exculpatory evidence from a new witness coming forward was merely impeaching.  <u>See</u> 447 F. Supp. at 1208-09.  The impeachment situation in <u>United State v. Baca</u> is, however, materially different than the situation here.  In <u>United States v. Baca</u>, after Cordova's VICAR trial, Christopher Garcia allegedly told the FBI that he did not hire Cordova to murder Shane Dix.  <u>See</u> 447 F. Supp. at 1189.  Cordova argues that Garcia's post-trial statements negate an essential element of Cordova's VICAR charge, and are thus not merely impeaching.  <u>See</u> <u>United States v. Baca</u>, 447 F. Supp. at 1208.  The Court concludes that Garcia's statements merely impeach the United States' key witness -- Mario Montoya -- who testified that Garcia hired both Montoya and Cordova to kill Dix.  <u>See</u> <u>United States v. Baca</u>, 447 F. Supp. at 1166-67.  The Court reasons that Garcia's post-trial statements "would not be dispositive regarding [the VICAR] element and instead would add only another narrative through which the jury would sift," and that "other witnesses have already impeached Montoya robustly."  <u>United States v. Baca</u>, 447 F. Supp. at 1208.  In contrast, here, Atencio's new testimony does not cast doubt on her old testimony; Atencio's new testimony changes her old testimony.  Although Atencio's new testimony does not dispose of the issues around R. Padilla's alibi, Atencio's new testimony is more than "another narrative through which the jury would sift."

United States v. Baca, 447 F. Supp. At 1208.  Instead, Atencio's new testimony changes one of the narratives that the jury sifted through at trial.  Because Atencio's testimony does more than impeach her prior testimony, it is not merely impeaching, and R. Padilla satisfies the third Sinclair prong.

### 4.    Atencio's New Testimony Is Material to the Principal Issues Involved.

The Court concludes that Atencio's new testimony is material to the principal issues involved, because it speaks to when Atencio hosted the party that R. Padilla used as his alibi at his murder trial.  The Court has adopted as a finding of fact that there is only one party at Atencio's apartment during the relevant period between July 21, 2019, and July 22, 2019.  See supra, at 5-8.  This party occurs on July 21, 2019, and, during the party: (i) Atencio posts a photograph on Snapchat of R. Padilla eating Cheetos; (ii) Montaño brings a bottle of Jägermeister to Atencio's apartment; (iii) R. Padilla and Halpern spend some time along in Atencio's bedroom; and (iv) Atencio, Halpern, and Montaño discuss sexual advice.  See supra, at 5-6.  In adopting these findings of fact, the Court declines to adopt R. Padilla's post-trial narrative, insofar as he suggests that he "had been at [Atencio's] apartment on both of those nights, and that [he] had indeed left her apartment, but on July 21, not July 22."  Padilla MNT Closing Arguments at 2.  R. Padilla has not provided the Court with any photographs that show that there was a party at Atencio's apartment on July 22, 2019, or that R. Padilla attended this hypothetical party and spent the entire night at Atencio's apartment.  See July 8, 2024, Tr. at 53:18-54:4 (Robert, Salazar)(describing how R. Padilla's investigator does not discover any photographs on Atencio's computer that were taken after 6:09 P.M. on July 22, 2019, or on July 23, 2019).  At R. Padilla's murder trial, no witness testifies that are were two consecutive parties at Atencio's apartment.  See supra, at 15-48.  At trial, Atencio testifies about a party at her apartment where: (i) Montaño arrives after dark;

(ii) Atencio posts a photograph of R. Padilla on Snapchat that prompts an argument over the telephone between R. Padilla and Archuleta; and (iii) R. Padilla and Halpern spend time together alone in Atencio's bedroom. See supra, at 19-20. At trial, Montaño testifies about a party at Atencio's apartment where: (i) Montaño arrives after 10:00 p.m., and brings a bottle of Jägermeister; and (ii) R. Padilla and Halpern come out of Atencio's bedroom, and Halpern, Montaño, and Atencio discuss sexual advice. See supra, at 35-38. At trial, Halpern testifies about a party at Atencio's apartment where: (i) a woman brings a bottle of Jägermeister; and (ii) Halpern sleeps with R. Padilla in Atencio's bedroom. See supra, at 39-46. The Atencio Snapchat Photograph and the Padilla Cheetos Photograph show R. Padilla eating Cheetos in Atencio's apartment, and both photographs were taken on July 21, 2019. See Atencio Snapchat Photograph. At the July 8, 2024, hearing, R. Padilla's investigator testifies that forensic examination of Atencio's computer indicates that the photographs of R. Padilla and Halpern partying at Atencio's apartment -- which were presented at trial -- were taken on July 21, 2019. See July 8, 2024, Tr. at 52:2-53:8 (Armijo, Salazar)(discussing Atencio Photographs II-VII). R. Padilla is wearing the same shirt in Atencio Photographs II-VII, the Atencio Snapchat Photograph, and the Padilla Cheetos Photograph. See Atencio Photographs II-VII; Atencio Snapchat Photograph; Padilla Cheetos Photograph. R. Padilla is wearing that same shirt in the photographs that Atencio sent to Ms. Mitsunaga on November 1, 2021, which, according to Atencio's recollection on November 1, 2021, depict a party at her apartment on July 21, 2019, where R. Padilla gets into an argument with Archuleta over the telephone. See Atencio/Mitsunaga Email 1 at 1-5; Atencio/Mitsunaga Email 3 at 1-2. Considering all of this evidence, the Court concludes that, at R. Padilla's murder trial, Atencio, Montaño, and Halpern all testified about the same party, and that this party occurred on July 21, 2019.

The date of Atencio's party, and whether there are consecutive parties, are principal issues in this case, because these facts underpin R. Padilla's alibi. See United States v. Hernandez-Rodriguez, 443 F.3d 138, 145 (1st Cir. 2006)("New evidence is material if it has the potential 'to alter the outcome of the lawsuit under the applicable legal tenets.'")(quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996)).  At issue for the fourth Sinclair factor is whether Atencio's new testimony -- which suggests that her trial testimony was about July 21, 2019, but does not detail whether R. Padilla spent the night at her apartment on July 22, 2019, see June 10, 2024, Tr. at 48:1-49:16 (Romero, Atencio) -- is material to either the date of Atencio's party, or whether there are consecutive parties.  Even though Atencio's new testimony does not provide information about R. Padilla's whereabouts on July 22, 2019, her new testimony is material, because it sheds light on the date of her party.  Accordingly, the Court concludes that Atencio's new testimony is material to a principal issue, and R. Padilla satisfies the fourth Sinclair prong.  !

**5.    Atencio's New Testimony is Not Likely to Persuade a New Jury to Acquit R. Padilla at a New Trial.**

Regarding the last Sinclair factor -- i.e., whether Atencio's new testimony is likely to produce an acquittal at a new trial -- the Court concludes that Atencio's new testimony is not likely persuade a new jury to acquit R. Padilla, because Atencio's new testimony inculpates, rather than exculpates, him.  As a reminder, Atencio's new testimony, for the purposes of the Court's Sinclair analysis, is limited to her post-trial assertion that her trial testimony was about July 21, 2019, and not about July 22, 2019.  See supra, at 140-44.  At R. Padilla's post-trial hearings, Atencio does not testify about R. Padilla's whereabouts on July 22, 2019, or testify that there are two consecutive parties at her apartment on July 21, 2019, and July 22, 2019.  See supra, at 81-88.  Accordingly,

the Court considers the exculpatory value of Atencio's new testimony only insofar as it indicates her trial testimony is about July 21, 2019, and not to the extent her new testimony suggests that, at a new trial, she might testify that, after a second party at her apartment, R. Padilla spent the entire night at her apartment on July 22, 2019.[33]

"In assessing whether the newly discovered evidence would probably produce an acquittal, this Court looks at the evidence in the case." United States v. Baca, 447 F. Supp. 3d at 1215. New evidence that, considered in light of the other evidence in the case, fails to exculpate a defendant is not likely to produce an acquittal at a new trial. See United States v. Schneider, 801 F.3d 186, 204 (3d Cir. 2015)(denying a motion for new trial and concluding that new evidence probably would not produce an acquittal, where the new evidence was "strongly corroborative of the victim's testimony at trial"); United States v. Brown, 595 F.3d 498, 513 (3d Cir. 2010)(denying a motion for new trial and concluding that new evidence probably would not produce an acquittal, where the new evidence of a government informant's "allegedly exculpatory statements" are "at best, neutral as to [the defendant's] guilt or innocence and not exculpatory"). As the Court summarized above, the evidence in this case indicates that there is one party at Atencio's apartment on July 21, 2019. See infra, at 149-50. Atencio's new testimony contributes to the Court's findings of fact related to the date and nature of Atencio's party. In this way, Atencio's new testimony inculpates, rather than exculpates, Padilla, because the new testimony indicates that R. Padilla's only alibi witnesses -- Halpern and Montaño -- also were testifying about July 21, 2019, instead of July 22, 2019. Consequently, R. Padilla has no affirmative, credible testimony about his whereabouts on July 22, 2019. Accordingly, the Court concludes that Atencio's new testimony is

---

[33]As promised, see supra, at 153-63, the Court will analyze fully this hypothetical in a later section in this memorandum opinion.

not likely to produce an acquittal at trial, because it fails to exculpate R. Padilla of his murder conviction.

C.    IN THE ALTERNATIVE, THE COURT CONCLUDES THAT ATENCIO'S OUT-OF-COURT STATEMENTS AND HYPOTHETICAL FUTURE TESTIMONY ABOUT R. PADILLA'S WHEREABOUTS ON JULY 22, 2019, ALSO DO NOT WARRANT A NEW TRIAL UNDER RULE 33.

As promised, the Court evaluates, in the alternative, whether Atencio's out-of-court statements -- in the Romero/Atencio Telephone Conversation, the Salazar Testimony, and the Padilla/Atencio Jail Calls -- warrant a new trial under rule 33. Although the Court has concluded that none of these statements is admissible, the Court seeks to be intellectually rigorous with the situation before it. Atencio has not testified that there were two consecutive parties at her apartment, or -- considering the mistake in her trial testimony -- about R. Padilla's whereabouts on July 22, 2019. See supra, at 81-88; June 10, 2024, Tr. at 49:1-22 (Robert, Atencio). Considering the Romero/Atencio Telephone Conversation, the Salazar Testimony, and the Padilla/Atencio Jail Calls, however, the Court recognizes two possibilities: (i) if the Romero/Atencio Telephone Conversation, the Salazar Testimony, and the Padilla/Atencio Jail Calls were admissible, a fact-finder could infer that there were two consecutive parties at Atencio's apartment and that R. Padilla spent the night at her apartment on July 22, 2019; and (ii) at a new trial, Atencio might testify that there were two consecutive parties at her apartment and that R. Padilla spent the night at her apartment on July 22, 2019. As a threshold matter, the inferences referenced in (i) are not intuitive, given that, although Atencio tells Mr. Romero that there were two consecutive parties at her apartment, see Romero/Atencio Telephone Conversation Transcript at 7:14-8:11 (Romero, Atencio), Atencio only once states clearly, when Mr. Romero prompts her, that R. Padilla did not leave her apartment on the evening of July 22, 2019:

- 153 -

[Romero]:     Oh, okay. So on the 22nd, as far as you can remember, they didn't leave at all?

[Atencio]:     No, now -- no, they didn't 'cause now that I'm thinking of the right day, no, he didn't because I remember him being there and then I remember 'cause that's why I couldn't remember because that was that day I remember for sure because of the pictures on July 21st happened, they did leave that night. So then that's why I was being confused. I was like, Rob, no, you left, you know. And now that I know I'm talking about the wrong night, he was there that night and we were drinking, you know. And then I do remember because I remember [M. Ruiz] showing up in the morning. But what I couldn't remember I was like how did they leave and then [M. Ruiz] show up in the morning and Rob's there. I couldn't remember how Rob got back over there but obviously getting the wrong date.

Romero/Atencio Telephone Conversation Transcript at 4:9-24 (Romero, Atencio). The Court recognizes that a fact-finder could conclude from this exchange that R. Padilla spent the night at Atencio's apartment -- or, at the least, that he was there around the time of Lucero's murder. The Padilla/Atencio Jail Calls are less clear on this point. R. Padilla's investigator identifies only two portions of the Padilla/Atencio Jail Calls where Atencio suggests that R. Padilla spent the night at her apartment on July 22, 2019 or was at her apartment when Lucero was murdered: (i) an exchange where Atencio says "I think you did [spend the night,]" and that he "might have spent the night," while Atencio questions him about where she would have slept if he slept in her bed, see July 8, 2024, Tr. at 8:23-11:6 (Salazar, Armijo); and (ii) an exchange where Atencio, again questioning where she would have slept if R. Padilla spent the night July 22, 2019, says that, although she remembers R. Padilla and Halpern coming out of her room and asking Montaño and Atencio for sexual advice, she recalls that R. Padilla slept in her room only for a few hours and woke up some time between two and four in the morning, see July 8, 2024, Tr. at 13:11-16:5 (Armijo, Salazar). Atencio does not state clearly in either of these out-of-court statements that R. Padilla was at her apartment when Lucero was murdered. The Court concludes, however, that,

based on these out-of-court statements, a fact-finder can infer that R. Padilla was at her apartment when Lucero was murdered. Importantly, given the totality of Atencio's out-of-court statements, it is not unreasonable to predict that Atencio might state more clearly at a new trial that R. Padilla was at her apartment when Lucero was murdered. Accordingly, the Court evaluates whether Atencio's out-of-court statements or Atencio's hypothetical favorable testimony warrant a new trial as newly discovered evidence under rule 33, even though neither the out-of-court statements or Atencio's hypothetical favorable testimony are admissible evidence.

The analysis of the first four Sinclair factors, as applied to Atencio's out-of-court statements or her hypothetical favorable testimony, is identical to the Court's analysis of those factors as applied to Atencio's actual, admissible new testimony, which the Court conducted above. See supra, at 145-53. R. Padilla discovered Atencio's out-of-court statements and her hypothetical favorable testimony after his murder trial; his lack of diligence caused his failure to discover these materials; these materials are not merely impeaching, and these materials are material to the principal issues involved.

Regarding the first factor, the Court concludes that R. Padilla discovered Atencio's out-of-court statements and her hypothetical favorable testimony after his murder trial, because these statements either were made after the trial, or do not exist presently. Regarding the second factor, the analysis is straightforward: just as R. Padilla could have elicited Atencio's actual, admissible new testimony at his murder trial, R. Padilla could have elicited Atencio's out-of-court statements about him spending the night at her apartment on July 22, 2019, or her hypothetical favorable testimony about two consecutive parties where R. Padilla spends the night on July 22, 2019, at his murder trial. At trial, R. Padilla did not suggest that there were two consecutive parties and that Atencio's testimony was about the first night, rather than the second. Although R. Padilla had all

the information he needed to present a two-party theory to the jury, he did not choose that strategy. Accordingly, the Court concludes that, just as R. Padilla's lack of diligence prevented him from discovering Atencio's actual, admissible new testimony, his lack of diligence prevented him from discovering Atencio's out-of-court statements and hypothetical favorable testimony. See United States v. Garcia-Alvarez, 541 F.3d at 18 ("Rule 33 does not give counsel a second opportunity to rectify a faulty trial strategy."). Regarding the third factor, the Court concludes that Atencio's out-of-court statements and hypothetical favorable testimony are not merely impeaching, because, like Atencio's actual, admissible new testimony, these materials speak substantively about where R. Padilla was when Lucero was murdered. See supra, at 148-49. Regarding the fourth factor, the Court concludes that Atencio's out-of-court statements and hypothetical favorable testimony are material to the principal issues involved, because they shore up R. Padilla's alibi, which is a principal issue in this case.

The fifth Sinclair factor -- whether the new evidence likely produce an acquittal at a new trial -- is a closer call. Because Atencio's out-of-court statements and hypothetical favorable testimony strengthen R. Padilla's alibi, these materials are facially exculpatory. Considering all of the evidence, the Court concludes, however, that Atencio's out-of-court statements and hypothetical favorable testimony would not likely persuade a jury to acquit R. Padilla at a new trial, because: (i) the weight of the evidence indicates that Atencio's out-of-court statements and hypothetical favorable testimony are incorrect whether there were two consecutive parties and whether R. Padilla was at Atencio's apartment when Lucero was murdered; (ii) Atencio would not be a convincing witness at a new trial, given her prior inconsistent testimony and out-of-court statements; and (iii) the Court cannot predict how Halpern and Montaño would testify, if at all, at a new trial.

Regarding (i), Atencio's out-of-court statements and hypothetical favorable testimony do not change the Court's finding of fact that there is only one party at Atencio's apartment during the relevant period between July 21, 2019, and July 22, 2019, and that this party occurs on July 21, 2019. All of the photographs of Atencio, R. Padilla, and Halpern partying at Atencio's apartment were taken on July 21, 2019. See July 8, 2024, Tr. at 52:2-53:8 (Armijo, Salazar). The Atencio Snapchat Photograph shows R. Padilla eating Cheetos in Atencio's apartment and is date-stamped July 21, 2019. See Atencio Snapchat Photograph. Atencio, Halpern, and Montaño all testified about only one party at Atencio's apartment, and those testimonies share key details with the July 21, 2019, photographs. See supra, at 19-20, 35-38, 39-46; Atencio Snapchat Photograph; Padilla Cheetos Photograph; Atencio Mitsunaga Emails 1-3; July 8, 2024, Tr. a 52:2-53:8. Accordingly, the Court concludes that, given the other evidence that speaks directly to the events at Atencio's apartment on July 21-22, 2019, it is unlikely that a fact-finder would conclude that there are two consecutive parties and that R. Padilla spent the second night at her apartment, even with Atencio's out-of-court statements and hypothetical favorable testimony. Because the evidence destroying R. Padilla's alibi outweighs Atencio's out-of-court statements and hypothetical favorable testimony, the Court concludes that these materials are not likely to produce an acquittal at trial. See United States v. Reyes, 542 F.3d 588, 596 (7th Cir. 2008)(affirming the denial of a motion for new trial, and concluding that, even though newly discovered testimony allegedly absolving the defendant "would bolster, to a degree, his defense," the new testimony would not result in acquittal, where there was significant evidence otherwise indicating the defendant's culpability). Other evidence -- namely, Coca's testimony that he accompanied R. Padilla when R. Padilla killed Lucero, Garcia and Urquizo's testimony that R. Padilla told them that he killed Lucero, and Garcia's testimony that R. Padilla told him that, if R. Padilla killed

Lucero, he would improve his standing in SNM -- also outweighs Atencio's out-of-court statements and hypothetical favorable testimony. Accordingly, the Court concludes that, because other evidence undermines and outweighs Atencio's out-of-court statements and hypothetical favorable testimony, these new materials likely would not cause a jury to acquit R. Padilla at a new trial. See United States v. Persico, 645 F.3d 85, 110 (2d Cir. 2011)(affirming the denial of a motion for new trial and concluding that the discovery of a murder victim's buried body in Farmingdale, New York, would not likely cause a jury to acquit a defendant convicted of ordering and arranging the murder, because "there was solid evidence, taken as a whole," that the defendant "had a strong motive to have" the victim killed and "lured [the victim] to a secluded location from which he could be kidnapped and killed," even though the United States had argued in closing that the defendants concealed the body by dumping it in the ocean); December 6, 2023, Tr. at 204:25-205:5 (Coca)(describing a party where R. Padilla accuses Lucero of being a "rat")' December 7, 2023, Tr. at 243:25-244:10 (Garcia)( testifying that R. Padilla told him that a high ranking SNM member told R. Padilla that, if R. Padilla killed Lucero, R. Padilla would improve his standing in SNM); December 6, 2023, Tr. at 188:21-201:7 (Coca)(testifying that he drove R. Padilla to Lucero's house and witnessed R. Padilla shoot and kill Lucero in Lucero's driveway); December 7, 2023 Tr. at 141:10-143:2 (Frederickson)(testifying that R. Padilla told him that he shot someone who was working with federal authorities in a driveway); id. at 241:17-243:17 (Garcia)(testifying that R. Padilla told him how R. Padilla killed Lucero in front of Lucero's house); December 8, 2023 Tr. at 40:5-21 (Urquizo)(testifying that R. Padilla told him how R. Padilla killed Lucero in front of Lucero's house).

Regarding (ii) -- i.e., whether Atencio would be a convincing witness at a new trial -- the Court concludes that Atencio's original trial testimony and prior inconsistent statements also

would undermine and outweigh her out-of-court statements and hypothetical favorable testimony. At a new trial, the United States likely would impeach Atencio with her original trial testimony -- where she testifies about a single party at her apartment where R. Padilla leaves -- and her many out-of-court statements indicating that R. Padilla did not spend the night at her apartment the night that Lucero is murdered.  See supra, at 52-56; 63-66; Fed. R. Evid. 613.  Overall, Atencio would not be a credible witness at a new trial, even if she now sincerely believes that her out-of-court statements and hypothetical favorable testimony are truthful.  Accordingly, Atencio's out-of-court statements and hypothetical favorable testimony are not likely to produce an acquittal at a new trial.  See United States v. Glover, 21 F.3d 133, 139 (6th Cir. 1994)(affirming denial of a motion for a new trial and concluding that new, exculpatory testimony is not likely to produce an acquittal, where the witness offering the new testimony is "readily-impeachable").

Regarding (iii) -- i.e., how Atencio's out-of-court statements and hypothetical favorable testimony may interact with other witness testimony at a new trial -- the Court recognizes that Atencio's out-of-court statements and hypothetical favorable testimony do not exist in a vacuum. R. Padilla's assertion that Atencio's out-of-court statements and hypothetical favorable testimony align with Halpern's and Montaño's trial testimonies, see MNT at 6; Padilla MNT Closing Arguments at 21-22, lacks force, however, insofar as it considers only part of these witness' testimonies.  Although it is true that Atencio's out-of-court statements and hypothetical favorable testimony, Halpern's trial testimony, and Montaño's trial testimony all suggest that R. Padilla "was in Ms. Atencio's apartment all evening, night and early morning on July 22-23, 2019," MNT at 6, Halpern and Montaño did not testify that there were two consecutive parties.  Moreover, the party about which Halpern and Montaño testify shares key details with the party that, based on the Court's findings of fact, occurred on July 21, 2019.  See supra, at 5-6, 149-50.  The Court cannot

predict with certainty whether either party would call Halpern or Montaño at a new trial, or, if either witness testifies again, what she would say.  It is possible that: (i) Halpern or Montaño will refuse to testify, and the United States cannot introduce their trial testimonies -- which do not mention two parties -- to undermine Atencio's hypothetical favorable testimony;[34] (ii) Halpern or

---

[34]The Court concludes that Halpern and Montaño's prior testimonies are not admissible at a new trial, because their testimonies do not satisfy any hearsay exception, and because introducing either testimony violates the Confrontation Clause.  Regarding the hearsay issue, Halpern and Montaño's prior testimonies most likely would be admitted under rule 804(b)(1), which allows prior trial testimony to be admitted when the declarant is unavailable and the party against whom the prior testimony is offered had an opportunity and similar motive to develop the prior testimony.  See Fed. R. Evid. 804(b)(1).  If Halpern and Montaño refuse to testify, they are unavailable.  See Fed. R. Evid. 804(a)(2) (providing that a declarant who "refuses to testify about the subject matter despite a court order to do so" is "considered to be unavailable as a witness").  An unavailable declarant's former testimony is admissible if it: (i) "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one," Fed. R. Evid. 804(b)(1)(A), and (ii) is offered against a party who had "an opportunity and similar motive to develop it by direct, cross- or redirect examination," Fed. R. Evid. 804(b)(1)(B).  Rule 804(b)(1)(A)'s requirement is met, because Halpern and Montaño were witnesses at R. Padilla's murder trial.  Regarding 804(b)(1)(B)'s requirements -- opportunity and motive to develop prior testimony -- R. Padilla had the opportunity to develop Halpern and Montaño's prior testimonies, because they were his witnesses at trial.  However, R. Padilla did not have a motive at his murder trial to develop those testimonies in a similar way as he would at a new trial.

The way to determine whether or not motives are similar is to look at the issues and the context in which the opportunity for examination previously arose, and compare that to the issues and context in which the testimony is currently offered.  The similar motive inquiry is essentially a hypothetical one: is the motive to develop the testimony at a prior time similar (not necessarily identical) to the motive that would exist if the declarant were produce (which of course he is not) at the current trial or hearing?

4 Stephen A. Saltzburg, Michale M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual § 804.02[4] at 804-11 (11th ed. 2015)("Saltzburg, Martin, & Capra").  See United States v. DiNapoli, 8 F.3d 909, 914-15 (2d Cir. 1993)("The proper approach . . . in assessing similarity of motive under Rule 804(b)(1) must consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue.").  R. Padilla did not have a similar motive to develop Halpern's and Montaño's testimony at his murder trial, because he did not have an interest in proving "the same side of a substantially similar issue."  United States v. DiNapoli, 8 F.3d at 914-15.  At R. Padilla's murder trial, R. Padilla's defense was that there was one party

on July 22, 2019.  See supra, at 15-48.  R. Padilla called Halpern and Montaño as witnesses to testify that he was at that one party around the time that Lucero was murdered.  See supra, at 35-38, 39-46.  At a new trial, R. Padilla's defense would be that there were two consecutive parties on July 21, 2019, and July 22, 2019, and that he spent the entire evening during the second party at Atencio's apartment.  See supra, at 69-70, 96, 98-99, 153.  R. Padilla's motivations in examining Halpern and Montaño at the second trial would be different from those at his first trial.  At a new trial, R. Padilla would want Halpern and Montaño to corroborate the two-party theory.  In contrast, at the first trial, R. Padilla had no interest in soliciting testimony from any witness whether there were two consecutive parties, because he pursued a one-party theory.  These different motivations preclude admitting, under rule 804(b)(1), Halpern and Montaño's prior testimonies at a new trial.  See United States v. Duenas, 691 F.3d 1070, 1089-90 (9th Cir. 2012)(concluding that an unavailable police officer's prior suppression hearing testimony about the voluntariness of a defendant's incriminating statements is not admissible at trial, because the defendant's "fundamental objective at the suppression hearing was not the same as his motive would have been had [the officer] testified at trial," given that "the issue at trial was whether the evidence proved [the defendant's] guilt beyond a reasonable doubt, not the circumstances of his confession"); United States v. Feldman, 761 F.2d 380, 386 (7th Cir. 1985)(concluding that prior civil deposition testimony is not admissible at a later criminal trial, because, even though the criminal defendants were parties in the civil case, the defendants pursued different trial strategies at the criminal proceeding), abrogated on other grounds by United States v. Rojas-Contreras, 474 U.S. 231 (1985).

     Regarding the Confrontation Clause issue, introducing Halpern's and Montaño's prior testimonies violates the Confrontation Clause, because those prior testimonies would be used against R. Padilla, and R. Padilla did not have an opportunity to cross-examine Halpern or Montaño.  "The Sixth Amendment's Confrontation Clause bars from admission an absent witness' testimonial hearsay statements, unless the defendant has had a prior opportunity to cross-examine that witness."  United States v. Salas-Aguayo, 2024 WL 453642, at *21.  As an initial matter, the Court concludes that the Confrontation Clause applies here, because Halpern and Montaño are adversarial and unavailable, and their prior testimonies are testimonial.  See Crawford v. Washington, 541 U.S. at 51 (holding that the Confrontation Clause "applies to 'witnesses' against the accused")(quoting 2 N. Webster, An American Dictionary of the English Language (1828)); id., at 68 ("Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial.").  The key issue here is whether R. Padilla had the opportunity to cross-examine Halpern or Montaño.  See Crawford v. Washington, 541 U.S. at 57 ("[P]rior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine.").  Although Halpern and Montaño were R. Padilla's witnesses at his murder trial, he did not have the opportunity to cross-examine them in a scenario where that testimony is being used against him in a new trial.  This circumstance is unusual, where defense witnesses have been converted into prosecution witnesses.  The Court must consider whether a defendant's prior direct examination satisfies the Confrontation Clause's requirement that a defendant has the opportunity to cross-examine adversarial witnesses.  In Crawford v. Washington, the Honorable Antonin Scalia, Associate Justice of the Supreme Court, does not identify any alternative avenue to satisfy the cross-examination requirement other than cross-examination, and holds that "the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts."  Crawford v.

Montaño would testify and reaffirm their trial testimony about R. Padilla leaving, but also, when

presented with time-stamped photographs, testify that those events occurred on July 21, 2019; or

(iii) Halpern or Montaño adopts R. Padilla's new narrative and says that their trial testimony was

about July 22, 2019.  It is not possible for the Court to predict with certainty which of these

scenarios is most likely to occur.[35]  With this uncertainty, the Court cannot conclude soundly that

Atencio's out-of-court statements and hypothetical favorable testimony likely are to produce an

_____

Washington, 541 U.S. at 54.  Introducing Halpern's and Montaño's prior testimonies against R. Padilla violates R. Padilla's right to confront witnesses who testify against him, because, in his first trial, Halpern and Montaño did not testify against him; thus, he never had the opportunity to confront and cross-examine them.  See Cook v. McKune, 323 F.3d 825, 832 (10th Cir. 2003)("If the state is allowed to prove its case using a transcript of prior testimony, rather than live testimony, the defendant certainly loses the chance to have the factfinder view the witness's demeanor, and he may also lose the chance to make the witness face him as the witness testifies.").  Accordingly, the Court concludes that, even if Halpern's and Montaño's prior testimonies are admissible at a new trial under rule 804(b)(1) -- while the Court concludes that these testimonies are not admissible under the Federal Rules of Evidence -- introducing these testimonies violates the Confrontation Clause, and the Court cannot admit them.

      This scenario -- where Atencio says that there were two consecutive parties and that R. Padilla never left her apartment during the second party on July 22, 2019, and the United States cannot introduce Halpern and Montaño's prior testimonies to undermine Atencio's favorable testimony -- is R. Padilla's best case.  The future jury would have only one alibi witness, who testifies that R. Padilla was elsewhere when Lucero was murdered.  Even in this case, the Court concludes, however, that a jury would not acquit R. Padilla.  At a new trial, Atencio would not be a credible witness, because her testimony is so inconsistent, she admits to having a poor memory, and the jail calls would show that she is under tremendous pressure from R. Padilla and her boyfriend to provide favorable testimony.  The United States' other inculpatory evidence, like Coca's, Garcia's, Urquizo's, and Frederickson's prior testimonies -- which would all be admissible if they refuse to testify, because R. Padilla cross-examined each of them at his first trial, and had similar motivations during those cross-examinations -- outweighs a single, very impeachable alibi witness.  Accordingly, even in this best-case scenario, the Court concludes that a jury likely would not acquit R. Padilla.

      [35]That neither Halpern nor Montaño can pinpoint the date of the party which her testimony discusses adds to this uncertainty.  See December 8, 2023, Tr. at 335:2-21 (Armijo, Halpern); id. at 349:10-23 (Halpern)(testifying that she cannot say with certainty that the night she describes is July 22, 2019); id. at 262:22-264:1 (Montaño)(stating that she believes her testimony is about July 22, 2019, only because R. Padilla's counsel told her).

acquittal at trial, particularly given the other significant evidence inculpating R. Padilla. Accordingly, even if the Court considers Atencio's out-of-court statements and hypothetical favorable testimony for the purposes of R. Padilla's MNT, the Court will not grant, pursuant to rule 33, R. Padilla a new trial.[36]

---

[36]The Court's conclusion that Atencio's revised recollection -- either in its admissible or inadmissible form -- does not warrant a new trial under rule 33 comports with the Court's independent research. The Court has not found any case where a district court or Court of Appeals has granted a motion for new trial based on a witness' post-trial revision of her trial testimony. The lack of precedent makes sense, because "Courts are particularly reluctant to grant such motions where the newly discovered evidence consists of a witness recantation as such recantations are 'looked upon with the utmost suspicion.'" United States v. DiPaolo, 835 F.2d at 49 (quoting U. S. ex rel. Sostre v. Festa, 513 F.2d 1313, 1318 (2d Cir. 1975)). See In re Stewart, 78 F.4th at 697 ("No federal court that we know of has ever held that regained memory that was previously repressed constitutes newly discovered evidence for purposes of federal habeas relief.")

R. Padilla argues that United States v. DiPaolo is inapposite, because the defendant in that case coerced a witness to recant her testimony through actual violence. See Padilla MNT Closing Arguments at 16-17. The Court disagrees with R. Padilla's analysis. First, R. Padilla's proposed distinction does not undermine United States v. DiPaolo's core holding: it is difficult to grant a new trial based on a witness recantation, because recantations are not likely to be so credible that a jury will find that this impeachable witness requires it to acquit the defendant. Second, R. Padilla's proposed distinction is not meaningful, because, although R. Padilla has not threatened or harmed Atencio, over the course of twenty-five telephone calls, R. Padilla exerted tremendous pressure on Atencio to provide favorable testimony about his alibi. Also, Atencio's boyfriend is encouraging her to change her testimony. R. Padilla's attempts to distinguish In re Stewart, 78 F.4th 690, also do not persuade the Court to grant the MNT. See Padilla MNT Closing Arguments at 18-19. R. Padilla argues that In re Stewart is inapposite, because, in that case, Weldon Stewart, a defendant convicted of murdering his girlfriend, sought habeas relief after he allegedly recovered, after undergoing hypnosis, a memory of her committing suicide. See Padilla MNT Closing Arguments at 18. The Court disagrees with R. Padilla's analysis. The United States Court of Appeals for the Fourth Circuit denies Stewart habeas relief, because, although Stewart's regained memory "provides some support for his claim of innocence," his new memory lacks key corroborating details, contradicts his sworn trial testimony, and the State's "substantial evidence that Stewart killed" his girlfriend undermines the new story. In re Stewart, 78 F.4th at 698-99. Although the circumstances under which Stewart recovered his revised recollection differ from the circumstances under which Atencio recovered her revised recollection, the central point is the same: courts do not grant relief based on suspicious recantations, where other evidence inculpates significantly the party seeking relief. Accordingly, R. Padilla's proposed factual distinction does not persuade the Court to grant the MNT, because, like Stewart's hypnosis-fueled recollection,

### III.    THE COURT WILL NOT ORDER A NEW TRIAL BASED ON AN ALLEGED BRADY <u>VIOLATION.</u>

Next, the Court turns to R. Padilla's <u>Brady</u> claims.  R. Padilla argues that the United States' alleged failure to disclose Atencio's uncertainty regarding her testimony is a <u>Brady</u> violation.  <u>See</u> MNT Supplement at 3-12.  R. Padilla alleges that: (i) before R. Padilla's murder trial, Atencio tells Acee that she is confused about the dates; and (ii) during R. Padilla's murder trial, Atencio tells Mr. Castellano that she is confused about the dates.  <u>See</u> Padilla MNT Closing Arguments at 24 (citing June 10, 2024, Tr. at 36-39 (Robert, Atencio)).[37]  R. Padilla asserts that, if the United States had told R. Padilla about Atencio's allegedly expressed concerns, R. Padilla could have used that information to impeach Atencio's testimony at trial -- <u>i.e.</u>, that R. Padilla partied at her house on July 22, 2019, and left early in the evening .  <u>See</u> MNT Supplement at 6-7.  The United States maintains that "Atencio never made representations to any member of the prosecution team that she was confused about the date that the defendant left her house."  United States MNT Closing Arguments at 10.  A defendant seeking a new trial based on an alleged <u>Brady</u> violation must

---

Padilla pressured Atencio to reach her favorable revised recollection, and the significant evidence that inculpates R. Padilla in Lucero's murder outweighs this tarnished and impeachable new story.

[37]In the Padilla MNT Closing Arguments, R. Padilla appears to have abandoned his argument that the United States' failure to disclose Atencio's alleged post-trial statements to Acee on January 9, 2024, is a <u>Brady</u> violation.  <u>Compare</u> Padilla MNT Closing Arguments at 24, <u>with</u> Padilla Supplement Reply at 3.  The Court has made a finding of fact that, on January 9, 2024, Atencio does not tell Acee that she testified about the wrong date at R. Padilla's murder trial.  <u>See</u> <u>supra</u>, at 68-69 & n.20.  Atencio's statements that she allegedly made to Acee on January 9, 2024, are substantively identical to the statements that Atencio allegedly made to Acee when he served her subpoena and to the statements that Atencio allegedly made to Mr. Castellano during R. Padilla's murder trial -- both of which the Court also has concluded Atencio did not make.  <u>See</u> <u>supra</u>, at 14-15, 22, 100.  Accordingly, the Court applies the same analysis below to Atencio's statements that she allegedly made to Acee on January 9, 2024: there is no <u>Brady</u> violation, because the United States did not possess the evidence that R. Padilla alleges it suppressed, and, even if the United States had possession of the allegedly suppressed evidence, that evidence is not material for <u>Brady</u> purposes.  <u>See</u> <u>infra</u>, at 151-53; 156-63.

demonstrate that: "'(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" United States v. Velarde, 485 F.3d at 558 (quoting Quintanilla, 193 F.3d at 1149 n.10). The Court concludes that there is no Brady violation, because the United States did not possess the evidence that R. Padilla alleges it suppressed, and, even if the United States had possession of the allegedly suppressed evidence, that evidence is not material for Brady purposes.

### A.    THE UNITED STATES DID NOT SUPPRESS ATENCIO'S ALLEGED STATEMENTS TO ACEE.

First, the Court concludes that the United States does not violate Brady, because the United States never possessed the evidence that R. Padilla alleges it suppressed.  Accordingly, the Court concludes that R. Padilla fails to satisfy Brady's first prong, because the United States could not have suppressed evidence that it did not have.  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *7 (D.N.M. Mar. 14, 2011)(Browning, J.)(citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)). Brady's "duty to disclose extends to prosecutors, police, and other government investigators." United States v. Velarde, 485 F.3d at 559.  On the one hand, "'[i]t is well settled that there is no "affirmative duty upon the government to take action to discover information which it does not possess."'" United States v. DeLeon, 428 F. Supp. 3d at 762)(quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.).  On the other hand, "a prosecutor's office cannot get around Brady by

keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984). Accordingly, the Court concludes that the United States -- including prosecutors, like Mr. Castellano, and investigators, like Acee -- is obligated only to disclose Brady material that it possesses.

To support his contention that the United States violates Brady, R. Padilla points to Atencio's June 10, 2024, testimony, during which she describes how: (i) when Acee serves her a trial subpoena, she tells Acee that she is unsure her testimony is about the right date, see Padilla MNT Closing Arguments at 24; June 10, 2024, Tr. at 36:25-37:16 (Robert, Atencio); and (ii) during R. Padilla's trial, Acee asks Atencio to speak with Mr. Castellano about her confusion regarding the dates, and Mr. Castellano tells her that she has the right date, see MNT Closing Arguments at 25; June 10, 2024, Tr. at 38:3-22 (Robert, Atencio). At the same hearing, the United States calls Acee as a witness. See June 10, 2024, Tr. at 141:22-142:4 (Armijo, Court). Acee says that, when he served her subpoena, Atencio tells him that D. Padilla and Quintana had been attempting to contact her. See June 10, 2024, Tr. at 143:16-144:8 (Armijo, Acee). Acee maintains that these comments are "the extent of [his] conversation with her that day." June 10, 2024, Tr. at 144:10-11 (Armijo, Acee). On cross-examination, Acee says that he does not remember Atencio saying that she is not sure whether her expected testimony is about the right night, although he remembers her being unsure about many aspects of her testimony. See June 10, 2024, Tr. at 157:9-13 (Robert, Acee). Regarding any other conversations with Atencio before or during R. Padilla's trial, Acee says that he does not have any conversations with Atencio "prior to her testimony in reference to her testifying." June 10, 2024, Tr. at 144:15-24 (Armijo, Acee).

Assessing each witness' credibility, the Court makes the following findings of fact: (i) Atencio did not tell Acee before R. Padilla's murder trial that she was unsure whether her

expected testimony was about the right date; and (ii) Atencio did not tell Acee or Mr. Castellano during R. Padilla's murder trial that she was unsure whether her testimony was about the right date.  See supra, at 14-15, 22, 100.  Atencio has admitted that she has a bad memory, see June 10, 2024, Tr. at 66:8-11 (Castellano, Atencio), and Acee has testified credibly before the Court many times in many hearings and multiple trials.  Acee does not overstate testimony.  He gives up information for the defendant as easily and quickly as for the prosecutor, and he corrects or admits mistakes readily, and without a struggle.  His language is precise, and he chooses his words with care.  The Court's perception is that juries and defense counsel find him credible and accurate. Acee's testimony also aligns with the November 16, 2023, Atencio 302, which documents Acee's conversation with Atencio when he serves her trial subpoena and does not mention Atencio saying she was confused about the dates.  See November 16, 2023, Atencio 302 at 1.  The United States asserts that "Atencio never made representations to any member of the prosecution team that she was confused about the date that the defendant left her house."  United States MNT Closing Arguments at 10.  Mr. Castellano signed the MNT Closing Arguments, and, as an officer of the Court, Mr. Castellano represents that the MNT Closing Arguments are truthful.  See United States MNT Closing Arguments at 18.  Accordingly, the Court concludes that R. Padilla does not satisfy Brady's first prong, because he does not show that the United States possessed the evidence -- Atencio's uncertainty regarding her trial testimony that she allegedly expressed to Acee and Mr. Castellano -- which R. Padilla alleges the United States suppressed.

### B. ATENCIO'S ALLEGED STATEMENTS TO ACEE AND MR. CASTELLANO ARE FAVORABLE.

Regarding favorability, the Court concludes that, even if Atencio told Acee or Mr. Castellano that she was unsure about her expected testimony's date, this information is favorable

for Brady purposes, because R. Padilla could have used it to impeach Atencio's trial testimony. See Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. at 676)(brackets in Douglas v. Workman, but not in United States v. Bagley); Snow v. Sirmons, 474 F.3d 693, 717 (10th Cir. 2007)("Impeachment evidence is exculpatory for Brady purposes."); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."); United States v. DeLeon, 428 F. Supp. 3d at 757 ("The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.")(citing Giglio v. United States, 405 U.S. 150, 154 (1972)(Burger, C.J.)).    Although the Court has concluded that Atencio's revised recollection -- both in its admissible and non-admissible forms -- is not merely impeachment material, see supra, at 149-50, 156, the Court also concludes that, for Brady purposes, Atencio's alleged statements to Acee and Mr. Castellano are only impeachment material because they are different from her post-trial statements.    In the pre-trial statements, Atencio allegedly says that she is not sure that she has the right date in mind.    See June 10, 2024, Tr. at 36:25-37:16 (Atencio).    In the post-trial statements, Atencio says that her trial testimony was about July 21, 2019, and not about July 22, 2019.    See June 10, 2024, Tr. at 48:1-25 (Atencio). Atencio's alleged statements to Acee say nothing substantively about her testimony, other than that she has doubts about it.    Accordingly, the Court disagrees with R. Padilla's assertion that "[i]t is a virtual certainty that Ms. Atencio's concerns, which led to her too-late realization that she had testified incorrectly, would have avoided the after-the-fact situation in which we now find

ourselves." MNT Supplement at 7. Although the Court cannot predict with certainty what would have happened in the double-hypothetical situation that R. Padilla posits, the Court declines to take R. Padilla's leap of faith that, had he known that Atencio's expressed doubts about the date of her testimony, his lawyers would have elicited testimony from Atencio that aligned with his other alibi witnesses. See MNT Supplement at 9-11. Accordingly, the Court concludes that Atencio's alleged statements to Acee and Mr. Castellano are favorable, only insofar as R. Padilla could have used those alleged statements to impeach Atencio's trial testimony.

### C.   HAD ATENCIO'S ALLEGED STATEMENTS TO ACEE AND MR. CASTELLANO BEEN DISCLOSED, THERE IS NOT A REASONABLE PROBABILITY THAT THE RESULT OF R. PADILLA'S MURDER TRIAL WOULD HAVE BEEN DIFFERENT.

Turning to the third Brady prong, the Court concludes that Atencio's alleged statements to Acee and Mr. Castellano are not material, because, had the information been disclosed, there is not a reasonable probability that the result of R. Padilla's murder trial would have been different. Impeachment evidence is not always material for Brady purposes. See Snow v. Sirmons, 474 F.3d at 713-16 (concluding that the United States' failure to disclose impeachment material for a government witness who later recants her trial testimony does not violate Brady, because the impeachment material does not undermine confidence in the trial outcome "even assuming [the government witness] lied" at trial, where defense counsel "vigorously cross-examined" the government witness, her "credibility was [] placed squarely before the jury," and other evidence inculpates the defendant).

> The standard for determining Brady materiality is well established. The "touchstone of materiality is a 'reasonable probability' of a different result," which exists "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 434 . . . (1995) (quoting United States v. Bagley, 473 U.S. 667, 678 . . . (1985)). This inquiry does not permit piecemeal evaluation of suppressed evidence; instead, courts must

> "review the cumulative impact of the withheld evidence; its utility
> to the defense as well as its potentially damaging impact on the
> prosecution's case. Furthermore, . . . [courts should] evaluate the
> materiality of withheld evidence in light of the entire record in order
> to determine if the omitted evidence creates a reasonable doubt that
> did not otherwise exist. What might be considered insignificant
> evidence in a strong case might suffice to disturb an already
> questionable verdict."
>
> Snow[ v. Sirmons], 474 F.3d at 711 (quoting Banks v. Reynolds, 54 F.3d 1508,
> 1518 (10th Cir. 1995)).

Trammell v. McKune, 485 F.3d 546, 551 (10th Cir. 2007)(ellipses added).  Considering the

"cumulative impact" of the allegedly suppressed evidence "in light of the entire record," Banks v.

Reynolds, 54 F.3d at 1518, the Court concludes that Atencio's alleged statements to Acee and Mr.

Castellano are not material.  Although R. Padilla may have used these alleged statements to

impeach Atencio's trial testimony, the lack of this impeachment material does not "undermine[]

confidence in the trial."  United States v. Bagley, at 678.  At best, R. Padilla partially could have

impeached Atencio's testimony with statements that she allegedly made to an FBI agent and a

prosecutor about how she was unsure whether her expected testimony was about the right date.

This hypothetical impeachment would not have undermined Atencio's credibility at trial to such

an extent that the jury would have disregarded her testimony -- that R. Padilla partied at her house

on July 22nd and left early in the evening -- in favor of Halpern and Montaño's testimony.

Importantly, Halpern says that: (i) she cannot confirm independently whether she is testifying

about the right date, see December 8, 2023, Tr. at 355:2-21; id. at 349:10-23 348 (Armijo,

Halpern); (ii) although she remembers sleeping with R. Padilla in Atencio's room on the night in

question, she recalls awaking while it is still dark outside, and R. Padilla returning to bed with cold

hands, see December 8, 2023, Tr. at 358:13-19 (Armijo, Halpern); (iii) R. Padilla's friends and

family have paid her hush money for her favorable testimony, see December 8, 2023, Tr. at 345:13-

346:6 (Armijo, Halpern).    Montaño also says that she does not have any "independent recollection," December 8, 2023, Tr. at 263:21-22 (Armijo), of the date that she was at Atencio's house with Padilla and Halpern, and that she says it is July 22, 2019, only because R. Padilla's counsel told her, see December 8, 2023, Tr. at 262:22-264:1 (Armijo, Montaño).  Halpern's and Montaño's testimony do not provide a rock-solid alibi that would have convinced the jury to acquit R. Padilla if R. Padilla had been able partially to impeach Atencio's testimony with her alleged pre-trial statements to Acee.  The other evidence at R. Padilla's murder trial -- including Coca's testimony that he accompanied R. Padilla when R. Padilla killed Lucero, Garcia and Urquizo's testimony that R. Padilla told them that he killed Lucero, and Garcia's testimony that R. Padilla told him that, if R. Padilla killed Lucero, he would improve his standing in SNM -- also outweighs whatever impeachment value Atencio's alleged statements to Acee has.  Accordingly, the Court concludes that, even if Atencio told Acee and Mr. Castellano that she was unsure about the date of her expected testimony, it is not reasonably probable that R. Padilla's use of those alleged statements to impeach her testimony would have produced a different result at his murder trial. Thus, the Court concludes that R. Padilla fails to satisfy Brady's third prong and that he is not entitled to a new trial based on any alleged Brady violation.[38]

---

[38]R. Padilla's Glossip Supplement does not persuade the Court otherwise.  R. Padilla argues that, in Glossip, the Supreme Court concludes that the United States violates a defendant's due process rights by failing to correct false trial testimony.  See Glossip Supplement at 2-3. R. Padilla argues that the same situation is present here, where Atencio allegedly tells the United States that she is uncertain about her trial testimony, and the United States allegedly "never advised the defense team of Ms. Atencio's expressed uncertainty."  Glossip Supplement at 4.  The Court disagrees with R. Padilla.  The United States does not violate R. Padilla's due process rights by allowing Atencio to testify at R. Padilla's murder trial, because the United States does not have a Constitutional obligation to correct Atencio's testimony, where she does not tell the United States that she is uncertain about her testimony.

The Supreme Court in Glossip concludes that the defendant is entitled to a new trial, because the United States "violated its constitutional obligation to correct false testimony."

**IT IS ORDERED** that: (i) the Defendant's Motion for Order Compelling Immunity for

---

Glossip, 145 S. Ct. at 626.  "In Napue v. Illinois, this Court held that a conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause."  Glossip, 145 S. Ct. at 626 (quoting Napue v. Napue v. People of State of Ill., 360 U.S. 264, 269 (1959)(Warren, C.J.)("Napue")).  "To establish a Napue violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'"  Glossip, 145 S. Ct. at 626 (quoting Napue, 360 U.S. at 269)(brackets in Glossip, but not in Napue).  If a defendant establishes a Napue violation, then "a new trial is warranted so long as the false testimony" is material in that it "'"in any reasonable likelihood [could] have affected the judgment of the jury."'"  Glossip, 145 S. Ct. at 626 (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)(Burger, C.J.)(quoting Napue, 360 U.S. at 272)(brackets in Glossip, but not in Giglio v. United States or in Napue).  In Glossip, a witness, Justin Sneed, testifies that the defendant, Richard Glossip, paid Sneed to murder Barry Van Treese.  See Glossip, 145 S. Ct. at 618.  Although Sneed suffered from bipolar disorder, which can cause violent outbursts, the United States "allowed Sneed falsely to testify at trial that he had never seen a psychiatrist."  Glossip, 145 S. Ct. at 618.  The Supreme Court concludes that the United States' failure to correct Sneed's testimony violates Napue.  See Glossip, 145 S. Ct. at 626-30.  First, the Supreme Court notes that the Oklahoma attorney general "conced[es] that Sneed's testimony was false and that the prosecution knowingly failed to correct it," and that the "evidence likewise establishes that the prosecution knew Sneed's statements were false as he testified to them."  Glossip, 145 S. Ct. at 627.  Second, the Supreme Court concludes that Sneed's false testimony is material, where "Sneed's testimony was the only direct evidence of Glossip's guilt," and the false testimony speaks directly to Sneed's credibility.  Glossip, 145 S. Ct. at 628.

The Court concludes that there is no Napue violation in R. Padilla's case, and no new trial is warranted.  First, the United States does not knowingly solicit false testimony from Atencio or allow false testimony to go uncorrected.  The Court has found that it is more probable than not that Atencio never told the United States that she was uncertain about her trial testimony.  See supra, at 14-15 & n.15.  Moreover, even if Atencio told the United States that she was uncertain about her testimony, the United States does not "knowingly solicit[] false testimony" by allowing her to testify about an allegedly uncertain recollection.  Glossip, 145 S. Ct. at 626.  These circumstances are not similar to those in Glossip, where the government concedes that prosecutors knew Sneed's testimony was false, and the evidence further demonstrates that Sneed is bipolar and lies about it on the stand.  See Glossip, 145 S. Ct. at 627.  Second, even if the United States knowingly elicits false testimony from Atencio or allows false testimony to go uncorrected, her testimony is not material under Glossip.  In Glossip, "the jury could convict Glossip only if it believed Sneed," because "no other witness and no physical evidence established that Glossip orchestrated Van Treese's murder."  Glossip, 145 S. Ct. at 628.  Believing Atencio's trial testimony is not the only way to convict R. Padilla.  Atencio is one of many witnesses who inculpate R. Padilla in his murder trial.  For example, Coca testifies that he sees R. Padilla kill Lucero, and Frederickson, Garcia, and Urquizo testify that R. Padilla tells them that he killed Lucero.  See supra, at 16-19, 22-23, 24-33.  The Court concludes that Atencio's testimony about his whereabouts on July 22, 2019, is not material the way the evidence was in Glossip, and, accordingly, the Court will not order a new trial.

Witness, filed June 3, 2024 (Doc. 308), is denied; (ii) the Defendant's Mr. Padilla's Motion for

New Trial, filed February 13, 2024 (Doc. 273), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alex M. M. Uballez
   United States Attorney
Maria Y. Armijo
Randy M. Castellano
Ryan Ellison
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*


Ronald Gainor
Ronald Gainor Attorney at Law
Highlands Ranch, Colorado

--and--

Marc H. Robert
Marc H. Robert, Attorney
Albuquerque, New Mexico

   *Attorneys for the Defendant*