# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.              No. CR 22-0634 JB

ROBERT PADILLA,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER[1]</u>

**THIS MATTER** comes before the Court on: (i) the Defendant Robert Padilla's Sentencing Memorandum and Objections to the Presentence Report, filed March 31, 2024 (Doc. 294)("Objections"). The sentencing is scheduled for December 19, 2025. The primary issues are: (i) whether the Presentence Investigation Report, filed February 9, 2024 (Doc. 271)("PSR") correctly applies a 2-level enhancement under § 3A1.3, because the PSR states that during the offense the victim is physically restrained; (ii) whether the PSR correctly applies a 2-level enhancement under § 3A1.1(b)(1), because Robert Padilla knew or should have known that the offense's victim is a vulnerable victim; (iii) whether the Court will sustain Padilla's Objections regarding the PSR ¶¶ 88-89, at 21-22, because of Padilla's contention that another individual is using his name and identification when arrested by the authorities as those paragraphs reflect, and accordingly, the Court should not include those events in the calculation of Padilla's criminal history score; (iv) whether the Court will sustain Padilla's Objection regarding the PSR ¶ 100, at

---

[1] This Memorandum Opinion and Order disposes of the Defendant Robert Padilla's Sentencing Memorandum and Objections to the Presentence Report, filed March 31, 2024 (Doc. 294). The Court may issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision.

25, because another individual commits this offense and, accordingly, the PSR should not attribute the offense to Padilla; (v) whether the Court will sustain Padilla's Objection regarding the PSR ¶ 105, at 27, because Padilla is in jail when the offense occurs and accordingly the offense does not qualify as other criminal conduct attributable to Padilla; (vi) whether the Court should sustain Padilla's Objection regarding the PSR ¶¶ 21, 116, at 10, 29, 43, because the PSR mischaracterizes Padilla's relationship with the SNM gang.  The Court concludes that: (i) it overrules Padilla's Objection to the application of a 2-level enhancement under § 3A1.3, because the victim is physically restrained during the course of the offense; (ii) it overrules Padilla's Objection to the application of a 2-level enhancement under § 3A1.1(b)(1), because Padilla knows or should know that the offense's victim is a vulnerable victim; (iii) it sustains Padilla's Objections to PSR ¶¶ 88-89, at 21-22, because the United States Probation Officer ("USPO") acknowledges that Padilla is not arrested for these offenses; instead, it is his brother, Chusai, who is arrested using Padilla's identity.  See Addendum to the Presentence Report, at 2, filed April 12, 2024 (Doc. 302) ("Addendum"); (iv) it overrules Padilla's Objection to PSR ¶ 100, at 25, because booking photographs that the USPO obtains confirm by a preponderance of the evidence that this arrest is attributable to Padilla; and (v) it sustains Padilla's Objection to PSR ¶ 105, at 27, because the USPO states that "it does appear [Padilla] was in custody in Docket No. D-412-CR-2014-00021" during the charged offense, making it "unlikely that [Padilla] could have committed this other offense." First Addendum, at 2; and (vi) it overrules Padilla's Objection to PSR ¶¶ 21, 116, 173, at 10, 29, 43, because the PSR does not mischaracterize Padilla's relationship with the SNM gang. The applicable offense level is 47, treated as 43 pursuant to Chapter 5, Part A (comment n.2) of the U.S.S.G., the applicable criminal history category is I, and the United States Sentencing Guidelines establish an imprisonment range of life.

## FACTUAL BACKGROUND

Padilla does not object to the PSR facts except those in ¶¶ 21, 23, 24, 88, 89, 100, 105, 116, 142, 173, at 10, 11, 21-22, 25, 29, 43, and 44.  See Objections at 1-3.  Those undisputed facts are the Court's findings of fact.  See Fed. R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact.").  Regarding PSR ¶¶ 88-89, 105, at 21-22, 25, the Court sustains Padilla's objections and incorporates his finding of fact.  Regarding PSR ¶ 100, at 25, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that the allegations in those paragraphs are true.  The Court therefore includes the allegations in PSR ¶ 100, at 25, in the Court's findings of fact.

When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence.  See United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008).  In evaluating whether the United States has met its burden, "sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability."  United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).  See U.S.S.G. § 6A1.3.[2]  "This is not a high standard, for it requires only 'minimal indicia of

---

[2] Although a district court "resolving any dispute concerning a factor important to the sentencing determination . . . may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3, the federal rules of evidence can be relevant to fact-finding at sentencing.  In United States v. Calvert-Cata, No. CR 16-4566 JB, 2022 WL 14813473, at *12 (D.N.M. October 26, 2022)(Browning, J.), aff'd, No. 23-2000, 2024 WL 33901 (10th Cir. January 3, 2024), the Court holds, in a revocation context, that it may consider and rely upon out-of-court statements if those statements are admissible under the Federal Rules of Evidence and under Crawford v. Washington, 541 U.S. 36 (2004)("Crawford"), without evaluating separately those statements' reliability.  See United States v. Calvert-Cata, 2022 WL 14813473, at *12.  The Court reasons that, "because evidentiary standards for revocation hearings are supposed to be more inclusive and flexible than trials," it "makes no sense to require the United States to" clear hurdles that are not there at trial.  Calvert-Cata, 2022 WL 14813473, at *12.

Here, the Court concludes that the same principles apply and that, in a sentencing context, it may consider and rely upon out-of-court statements that are admissible under the Federal Rules

reliability.'"  United States v. Ayon, 226 F. App'x 834, 840 (10th Cir. 2007)(unpublished)(quoting

United States v. Fennell, 65 F.3d 812, 813 (10th Cir. 1995)).

---

of Evidence without evaluating separately those statements' reliability.  Like revocation hearings, sentencing hearings are supposed to have more inclusive and flexible evidentiary standards than trials.  For example, at sentencing, district courts use a preponderance of the evidence standard to resolve factual disputes and apply sentencing enhancements.  See United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008); United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005).  Similarly, a district court may "revoke supervised release after concluding that the defendant violated a condition of probation by a preponderance of the evidence."  United States v. Hykes, 653 F. Supp. 3d 913, 926 (D.N.M. 2022)(Browning, J.)(citing 18 U.S.C. § 3583(e)).  Also, a district court may consider, for both sentencing and revocation, out-of-court statements that are not admissible at trial.  See U.S.S.G. § 6A1.3; Fed. R. Crim. P. 32.1(b)(2)(C).  Moreover, the standard for considering an out-of-court statement at sentencing is higher than the standard for considering an out-of-court statement at revocation.  At sentencing, a district court need only determine that the statement has "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.  See United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).  At revocation, a district court must weigh the statement's reliability and the defendant's interest in cross-examination against the United States' explanation for not presenting a witness.  See United States v. Jones, 818 F.3d 1091, 1099-1100 (10th Cir. 2016); United States v. Murphy, 769 F. App'x 631, 633-34 (10th Cir. 2019).  Given that it is easier to consider an inadmissible out-of-court statement at sentencing, it makes sense to apply the Court's reasoning in United States v. Calvert-Cata to sentencing; if the Court can consider admissible out-of-court statements at revocation without evaluating separately whether those statements are reliable, then the Court can do the same at sentencing, where the evidentiary hurdle is lower.

United States v. Murphy is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Murphy, and United States v. Ayon, 226 F. App'x 834 (10th Cir. 2007), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

On July 22, 2019, former Syndicate of New Mexico, ("SNM") leader L.L. is shot and killed in his residence's driveway in Las Vegas, New Mexico. See PSR, ¶ 12, at 8. L.L. served as an FBI informant and Plaintiff United States of America's witness in the racketeering murder prosecution against key SNM leaders and members. See PSR ¶ 12, at 8. Preliminary investigative information indicates that L.L's murder is tied to both the SNM and to the Padilla Drug Trafficking Organization ("RPDTO"). See PSR ¶ 12, at 8. On September 11, 2019, a nineteen count Indictment is filed in CR 22-0634 JB arising from a Drug Enforcement Agency investigation of the RPDTO which takes place between approximately 2018 and 2019, targeting participants of the RPDTO. See PSR ¶ 12, at 8. The United States identifies Padilla as a primary supplier of cocaine, heroin, and methamphetamine in Las Vegas. See PSR ¶ 12, at 8.

On May 24, 2018, the FBI speak with L.L. over the telephone, in which L.L. describes attempts of apparent witness intimidation. See PSR ¶ 15, at 8. On July 22, 2019, officers with the Las Vegas Police Department are dispatched to L.L.'s home after reports that L.L. is shot multiple times. See PSR ¶ 17, at 9. L.L. dies on the scene, and the Office of the Medical Investigator lists the manner of death as homicide. See PSR ¶ 17, at 9. In the days following L.L's death, law enforcement interview several people, during which they learn that Padilla and Defendant Gary Coca are involved in L.L.'s killing. See PSR ¶ 18, at 9. During the FBI's second interview with Coca, he recounts the events that occur on the night L.L. is killed and later provides testimony at trial about that night. See PSR ¶ 20, at 9. Coca describes how he drove Padilla, at Padilla's instruction, to L.L.'s residence, and Padilla honked the horn to get L.L. to exit his house. See PSR ¶ 20, at 9. After L.L. approaches the car's passenger side where Padilla sits, Padilla pulls a gun, identified as a black .45 caliber handgun, and attempts to shoot L.L., but the gun does not fire. See PSR ¶ 20, at 9. As L.L. backs away, Padilla states "I'm just fucking with you" while passing the

gun to Coca and directing him to "fix it." PSR ¶ 20, at 9. After chambering a round, Coca shoots

L.L. See PSR ¶ 20, at 9. Coca then returns the firearm to Padilla, who shoots at L.L. before exiting

the vehicle and shooting L.L. again as he is attempting to crawl back to his home. See PSR ¶ 20,

at 10. Coca explains that Padilla wants L.L. killed, as Padilla believes L.L. is a cooperating witness

against the SNM and has overheard Padilla call L.L. a "rat." PSR ¶ 21, at 10.

In October 2020, P.G., an inmate at the Cibola County Correctional Center, requests to

speak to someone associated with the SNM prosecution team related to Padilla. See PSR ¶ 30, at

12. On October 29, 2020, Federal Bureau of Investigation ("FBI") Agent Brian Acee meets with

P.G. See PSR ¶ 30, at 12. P.G. relates that Padilla has disclosed to him that he killed L.L. and

indicates that Padilla intends to kill Marcos Ruiz with a "hot shot" of heroin, as he believes Ruiz

is cooperating with the government. PSR ¶ 30, at 12. P.G. agrees to cooperate with the FBI and

record conversations between Padilla and P.G. See PSR ¶ 30, at 12. On or about November 25,

2020, before P.G. had recorded any conversations, Padilla, and federal inmates Daniel Silva,

Antonio Alvarez, John Montano, and Robert Alderete, stab and assault P.G. in the Cibola

Correctional Facility at Padilla's direction. See PSR ¶ 31, at 12. Surveillance captures the assault,

which reflects that the inmates enter P.G.'s cell, and proceed to kick, punch, and stab P.G. with a

shank. See PSR ¶ 31, at 12. It is unknown how Padilla is made aware of P.G.'s attempted

cooperation. See PSR ¶ 31, at 12.

In summary, Padilla facilitates and participates in L.L.'s murder, whom he shoots in

retaliation for providing information to law enforcement and testifying against other SNM

members about the commission of federal offenses, specifically conduct related to Violent Crimes

in Aid of Racketeering. See PSR ¶ 38, at 13. This conduct occurs while Padilla is actively engaged

in drug distribution as the RPDTO's leader. See PSR ¶ 38, at 13. Later, Padilla orders the P.G.

assault.  P.G. is attempting to obtain information from Padilla related to the murder of L.L.  See PSR ¶ 38, at 13.

The PSR sets out Padilla's criminal history.  Listed among the criminal history are offenses for driving while intoxicated on August 26, 2007; aggravated driving while intoxicated first offense on February 21, 2009; and arrests for aggravated driving while intoxicated first offense, driving on a revoked license, leaving scene of an accident involving death or great bodily injury, careless driving, and no valid driver's license on December 7, 2005; and unlawful taking of a motor vehicle, larceny (over $2,500 but not more than $20,000), criminal trespass, bribery of a witness, and two counts of tampering with evidence on January 1, 2014.  See PSR ¶¶ 88, 89, 100, 105, at 21, 22, 25, 27.

## PROCEDURAL BACKGROUND

On April 19, 2023, a Third Superseding Indictment is filed in the United States District Court for the District of New Mexico, charging the defendants as follows:

Count 1: **Robert Padilla** with the Murder of L.L.  The offense occurred on or about July 22, 2019, in San Miguel County.

Count 2: **Robert Padilla** and Gary Coca with Retaliation Against a Witness, Victim, and Informant.  The offense on or about July 22, 2019, in San Miguel County.

Count 3: **Robert Padilla** with Killing While Engaged in Drug Trafficking. The offense occurred from on or about September 17, 2018 and continuing to on or about September 10, 2019, in Bernalillo County, in the District of New Mexico, and elsewhere.

Count 4: **Robert Padilla** with Using, Carrying, Brandishing, Possessing in Furtherance of, and Discharging a Firearm During and in Relation to, a Crime of Violence or Drug Trafficking Crime and Causing Death Through Use of the Firearm.  The offense occurred on or about July 22, 2019 in San Miguel County.

Count 5: **Robert Padilla** with Tampering with a Witness, Victim or Informant by Physical Force or Threat.  The offense occurred on or about November 25, 2020 in Cibola County.

Count 6: **Robert Padilla** with Conspiracy.  The offense occurred from on or about July 2022 and continuing to on or about September 21, 2022, in Santa Fe County, in the District of New Mexico, and elsewhere.

Count 7: **Robert Padilla** with Possession with Intent to Distribute Buprenorphine.  The offense occurred on or about September 6, 2022, in Santa Fe County.

Count 8: **Robert Padilla** with Possession of Contraband in Prison.  The offense occurred on or about September 6, 2022, in Santa Fe County.

See  PSR ¶ 1, at 5 (bold in 2nd PSR).  On December 12, 2023, Padilla is found guilty by jury trial

as to all counts of the eight-count Third Superseding Indictment.  See  PSR ¶ 2, at 5.

On February 9, 2024, the USPO files the PSR, which applies a total offense level of 47,

treated as a level 43 pursuant to Chapter 5, Part A (comment n.2) of the U.S.S.G.  See PSR at 17.

On March 31, 2024, Padilla files the Objections, which raises seven objections to the PSR that the

Court addresses here.  See Objections ¶¶ 8, 9, 10, 12, 13, at 4-6.  Padilla's first Objection is to the

addition of two levels for "restraint of the victim ([L.L]) of the killing alleged in counts 1 through

4."  Objections ¶ 8, at 4.  Padilla "denies participating in the killing at all; but the facts of the

incident reported by witness Coca (who, incidentally, admitted to shooting Mr. Lucero) involved

no restraint."  Objections ¶ 8, at 4.  Padilla's second Objection is that the USPO improperly applies

a 2-level enhancement for vulnerable victim.  See Objections ¶ 9, at 4.  Padilla again denies

involvement in the killing, but maintains additionally that there is no indication that L.L. is a

vulnerable victim.  See Objections ¶ 9, at 4-5.  Padilla's third Objection is that the offenses reflected

in paragraphs 88 and 89 on pages 21 and 22 of the PSR should not be attributed to Padilla, because

another individual was arrested by the authorities using Padilla's name and identification, and

therefore the criminal history points associated with those paragraphs should not be included in

the calculation of Padilla's criminal history score.  See Objections ¶ 10, at 5.  Accordingly, Padilla

maintains that his criminal history score is three, rather than five as reflected in paragraph 91 on

page 23 of the PSR, and his criminal history category is II, rather than III as reflected in paragraph

92 on page 23 of the PSR.  See Objections ¶ 5, at 5.  Padilla's fourth Objection is that the offense reflected in paragraph 100 on page 25 of the PSR, in the Other Criminal Conduct section, is not attributable to Padilla and should be stricken from the PSR.  See Objections ¶ 12, at 5.  Padilla's fifth Objection is that the offense reflected in paragraph 105 on page 27 of the PSR, in the Other Criminal Conduct section, cannot be attributable to Padilla because he is in jail when the offense occurs, and accordingly should be struck from the PSR.  See Objections ¶ 13, at 6.  Padilla's Sixth and Seventh Objections are that the PSR improperly states his relationship to the SNM gang because he is not associated with the SNM gang.  See Objections ¶¶ 5, 14, at 3, 6.

On April 8, 2024, the United States files its Response to Defendant's Sentencing Memorandum and Objections to Presentence Report, filed April 8, 2024 (Doc. 298)("Response"). See Response at 1.  The United States first argues that the Court should overrule Padilla's first and second Objections, because although Padilla objects to the two enhancements in paragraphs 55 and 56 of the PSR for the physical restraint of the victim and for a vulnerable victim as they would apply to L.L., Padilla overlooks how these enhancements apply to P.G.  See Response at 3.  The United States highlights how P.G. is trapped in his cell at a detention facility while numerous inmates punch and stab him at Padilla's direction, and points to United States v. DeLeon, 437 F. Supp. 3d 955 (D.N.M. 2020)(Browning, J.)("DeLeon") as support for the application of these enhancements.  See Response at 3.  In response to Padilla's third Objection, the United States states that it "currently has no information to support or contradict the information contained in those paragraphs" but agrees that Padilla's criminal history score should be adjusted "if the allegations in paragraphs 88 and 89 remain unsubstantiated at the time of sentencing."  See Response at 3. The United States similarly states that it "currently has no information to support or contradict the information contained" in paragraphs 100 and 105 of the PSR in response to Padilla's fourth and

fifth Objections.  <u>See</u> Response at 4.  In response to Padilla's Sixth and Seventh Objections the United States argues that the language in the PSR regarding Padilla's relationship with the SNM gang is consistent with trial testimony and evidence, and therefore should be overruled.  <u>See</u> Response at 1, 4.

On April 12, 2024, the USPO responds to the Objections.  <u>See</u> Addendum to the Presentence Report at 1, filed April 12, 2024 (Doc. 268)(" Addendum").  Regarding Padilla's first and second Objections, the USPO agrees with the United States that Padilla incorrectly attributes the physical restraint and vulnerable victim enhancements to L.L., instead of the assault of P.G. as charged in count 5.  <u>See</u> Addendum at 2.  The USPO agrees that these enhancements are appropriate as outlined in the PSR, again citing to <u>United States v. DeLeon</u>.  <u>See</u> Addendum at 2. As to Padilla's third Objection, the USPO states that contact with the Bernalillo County Detention Center confirms that Padilla is not arrested for the offenses stated in paragraphs 88 and 89 on pages 21 and 22 of the PSR, and that the booking photos confirm that it is instead Padilla's brother, Chusai, who is arrested.  <u>See</u> Addendum at 2.  Accordingly, the USPO concludes that Padilla is "incorrectly assessed a total of three additional criminal history points for these offenses and should only have been assessed a total of two criminal history points, resulting in a criminal history category of II."  <u>See</u> Addendum at 2.  Regarding Padilla's Fourth Objection, the USPO states that booking photos obtained from the Bernalillo County Detention Center confirm that Padilla is the individual arrested for the offense noted in paragraph 100 on page 25 of the PSR, and therefore this arrest is attributable to the Defendant.  <u>See</u> Addendum at 2.  Regarding Padilla's fifth Objection, the USPO states that it does appear as if Padilla is in custody at the time that the offense in paragraph 105 on page 27 of the PSR is committed, making it "unlikely" that Padilla could have committed the offense.  <u>See</u> Addendum at 2.  Finally, regarding Padilla's Sixth and Seventh

Objections, the USPO argues that the information stated in the PSR is consistent with statements provided by Padilla's co-defendant, Gary Coca, as well as statements provided by other former SNM members, and therefore that the PSR accurately reflects that Padilla is associated with the SNM gang.  See Addendum at 1.

On April 12, 2024, the USPO files a revised Presentence Investigation Report, which both removes paragraphs ¶ 88, 89, and 105, paragraphs that contained arrests not attributable to Padilla, and corrects Padilla's criminal history score in accordance to reflect a total of two criminal history points, resulting in a criminal history category of II.  See Memorandum to the revised Presentence Investigation Report, at 1, filed April 12, 2024 (Doc. 303)("Revised PSR").  On August 1, 2024, the USPO files the Second Presentence Investigation Report, after Padilla files a sentencing memorandum and objections to the presentence report in CR 19-3113 JB, a related case, and the USPO concludes that Padilla's criminal history point should be corrected to reflect a total of one criminal history point, resulting in a criminal history category of I.  See Memorandum to the Second Presentence Investigation Report, filed August 1, 2024 (Doc. 326)("Second PSR").

## ANALYSIS

The Court sustains in part and overrules in part the Objections.  First, the Court sustains Padilla's first Objection to the § 3A1.3 enhancement, because Padilla does not physically restrain P.G. during the assault.  Second, the Court overrules Padilla's second Objection to the § 3A1.1(b)(1) enhancement, because Padilla knew or should have known that P.G. was a vulnerable victim.  Third, the Court sustains Padilla's third Objection to the inclusion of the offenses in paragraphs 88 and 89 of the PSR in the calculation of his criminal history, because Padilla is not the individual arrested for these offenses.  Fourth, the Court overrules Padilla's fourth Objection to the inclusion of the arrest in paragraph 100 of the PSR, because the Court concludes by the

preponderance of the evidence that this offense is committed by Padilla. Fifth, the Court sustains

Padilla's fifth Objection to the inclusion of the arrest in paragraph 105 of the PSR, because the

Court concludes by the preponderance of the evidence that this offense is not committed by Padilla.

Finally, the Court overrules Padilla's sixth and seventh Objections, because the Court concludes

by the preponderance of the evidence that the PSR accurately states Padilla's relationship with the

SNM gang.

## I.    PADILLA'S BASE LEVEL OFFENSE IS SUBJECT TO A 2-LEVEL PHYSICAL RESTRAINT ENHANCEMENT INCREASE PURSUANT TO § 3A1.3.

U.S.S.G § 3A1.3 states that, "[i]f a victim was physically restrained in the course of the

offense, increase by **2** levels." U.S.S.G. § 3A1.3 (bold in original). The Guidelines define the term

"physically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked

up." U.S.S.G. § 1B1.1 Application Note 1(L). These examples "are merely illustrative and not

exhaustive." United States v. Rodella, No. CR 14-2783, 2015 WL 711941, at *27 (D.N.M. Feb. 5,

2025)(Browning, J.)(citing United States v. Checora, 175 F.3d 782, 790 (10th Cir. 1999)). The

physical-restraint adjustment applies where "there [is] a forcible restraint of a victim which occurs

during commission of the offense." United States v. Checora, 175 F.3d at 790. There does not

have to be "physical touching of the victim," because "[k]eeping someone from doing something

is inherent within the concept of restraint." United States v. Fisher, 132 F.3d 1327, 1329-30 (10th

Cir. 1997)(applying § 3A1.3 where a "coconspirator deliberately kept the security guard at bay by

pointing a gun directly at his head"). Furthermore, the Tenth Circuit has held that the physical-

restraint adjustment applies when two defendants tackle a victim to the ground to prevent the

victim from escaping. See United States v. Checora, 175 F.3d at 790.

The United States argues that the physical restraint enhancement should apply here based

on the assault of P.G., where P.G. is "locked inside his own cell while a group of inmates prevented

his escape by punching and stabbing him." Response at 3. The United States also points out that "[o]ne of the videos from the detention facility also showed the defendant punching the victim after he finally escaped from his cell and as he headed towards an exit door for help." Response at 3. The United States and the USPO both rely heavily on United States v. DeLeon in concluding that the physical restraint enhancement should apply here. See Response at 3 ("Likewise, this Court in DeLeon applied the physical-restraint enhancement under similar circumstances"); Addendum at 2 ("It is the position of the United States Probation Office (USPO) that these enhancements are appropriate as outlined in the PSR, and as established in United States v. DeLeon, 437 F.Supp.3d 955 (Jan. 27, 2020)("DeLeon"), involving a "hit" against an incarcerated defendant who, similar to P.G., was physically attacked by several others while confined to a jail cell, and physically restrained."). The PSR states that P.G. "was restrained while being choked and was confined to his prison cell with only one entrance/exit" as justification for the application of the physical restraint enhancement. PSR ¶ 38, at 13. The Court concludes that these facts mirror the facts of DeLeon, in which the Court concludes that the physical restraint adjustment applies "because DeLeon and J. Gallegos held Castillo down while Jaramillo strangled him to death." DeLeon, 437 F.Supp.3d at 1022. The Court specifically identifies the act of holding down Castillo's arms "to make it easier for Jaramillo to strangle Castillo" as the fact which necessitates the application of the physical restraint enhancement. DeLeon, 437 F.Supp.3d at 1023. This fact of independent restraint to facilitate the offense is present here, because the PSR concludes hat P.G. "was restrained while being choked." PSR ¶ 38, at 13. The Court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). Padilla does not object to the facts contained in paragraph 38 of the PSR so the Court adopts these facts as true. Accordingly, the Court finds by a preponderance of the evidence that physical restraint occurs

during the assault, and as a result overrules Padilla's Objection and applies U.S.S.G. § 3A1.3 2-level enhancement for physical restraint.

## II.    PADILLA'S BASE LEVEL OFFENSE IS SUBJECT TO A 2-LEVEL VULNERABLE VICTIM ENHANCEMENT INCREASE PURSUANT TO § 3A1.1(b)(1).

The vulnerable victim enhancement, U.S.S.G. § 3A1.1(b), provides in relevant part: "(b)(1) If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels."  U.S.S.G. § 3A1.1(b)(1)(bold in original).  Application Note 2 to U.S.S.G. § 3A1.1 explains:

> For purposes of subsection (b), "**vulnerable victim**" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, **physical** or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

> Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2 (bold in original). "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'"  United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 835 (10th Cir. 1992)).  In addition, "the enhancement should apply when the victim is 'less able to resist than the typical victim.'"  United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d

- 14 -

978, 980 (10th Cir. 2001)).  The vulnerable victim adjustment "applies to offenses involving an

unusually vulnerable victim in which the defendant knows or should have known of the victim's

unusual vulnerability."  U.S.S.G. § 3A1.1 Application Note 2 (emphasis added).

The United States relies on DeLeon to argue that P.G. is a vulnerable victim.  See Response

at 3.  In DeLeon, the Court determines that the victim is a vulnerable victim because: "(i) the SNM

placed a hit on Castillo; (ii) Castillo was incarcerated with other SNM members who were ordered

to carry out the hit; (iii) DeLeon, J. Gallegos, and Jaramillo attacked and killed Castillo while he

was intoxicated from heroin; and (v) Castillo could not defend himself or escape from the surprise

attack in his cell."  DeLeon, 437 F.Supp.3d at 1021.  The United States argues that the victim in

this case "found himself in a very similar scenario" to the victim in DeLeon, Response at 3, and

the USPO argues that P.G. "is identified as a vulnerable victim by virtue of his custodial status,

which made him more susceptible to the assault ordered by Padilla."  PSR ¶ 38, at 13.

Here, P.G. had made contact with FBI Agent Acee after befriending Padilla, and disclosed

to Acee that Padilla had stated that he killed L.L. and that he intended to kill Marcos Ruiz with a

"hot shot" of heroin, as Padilla believed that Ruiz was cooperating with the government.  See PSR

¶ 30, at 12.  P.G. agreed to "cooperate with the FBI and record conversations between himself and

Padilla."  PSR ¶ 30, at 12.  The Court concludes that P.G.'s status as an informant cooperating with

law enforcement proves by the preponderance of the evidence that P.G. was a vulnerable victim

under U.S.S.G. § 3A1.1(b)(1).  Although P.G.'s status as an inmate contributed to his vulnerability,

this fact alone does not justify applying the vulnerable-victim enhancement.  See United States v.

Smith, 133 F.3d at 749 ("The vulnerable victim enhancement cannot be based solely on the

victim's membership in a certain class.").  Nevertheless, the Court concludes that, because of his

cooperation with law enforcement, P.G. was particularly susceptible to being assaulted.  See United

States v. Baca, 428 F. Supp. 3d 800, 839 (D.N.M. 2019)(Browning, J.)(concluding that an inmate's status as someone who had cooperated with law enforcement against the SNM gang constituted a vulnerable victim). Further, P.G. was incarcerated in the same facility as other inmates who were able to carry out the hit, and he had a limited ability to defend himself or escape from the surprise attack in his cell. See PSR ¶ 31, at 12 ("The assault was captured on surveillance, which reflects the inmates entered P.G.'s cell during which they kicked, punched, and stabbed him with a shank. Approximately four minutes later, the inmates exited the cell followed by P.G., who was visibly bleeding and staggering towards the door to exit the pod."). The Court determined the vulnerable victim enhancement to apply in similar circumstances in United States v. Troup, where the Court concluded that a victim was vulnerable because of: "SNM's hit on him, his incarceration with other SNM members who were ordered to act on the hit, and his limited ability to defend himself or escape from the surprise attack in his cell." 426 F.Supp.3d 1072, 1134 (D.N.M. 2019)(Browning, J.). Although there is no hit ordered by SNM in this case, the Court determines by a preponderance of the evidence that Padilla organizes the hit on P.G., because of the fact that the assault on P.G. occurs after P.G. agrees to cooperate with the FBI against Padilla, and the fact that the assault occurs on the same day that the recording device is intended to be placed in P.G.'s cell. See PSR ¶¶ 30-31, at 12. Accordingly, the Court determines by a preponderance of the evidence that P.G. was vulnerable because of Padilla's hit on him, his incarceration with Padilla and other inmates who carried out the attack, and his limited ability to defend himself or escape from the surprise attack in his cell. Further, the Court concludes that Padilla knows or should have known of these particular vulnerabilities, because, by a preponderance of the evidence, the Court determines that Padilla knew that P.G. was cooperating with law enforcement, and therefore organized the assault on P.G. The Court also notes, in support of this conclusion that Padilla knew that P.G. was

cooperating with law enforcement, that the jury instructions in Padilla's trial, at which Padilla is found guilty of the assault of P.G., required the jury to find that Padilla "acted knowingly and with the intent to influence, delay, or prevent Phillip Garcia from communicating with a law enforcement officer relating to the commission of federal offenses, that is drug trafficking or retaliation against a witness, victim, or informant" in order to convict Padilla for the assault. Court's Final Jury Instructions With Citations, at 46, filed December 11, 2023 (Doc. 249). The Court thus overrules Padilla's Objection and applies U.S.S.G. § 3A1.1(b)(1)'s 2-level adjustment for attacking a vulnerable victim.

### III.    THE COURT SUSTAINS PADILLA'S OBJECTIONS TO PSR ¶¶ 88, 89 AT 21, 22.

The Court concludes that PSR ¶¶ 88, 89 at 21, 22, do not describe accurately Padilla's criminal history. The pertinent paragraphs allege that Padilla is convicted of driving while intoxicated on August 26, 2007, and aggravated driving while intoxicated on February 21, 2009. See PSR ¶¶ 88, 89 at 21, 22. Padilla argues that these offenses should not be included in the calculation of his criminal history, because "another individual was using Mr. Padilla's name and identification when that person was arrested by the authorities as reflected in those paragraphs." Objections at 5. The United States states that it does not have information to support or contradict the information contained in paragraphs 88 and 89 of the PSR, but "agrees with the defendant that his criminal history score in paragraph 91 should be adjusted if the allegations in paragraph 88 and 89 remain unsubstantiated at the time of sentencing." Response at 4. The USPO concludes that Padilla was not arrested for the offenses in paragraphs 88 and 89 of the PSR, and that booking photos from the Bernalillo County Detention Center confirm that Padilla's brother, Chusai, is the one arrested for these offenses. See Addendum at 2. The Court therefore sustains Padilla's Objection. In accordance with this ruling, the Court determines that Padilla's criminal history score should be re-calculated to a score of two, and the applicable criminal history category is II.

After Padilla's Objections are filed, the USPO re-calculates Padilla's criminal history score, and the appropriate criminal history category is I.  See Revised Presentence Investigation Report, ¶ 91, at 22, filed August 1, 2024 (Doc. 326).[3]

## IV.    THE COURT OVERRULES PADILLA'S OBJECTIONS TO PSR ¶ 100, AT 25.

The Court concludes by a preponderance of the evidence that the offense described in paragraph 100 of the PSR is attributable to Padilla.  The pertinent paragraph alleges that Padilla is arrested for aggravated driving while intoxicated, driving on a revoked license, leaving scene of an accident involving death or great bodily injury, careless driving, and no valid driver's license on December 7, 2005.  See PSR ¶ 100, at 25.  Padilla objects to the inclusion of this offense in the Other Criminal Conduct section of his report, because he argues that it was another individual, not Padilla, who was the transgressor.  See Objections at 5.  The United States states that it "currently has no information to support or contradict the information contained" in paragraph 100, Response at 4, but the USPO argues that booking photos from the Bernalillo County Detention Center confirm that this arrest is attributable to Padilla.  See Addendum at 2.  Looking at the booking photos, the Court concludes by a preponderance of the evidence that the individual arrested in this incident is Padilla, and accordingly overrules Padilla's Objection to PSR ¶ 100, at 25.

## V.    THE COURT SUSTAINS PADILLA'S OBJECTIONS TO PSR ¶ 105, AT 27.

---

[3] At the time that Padilla's Objections are filed, Padilla argues that his criminal history score should be three instead of five, and that his criminal history category is II, rather than III.  See Objections at 5.  After sustaining this Objection, the Court calculates the criminal history category as II.  After Padilla files his Objections, however, Padilla files a Sentencing Memorandum and Objections in CR 19-3113 JB, a related case, objecting to the criminal history points assessed to his prior State conviction for Battery in Docket No. D-412-CR-2014-00021.  Upon further review of this conviction, the USPO concluded that "only one criminal history point should be assessed" and the USPO rediscloses the PSR in this case to reflect one criminal history point, resulting in a criminal history category of I.  Second PSR at 1.

The Court concludes that PSR ¶ 105 at 27 does not describe accurately Padilla's Other Criminal Conduct. The pertinent paragraph alleges that Padilla is arrested for unlawful taking of a motor vehicle, larceny (over $2,500 but not more than $20,000), criminal trespass, bribery of a witness, and two counts of tampering with evidence. See PSR ¶ 105, at 27. Padilla objects to the inclusion of this offense in the Other Criminal Conduct section of his report, because he argues that he was actually in jail when the offense occurred, and accordingly, could not have been involved in this offense. See Objections at 6. The United States states that it "currently has no information to support or contradict the information contained in" paragraph 105. Response at 4. The USPO states that Padilla's contention is "fairly stated, as it does appear he was in custody . . . making it unlikely the Defendant could have committed this other offense." Addendum at 2. The Court therefore determines by a preponderance of the evidence that Padilla is not the individual arrested for the offenses listed in paragraph 105 of the PSR, and therefore sustains Padilla's Objection.

## VI.  PSR ¶¶ 21, 116, 173, at 10, 29, 43, ACCURATELY REFLECTS PADILLA'S RELATIONSHIP WITH THE SNM GANG.

The Court concludes that PSR ¶¶ 21, 116, 173, at 10, 29, 43, are an accurate representation of Padilla's relationship with the SNM gang. PSR ¶ 21, at 10, states in relevant part: "Coca explained that although not a member of the SNM, Padilla used members for purposes of intimidation as it relates to his drug distribution activities. Coca noted that SNM members have reputations for being "killers" and having them collect money on his (Padilla's) behalf proved to be very beneficial for Padilla." PSR ¶ 21, at 10. PSR ¶ 116, at 29, states: "As noted in the offense conduct, the defendant is not a member of the SNM, but appears to be associated." PSR ¶ 116, at 29. Finally, PSR ¶ 173, at 43, states in relevant part: "The defendant is associated with the SNM; however, has also implied or been suspected of being involved with other gangs." PSR ¶ 173, at

43.  Padilla objects to this language in the PSR, because he maintains that he does not have "any relationship with the SNM prison gang."  Objections ¶ 5, at 3.  Padilla argues that "any use of individuals who may have been members of the gang in his own operation does not make him a member, associate, wanna-be or anything else with respect to the gang," and that association, either "socially or commercially, with individuals who happened to be members" does not result in any type of connection with the SNM gang.  Objections ¶¶ 5, 14, at 3, 6.  The United States argues that the "evidence at trial and the jury's verdict clearly established" that Padilla "was not an SNM member, but he was an associate."  Response at 4.  The Court finds persuasive Coca's testimony that Padilla would use SNM members for his own drug dealing activities. The Court also determines that the undisputed facts of the PSR, which the Court accepts as findings of fact, establish that Padilla is an associate of the SNM gang.  See PSR ¶ 26, at 11 (explaining that Lupe Urquizo, a former SNM member who was incarcerated with Padilla after the killing of L.L., testified that "Padilla disclosed to Urquizo that he was now a member of the SNM and would be getting 'rank' for killing L.L.").  See PSR ¶ 27, at 27 (describing how P.G. testified that "Padilla told him that he killed L.L. to gain rank in the SNM").  Based on the undisputed facts found in the PSR, the Court determines by a preponderance of the evidence that Padilla is an associate of the SNM gang, and therefore overrules Padilla's Objections to the statements in paragraphs 21, 116 and 173 of the PSR stating or implying as such.  This ruling has no bearing on Padilla's offense level.

**IT IS ORDERED** that: (i) the Defendant Robert Padilla's Sentencing Memorandum and Objections to the Presentence Report, filed March 31, 2024 (Doc. 294)("Objections"), are sustained in part and overruled in part; (ii) the 2-level U.S.S.G. § 3A1.3 enhancement applies; (iii) the 2-level U.S.S.G. § 3A1.1(b)(1) enhancement applies; (v) the applicable offense level is 47,

reflected as 43 pursuant to Chapter 5, Part A (comment n.2) of the U.S.S.G.; (vi) the applicable

criminal history category is I; and (vii) the United States Sentencing Guidelines establish an

imprisonment range of life.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
   Acting United States Attorney
Maria Y. Armijo
Randy M. Castellano
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Marc H. Robert
Marc H. Robert, Attorney
Albuquerque, New Mexico

--and--

Ronald Gainor
Ronald Gainor, Attorney at Law
Highlands Ranch, Colorado

      *Attorneys for the Defendant*