IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                    No. CR 22-0634 JB

ROBERT PADILLA,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant Robert Padilla's Sealed Motion for Recusal, filed July 17, 2023 (Doc. 103)("Motion"). The Court held a hearing on August 1, 2023. See Clerk's Minutes at 1, filed August 1, 2023 (Doc. 132). The primary issue is whether the Court's impartiality is reasonably brought into question as a result of the alleged threats that Defendant Padilla made against the Court such that the Court should recuse itself from presiding over the trial. The Court concludes that it will not recuse from the trial, because a reasonable person, knowing all the facts, would not question the Court's impartiality. Accordingly, the Court denies the Motion.

## FACTUAL BACKGROUND

The Court sets forth its findings of fact to provide context to the Motion. The Court takes

---

[1] After the Court conducts the sentencing in this case on December 19, 2025, in Las Cruces, New Mexico, see Clerk's Minutes at 1, filed December 19, 2025 (Doc. 381), a substitute Courtroom Deputy ("CRD") in Las Cruces files the Judgment and Commitment, filed December 19, 2025 (Doc. 382), without the Court's knowledge in Albuquerque, before the Court is finished writing this Memorandum Opinion and Order. The Court only realizes that the Las Cruces CRD had filed a Judgment and Commitment when it considers the Motion to Withdraw as Attorney by Ronald Gainor (Doc. 395), on March 9, 2026. See Order Granting Motion to Withdraw, at 1, filed March 19, 2026 (Doc. 409). Accordingly, the Court now files its Memorandum Opinion and Order responding to Defendant Robert Padilla's Sealed Motion for Recusal, filed July 17, 2023 (Doc. 103).

the majority of its recitation of facts from the Redacted Third Superseding Indictment, filed April 19, 2023 (Doc. 80)("Third Superseding Indictment"), and the Revised Presentence Investigation Report as to Robert Padilla, filed August 1, 2024 (Doc. 326)("Revised PSR").  Padilla does not object to the PSR facts except those in ¶¶ 21, 23, 24, 88, 89, 100, 105, 116, 142, 173, at 10, 11, 21-22, 25, 29, 43, and 44.  See Objections at 1-3.  Those undisputed facts are the Court's findings of fact.  See Fed. R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact.").  Regarding PSR ¶¶ 88-89, 105, at 21-22, 25, the Court sustains Padilla's objections and incorporates his finding of fact.  Regarding PSR ¶ 100, at 25, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that the allegations in those paragraphs are true.  The Court therefore includes the allegations in PSR ¶ 100, at 25, in the Court's findings of fact. Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion which involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes the following findings of fact related to the Syndicato de Nuevo Mexico ("SNM"), Padilla's criminal activities, the alleged threats made against the Court in connection with the Martinez trial, United States v. Martinez, No. CR 19-3725, and finally the threats made against the Court in connection with the Padilla murder trial.

1.    **General Background on the SNM Gang.**

1.    SNM is a prison gang that forms in February, 1980, after a prison riot at the Penitentiary of New Mexico ("PNM") in Santa Fe, New Mexico.  See Revised PSR ¶ 5, at 6.

2.    "During the prison riot, twelve correctional officers were taken hostage and several

of them were seriously assaulted and raped by the inmates." Third Superseding Indictment ¶ 3, at 2.

3.      SNM and other prison gangs that form in the wake of the 1980 prison riot "focused primarily on gaining their own status within the correctional institutions by employing violence upon the inmate population to assume a position of leadership and control."  Revised PSR ¶ 5, at 6.

4.      "As a result, the SNM gang expanded throughout the New Mexico penal system and has boasted as many as 500 members since the 1980s, with approximately 200 currently active members who control the gang." Revised PSR ¶ 5, at 6.

5.      "SNM gang members are bound to protect the enterprise's members and associates who commit crimes by hindering, obstructing, and preventing law enforcement officers from identifying, apprehending, and successfully prosecuting and punishing the offenders."  Revised PSR ¶ 7, at 7.

6.      "Members who fail to show continued loyalty to the gang are disciplined in various ways, to include murder and assaults."  Third Superseding Indictment ¶ 5, at 3.

7.      SNM is connected to at least fifteen homicides and/or assaults that occur within the New Mexico penal system between 1988 and 2014.  See Revised PSR ¶ 8, at 7.

8.      Between 2015 and 2022, the United States investigates and indicts approximately 170 SNM members, prospects, and associates for federal charges related to their criminal activities. See Revised PSR ¶ 11, at 7.

**2.      Padilla's Criminal Activities.**

9.      Padilla is an SNM "primo," which is a close associate, but not a member.  Revised PSR ¶ 29, at 14.

10.     Between 2018 and 2019, the United States Drug Enforcement Agency ("DEA")

investigates the Robert Padilla Drug Trafficking Organization, and identifies Padilla as a primary supplier of cocaine, heroin, and methamphetamine in Las Vegas, New Mexico, who works with SNM associates to facilitate his drug trafficking enterprise.  See Revised PSR ¶ 12, 29, at 8, 14; Draft Transcript of December 6, 2023, Trial at 282:13-16 (taken December 6, 2023)("December 6, 2023, Tr.").[2]

11.    As part of this investigation, the DEA observes Padilla selling tens of thousands of dollars of powder and crack cocaine.  See Revised PSR ¶ 13-4, 16, at 8-9.

12.    On September 11, 2019, the federal Grand Jury indicts Padilla on charges related to the Padilla DTO, including charges for conspiracy, distribution, and possession with intent to distribute of fentanyl, methamphetamine, and cocaine.  See United States v. Padilla, et al., No. CR 19-3113, Indictment, filed September 11, 2019 (Doc. 2)("Padilla DTO Matter").

13.    Padilla is brought before the Court on these charges, and this case remains active before the Court until Padilla accepts a plea deal and a judgment is entered in the case on December 16, 2024.  See Judgment, at 1, filed December 16, 2024 (Doc. 935).

14.    While the United States investigates the Padilla DTO Matter, as well as investigates and prosecutes other SNM cases, Lucero, a former SNM leader, serves as a Federal Bureau of Investigations informant and United States witness, and testifies during a lengthy SNM trial in 2018. See Revised PSR ¶ 12, at 8.

15.    "On July 22, 2019, L.L. was shot and killed in the driveway of his residence in Las Vegas, New Mexico."  Revised PSR ¶ 12, at 8.

16.    Preliminary investigative information indicates that Lucero's murder has ties to both

---

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

the SNM and to the Padilla DTO.  See Revised PSR ¶ 12, at 8.

17.     On the evening of July 22, 2019, Defendant Gary Coca drives Padilla to Lucero's home, where Lucero and his wife are watching television.  See Revised PSR ¶ 18, 20, at 9; December 6, 2023, Tr. at 188:21-193:7 (Castellano, Coca); id. at 188:21-201:7 (Castellano, Coca).

18.     While Padilla and Coca are parked outside Lucero's home, Padilla reaches over Coca to the driver's side and honks the horn.  See Revised PSR ¶ 18, 20, at 9; December 6, 2023, Tr. at 193:8-10 (Castellano, Coca).

19.     After Lucero approaches the car, Padilla pulls out a black .45 caliber handgun and attempts to shoot Lucero, but the gun does not fire.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 196:7-198:18 (Castellano, Coca).

20.     Lucero backs away from the car, and Padilla hands the gun to Coca and directs him to "fix it." Revised PSR ¶ 20, at 9.

21.     Coca observes that the gun is unloaded, and, after loading it, Coca shoots Lucero. See Revised PSR ¶ 20, at 9.

22.     After Coca shoots Lucero, Coca returns the gun to Padilla, and Padilla shoots Lucero, who falls to the ground.  See Revised PSR ¶ 20, at 9; December 6, 2023, Tr. at 199:25-200:11 (Coca, Castellano).

23.     Padilla exits the vehicle and shoots Lucero again.  See Revised PSR ¶ 18, 20 at 9-10; December 6, 2023, Tr. at 200:12-201:7 (Castellano, Coca); Draft Transcript of December 7, 2023 Trial at 141:10-143:2 (taken December 7, 2023)("December 7, 2023, Tr.")(Frederickson, R. Padilla's fellow inmate)(testifying that R. Padilla told him that he shot someone who was working with federal authorities in a driveway); id. at 241:17-243:17 (Garcia, R. Padilla's fellow inmate)(testifying that R. Padilla told him how R. Padilla killed Lucero in front of Lucero's house);

December 8, 2023 Tr. at 40:5-21 (Urquizo, R. Padilla's fellow inmate)(testifying that R. Padilla told him how R. Padilla killed Lucero in front of Lucero's house).

24.     When Las Vegas Police Department ("LVPD") officers arrive on the scene, they discover Lucero lying in a pool of blood with apparent gunshot wounds in his right upper chest area and right forearm.  Revised PSR ¶ 17, at 9.

25.     Although paramedics and firefighters attempt to save his life, Lucero succumbs to his wounds and dies on the scene.  See Revised PSR ¶ 17, at 9.

26.     Lucero's wife tells LVPD officers that she received information that Coca was one of the men who shot her husband.  See Revised PSR ¶ 18, at 9.

27.     Over the next few days, law enforcement officers interview Lucero's neighbors and other confidential human sources ("CHS") who inform them that Padilla is also involved in Lucero's murder.  See Revised PSR ¶ 18, at 9.

28.     On April 15, 2019, New Mexico State Police investigators interview Coca while he is in custody on an unrelated charge.  See Revised PSR ¶ 19, at 9.

29.     During the interview, Coca denies any involvement in Lucero's murder.  See Revised PSR ¶ 19, at 9.

30.     During Coca's second interview on September 5, 2019, Coca tells law enforcement officers that Padilla killed Lucero.  See Revised PSR ¶ 20, at 9.

31.     Coca tells law enforcement that Padilla wants Lucero killed, because Padilla believes Lucero is a cooperating witness against the SNM.  See Revised PSR ¶ 21, at 10.

32.     Coca tells law enforcement that, although Padilla is not, at this time, an SNM member, Padilla has SNM members intimidate others and collect money on his behalf to further his drug trafficking activities.  See Revised PSR ¶ 21, at 10; December 6, 2023, Tr. at 282:13-16 (Coca).

33.     Padilla and Coca are indicted on charges stemming from the murder of Lucero on April 20, 2022.  See Indictment, filed April 20, 2022 (Doc. 5).

**3.      Threats Allegedly Made Against the Court in Connection with the Martinez Trial.**

34.     The Court has presided over several SNM related cases in addition to this case.  See United States v. DeLeon, No. CR 15-4268 (D.N.M.)(Browning, J.); United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)(involving twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d)); United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.)(involving a separate prosecution of C. Garcia for drug crimes); United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.)(a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959); United States v. Gallegos, No. CR 16-429 (D.N.M.)(Browning, J.)(involving a defendant severed from United States v. Baca).

35.     One such related case is United States v. Martinez, where the Grand Jury indicts Martinez on charges of murder, racketeering conspiracy, tampering with a witness, and felon-in-possession of a firearm and ammunition.  See United States v. Martinez, No. CR 19-3725 JB, 2021 WL 2915110, at *5-6 (D.N.M. July 12, 2021), aff'd, 92 F.4th 1213 (10th Cir. 2024).

36.     On or about December 2020, the United States Marshals alert the Court that Padilla wants to "light up the Court."  United States v. Martinez, 2021 WL 2915110, at *6.

37.     The Marshals tell the Court that it is a "future" threat, in that Padilla's trial is set for October 18, 2021.  United States v. Martinez, 2021 WL 2915110, at *6.

38.     Because of the threat, the Marshals increase security on the Court.  See United States v. Martinez, 2021 WL 2915110, at *6.

39.     As the Martinez trial gets closer, the concerns become that Padilla wants to kill

cooperating witnesses as they come to the courthouse for the <u>Martinez</u> trial, because the SNM does not know where some cooperating witnesses are.  See <u>United States v. Martinez</u>, 2021 WL 2915110, at *6.

40.    On March 1, 2021, the Honorable Karen B. Molzen, United States Magistrate Judge for the District of New Mexico, signs a sealed search warrant for offenses related to "RICO Act conspiracy; VICAR; intimidating and retailing against a witness, victim, or informant; use of a firearm in furtherance of violent crime or drug trafficking; felon in possession of a firearm, aid and abet, maintain drug premises, conspiracy and possession with intent to distribute controlled circumstances."  Search Warrant at 1, filed July 31, 2023 (Doc. 113-1).

41.    FBI Special Agent Acee provides an affidavit in support of the application for the search warrant.  See Affidavit of Bryan Acee at 2-8, (dated March 1, 2021) filed July 31, 2023 (Doc. 113-1)("Acee Aff.").

42.    In the Acee Aff., Acee states that he is aware of SNM gang members threatening to harm the presiding judge:

> In late November 2020, a cooperating defendant within the Cibola County Correctional Center in Milan, New Mexico, overheard SNM members Jonathan Gomez, aka: "Baby G," Sergio Rodriguez, aka: "Churo," Toney Gauna, aka: "Whiskers," Robert Trujillo, aka: "Sleepy," Jody Rufino Martinez, aka: "Mono," Angel DeLeon, and SNM associate Robert Padilla, aka: "Fat Head," discussing the government's case against the SNM . . . .  SNM associate Robert Padilla is in custody on federal drug charges.  The SNM members and Robert Padilla discussed putting a green light on "Acee, Armijo, and Browning," and "lighting up the courtroom" when the case(s) went to trial.

Acee Aff. ¶ 83, at 45-46.

43.    On March 3, 2021, agents and task force officers with the FBI and U.S. Marshals Service execute federal search warrants in connection with the threats made, and the following subjects are arrested: SNM member Dennis Charles Aragon, aka: "Oso,"

SNM member Arrow Natseway, and SNM member Lance Roman Natseway, aka "Pee-Wee." Federal Bureau of Investigation Report of Investigation, dated March 3, 2021, filed July 31, 2023 (Doc. 113-3).

44.     Because of the FBI arrests, the immediate threat is mitigated.  See United States v. Martinez, 2021 WL 2915110, at *14.

45.     Acee testifies in connection with the threats at the Martinez trial.  See Clerk's Minutes at 6, filed March 1, 2021 (Doc. 265)("Trial Minutes").

46.     The United States asked Acee whether he had arrested "anybody, even this morning before court, who were SNM Gang members?"  Trial Tr. Day 3 at 123:3-4 (Castellano).

47.     Acee "arrested four SNM gang members this morning and one two days ago."  Trial Tr. Day 3 at 123:5-6 (Acee).

48.     During the arrest two days before the evidentiary portion of the trial, Acee recovered a loaded firearm, and, during the arrest that morning, the FBI recovered four guns and drugs.  See Trial Tr. Day 3 at 123:9-11 (Acee).

49.     After the United States asked about the arrests, it passed the witness.  See Trial Tr. Day 3 at 123:15-16 (Castellano).

50.     Martinez then asked for a bench conference.  See Trial Tr. Day 3 at 123:20-21 (Harrison).

51.     Martinez' counsel, Mr. Carter Harrison, told the Court and the United States that he did not know about the arrests, and that "I've been trying to not object to this stuff because of the nexus to Rufino" Martinez.  Trial Tr. Day 3 at 123:24-124:1 (Harrison).

52.     Mr. Harrison asked if the United States was "contending that th[e]" arrests "[a]re related to" Martinez?  Trial Tr. Day 3 at 124:1-4 (Harrison).

53.     Counsel for the United States, Mr. Randy Castellano, stated "No," the arrests "relate[] to threats against a witness," but they "have nothing to do with the Defendant," and did not "relate . . . directly" to Martinez.  Trial Tr. Day 3 at 155:12-16 (Castellano).

54.     Mr. Castellano explained:

It relates to threats against a witness, and I didn't want to bring that out in front of this jury.  I have no intention of doing so.  It was a threat against a witness that we're trying to present and testify in this case, but I'm not bringing that out through. Obviously, and -- anyway, the matter [has] to do a lot with . . . whether or not the SNM was alive and well, whether or not they are largely a defunct organization. So it has to do with more than that, than Mr. Martinez in particular.

Trial Tr. Day 3 at 155:12-156:1 (Castellano).

55.     Martinez' co-counsel, Mr. Nicholas Hart, asked the United States whether the arrests "are all related to witness intimidation?"  Trial Tr. Day 3 at 156:7-8 (Hart).

56.     Mr. Castellano: "It tends to be.  We're looking at that."  Trial Tr. Day 3 at 156:9-10  Castellano).

57.     Mr. Hart stated that Martinez "had no discovery on anything, now they've submitted testimony that we're supposed to do cross-examination and this is literally the first we've heard of these arrests."  Trial Tr. Day 3 at 156:11-15 (Hart).

58.     The Court asked the United States what disclosure it could give Martinez.  See Trial Tr. Day 3 at 156:16-17 (Court).

59.     Mr. Castellano stated that it had "a sealed affidavit related to some searches."  Trial Tr. Day 3 at 156:18-19 (Castellano).

60.     The United States asked the Court to unseal the affidavit, so that it could show the affidavit to Martinez, but stated that it did not want the affidavit published, because "[w]e don't want any publicity about it, but I'll ask Agent Acee to check and just to turn  it over to the defense." Trial Tr. Day 3 at 156:18-24 (Castellano).

- 10 -

61.    Mr. Hart stated that "works for us." Trial Tr. Day 3 at 157:1 (Hart).

62.    The Court did not unseal the Acee Aff. that time. See Trial Minutes at 6-7; Trial Tr. Day 3 at 203:12-15 (Court, Harrison).

63.    Martinez did not make a motion for the Court to recuse, and the Court never thought on its own that it should recuse, because it did not connect Martinez to the threat on the Court.

64.    All men in ¶ 83 of the Acee Aff. were in custody, and while the Court mistakenly thought that the four arrests on Wednesday morning were not related to the threat on the Court, at the time, with Acee's testimony, the Court thought all men related to the threat on the Court where now in custody.

65.    The bench conference ended, and Mr. Harrison started his cross-examination of Acee. See Trial Tr. Day 3 at 157:8-13 (Harrison).

66.    During cross-examination, Mr. Harrison asked Acee about the alleged threats: "Now, a couple of things that you mentioned I just wanted to clear up because they were said on direct. You had mentioned a plot to kill FBI agents and prosecutors. Do you recall saying that on direct, or mentioning it?" Trial Tr. Day 3 at 179:12-16 (Harrison).

67.    Mr. Harrison did not specifically mention the Court or a federal judge in his question. See Trial Tr. Day 3 at 179:12-16 (Harrison).

68.    Acee stated that he was "intimately familiar with those threats." Trial Tr. Day 3 at 179:17-18 (Acee).

69.    Mr. Harrison asked whether "Rufino Martinez [had] anything to do with them?" Trial Tr. Day 3 at 179:19-20 (Harrison).

70.    The Court was surprised by the question, and the Court was trying to figure out why Mr. Harrison would want to ask that question.

71.    Acee responded that Martinez had something to do with the threats at "one time." Trial Tr. Day 3 at 179:21 (Acee).

72.    Mr. Harrison then asked Acee how he knew that "Martinez was involved with a plot to assassinate FBI agents and federal prosecutors," but did not mention the Court: "Okay, well -- okay.  So without telling me anything that -- the substance of anything that anyone told you, what interviews give you the idea that Rufino Martinez was involved with a plot to assassinate FBI agents and federal prosecutors?"  Trial Tr. Day 3 at 179:24-180:3 (Harrison).

73.    Acee answered:

> I can think of two.  And I'll go slowly so I answer your question the way you want me to.  The first one was after the FIT[3] charge.  So right around, I think, the RICO VICAR timeline, somewhere in one of the superseding indictments.  We got that information out of the Santa Fe County Detention Center, if I remember correctly.  I can say who was involved or who were the targets of the threat, if you want, but I don't have to.  The second time it came up was more recently at Cibola.

Trial Tr. Day 3 at 180:4-13 (Acee).

74.    After Mr. Harrison asked Acee a series of questions about how Acee had obtained the information from informants, Mr. Harrison asked: "We're scrambling.  We've got to react to your testimony.  So . . . I just wanted to . . . close off the threats against FBI agents and prosecutors, just for completeness.  I think there was a judge's name was floated on one of those; is that correct?"  Trial Tr. Day 3 at 187:6-11 (Harrison).

75.    Acee responded: "Yes," but did not state the judge's name or refer to the Court. Trial Tr. Day 3 at 187:12 (Acee).

76.    At the time of Acee's testimony, no one had as of yet been attacked based on the

---

[3]The transcript says "FIT," but the Court does not know for what "FIT" stands; the Court assumes that it should read "FIP" for felon-in-possession.

threats, but Acee "d[id]n't know that they're over," because sometimes SNM does not act immediately on its threats. Trial Tr. Day 3 at 187:13-17 (Harrison, Acee).

77.    While the jury was dismissed for lunch, Mr. Castellano asked the Court to "partially unseal" the warrant "for disclosure to the Defense only." Trial Tr. Day 3 at 203:7-11 (Castellano).

78.    After Mr. Harrison stated that he did not object, the Court stated that the United States "can go ahead and do it." Trial Tr. Day 3 at 203:12-15 (Court, Harrison).

79.    The Warrant and Acee Aff. were partially unsealed and the United States gave the documents to Martinez. See Trial Minutes at 7.

80.    At some point during the discussion of the Warrant and the Acee Aff., a court employee, one of the Court's two courtroom deputies ("CRD") during the trial, was handed a copy of the Warrant and the Acee Aff.

81.    The CRD looked through the Acee Aff., but she too did not see that Martinez was connected to the alleged threats.

82.    The CRD highlighted the portions that discussed the threat on the Court.

83.    The Court recalls that the CRD showed the Court a few highlighted pages, which made reference to the Court, but the Court did not read all the capitalized names carefully and did not make the connection between Martinez and the threat

84.    The Court does not recall anything connecting Martinez to the alleged threats on the Court, and, in any case, the Court did not mentally connect Martinez to the alleged threats on the Court.

85.    Two of the Court's law clerks briefly saw the Acee Aff. but did not look at it closely.

86.    Neither of the law clerks connected Martinez to the alleged threat.

- 13 -

87.    The Court then stood in recess for the afternoon break.  See Trial Tr. Day 3 at 203:17-19 (Court); Trial Minutes at 8.

88.    After the break, Mr. Hart moved for a mistrial, because the United States had not disclosed information related to Acee's testimony on the threats.  See Trial Tr. Day 3 at 204:1-2 (Hart); Trial Minutes at 8.

89.    The Court still did not pick up that Martinez was involved in the threat on the Court.

90.    Mr. Hart did not argue that the Court should recuse itself because of the alleged threats.  See Trial Tr. Day 3 at 204:1-206:2 (Hart).

91.    Mr. Hart argued:

Mr. Martinez is just moving for a mistrial, Your Honor, based on the failure to disclose the information that Agent Acee testified to and was elicited on cross about the incidents that happened this morning.  We just got this in our hand.  When we approached the bench, Your Honor, the Government had represented that this dealt solely with witness -- tampering of a witness in this case.  We took them at their word.

When Mr. Harrison stood up to cross Special Agent Acee, Special Agent Acee testified that it also deals with threats against FBI agents and federal prosecutors that was not disclosed when we were at the bench.  None of the information related to this had been disclosed prior, but what is interesting, I did go back and look in the discovery, and the only reference at all, when it comes to Mr. Martinez and threats upon FBI agents and the hundreds of thousands of pages of documents that we have, is a 302[4] from January 19 of 2021 where Special Agent [Nancy] Stemo states that she had listened to phone calls, and that there was no information pertaining to hits on AUSA Armijo, Special Agent Acee, or Judge Browning during these interactions.

So that shows clearly that the Government knew or was at least looking at and investigating these issues and never disclosed them.

Special Agent Acee also testified that one of the alleged threats occurred when Mr. Martinez was in Santa Fe Correctional Center, the adult detention center.

---

[4]A 302, or FD 302, is a document that the FBI uses to memorialize interviews.  See Trial Tr. Day 3 at 184:10-16 (Harrison, Acee)(Harrison: "Now, to . . . talk about how you memorialize your interviews, you produce what are colloquially called 302s; is that correct?" Acee:  "Yes, sir. The form is FD 302, but attorneys and agents just call them 302s.  They're our reports.").

He's not been there since March of 2020. It's been a year, and none of this had been disclosed to us, Your Honor. That obviously would have been something that aided or guided the defense where we asked the question about the generic statements that Special Agent Acee made regarding threats to FBI and federal prosecutors.

And we would just submit, Your Honor, there are significantly more prejudicial . . . nondisclosures about cooperating witnesses or other instances, because the testimony here is threats against federal agents and federal prosecutors, which, you know, are much more revered and something much more alarming to a jury, to the average person, as we've talked about in previous instances . . . .

Based on that, Your Honor, we would just make our motion asking for a mistrial. In the alternative, if you disagree, we would ask that all of that be stricken from the record in this case for failure to disclose any of it before it was elicited on direct examination.

Trial Tr. Day 3 at 204:1-206:2 (Hart).

92.     The Court asked why Martinez was prejudiced by the lack of disclosure:

Well, it sounds like it's an ongoing thing. It sounds like things occurred this morning and the last few days, and that happens in a trial. Tell me how, if it's ongoing and it's happening right now, how has it prejudiced you? I mean, it's one of those things that's kind of developing. How is it prejudicing you?

Trial Tr. Day 3 at 206:3-9 (Court).

93.     Mr. Hart responded:

In two instances, Your Honor, one is Special Agent Acee testified that the Government was in possession of information regarding alleged threats that happened when Mr. Martinez was incarcerated in Santa Fe. It's been more than a year since he was incarcerated in Santa Fe. It certainly lends credence to the fact that the Government has had this information before this morning.

And also, Your Honor, as I stated -- and we can enter it into the record, if you'd like -- we did receive a 302 in discovery in February, last month, dated January 19, 2021, where Special Agent Stemo stated that she was listening to recordings. Now, she does not say that they're investigating threats. All she states is -- and this is a quote -- "It does not appear that any information pertaining to hits on AUSA Maria Armijo, SA Bryan Acee, or Judge Browning was exchanged during these interactions."

The Government knew that these existed. The Government was investigating it, but made no disclosure prior to Special Agent Acee testifying in

this trial. That's prejudicial. We obviously would have approached this very differently. All of the instances of what is disclosed in trial and what is disclosed in discovery of any alleged threats against the Court, the FBI agents, or the federal prosecutors in this case don't mention Mr. Martinez whatsoever. They all refer to prior threats from prior trials relating to Mr. Anthony Ray Baca, related to Pup.

So for this to come up for the first time in the middle of trial I think is a misrepresentation Your Honor. Or I shouldn't say misrepresentation. It's shading what's going on to say that we had no knowledge of this before today.

For example, Your Honor, we now have the warrant, which is more than 90 pages. Special Agent Acee testified that he was out arresting people this morning. I'm sure he didn't write this this morning. I'm sure he didn't write it just yesterday. There is a lot of investigative activity going on in here which we haven't even had a chance to review completely, because we've just been given it.

So based on that, Your Honor, that shows an ongoing -- it's not something that just came up this morning for the first time.

Trial Tr. Day 3 at 206:3-208:4 (Hart).

94.    Mr. Castellano responded:

This is ongoing, as the Court noted. I don't know -- I think there is maybe information that we don't have that a taint team[5] might have in the office. Because anything dealing with the Defendant, because he's represented by counsel, wouldn't come to us. It would come to a taint team. But we don't get any information related to the Defendant or his counsel. And this morning, I did tell the Court and the parties that this was related to ongoing threats to a witness, and that was contained in the affidavit. I mean, I don't understand. I think they probably should have read the affidavit first, before asking questions about it. I didn't bring it up at all in court. I only asked him if he arrested people this morning. I didn't even say related to today. I said if you arrested people and recovered evidence of crime. That was it. And then they asked a further question, not knowing what was in the affidavit which we turned over to them. So I don't know what to say about that. It is ongoing, it was a sealed matter. It actually remains sealed now, and they are the only people who have this, other than the agent at this point. So it's ongoing.

---

[5]A taint team is a group of Department of Justice ("DOJ") and FBI agents who are not part of a prosecution team and are assigned to review potentially privileged material seized in connection with a specific investigation. See, e.g., DOJ Creates Special Unit to Handle Privileged Documents, American Bar Association, https://www.americanbar.org/groups/litigation/committees/criminal/practice/2020/doj-creates-special-unit-to-handle-privileged-documents/ (last visited July 10, 2021).

Trial Tr. Day 3 at 208:8-209:8 (Castellano).

95.    The Court stated that it was "going to deny the motion without prejudice."  Trial Tr. Day 3 at 209:9-10 (Court).

96.    The Court explained that it was "having a . . . hard time" understanding why the lack of disclosure was prejudicial:

> It's just part of trial work.  You've got stuff that's coming out in the middle of trial. . . .  It sounds more like a Brady[6] disclosure issue, not really a mistrial issue.  I'm not seeing what the prejudice is, but I'm not precluding it if you want to make another run at me.

Trial Tr. Day 3 at 209:10-15 (Court).

97.    Martinez does not renew his motion for a mistrial again and does not move for the Court to recuse itself until Martinez files the motion for recusal on April 13, 2021, twenty-eight days after trial.  See Trial Minutes at 1-28; Defendant's Sealed Motion for New Trial, at 1-6, filed April 13, 2021 (Doc. 275)("Martinez Motion for Recusal").

98.    The Court denies the Martinez Motion for Recusal, because: (i) the Court does not have any discretion in sentencing Martinez to life imprisonment; (ii) Martinez' alleged threat against the Court is not as serious as in Greenspan; and (iii) Martinez does not allege that the Court has taken any action against him because of the threat.  See Martinez, 2021 WL 2915110, at * 29.

99.    The Tenth Circuit affirms the Court's decision not to recuse either from the Martinez trial or the Martinez sentencing.  See United States v. Martinez, 92 F.4th 1213, 1265 (10th Cir. 2024).

---

[6]In Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), the Supreme Court of the United States of America explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.

100.    The Tenth Circuit affirms the Court's decision not to recuse from the Martinez trial, because it determines that: "a reasonable observer would not have expected the district court judge to know from the events of trial -- specifically, Agent Acee's testimony -- about Mr. Martinez's connection to SNM's threats against him . . . and [consequently, a reasonable juror] would have had no reason to question the district court judge's impartiality in presiding over Mr. Martinez's trial." 92 F. 4th at 1264.

101.    The Tenth Circuit also affirms the Court's denial of the motion to recuse for Martinez' sentencing, although the Tenth Circuit does not reach the question's merits, because Martinez fails to offer any "discrete recusal arguments related to his sentencing."  92 F.4th at 1264.

**5.    The Motion to Recuse in the Padilla Drug Trial ("Padilla I").**

102.    On September 11, 2019, the federal Grand Jury indicts Padilla on charges related to the Padilla DTO, including charges for conspiracy, distribution, and possession with intent to distribute of fentanyl, methamphetamine, and cocaine.  See United States v. Padilla, et al., No. CR 19-3113, Indictment, filed September 11, 2019 (Doc. 2)("Padilla DTO Matter").

103.    Padilla is brought before the Court on these charges, and this case remains active before the Court until Padilla accepts a plea deal and a judgment is entered in the case on December 16, 2024.  See Judgment, at 1, filed December 16, 2024 (Doc. 935).

104.    On July 20, 2021, the Court files a Notice and Order, (Doc. 508), providing the Court's MOO in Martinez, and explaining that the Court decides in Martinez that it does not have to recuse itself.  See Notice and Order at 1.

105.    The Court states that it also determines that it does not need to recuse in Padilla I. See Notice and Order at 1.

106.    The Court understands that Padilla's position in Padilla I is different than Martinez'

- 18 -

position, and, accordingly, directs both Padilla and the United States to look at the MOO and see if they agree with the Court's decision not to recuse in this case. See Notice and Order at 1.

107. Padilla files a motion to recuse on September 1, 2021, because Padilla "was allegedly involved in a threat on the Court's personal safety and wellbeing." Defendant's Motion to Recuse, at 1, (Doc. 546).

108. Padilla does not want this motion argued or decided, however, and the motion remains pending for at least a year after Padilla's murder case begins. See Unopposed Nunc Pro Tunc Motion for Additional Time to Respond to Defendant's Motion to Recuse, filed August 18, 2023 (Doc. 802).

### 4. Alleged Threats Made Against the Court in Connection with the Padilla Murder Trial.

102. Between May 23, 2023, and May 26, 2023 the Court receives two calls from Deputy United States Marshal Sergio Hermosillo. See Letter from Judge Browning to Counsel as to Robert Padilla, Gary Coca, at 1, (dated July 28, 2023) filed July 28, 2023 (Doc. 107)("Letter").

103. In the first call, Hermosillo says that the U.S. Marshals tip line has received a call saying that the old threat against the Court (and perhaps others) is back on. See Letter at 1.

104. The Court eventually learns that the tipster is Phillip Garcia. See Letter at 1.

105. Although the Marshals try to talk to Garcia, Garcia refuses to talk to anyone other than Acee. See Letter at 2.

106. In the second call, Hermosillo informs the Court that the Marshals believe the threat to be inactive. See Letter at 2.

107. Hermosillo informs the Court that Acee believes that Garcia may not be truthful with regards to the threat. See Letter at 2.

108. Garcia has a brother in federal custody in California, and the Court's impression is

that Garcia wants to talk to Acee, not to protect the Court or anyone else, but because Garcia believes that Acee can help his brother.  See Letter at 2.

109.    The Court re-reviews the Presentence Report for Garcia, filed June 24, 2016 (Doc. 94), in United States v. Garcia, No. 07-CR-0788 JB, and does not see any indication of mental health issues for Garcia.  See Letter at 2.

110.    Neither the Court nor the Marshals implement any additional security measures as a result of the tip.  See Letter at 2.

**PROCEDURAL BACKGROUND**

The Court first discusses the Motion.  The Court then discusses the United States' response, and a letter that the Court filed regarding Padilla's Motion.  Finally, the Court discusses the hearing on the Motion.

**1.    The Motion.**

In the Motion, Padilla argues that the Court should recuse itself from presiding over Padilla's trial, because of Padilla's and SNM's threats against the Court.  See Motion ¶ 1, at 2. Padilla argues that the threat makes it so that "a reasonable person would have ample reason to question the Court's impartiality. . . ." Motion ¶ 1, at 2.  Importantly, Padilla's argument for recusal appears to be based entirely on the threat, of which Padilla allegedly is a part, made against the Court during Martinez' trial, which occurs two years before Padilla's trial.  See Motion ¶¶ 4-5, 7, at 3-5 (discussing in the Procedural Background only the threat made against the Court in connection with the Martinez trial and stating in the Factual Background that the U.S. Marshal Service recommends increased security for the Court; the Marshals recommend increased security in connection with the first threat during the Martinez trial).

Padilla relies on United States v. Greenspan, 26 F.3d 1001 (10th Cir. 1994)("Greenspan")

in which the Tenth Circuit holds that the judge should recuse himself from sentencing due to a death threat, given that there is no indication that the threat is a "ruse by the defendant in an effort to obtain a different judge." Motion ¶ 9, at 6 (quoting Greenspan, 36 F.3d at 1006). Padilla argues that, similar to the threat in Greenspan, the threat against the Court here is not a "ruse" meant to "manipulate the system into removing Judge Browning from the case," because the conversation which the informant allegedly overheard was in a jail yard and intended to be private. Motion ¶¶ 9-10, at 6. Padilla distinguishes between the Martinez trial and sentencing, in which the Court declines to recuse itself, and this current Padilla trial, because it is never clear whether Martinez is one of the alleged plotters in the threat, whereas Padilla is unambiguously named as one of the participants in the threat against the Court. See Motion ¶ 11, at 7. Padilla also points to the fact that both the Marshals and the Court took seriously the threat issued against the Court. See Motion ¶ 12, at 7. Padilla differentiates this case from Greenspan, where the judge is presiding over sentencing, and argues that, because here the Court is presiding over a "pending trial and pretrial motions practice," recusal is more appropriate, because there are greater opportunities for the "exercise of judicial discretion." Motion ¶ 13, at 7. Padilla emphasizes that the "standard for recusal is an entirely objective one" and that the only appropriate consideration is whether a judge's "impartiality could reasonably be questioned." Motion ¶ 14, at 8. Padilla concludes that the alleged threats plotted against the Court by Padilla and members of SNM before the initiation of this proceeding, which both the Court and the Marshals took seriously, makes it "almost inconceivable that an objective onlooker would fail to wonder about the impartiality of a judge who was the subject of such alleged intent." Motion ¶¶ 15-16, at 8-9. Padilla concludes, therefore, that recusal is necessary. See Motion ¶ 17, at 9.

      **2.**       **The Response.**

The United States begins its response by highlighting that Padilla is seeking the Court's recusal on the basis of alleged threats made against the Court in 2021, "based on facts it has known the entire pendency of this prosecution." United States' Response to Defendant Robert Padilla's Motion for Recusal, at 3, filed July 31, 2023 (Doc. 113)("Response"). The United States acknowledges the statutory requirement that a judge "'shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" Response at 4 (quoting 28 U.S.C. § 455(a)). The United States also, however, cites Tenth Circuit precedent that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." Response at 4 (quoting Greenspan, 26 F.3d at 1005). The United States asserts that the test for recusal is a totality of the circumstances test and that there is no categorical rule which requires recusal "every time a judge learns of an extrajudicial threat to question a judge's impartiality in the first place." Response at 4. The United States argues that the threat in this case is less serious than the threat in Greenspan, because, in this case, all of the people alleged to be a part of the threat are in custody, the alleged threat is now more than two years old, there is no evidence that the Court is concerned with its personal safety specifically because of Padilla, and there is no evidence that the Court has taken any action based on the threat that raises a question about the Court's impartiality. See Response at 5. As a result of these factors, the United States argues that recusal in this case is inappropriate. See Response at 6.

3.      **The Letter.**

Upon receiving notification of Padilla's Motion, the Court sent out a letter to both Padilla and the United States informing the parties of the most up to date information regarding the alleged threats issued against the Court "so that everyone has the same information and can make informed decisions whether [the Court] should remain on the case." Letter at 1. The Court informs the parties

that while in Berkley, California, from Tuesday, May 23, 2023, to Friday, May 26, 2023, the Court receives two calls from Hermosillo. See Letter at 1. The Court states that the first call informs the Court that the Marshals tip line has received a call saying that "the old threat against me (and perhaps others) was back on." Letter at 1. The Court states that the call came from Garcia, who refuses to talk to anyone about the tip other than Acee. See Letter at 1-2. The Court states that it then receives a second call where Hermosillo informs the Court that the Marshals believe the tip to be an inactive threat and that no one has implemented any additional security measures as a result of the tip. See Letter at 2. The Court informs the parties that it has attaches two letters that Garcia sent to the Court, one postmarked February 17, 2021, and filed March 10, 2021, and one postmarked June 7, 2023 and filed June 9, 2023. See Letter at 2. The Court then states that it does not believe there to be a credible threat at the current time. See Letter at 2. In support of this conclusion, the Court cites the fact that the Marshals do not ask the Court to take any special precautions, and the Court does not, of its own accord, take any special precautions. See Letter at 2. The Court also explains that Garcia has a brother in federal custody in California, that the Court's impression is that Garcia believes that Acee can help his brother, and that this tip is a way to get into contact with Acee. See Letter at 2. The Court concludes that it does not believe that Padilla has threatened to kill or wants to kill the Court. See Letter at 2.

### 5. The Hearing.

The Court held a hearing on the Motion. See Transcript of Hearing at 1:10-13, filed October 6, 2023 (Doc. 141)("Tr."). Padilla begins discussing the recusal issue by stating that the standard for recusal is an objective standard and that the case law is clear that the relevant standard is whether a reasonable person has reason to question the presiding judge's impartiality. See Tr. at 8:8-17 (Robert). Acknowledging that the Court states in its Letter to the parties that the Court concludes

there is no legitimate threat, Padilla submits that the Court's conclusion whether the threat is real was irrelevant. See Tr. at 8:19-9:3 (Robert). The Court then questions Padilla about this conclusion, asking Padilla if it is true that the Tenth Circuit in Greenspan, contrary to some other Courts of Appeals, consider the threat's seriousness to be a major factor. See Tr. at 9:4-14 (Court). Padilla then refers to the fact that law enforcement thought that the threat was serious, and states that it's a problem that he does not "know all the things that the marshals or other law enforcement might have done in response to what they thought was a serious threat." Tr. at 10:12-17 (Robert). The Court states that the Court asks Padilla a year ago whether Padilla believes that the Court should recuse, and that Padilla waits until a year passes to file the motion, at which point "there is no threat." Tr. at 10:18-23 (Court). Padilla responds by re-iterating the belief that a reasonable person, knowing Padilla is part of a group that wants to kill the Court, would find it fair to question the Court's impartiality towards Padilla. See Tr. at 11:21-12:7 (Padilla). The Court answers by stating that the case law is adamant that not every threat is grounds for recusal, and that it seems as though Padilla is arguing that anytime there is a threat, the result is automatic recusal. See Tr. at 12:8-14 (Court). Padilla then pivots and brings up the recent tip call made in 2023, which the Court quickly dismisses by stating "I don't think anybody has taken that seriously." Tr. at 12:23-13:2 (Court). The Court then asks Padilla whether, because the motion for recusal is not filed a year ago, but is instead filed after two new judges joined the District of New Mexico, this fact plays a role in Padilla's decision to file the recusal motion. See Tr. at 13:7-12 (Court). Padilla responds that he is not attempting to judge-shop, but instead, that he had not gotten around to reviewing the relevant material on this issue until the last month or two. See Tr. at 13:13-15:7 (Robert).

The Court then gives the United States the opportunity to speak on the Motion. See Tr. at 16:23-25 (Court). The United States begins by stating that a reasonable person would not have

reason to question the Court's impartiality, both because the Court appears not to have taken the alleged threat seriously, and because the Court has taken no adverse action on account of the alleged threat. See Tr. at 17:1-8 (Ellison). The United States then points to the conclusion in Greenspan which identifies that a judge has just as much of a duty to continue to sit on a case where recusal is not warranted as a judge has a duty to recuse when recusal is necessary. See Tr. at 17:9-17 (Ellison). The United States argues that this is a case where the Court has a duty to continue to sit. See Tr. at 17:18-19 (Ellison). The United States first refers to the Greenspan seriousness of the threat factor and states first that all of the individuals who allegedly were involved with the threat made in connection with the Martinez trial were in custody at the time the alleged threat was made. See Tr. at 17:22-18:2 (Ellison). The United States maintains that the alleged threat was made over two and a half years ago, so it is reasonable at this point to not recuse on the basis of that threat. See Tr. at 18:2-6 (Ellison). The United States also makes reference to the fact that the Court has not taken any adverse action towards Padilla or Padilla's trial in response to learning of the alleged threats. See Tr. at 18:22-19:3 (Ellison). The Court then questions the United States whether Acee has sat down with Garcia since he made the tip of a renewed threat, and whether Acee has made an independent evaluation as to the quality of information from Garcia. See Tr. at 20:3-5 (Court). The United States responds that Garcia has since recanted the threats and that it is Acee's assessment that the threats do not contain any level of credibility. See Tr. at 20:13-19 (Ellison). The Court then asks whether the United States or Acee believes that the original threat, made at the start of the Martinez trial, was credible at the time that it was made. See Tr. at 20:20-24 (Ellison). The United States responds that the original threats were taken seriously, and that they were vetted thoroughly, but that nothing ever resulted from the investigation into the threats. See Tr. at 21:4-13 (Ellison). The United States emphasizes that the prime concern was for the witnesses, against whom the threat

- 25 -

was also issued. See Tr. at 21:17-19 (Ellison). The Court then asks the United States whether the United States' appellate lawyers will defend the Court's decision not to recuse if the Court decides to stay on the case. See Tr. at 23:11-19 (Court). The United States confirms that it will defend the Court's decision not to recuse, and also mentions that the United States has already argued in support of the Court's position not to recuse before the Tenth Circuit in connection with an appeal from the Martinez trial. See Tr. at 23:20-24:6 (Ellison). The Court mentions that the Tenth Circuit's opinion in the Martinez appeal can influence its decision in this case and then allows Padilla to respond to respond to the United States' arguments. See Tr. at 24:7-18 (Court).

Padilla attempts to draw the Court's attention to the initial threat's specific details, and then argues that, in the initial notice of the renewed threat, there is no indication from the Marshals that they do not believe the renewed threat to be legitimate. See Tr. at 25-26 (Robert). The Court responds, however, and states that the Marshals quickly informed the Court that they did not believe the threat is an active threat. See Tr. at 26:16-23 (Court). Padilla states that the letters from Garcia renewing the threat seem to raise some concerns, and that he is not privy to the communications from the Marshals, and therefore does not know how the Marshals have handled the threats. See Tr. at 27:2-9 (Robert). The Court responds that Padilla is, in fact, privy to the information from the Marshals, because of the letter that the Court provided to the parties. See Tr. at 27:17-21 (Court). The Court states that it is trying to give the parties everything that the Court knows regarding the alleged threats so that the parties can make their best arguments on the motion for recusal. See Tr. at 28:3-6 (Court). The Court thereafter denies the motion without prejudice, stating that, if something else occurs, or if the Tenth Circuit disagrees with the Court's analysis regarding recusal for the initial threat in the Martinez trial, the Court will reconsider its decision. See Tr. at 31:1-10 (Court).

## LAW REGARDING 28 U.S.C. § 455 RECUSAL

An important feature of the judicial system is that judges are fair and impartial arbiters of the disputes before them.  28 U.S.C. § 455(a) states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Certain listed circumstances also require a judge to recuse himself:

**(1)**    Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

**(2)**    Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

**(3)**    Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

**(4)**    He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

**(5)**    He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

    **(i)**    Is a party to the proceeding, or an officer, director, or trustee of a party;

    **(ii)**    Is acting as a lawyer in the proceeding;

    **(iii)**    Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

    **(iv)**    Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b).

"'Under section 455(a), the judge is under a continuing duty to ask himself what a

reasonable person, knowing all the relevant facts, would think about his impartiality.'" United States v. Greenspan, 26 F.3d 1001, 1005 (10th Cir. 1994)("Greenspan")(quoting United States v. Hines, 696 F.2d 722, 728 (10th Cir. 1982)).  On the other hand, the Tenth Circuit has emphasized, however, that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995)(citing Greenspan, 26 F.3d at 1005; In re Am. Ready Mix, Inc., 14 F.3d 1497, 1501 (10th Cir. 1994); Hinman v. Rogers, 831 F.2d at 939).  Thus, the recusal statute "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." United States v. Hines, 696 F.2d 722, 729 (10th Cir. 1982).  Moreover, the recusal "statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993)(citing In re United States, 666 F.2d 690, 694 (1st Cir. 1981); United States v. Greenough, 782 F.2d 1556, 1558 (11th Cir. 1986)(per curiam)).  See Advanced Optics Elecs., Inc., v. Robins, No. CIV 07-0855 JB/GBW, 2011 WL 1103830, at *4-5 (D.N.M. 2011)(Browning, J.)(concluding that recusal was not warranted where the Court had accounts with Wells Fargo, but Wells Fargo had no interest in the case).

Section 455(a)'s purpose is "to promote public confidence in the integrity of the judicial process." Liljeberg v. Health Servs. Corp., 486 U.S. 847, 859-60 (1988).  "There are few characteristics of a judiciary more cherished and indispensable to justice than the characteristic of impartiality.  Congress has mandated that justice must not only be impartial, but also that it must reasonably be perceived to be impartial." Greenspan, 26 F.3d at 1007 (citing 28 U.S.C. § 455(a)). "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" United States v. Cooley, 1 F.3d 985, 993 (10th Cir.

1993)(quoting (quoting Hinman v. Rogers, 831 F.2d 937, 939 (10th Cir. 1987)). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable factual basis exists for calling the judge's impartiality into question." United States v. Cooley, 1 F.3d at 993 (emphasis in the original). A recusal determination is "'extremely fact driven.'" Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d at 659 (quoting Nichols v. Alley, 71 F.3d at 352). Close calls, however, are resolved in favor of recusal. See Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d at 659. See also Nichols v. Alley, 71 F.3d at 351 (emphasizing that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require.")(citing Greenspan, 26 F.3d at 1005; In re Am. Ready Mix, Inc., 14 F.3d at 1501; Hinman v. Rogers, 831 F.2d at 939)).

Ordinarily "threats or attempts to intimidate a judge will not . . . satisfy the requirements for disqualification under section 455(a)." Greenspan, 26 F.3d at 1006 (citing United States v. Cooley, 1 F.3d 985, 993-94 (10th Cir. 1993)). See United States v. Dehghani, 550 F.3d 716, 721 (8th Cir. 2008)("Judges are not required to recuse themselves any time they are threatened."); United States v. Hairston, 38 F. App'x 884, 886 (4th Cir. 2002)(noting that "[w]hile a defendant's alleged death threat against a judge may, in some cases, sufficiently raise the specter of partiality to warrant the judge's recusal, recusal is not automatically required simply because the trial judge becomes aware of the threats."); United States v. Yu-Leung, 51 F.3d 1116, 1120 (2d Cir. 1995)("[D]espite [the judge's] knowledge of [the defendant's] alleged threat, we would be hard pressed to say that there exists the kind of basis . . . requiring the judge's recusal[.]"); Greenspan, 26 F.3d at 1006 ("This is not to say that all death threats against a judge will mandate that judge's recusal under Section 455."). A judge should not recuse if the threat is made as a ruse or to judge-

shop.  See United States v. Beale, 574 F.3d 512, 519 (8th Cir. 2009)("[D]efendants are not permitted to use such a plot or threat as a judge-shopping device.")(internal citations omitted); In re Basciano, 542 F.3d 950, 957 (2d Cir. 2008)("Requiring a judge to recuse himself because the defendant, in an attempt to change judges, has plotted or threatened to kill the judge would provide any defendant who wanted a new judge with an effective, if in some cases dreadful, method to achieve that end. A defendant cannot be permitted to use such a plot or threat as a judge-shopping device."); Greenspan, 26 F.3d at 1006 ("As we have stated earlier, if a judge concludes that recusal is at least one of the defendant's objectives (whether or not the threat is taken seriously), then section 455 will not mandate recusal because that statute is not intended to be used as a forum shopping statute."); United States v. Cooley, 1 F.3d at 993 ("The statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice."); United States v. Owens, 902 F.2d 1154, 1156 (4th Cir. 1990)("Parties cannot be allowed to create the basis for recusal by their own deliberate actions. To hold otherwise would encourage inappropriate 'judge shopping.'").

In situations where the "threat is properly characterized as an 'extrajudicial source'" -- a "threat was not delivered in court or in connection with an official judicial proceeding involving this defendant" -- a threat can bring into question a judge's impartiality.  Greenspan, 26 F.3d at 1006 (no citation for quotation).  In Greenspan, the Tenth Circuit concluded that the sentencing judge should have recused, where the judge (i) "learned of an apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that the threat was intended as a device to obtain a recusal"; and (ii) "obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it." Greenspan, 26 F.3d at 1007.  Before sentencing, the judge was aware that the Federal

Bureau of Investigation was looking into allegations that the defendant had conspired to kill him and his family, and that the "alleged conspiracy spanned several states and included a number of persons who had allegedly contributed large sums of money for the hiring of a 'hit man.'" Greenspan, 26 F.3d at 1005 (no quotation for citation). The judge had "expedited the hearing in order to 'get [the defendant] into the federal penitentiary system immediately, where he can be monitored more closely.'" Greenspan, 26 F.3d at 1005 (quoting appellate record). In addition, the judge took additional action and "refused to continue the sentencing hearing at the request of defendant's counsel, who had been appointed only two days before the expedited sentencing date." Greenspan, 26 F.3d at 1005. Further, the United States, at oral argument on appeal, "conceded that a reasonable person might have questioned the judge's impartiality in light of the judge's knowledge that an investigation was being conducted into alleged threats against him by the defendant." Greenspan, 26 F.3d at 1006. The Tenth Circuit concluded that there was "nothing in the record to suggest the threat was a ruse by the defendant in an effort to obtain a different judge," and held:

> In a case like the present, where there is no inference that the threat was some kind of ploy, the judge should have recused himself pursuant to section 455(a) and allowed another judge to sentence [the defendant]. Had there been any reason to believe that threats were made only in an attempt to obtain a different judge, to delay the proceedings, to harass, or for other vexatious or frivolous purpose, recusal would not have been warranted, even if the judge learned of the threats from a third person such as a federal agent.
>
> . . . .
>
> The bottom line here is that this judge learned of an apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that the threat was intended as a device to obtain a recusal. The judge obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it. Under such circumstances, it is obvious to us that a reasonable person could question the judge's impartiality. Even if this judge were one of those remarkable individuals who could ignore the personal implications of such a threat, the public

- 31 -

reasonably could doubt his ability to do so.

Greenspan, 26 F.3d at 1006.

## ANALYSIS

Padilla argues that the Court should recuse itself from overseeing Padilla's trial under 28 U.S.C. § 455(a) and Greenspan, because of Padilla's connection to the alleged threats that have been made against the Court. Padilla argues that, under § 455(a), Padilla's connection to the alleged threats against the Court raises questions about the Court's impartiality, and therefore the Court must recuse. See Motion at 8-9. Although the Court takes its § 455(a) duty seriously, the Court concludes that the Court is not required to recuse itself from the trial, because after never prosecuting his motion to recuse in Padilla I, at the time Padilla got around to filing his motion to recuse in this case, no one was taking the threat seriously, because the FBI and Marshals had concluded that Garcia was making up the story of the threats so that Acee would talk to him about Garcia's brother.

## I. THE COURT CONCLUDES THAT RECUSAL IS NOT REQUIRED UNDER 28 U.S.C. § 455(a), BECAUSE THE ALLEGED THREATS WERE NOT SERIOUS SUCH THAT A REASONABLE PERSON WOULD QUESTION THE COURT'S IMPARTIALITY.

There are two separate instances Padilla allegedly makes a threat against the Court, and Padilla relies on both instances in arguing for recusal under § 455(a). The Court therefore discusses each instance separately in analyzing whether the Court's impartiality is in such question that recusal is necessary. Padilla allegedly makes the first threat while is in custody on federal drug charges. See Acee Aff. ¶ 83, at 45-46. Padilla, along with SNM members Gomez, Rodriguez, Gauna, Trujillo, Martinez, and DeLeon are overheard by a cooperating defendant within the Cibola County Correctional discussing "putting a green light on 'Acee, Armijo, and Browning,' and 'lighting up the courtroom.'" Acee Aff. ¶ 83, at 45-46. The US Marshals and the FBI take this

alleged threat seriously at the time, and warrants are issued and arrests made in connection to these threats. United States v. Martinez, 2021 WL 2915110, at * 6-8. After the arrests are made, although the Court and the Marshals remain vigilant, the immediate threat is mitigated, because everyone is in custody. United States v. Martinez, 2021 WL 2915110, at * 14.

This threat is made in connection with the trial of Martinez, and Martinez subsequently files both a motion for new trial on the basis of the Court's failure to recuse from the trial, and a motion for recusal from Martinez' sentencing. The Court denies both motions. The Court denies the motion for a new trial on the basis of the failure to recuse, because:

> (i) the Court was not aware of the connection between Martinez and the threat until after trial; (ii) even if the Court had been aware of Martinez' threat, the threat is not as serious as the one in Greenspan, which involved a multi-state conspiracy to hire a hitman to kill the judge and his family; and (iii) the Court has not taken any actions to 'accelerate court procedures in order to reduce the risk to' it, nor has Martinez alleged that to be true.

United States v. Martinez, 2021 WL 2915110, at * 27. Although factually distinct, the Court relies on similar reasoning to dismiss the motion for recusal over Martinez' sentencing. United States v. Martinez, 2021 WL 2915110, at *29 ("The Court concludes that a reasonable person, knowing all the facts, would not question its impartiality, because: (i) the Court does not have discretion in sentencing Martinez to life imprisonment; (ii) Martinez' alleged threat against the Court is not as serious as in Greenspan; and (iii) Martinez does not allege that the Court has taken any action against him because of the threat.").

The Tenth Circuit affirms the Court's decision not to recuse from either the Martinez trial or from the Martinez sentencing. See United States v. Martinez, 92 F.4th 1213, 1265 (10th Cir. 2024). The Tenth Circuit reaches this conclusion because it determines that "a reasonable observer would not have expected the district court judge to know from the events of trial -- specifically, Agent Acee's testimony -- about Mr. Martinez's connection to SNM's threats against him." United

States v. Martinez, 92 F.4th at 1264. "Consequently, a reasonable observer would have had no reason to question the district court judge's impartiality in presiding over Mr. Martinez's trial." United States v. Martinez, 92 F.4th at 1264. The Tenth Circuit also affirms the Court's denial of the motion to recuse for Martinez' sentencing, although the Tenth Circuit does not reach the question's merits, because Martinez fails to offer any "discrete recusal arguments related to his sentencing." United States v. Martinez, 92 F.4th at 1264.

Padilla argues that the Court should distinguish his motion for recusal from Martinez' case, because unlike in Martinez, where it was never made clear to the Court during trial that Martinez was named as being among the alleged plotters of the threat, Padilla has been "specifically named" as being among the alleged plotters against the Court. Motion ¶ 11, at 7. Although the Court acknowledges the factual difference between Padilla's case and Martinez, this distinction does not require recusal in this case. Indeed, the case for recusal in Martinez is stronger than it is in this case. In Martinez, law enforcement takes the threat seriously. In Padilla I, Padilla and Mr. Romero file a motion to recuse, but never wants it set for a hearing, suggesting that it was being used as a bargaining chip with the United States; Padilla I settled. In this case, even though they knew that Padilla had filed a motion to recuse in Padilla I, they delay filing a motion to recuse until no one thought Padilla was making any threat, suggesting again that it was filed for delay or other strategic purposes other than a genuine concern about impartiality.

First, it is important to note that ordinarily "threats or attempts to intimidate a judge will not . . . satisfy the requirements for disqualification under section 455(a)." Greenspan, 26 F.3d at 1006 (citing United States v. Cooley, 1 F.3d 985, 993-94 (10th Cir. 1993)). The Tenth Circuit's test, expounded in Greenspan, weighs heavily the seriousness of the threat. See In re Basciano, 542 F.3d 950, 957 n.6 (2d Cir. 2008)("We are wary of the approach taken by the Tenth Circuit in

Greenspan, which focused largely on the seriousness of the threat rather than the evidence of resulting bias"); United States v. Read-Forbes, No. 23-3238, 2024 WL 2861833 (10th Cir. June 6, 2024)(When a defendant allegedly threatens a judge, the recusal analysis turns 'on whether a reasonable observer would perceive the threats as serious and, moreover, to be of the kind that would cause a reasonable observer to question the [judge's] impartiality.'") (quoting United States v. Martinez, 92 F.4th 1213, 1259 (10th Cir. 2024).  Even if the Tenth Circuit no longer wants to give so much weight to seriousness, it remains a factor, because if no thinks it is a real threat, it is not likely to influence any action by the Court.  It is ignored.  By the time Padilla files his motion for recusal, he was not interested in impartiality, as much as delay and strategic advantage.

**IT IS ORDERED** that the Defendant Robert Padilla's Sealed Motion for Recusal, filed July 17, 2023 (Doc. 103), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Maria Armijo
Randy Castellano
Ryan Ellison
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Ronald Gainor
Ronald Gainor, Attorney at Law
Highlands Ranch, Colorado

--and--

Marc Robert
Marc H. Robert, Attorney
Albuquerque, New Mexico

      *Attorneys for the Defendant*